| Case No. 2025-1674 |
| --- |

# BEFORE THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PT. ZINUS GLOBAL INDONESIA,

*Plaintiff-Appellee*,

BROOLYN BEDDING, LLC, CORSICANA MATTRESS CO., ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES, INC., LEGGETT & PLATT, INC., INTERNATIONAL BROTHERHOOD OF TEAMSTERS, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,

*Plaintiffs-Appellants*,

v.

UNITED STATES,

*Defendant-Appellee*.

| Appeal from the United States Court of International Trade in Consoli. Case No. 1:21-cv-00277-JCG Judge Jennifer Choe-Groves |
| --- |

## PLAINTIFF-APPELLANTS' NONCONFIDENTIAL PRINCIPAL BRIEF

Yohai Baisburd
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
900 19th Street N.W., Suite 400
Washington, DC 20006
Phone: (202) 567-2300
Fax: (202) 567-2301

*Counsel for Plaintiffs-Appellants*

Dated: June 23, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2025-1674 |
| **Short Case Caption** | PT. Zinus Global Indonesia v. US |
| **Filing Party/Entity** | Mattress Petitioners |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/06/2025

Signature: /s/ Yohai Baisburd

Name: Yohai Baisburd

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Brooklyn Bedding, LLC | | |
| Corsicana Mattress Company | | |
| Elite Comfort Solutions | | Leggett & Platt, Incorporated |
| FXI, Inc. | | |
| Innocor, Inc. | | FXI, Inc. |
| Kolcraft Enterprises, Inc. | | |
| Leggett & Platt, Incorporated | | BlackRock, Inc.<br>The Vanguard Group, Inc. |
| International Brotherhood of Teamsters | | |
| United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable     ☑ Additional pages attached

| | | |
|---|---|---|
| Please see Attachment A. | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable     ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Attachment A

**Attachment A to Form 9A**
**CAFC No. 2025-1674**

The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court and who have not already entered an appearance in this Court.

*Appearing before trial court or agency:*  **CASSIDY LEVY KENT (USA) LLP**

Ulrika K. Swanson

Chase J. Dunn

Jeffery B. Denning (formerly)

Sarah E. Shulman (formerly)

# TABLE OF CONTENTS

I.     Introduction ................................................................................................1

II.    Statement of Related Cases .......................................................................1

III.   Jurisdictional Statement ............................................................................1

IV.    Statement of Issues ....................................................................................2

V.     Statement of the Case ................................................................................3

VI.    Summary of Argument .............................................................................10

VII.   Argument .................................................................................................12

  A.    Standard of Review ..................................................................................12

  B.    Commerce's Decision to Remove In-Transit Mattresses from the
      Data Used to Calculate Quarterly Allocation Ratios Was
      Unsupported by Substantial Evidence ......................................................13

  C.    Commerce's Decision to Utilize Inventory Data in its Quarterly
      Ratio Calculations Was Unsupported by Substantial Evidence and
      Contrary to Law ........................................................................................24

  D.    Commerce Erred in Relying Exclusively on Indonesian Data When
      Applying the Transactions Disregarded Rule ...........................................28

    1.    Commerce's Reliance on Indonesian GTA Data Conflicted with
       its Established Practice in Applying 19 U.S.C. § 1677b(f)(2) ...............28

    2.    In Calculating a Surrogate Market Value, Commerce Practice is
       to Rely on the Affiliate's COP Regardless of Where They Are
       Located ..................................................................................................30

VIII.  Conclusion and Relief Requested .............................................................34

**Confidential Material Omitted**

Pursuant to Federal Circuit Rule 28(d)(1)(B), Plantiff-Appellants have prepared a nonconfidential version of their brief from which they have redacted certain confidential information. Confidential information has been removed from pages 18-19 of the brief. This confidential information relates to details of Plaintiff-Appellee's inventory and sales data that was treated as proprietary in the underlying investigation.

## TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

19 U.S.C. § 1677b(f)(3) ...............................................................12, 32

19 U.S.C. § 1677m(e)(2).....................................................................27

19 U.S.C. § 1677m(i)...............................................................12, 27, 28

19 USC § 1677b(f)(2) .................................................................*passim*

28 U.S.C. § 1581(c) ...............................................................................2


**Court Decisions**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 515
F.3d 1372 (Fed. Cir. 2008)...................................................................13

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed. Cir.
2003) ....................................................................................................13

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir.
1984) ....................................................................................................13

*Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp.
3d 1347 (Ct. Int'l Trade 2023).......................................................32, 33

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156
(1962) ...................................................................................................23

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)................................13

*Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125 (2002)..............29

*Diamond Sawblades Mfrs. Coalition v. United States*, Slip
Op. 2014-112 (Ct. Intl. Trade 2014).....................................................33

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ....................................................13

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) ..........................................................................................27

*Micron Tech., Inc. v. United States*, 243 F.3d 1301 (Fed. Cir. 2001) ..........................................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..............................................31, 32, 34

*Nippon Steel Corp. v. U.S. Intern. Trade Com'n, 494 F.3d 1371 (Fed. Cir. 2007)* ..............................................................32

*NMB Singapore Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ......................................................................33, 34

*PPG Indus., Inc. v. United States*, 978 F.2d 1232 (Fed. Cir. 1992) ..........................................................................................12

*PT. Zinus Global Indonesia v. United States,* Consol. Ct. No. 21-00277, Slip Op. 23-39 (Ct. Int'l Trade March 20, 2023) .........................4, 9, 25

*PT. Zinus Global Indonesia v. United States*, Consol. Ct. No. 21-00277, Slip Op. 24-19 (Ct. Int'l Trade February 20, 2024) ..................4, 5, 9, 34

*PT. Zinus Global Indonesia v. United States*, Consol. Ct. No. 21-00277, Slip Op. 25-15 (Ct. Int'l Trade February 18, 2025) ......................*passim*

*Rebar Trade Action Coalition v. United States*, 398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019)..............................................30

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) ..........................................................................................31

*Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947) ..............23

*SKF USA Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001) ..........................................................................................23

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
44 F.3d 978 (Fed. Cir. 1994) ............................................................. 13, 20

*Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705,
(D.C. Cir. 1977) ..................................................................................... 23

*Timken Co. v. United States*, 894 F.2d 385 (Fed. Cir. 1990) .................. 23

*Unicatch Indus. Co. v. United States*, 539 F. Supp. 3d 1229
(Ct. Int'l Trade 2021) ............................................................................ 6, 32

## Administrative Determinations

*Bottom Mount Combination Refrigerator-Freezers From the
Republic of Korea: Preliminary Negative Countervailing
Duty Determination and Alignment of Final Determination
With Final Antidumping Determination*, 76 Fed. Reg. 55044
(Sep. 6, 2011) ........................................................................................ 31

*Heavy Walled Rectangular Welded Carbon Steel Pipes and
Tubes from the Republic of Korea: Final Results of
Antidumping Duty Administrative Review*, 86 Fed. Reg.
35060 (July 1, 2021) ........................................................................... 7, 32

*Mattresses from Indonesia: Final Affirmative Determination
of Sales at Less Than Fair Value*, 86 Fed. Reg. 15899
(March 25, 2021) ..................................................................................... 1

*Notice of Final Determination of Sales at Less Than Fair
Value and Affirmative Critical Circumstances
Determination: Bottom Mount Combination Refrigerator-
Freezers From Mexico*, 77 Fed. Reg. 17422 (Mar. 26, 2012) .................. 31

*Polyethylene Retail Carrier Bags from Thailand: Final
Results of Antidumping Duty Administrative Review*, 72 Fed.
Reg. 1982 (Jan. 17, 2007) ........................................................................ 6

**<u>Other Legislative Materials</u>**

Antonin Scalia & Bryan A. Garner, Reading Law: The
Interpretation of Legal Texts, 101 (2012)................................................................29

## I. INTRODUCTION

This brief is submitted on behalf of Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, "Appellants") in appeal of the decision by the Court of International Trade (the "CIT") in *PT. Zinus Global Indonesia v. United States*, Consol. Ct. No. 21-00277.

## II. STATEMENT OF RELATED CASES

Counsel for Appellants believe that the appeals of both the first and second administrative reviews of the antidumping duty order on Mattresses from Indonesia would be directly affected by this Court's decision on appeal. These cases include *PT Ecos Jaya Indonesia et al v. United States*, Consol. CIT No. 24-00001, *Brooklyn Bedding, LLC et al v. United States*, CIT No. 24-00002, and *PT Ecos Jaya Indonesia et al v. United States*, CIT No. 24-00238.

## III. JURISDICTIONAL STATEMENT

Appellants appeal the CIT's final decision concerning the results of the Department of Commerce's ("Commerce") antidumping duty investigation of Mattresses from Indonesia. Commerce published notice of its final determination on March 25, 2021. *Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15899 (March 25, 2021) and

accompanying Issues & Decision Memorandum ("IDM") (Appx10200-10236).[1]

PT. Zinus Global Indonesia ("Zinus") filed initiating documents with the CIT on

June 10, 2021 (CIT Court No. 21-00277). Appellants filed initiating documents

with the CIT on June 11, 2021 (CIT Court No. 21-00284). The CIT exercised

jurisdiction pursuant to 28 U.S.C. § 1581(c) and both actions were subsequently

consolidated as Consolidated Court No. 21-00277. Final judgement was entered in

the consolidated action on February 18, 2025. Judgement, *PT. Zinus Global*

*Indonesia v. United States*, Consol. Ct. No. 21-00277 (Ct. Int'l Trade February 18,

2025) ("Judgement") (Appx10001-10003). Appellants filed their notice of appeal

on April 17, 2025. Appellants' appeal is timely pursuant to Rule 4(a)(1)(B) of the

Federal Rules of Appellate Procedure and 28 U.S.C. §§ 2107(b), 2645(c).

Pursuant to 28 U.S.C. § 1295(a)(5), the U.S. Court of Appeals for the Federal

Circuit has jurisdiction over this appeal.

## IV.  STATEMENT OF ISSUES

1. Whether Commerce's exclusion of in-transit mattresses from the calculation of quarterly ratios was supported by substantial evidence;

2. Whether Commerce's decision to utilize unverified inventory data in its revised quarterly ratio calculations was supported by substantial evidence and in accordance with law; and

3. Whether Commerce's decision to rely on Indonesian import data to determine a fair market price under the transactions disregarded rule of 19

---

[1] All appendix citations are to the Confidential Joint Appendix.

USC § 1677b(f)(2) for purchases from a Chinese affiliate was supported by substantial evidence.

## V.   STATEMENT OF THE CASE

A. *In-Transit Mattresses and Revised Quarterly Ratio Calculations*

During the period of investigation ("POI") Zinus' U.S. sales affiliate Zinus, Inc. ("Zinus US") made constructed export price ("CEP") sales of mattresses produced in Indonesia and three other countries.  IDM at 8 (Appx10210); *see also* Letter from Zinus, "Zinus' Section A Questionnaire" ("Zinus AQR") at A-5 to A-7 (Appx10880-10882).  Zinus claimed that it was unable to trace the country of origin of many such "CEP inventory sales" because once Indonesian mattresses were entered into Zinus US' warehouse they were comingled with mattresses of the same model number that were produced in other countries.  IDM at 8 (Appx10210); *see also* Zinus AQR at A-5 to A-7 (Appx10880-10882).

While Zinus proposed to use a first-in first-out ("FIFO") methodology to identify the country of origin of its sales, Commerce chose instead to rely on a quarterly ratio methodology in which it allocated sales to Indonesia in a given quarter based on the share of Zinus US's purchases from Indonesia in that same quarter.  IDM at 9 (Appx10211).  In selecting quarterly purchase data, Commerce determined that applying quarterly ratios "grounded in purchase data to the full universe of Zinus US's sales from inventory … is neutral in terms of determining which sales to report as subject merchandise sales."  *Id*.  In its *Final*

*Determination*, Commerce relied on all of Zinus US' purchases from Zinus through Zinus' parent company Zinus Inc. ("Zinus KR"), including mattresses purchased from Zinus KR that physically entered Zinus US's warehouse during the POI as well as mattresses purchased from Zinus KR that were still in-transit at the end of the POI.[2] *Id.*

Zinus appealed both Commerce's (1) use of a quarterly ratio methodology instead of its preferred FIFO methodology and (2) the inclusion of in-transit mattresses in the universe of purchases. In *Zinus I*, the CIT upheld Commerce's use of the quarterly ratio methodology, but remanded the issue of in-transit mattresses for further explanation. *PT. Zinus Global Indonesia v. United States*, Consol. Ct. No. 21-00277, Slip Op. 23-39 (Ct. Int'l Trade March 20, 2023) ("*Zinus I*") (Appx10197-10198). In its First Remand Redetermination, Commerce explained that its decision was logical because the data showed that Zinus sold more mattresses than it had in its physical inventory. Final Results of Redetermination Pursuant to Court Remand in Slip Op. 23-39 (Dep't of Commerce, June 9, 2023) ("First Remand Redetermination") at 6-9 (Appx10094-10097). In *Zinus II*, the CIT remanded the in-transit issue again, noting that the record lacked information on mattresses physically held in inventory at the

---

[2] During the POI, all of Zinus' Indonesian mattress sales to the United States were made through Zinus KR. Zinus AQR at A-1 (Appx10876).

4

beginning of the POI and that Commerce had not requested this information. *PT. Zinus Global Indonesia v. United States*, Consol. Ct. No. 21-00277, Slip Op. 24-19 (Ct. Int'l Trade February 20, 2024) ("*Zinus II*") (Appx10076-10079, Appx10085).

Following the CIT's second remand, Commerce reopened the record to collect information on country- and model-specific quantity of mattresses held in Zinus US' physical inventory at the start of the period of investigation as well as the country- and model-specific quantity mattresses that entered inventory during the POI. In its draft Second Remand Redetermination, Commerce continued to rely on purchase data to calculate the quarterly ratios, but removed in-transit mattresses from the input data set. Draft Results of Redetermination Pursuant to Court Remand in Slip Op. 24-19 (Dep't of Commerce, April 19, 2024) ("Draft Second Remand Redetermination") at 6-8 (Appx25686-25688). However, in the final Second Remand Redetermination Commerce abruptly changed course and— without providing interested parties an opportunity to comment—introduced inventory data into the quarterly ratio calculations. Final Results of Redetermination Pursuant to Court Remand in Slip Op. 24-19 (Dep't of Commerce, May 17, 2024) ("Second Remand Redetermination") at 12-14 (Appx10053-10055). As a result, the quarterly ratios were no longer "grounded in purchase data," but instead on Zinus US' comingled inventory records, which had created the need for an allocation in the first place. Appellants submitted

comments alleging that both of these Department decisions were unlawful and unsupported by substantial evidence. Nonetheless, in *Zinus III*, the CIT affirmed Commerce's Second Remand Redetermination. *PT. Zinus Global Indonesia v. United States*, Consol. Ct. No. 21-00277, Slip Op. 25-15 (Ct. Int'l Trade February 18, 2025) ("*Zinus III*") (Appx10023-10024). This appeal followed.

B. *Transactions Disregarded Rule*

Commerce is authorized under the "transactions disregarded" rule to disregard the prices of inputs purchased from affiliated suppliers if those transfer prices do not reflect arm's-length transaction values. 19 U.S.C. § 1677b(f)(2). In interpreting this mandate, Commerce has long held that the relevant market price benchmark is not the price available to purchasers generally, but rather the price that "best represents the respondent's <u>own experience</u> in the market under consideration." *See Unicatch Indus. Co. v. United States*, 539 F. Supp. 3d 1229, 1249 (Ct. Int'l Trade 2021) (quoting *Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review*, 72 Fed. Reg. 1982 (Jan. 17, 2007), IDM at 18) (emphasis supplied). Accordingly, Commerce's longstanding practice for establishing a fair market price under 19 U.S.C. § 1677b(f)(2) is to first look to the respondent's purchases of the same input from unaffiliated suppliers and, where the record contains no such transactions, to then turn to sales of the input by the affiliated supplier to other unaffiliated parties. In

6

the absence of either, Commerce looks to the affiliated supplier's cost of production ("COP") of the input. First Remand Redetermination at 18 (Appx10106); *see also Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 86 Fed. Reg. 35060 (July 1, 2021) ("*Rectangular Pipes from Korea*"), IDM at Comment 7 (confirming that this is Commerce's "consistent and predictable" practice).

During the POI, Zinus obtained ten types of minor inputs from affiliated suppliers located in China, a non-market economy ("NME") country, that it did not also purchase from unaffiliated parties. IDM at 16-17 (Appx10218-10219). This presented Commerce with an issue of first impression under 19 U.S.C. § 1677b(f)(2): how should Commerce determine a fair market price as part of the transactions disregarded analysis when a market-economy ("ME") respondent purchases certain inputs only from affiliated suppliers located in a non-market-economy ("NME") country and where the affiliates' sales and COP are not an appropriate substitute for a market price? *Id*. at 17 (Appx10219).

In its *Preliminary Determination*, Commerce was guided by its statutory NME practice when determining a fair market price for these inputs. *Id*. Commerce preliminarily valued the inputs using import statistics from six countries that it considers to be economically comparable to China, plus Indonesia

(which is not economically comparable to China). *Id*. at 17-18 (Appx10219-10220). This methodology was consistent with Commerce's practice under 19 U.S.C. § 1677b(f)(2) of looking to the supplier's COP, its practice with respect to looking at surrogate values for costs in NMEs, and perhaps most importantly, it was consistent with the express direction of the second sentence of 19 U.S.C. § 1677b(f)(2): to use "information available" when preferred arm's length sales data for establishing a fair market price are unavailable.

In the *Final Determination*, on exactly the same factual record, Commerce abandoned its preliminary methodology and instead relied on only Indonesian import data to establish fair market values for certain inputs. *See id*. at 19 (Appx10221). Commerce's sole explanation for the change in approach was that was that "the statute indicates that the item being tested should reflect a market price in the country under consideration, which is Indonesia in the instant case." *Id*. at 18 (Appx10220).

Appellants appealed Commerce's statutory interpretation, arguing that although the first sentence of 19 U.S.C. § 1677b(f)(2) instructs Commerce to look for sales between unaffiliated parties in the "market under consideration," when such sales are not available the second sentence of 19 U.S.C. § 1677b(f)(2) permits Commerce to utilize any "information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." Slip

Op 23-39 at 66-67 (Appx10187-10188).  In *Zinus I*, the CIT agreed that "Commerce's interpretation of 'market under consideration' as only the market under investigation is unreasonably narrow and not in accordance with the law" and remanded Commerce's reliance on Indonesian import data to Commerce for reconsideration or further explanation.  Slip Op 23-39 at 71 (Appx10192).

In its First Remand Redetermination, Commerce acknowledged that the reference to "market under consideration" in 19 U.S.C. § 1677b(f)(2) "does not limit Commerce by law to use only the market under investigation or review as the 'market under consideration'" and that there may be circumstances where it is appropriate to use data from a different market.  First Remand Redetermination at 22-23 (Appx10110-10111).  However, Commerce nonetheless continued to rely on Indonesia import data stating that it has a preference to "first determine a market value…based on data available to the respondent in the country in which its production is located."  *Id*.  In *Zinus II*, the CIT sustained Commerce's determination in this regard.  Slip Op. 24-19 (Appx10085).  This appeal followed.

## VI.    SUMMARY OF ARGUMENT

Commerce's decisions in its Second Final Remand Redetermination to: (1) exclude in-transit mattresses from the input data used to calculate quarterly ratios, (2) rely on unverified inventory data in its revised quarterly ratio calculations, and (3) utilize Indonesian import data to determine a fair market price for inputs purchased from a Chinese affiliate were unsupported by substantial evidence and contrary to law.

*First*, Commerce failed to support its decision to remove in-transit mattresses from the input data used to calculate quarterly ratios with substantial evidence.  Commerce based its decision on its review of aggregate data for all mattresses, which showed that Zinus US had a sufficient number of mattresses in its inventory to support its POI sales.  Second Remand Redetermination at 6 (Appx10047).  However, Commerce's focus on aggregate data for all model numbers was unreasonable, as Zinus US made its mattress sales on a model-specific basis and inventory of one model number therefore could not be used to supply a sale of a different model number.  Examination of model-specific inventory and sales data shows that Zinus did not, in fact, have a sufficient number of mattresses in its comingled (all country) inventory to support its POI sales.  Commerce seemingly failed to recognize, and certainly failed to address, this anomalous model-specific data, which contradicts its stated reasoning for

removing in-transit mattresses from the quarterly ratio calculation. Commerce's

decision to remove in-transit mattresses is thus unsupported by substantial

evidence. For its part, the CIT relied on erroneous or post-hoc rationales to

support Commerce's determination in this regard.

*Second*, Commerce's determination to revise its quarterly ratio calculation to

incorporate unverified inventory data submitted by Zinus during the second

remand proceeding was unsupported by substantial evidence and contrary to law.

Commerce's sole rationale for incorporating inventory data was its determination

that quarterly ratios calculated based on purchase data alone resulted in

"impossible" estimates of Indonesian mattress sales for particular model numbers

in which the estimated Indonesian sales quantity exceeded the quantity of

Indonesian mattresses that Zinus US entered into its warehouse. Second Remand

Redetermination at 12 (Appx10053). However, Commerce failed to recognize or

address the fact that Zinus US' actual, all-country comingled inventory and sales

records—which, unlike the Indonesia-specific sales figures were not based on

estimates—contained similar impossibilities in which the aggregate quantity of

sales for an individual model number exceeded the quantity available in inventory

from all country sources. Commerce's decision to abandon purchase data based

quarterly ratios in favor of quarterly ratios based on both purchase and inventory

data was thus unsupported by substantial evidence. Commerce's use of the

inventory data for its quarterly ratio calculations was also contrary to law because Commerce failed to make any effort to verify the inventory data, as required by 19 U.S.C. § 1677m(i).

*Finally,* Commerce's decision to rely on Indonesian import data to establish a fair market price under 19 U.S.C. § 1677b(f)(2) conflicted with its established practice of relying on the affiliated supplier's COP when purchases or sales to unaffiliated parties are unavailable on the record. While Commerce could not use the actual COP of Zinus' NME affiliated supplier, it had recently developed an approach to estimating a Chinese affiliated supplier's COP when applying the major input rule in 19 U.S.C. § 1677b(f)(3). Commerce failed to explain why such an approach was not appropriate under 19 U.S.C. § 1677b(f)(2) or why its decision to focus on import prices available to all Indonesian companies was better reflective of Zinus' actual experience purchasing inputs from affiliated sellers located in China.

## VII.  ARGUMENT

### A. Standard of Review

The Court of Appeals for the Federal Circuit reviews decisions of the CIT *de novo*, replicating the CIT's review of the challenged agency determination. *See, e.g., PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1236 (Fed. Cir. 1992). "Thus, without affording any deference to the Court of International Trade, this

court reassesses the administrative record for 'substantial evidence' and for consistency 'with law.'" *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1036 (Fed. Cir. 2003) (citing 19 U.S.C. § 1516a(b)(1)(B)(i); *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1559 (Fed.Cir.1984)); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 515 F.3d 1372, 1379 (Fed. Cir. 2008). In doing so, the Court "applies anew the standard of review applied by the Court of International Trade in its review of the administrative record." *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1307-08 (Fed. Cir. 2001) (citing *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000)).

Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed.Cir.1994) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "{T}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica*, 44 F.3d at 985 (quotation marks omitted).

    B.  <u>Commerce's Decision to Remove In-Transit Mattresses from the Data Used to Calculate Quarterly Allocation Ratios Was Unsupported by Substantial Evidence</u>

        a.  *Commerce Failed to Address Model-Specific Data that Undermined its Conclusions*

Commerce was forced to develop a methodology to assign country of origin to certain sales because Zinus US' ***inventory*** records were fundamentally flawed and incapable of tracking the country of origin of sales. IDM at 8 (Appx10210); *see also* Zinus AQR at A-5 to A-7 (Appx10880-10882). That is the crux of this issue. Appellants do not challenge Commerce's use of quarterly ratios or the application of those ratios to allocate country of origin. Appellants challenge Commerce's decision to remove in-transit mattresses from the input data used to calculate the quarterly ratios and its 11th hour decision to introduce Zinus US' flawed inventory data into the quarterly ratio calculations.

Both physically in the warehouse, and electronically in its warehouse inventory records, Zinus commingled mattresses sourced from different countries that had the same product code. Once a mattress entered Zinus US' warehouse, Zinus lost traceability as to the country of origin. That continued to be the case when mattresses were sold from the warehouse. In other words, Zinus US' inventory records were not usable to determine the country of origin. IDM at 8 (Appx10210); *see also* Zinus AQR at A-5 to A-7 (Appx10880-10882).

For this reason, in its 2021 *Final Determination*, Commerce relied on purchase data to assign country of origin. IDM at 9 (Appx10211). This purchase data included all purchased mattresses, whether they entered Zinus US' physical inventory or were still in transit. *Id*. However, in its Second Remand

14

Redetermination, the Department injected inventory data for the first time and removed in-transit mattresses from its calculations. While these in-transit mattresses were purchased by Zinus US during the POI, Commerce determined that it was appropriate to remove them because it claimed that newly collected—but unverified—inventory data collected during the second remand proceeding demonstrated that the sum of Zinus US' beginning inventory quantity and purchased quantity of mattresses entering its warehouse during the POI was greater than the total quantity of Zinus US' reported sales from inventory. Second Remand Redetermination at 6 (Appx10047).

Commerce's determination is unsupported by substantial evidence because in reaching this determination Commerce only considered aggregate totals for all mattresses and failed to examine the data on a model specific basis. The record unequivocally establishes that on a model-specific level—which is the way mattresses are bought and sold—numerous models for which the sum of Zinus US' beginning inventory quantity and purchased quantity of mattresses entering its warehouse during the POI was <u>not</u> greater than the total quantity of Zinus US' reported sales from inventory. Commerce's decision to focus on aggregate data on total mattresses, rather than on a model-specific basis was unreasonable because mattress models are not interchangeable: just as a grocer cannot create sales of apples from its inventory of oranges, Zinus cannot create mattress sales of a

specific model number from its inventory of an entirely different model number. The model-specific data, which Commerce failed to consider or address in its analysis, clearly undermines Commerce's conclusions.

When reviewing inventory and sales data on a model-specific level—all of which is available on the record and was introduced by Commerce for the first time in Appendix 5 of its Second Final Remand Calc Memo—it is clear that Zinus US in fact ***did not*** have a sufficient number of mattresses in inventory to support all of its POI sales. Commerce Memorandum, "Final Remand Results Calculation Memorandum for PT Zinus Global Indonesia (Zinus Indonesia)" (May 16, 2024) ("Second Final Remand Calc Memo") at Attachment 5 (Appx26436). In particular, Attachment 5 includes a summary, by model number, of: (1) beginning POI inventory values ("Beginning POI Inventory"), sourced from Zinus' Exhibit RS-10, (2) total purchases entered into inventory from all country sources in quarter 1 ("QTR1 Non-Indonesia Purchases"),[3] quarter 2 ("QTR2 Total Purchases"), quarter 3 ("QTR3 Total Purchases"), and quarter 4 ("QTR4 Total Purchases"), sourced from Zinus' Exhibit SC2-1, and (3) total sales from all sources during the POI ("TOTAL Sales QTY"), sourced from Zinus "Indonesia" and "Non-Indonesia" US sales databases, which Commerce included in

---

[3] Zinus did not have any purchases from Indonesia in the first quarter.

Attachment 6 of its Second Final Remand Calc Memo.[4]  *Id*.  This information is reproduced for certain model numbers in Table 1 (next page).

Importantly, each of these figures are aggregate inventory, purchase, and sales figures reported by Zinus for all country sources, <u>prior to</u> the use of the quarterly ratio methodology to estimate Indonesia-specific sales quantities.  In other words, the anomalies are present in the source data Commerce used to calculate quarterly ratios, which was then used to allocate Zinus US' CEP inventory sales to a particular country of origin.

---

[4] In reporting Zinus US' CEP inventory sales, Zinus submitted two separate US sales databases "Indonesia US Sales Database" and "Non-Indonesia US Sales Database," in which it assigned country of origin based on its preferred FIFO allocation methodology.  IDM at 8 (Appx10210).  While the division of sales between the two databases is an estimate, the sum of sales included in the "Indonesia US Sales Database" and "Non-Indonesia US Sales Database" represents all sales from all countries based on Zinus' actual sales records.  *Id*.; *see also Letter* from Zinus, "Zinus' Section C Questionnaire Response" (July 14, 2020) ("Zinus CQR") at C-2 (Appx13713) (explaining that the two databases together reflect the "full record of Zinus' U.S. mattress sales (regardless of country of origin)").

The referenced Exhibit RS-10 can be found in Zinus' Remand Supplemental Questionnaire Response.  *See* Letter from Zinus, "Zinus' Remand Supplemental Questionnaire Response" (March 20, 2024) at Exhibit RS-10 (Appx25500-25505).  The referenced Exhibit SC2-1 can be found in Zinus' Second Section C Supplemental Questionnaire Response.  *See* Letter from Zinus, "Zinus' Second Section C Supplemental Questionnaire Response" (September 28, 2020) at Exhibit SC2-1 (Appx17839-17857).  The sales data, which Commerce summarized from Zinus' U.S. sales databases can be found in Attachment 6 of Commerce's Second Remand Calc Memo.  *See* Second Remand Calc Memo at Attachment 6 (Appx26094-26146).

**Table 1. Model Numbers for Which the Total Sold Exceeded
the Total Volume in Inventory During POI**

| | Model Number | Beginning Inventory Quantity | Total Quantity Entered into Inventory During POI from All Sources | Total Available for Sale in POI (Beginning Inventory + Entries) | Total Quantity Sold in POI from All Sources | Quantity for Which POI Sales Exceed Available Mattresses | |
|---|---|---|---|---|---|---|---|
| [ | number | number | number | number | number | number | ] |
| [ | number | number | number | number | number | number | ] |
| [ | number | number | number | number | number | number | ] |
| [ | number | number | number | number | number | number | ] |
| [ | number | number | number | number | number | number | ] |
| [ | number | number | number | number | number | number | ] |
| [ | number | number | number | number | number | number | ] |

The above data show that for certain model numbers, Zinus US reported a POI sales quantity that exceeded the quantity of mattresses that it had available in inventory. For example, based on Zinus' reported beginning inventory quantity and inventory entries, Zinus US had a maximum of [ number ] units of model number [ number ] physically present in its inventory during the POI. This figure includes both (a) the quantity from all country sources in inventory at the beginning of the POI and (b) entries into physical inventory from all country sources during the POI. However, in its sales databases, Zinus reported selling a total of [ number ] units of model number [ number ] from all country sources during the POI. This is [ num.] more mattresses than were physical present in its warehouse.

This data demonstrates that for model number [ number ] and the other model numbers included in Table 1, the sum of Zinus US' beginning inventory quantity and purchased quantity of mattresses entering its warehouse during the POI was ***less than*** the total quantity of Zinus US' reported sales from inventory. Yet through its sole focus on aggregate data, Commerce seemingly failed to recognize this anomalous model-specific data, which contradicts its stated reasoning for removing in-transit mattresses from the quarterly ratio calculation. It also never addressed it because it first presented the model-specific inventory data in Appendix 5 of its final Second Remand Redetermination, depriving the parties

an opportunity to identify these issues and from Commerce to address those concerns.

Commerce's decision to focus solely on aggregate level data and ignore model-specific data that directly undermined its factual conclusions renders its determination to exclude in-transit mattresses unsupported by substantial evidence. *See, e.g., Suramerica*, 44 F.3d at 985 ("{T}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn.")

> b. *In Upholding Commerce's Decision, the CIT Relied on Post-Hoc Rationalizations That Were Not Provided by Commerce*

In affirming Commerce's decision to remove in-transit mattresses from the quarterly ratio calculation, the CIT recognized that for the above model numbers the quantity of sales during the POI exceeded the quantity of mattresses available in inventory, but found that Commerce had sufficiently explained why its decision to use this data was reasonable. Slip Op. 25-15 at 18-20 (Appx10021-10024). But the "reasoned" explanations cited by the CIT were either (a) provided by Commerce to explain a wholly separate issue or (b) post-hoc rationalizations that are found nowhere in Commerce's Second Remand Redetermination.

As noted above in the Statement of the Case, the challenged errors were revealed for the first time in the final Second Remand Redetermination filed with

the CIT, when Commerce presented model-specific data in Attachment 5 of its Second Final Remand Calc Memo. Neither Appellants nor Appellee-Intervenors had an opportunity to address this change of methodology or identify the flaw in Commerce's use of aggregate data. To their credit, Appellee-Intervenors anticipated the problem and affirmatively asked Commerce to provide an opportunity for parties to provide comments on any changes in methodology. Letter from Zinus, "Zinus' Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand" (April 26, 2024) at 5-6 (Appx26000-26001). Commerce did not, and so to this day, Commerce itself has never addressed the anomalous model-specific data set forth above.

*First*, the CIT found that Commerce reasonably explained that an allocation methodology was necessary to identify Indonesian sales because Zinus "did not maintain records of the country of origin for mattresses after the merchandise entered {Zinus US's} domestic warehouse." Slip Op. 25-15 at 19 (Appx10022). Appellants agree. The CIT further determined that Commerce has adequately explained that application of the methodology to assign a country of origin resulted in sold quantities being greater than purchased quantities for some models, but that the results are smoothed out when cumulated. *Id*. But here, the CIT has put the cart before the horse. Commerce explanation went to the results of <u>application</u> of the quarterly ratios, not the input data used in the <u>calculation</u> of those ratios.

Commerce's conclusions about post-allocation estimates of Indonesia-specific sales quantities do not apply to the pre-allocation anomalous data identified in Table 1. This is because data in Table 1 are not country-specific estimated sales resulting from application of Commerce's allocation methodology. Instead, the data in Table 1 are Zinus US' actual model-specific records of inventory, purchases, and sales from all countries (*i.e.,* prior to the application of any allocation methodology to estimate country-specific sales). This is a critical distinction that the CIT appears to have overlooked.

To clarify, the record contains two types of data. *First*, the record contains data on purchases, inventory, and sales from all countries that Zinus reported to Commerce. This is the data that Commerce relied upon in its decision to exclude in-transit mattresses and the data that was ultimately used as an input into the quarterly ratio calculations. This is also the data that contained the anomalies identified in Table 1. *Second*, the record contains estimates of sales on a country-specific basis that resulted from the application of the quarterly ratio methodology. These estimates were necessary because Zinus claimed to be unable to identify the country of origin of its sales. Contrary to the CIT's reasoning, Commerce's explanations for anomalies in the country-specific estimates resulting from its allocation methodology cannot be used to explain anomalies in the actual data provided by Zinus, which were not subject to any allocation.

*Second*, the CIT claimed that Commerce's decision to remove in-transit mattresses was supported by substantial evidence because the anomalous models constituted only a small fraction of mattresses sold by Zinus during the POI. Slip Op. 25-15 at 19-20 (Appx10022-10023). However, such post hoc rationalizations by counsel—which are found nowhere in Commerce's analysis—cannot supplant Commerce's responsibility to support its conclusions with substantial evidence. *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("Although counsel sought to justify the agency's choice…the Supreme Court rejected this argument because 'courts may not accept appellate counsel's post hoc rationalizations for agency action.'"); *see also Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("{A} reviewing court, in dealing with a determination or judgment which an administrative agency is alone authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."); *Timken Co. v. United States*, 894 F.2d 385, 389 (Fed. Cir. 1990) (quoting *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 709–10 (D.C. Cir. 1977)) ("{A}gency action cannot be sustained on post hoc rationalizations supplied during judicial review."). Such post-hoc rationalizations

by counsel therefore cannot be substantial evidence supporting Commerce's decision. It is for Commerce to decide whether something is material, and the court's role is to evaluate whether Commerce's decision is supported by substantial evidence or otherwise in accordance with law.

C. Commerce's Decision to Utilize Inventory Data in its Quarterly Ratio Calculations Was Unsupported by Substantial Evidence and Contrary to Law

a. *Commerce failed to provide a reasonable explanation for using inventory data in its revised quarterly ratio calculations*

As discussed above, due to Zinus' inability to track the country of origin of Zinus US' inventory sales, Commerce was forced to utilize an allocation to distinguish Zinus US' sales of subject merchandise (*i.e.*, mattresses from Indonesia) and non-subject merchandise (*i.e.*, mattresses from other countries). IDM at 8 (Appx10210). While Zinus proposed a FIFO methodology to allocate sales to specific countries, in its initial determination Commerce chose instead to rely on a quarterly ratio methodology in which it allocated sales to Indonesia and other countries in a given quarter based on the proportional share of Zinus US's purchases for inventory in that same quarter. *Id*. Thus, if 30 percent of Zinus US's mattress purchases in a given quarter were from Indonesia, Commerce allocated 30 percent of Zinus US's sales to Indonesia in that quarter. Commerce determined that such an approach was preferable to Zinus' proffered FIFO methodology

because it was "grounded in purchase data" and thus "less susceptible to

manipulation." *Id*.

In *Zinus I*, the CIT upheld Commerce's decision to use the purchase-data

based quarterly ratios as reasonable and supported by substantial evidence. Slip

Op. 23-39 at 21 (Appx10142). Commerce continued to utilize quarterly ratios

calculated based on purchases of mattresses until the final Second Remand

Redetermination. In its final Second Remand Redetermination, Commerce—

without providing interested parties an opportunity to comment—abruptly changed

course and devised an entirely new quarterly ratios calculation that relied on both

purchase <u>and</u> newly-collected inventory data. Second Remand Redetermination at

12-14 (Appx10053-10055). Under this approach, Commerce estimated how many

Indonesian and third-country mattresses were sold out of inventory in a given

quarter based on the proportionate number of mattresses in inventory from each

country in that quarter. *Id*. These estimated Indonesian and third-country sales

became the basis of new inventory calculations in subsequent quarters, such that

each quarter's calculations were dependent implicitly on how many mattress sales

were assigned to Indonesia in the previous quarter.

Commerce's sole stated reason for incorporating inventory data into the

quarterly ratio calculations was that "it is indisputable that applying the revised

quarterly ratios (based on purchase data only) results in an adjusted sales quantity

25

for multiple Indonesia model numbers that is greater than the quantity Zinus U.S. has in inventory for those model numbers," a result Commerce determined was "impossible." Second Remand Redetermination at 11-12 (Appx10052-10053). However, in reaching this conclusion, Commerce failed to acknowledge or address the fact that the actual, all-country data provided by Zinus contained similarly "impossible" figures prior to the application of the quarterly ratio methodology. *See* Section B, *supra*. If such "impossibilities" exist in Zinus' own inventory and sales records for mattresses from all countries, prior to the application of the quarterly ratio methodology, then the fact that similar inconsistencies remain in the estimates for Indonesia after application of the quarterly ratio methodology is hardly a surprise, and certainly cannot justify Commerce's methodological about-face.

Moreover, Commerce's decision to incorporate unverified and demonstrably suspect inventory data into the quarterly ratios is unreasonable as it reintroduces the potential for manipulations that the purchase-based quarterly ratios were specifically intended to address. As discussed above, Commerce initially chose the quarterly ratio methodology because it was "grounded in purchase data," which was verified by Commerce during the course of the underlying proceeding. IDM at 9 (Appx10211). Commerce's revised methodology incorporates inventory data that was both: (1) never verified by Commerce and (2) based on Commerce's own

26

reasoning contains figures that should be "impossible" because—when combined with Zinus US' verified sales figures—they show that for certain model numbers Zinus US sold more mattresses than it had in its inventory for those model numbers.

Commerce's failure to address such inconsistencies in its reasoning render its determination unsupported by substantial evidence. The CIT notably failed to separately address this issue in its determination.

### b. *Commerce's reliance on unverified Zinus US' inventory data collected on remand is contrary to law*

In addition to being unsupported by substantial evidence, Commerce's Second Remand Redetermination was also contrary to law, as the inventory data Commerce collected and relied upon in its final determination were never verified as required under the statute. *See* 19 U.S.C. § 1677m(i) ("The {Department} shall verify all information relied upon in making a final determination in an investigation."); *see also* 19 U.S.C. § 1677m(e)(2) (permitting Commerce to rely on information submitted by an interested party only where "the information can be verified").

While this Court has previously found that Commerce has wide latitude in developing its verification procedures, *see, e.g., Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997), in this case Commerce did ***nothing*** to verify the inventory data submitted by Zinus during the second remand

proceeding.  Commerce's failure to take any steps to verify the Zinus inventory data that it collected during remand and relied on in its final Second Remand Redetermination is contrary to the statutory obligations set forth in 19 U.S.C. § 1677m(i), which require Commerce to "verify all information relied upon in making a final determination in an investigation."  While Appellants raised this in their comments filed with the CIT, the CIT did not address this issue in its opinion.

D. <u>Commerce Erred in Relying Exclusively on Indonesian Data When Applying the Transactions Disregarded Rule</u>

1. <u>Commerce's Reliance on Indonesian GTA Data Conflicted with its Established Practice in Applying 19 U.S.C. § 1677b(f)(2)</u>

In the First Remand Redetermination, Commerce acknowledged that the statute "does not limit Commerce by law to use only the market under investigation or review as the 'market under consideration'" for the purposes of determining a fair market input price under 19 U.S.C. § 1677b(f)(2).  First Remand Redetermination at 22-23 (Appx10110-10111).  However, Commerce nonetheless claimed that its reliance on Indonesian data was appropriate because it was consistent with "the goal of the transactions disregarded analysis {which} is to arrive at a market price for inputs which would be available to the respondent to the extent the record contains such information."  *Id*.  Commerce averred that an Indonesian market value was most appropriate because Indonesia is where Zinus is located.  *Id.*  But the statute does not focus on the "market under consideration"

when it provides for using "information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." 19 U.S.C. § 1677b(f)(2). The plain language of that provision looks to try to value the <u>transaction</u> at arm's length, not what it would have otherwise cost the respondent to purchase an input from someone in the same country. Here, the transaction was between a Chinese supplier and Zinus. Commerce erred when it limited its analysis to what it might have cost Zinus to purchase the inputs at the corner store.

A well-settled principal of statutory construction provides, "general terms are to be given their general meaning." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 101 (2012) ("*Reading the Law*") (discussing the "General-Terms Canon"); *see also e.g*., *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002) (giving unqualified statutory term broad meaning). The second sentence of 19 U.S.C. § 1677b(f)(2) unambiguously authorizes use of "information available" without any limitation. Had Congress intended to limit Commerce's considerable discretion when granting this authorization, it would have done so. To paraphrase *Reading the Law*, at 101: "information available" means information available and it "must be given general effect."

Consistent with Commerce's established practice when applying 19 U.S.C. §1677b(f)(2), the benchmark price should account for Zinus's experience when purchasing inputs from sellers located in China. This approach is consistent with the plain terms of the statute and Commerce's practice to use an affiliated supplier's costs as "information available" even when the affiliate is located in a different country.

2. In Calculating a Surrogate Market Value, Commerce Practice is to Rely on the Affiliate's COP Regardless of Where They Are Located

Under 19 U.S.C. § 1677b(f)(2), Commerce generally solicits the affiliated supplier's COP— which notably is not data on "sales of merchandise"—for use as a surrogate for market price. IDM at 17-18 (Appx10219-10220). In *Rebar Trade Action Coalition v. United States*, 398 F. Supp. 3d 1359, 1371-72 (Ct. Int'l Trade 2019), the CIT found that when applying the transactions disregarded provision Commerce has discretion to use an affiliated supplier's COP as a "reasonable source" for market sales value when no unaffiliated transactions are available. When it relies on COP, Commerce does so as "information available" and not under the auspices of the first sentence of 19 U.S.C. § 1677b(f)(2).

Commerce's "consistent and predictable" practice has not taken the location of the affiliated supplier into account. For example, *Bottom Mount Refrigerators from Mexico* involved a Korean conglomerate with affiliates located throughout the globe. Mexican respondent Samsung Electronics Mexico ("SAM") purchased

compressors from its Korean affiliate, Samsung Gwangju Electronics Co., Ltd

("SGEC"). *Notice of Final Determination of Sales at Less Than Fair Value and*

*Affirmative Critical Circumstances Determination: Bottom Mount Combination*

*Refrigerator-Freezers From Mexico*, 77 Fed. Reg. 17422 (Mar. 26, 2012), IDM at

Comment 29; *see also Bottom Mount Combination Refrigerator-Freezers From the*

*Republic of Korea: Preliminary Negative Countervailing Duty Determination and*

*Alignment of Final Determination With Final Antidumping Determination*, 76 Fed.

Reg. 55044, 55047 (Sep. 6, 2011) (noting that SGEC is a Korean producer of

bottom mount refrigerators subject to the CVD investigation). Because SGEC was

SAM's only source for compressors (a minor input), when applying 19 U.S.C. §

1677b(f)(2) Commerce compared the transfer price SAM paid SGEC to SGEC's

cost of production ("COP"). *Id.* Thus, Commerce used ***Korean*** costs to determine

the surrogate market price for a ***Mexican*** respondent because this reflected the

respondent's experience when purchasing compressors. It did not look to what it

would have cost to buy the compressor in Mexico.

This court has established that "if Commerce has a routine practice for

addressing like situations, it must either apply that practice or provide a reasonable

explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United*

*States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004) (citing *State Farm*, 463 U.S. at 42;

*see also Nippon* Steel, 494 F.3d at 1378 n.5 ("When an agency decides to change course…it must adequately explain the reason for a reversal of policy.").

Here, Commerce's reliance on Indonesian GTA data conflicts with its self-described "consistent and predictable" approach of using the affiliate's COP as information available to establish a fair market price where market prices on unaffiliated purchases or sales are not available. *Rectangular Pipes from Korea* (July 2021), IDM at Comment 7. It also ignores Commerce's longstanding reasoning that the relevant market price benchmark should not be based on the price available to purchasers generally, but rather on the price that best represents the individual respondent's own purchasing experience. *See Unicatch Indus. Co. v. United States*, 539 F. Supp. 3d at 1249. Put differently, if import AUVs into the subject country is the proper surrogate for a respondent's "potential purchasing experience" then Commerce would use such import AUVs in all cases in which unaffiliated purchase or sales information is not available and there would never be a need for its "consistent and predictable" practice of relying on the affiliate's COP (wherever that affiliate is located).

Notably, in recent determination applying the companion major input rule of 19 U.S.C. § 1677b(f)(3)—which Commerce uses to determine fair market value of major inputs—Commerce developed an approach to deal with estimating a Chinese affiliated supplier's COP. *See Best Mattresses Int'l Co. Ltd. v. United*

*States*, 622 F. Supp. 3d 1347, 1358 (Ct. Int'l Trade 2023).  Specifically, Commerce determined—and the CIT affirmed—that in such circumstances it was appropriate to use a six-country average of GTA import data from Romania, Russia, Malaysia, Turkey, Mexico, and Brazil, the market economies that Commerce considered to be economically comparable to China during the relevant POI.  *Id*.  In its First Remand Redetermination in this case, Commerce failed to explain why it was appropriate to use this approach to estimate a Chinese supplier's COP when using the major input rule, but to ignore such data and instead rely on Indonesian import statistics when calculating market price under the transactions disregarded rule in 19 U.S.C. § 1677b(f)(2).

In addition to relying on an improperly constrained construction of the statute when making the change to relying only on Indonesia GTA data, Commerce also failed to explain "why the methodology chosen from among available alternatives {in the *Final Determination*} produces the more accurate and undistorted dumping margin as compared with the preliminary methodology." *Diamond Sawblades Mfrs. Coalition v. United States*, Slip Op. 2014-112, 2014 Ct. Intl. Trade LEXIS 115 at *24 (2014) (remanding where Commerce failed to adequately explain methodological switch between preliminary and final determinations).  This failure also requires remand because Commerce did not provide a reasonably discernable explanation for its decision.  *See NMB Singapore*

*Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (noting that, although Commerce's "explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court") (citing *State Farm,* 463 U.S. at 43).

## VIII.    CONCLUSION AND RELIEF REQUESTED

For the reasons discussed above, Appellants respectfully request that this Court vacate the CIT's opinions in *Zinus II and Zinus III,* find Commerce's First Remand Redetermination and Second Remand Redetermination to be unsupported by substantial evidence and not in accordance with law, and remand for reconsideration consistent with the Court's opinion.

Respectfully submitted,

/s/

Yohai Baisburd
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP

*Counsel for Plaintiffs-Appellants*

June 23, 2025

Nonconfidential Addendum

Fed. Cir. R. 28(a)(11), 28.1(d)

## UNITED STATES COURT OF INTERNATIONAL TRADE

PT. ZINUS GLOBAL
INDONESIA,

     Plaintiff,

and

BROOKLYN BEDDING, LLC,
CORSICANA MATTRESS
COMPANY, ELITE COMFORT
SOLUTIONS, FXI, INC.,
INNOCOR, INC., KOLCRAFT
ENTERPRISES INC., LEGGETT
& PLATT, INCORPORATED,
INTERNATIONAL
BROTHERHOOD OF
TEAMSTERS, AND UNITED
STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING,
ENERGY, ALLIED INDUSTRIAL
AND SERVICE WORKERS
INTERNATIONAL UNION, AFL-
CIO,

     Consolidated Plaintiffs,

v.

UNITED STATES,

     Defendant,

and

**Before: Jennifer Choe-Groves, Judge**

**Consol. Court No. 21-00277**

**BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**

       **Defendant-Intervenors.**

## JUDGMENT

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. Department of Commerce's final determination in Mattresses from Indonesia, 86 Fed. Reg. 15,899 (Dep't of Commerce Mar. 25, 2021) (final affirmative determination of sales at less than fair value), as amended by, the Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 59-

Consol. Court No. 21-00277                                                          Page 3

1, 60-1, <u>and</u> the <u>Final Results of Redetermination Pursuant to Court Remand</u>, ECF

Nos. 87-1, 87-2, is sustained.

     /s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:     February 18, 2025
          New York, New York

Slip Op. 25-15

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PT. ZINUS GLOBAL INDONESIA,**<br><br>    **Plaintiff,**<br><br>**and**<br><br>**BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**<br><br>    **Consolidated Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>    **Defendant,** | **Before: Jennifer Choe-Groves, Judge**<br><br>**Consol. Court No. 21-00277** |

and

**BROOKLYN BEDDING, LLC,
CORSICANA MATTRESS
COMPANY, ELITE COMFORT
SOLUTIONS, FXI, INC.,
INNOCOR, INC., KOLCRAFT
ENTERPRISES INC., LEGGETT
& PLATT, INCORPORATED,
INTERNATIONAL
BROTHERHOOD OF
TEAMSTERS, AND UNITED
STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING,
ENERGY, ALLIED INDUSTRIAL
AND SERVICE WORKERS
INTERNATIONAL UNION, AFL-
CIO,**

        **Defendant-Intervenors.**

## **OPINION AND ORDER**

[Sustaining the U.S. Department of Commerce's Second Final Results of
Redetermination Pursuant to Court Order in the antidumping duty investigation of
mattresses from Indonesia.]

Dated: February 18, 2025

J. David Park, Henry D. Almond, Gina Marie Colarusso, Kang Woo Lee, and Lynn
M. Fischer Fox, of Arnold & Porter Kaye Scholer, LLP, Washington, D.C., for
Plaintiff PT. Zinus Global Indonesia. With them on the brief was Eric Johnson.

Yohai Baisburd, Nicole Brunda, Chase J. Dunn, Mary Jane Alves, Sarah E.
Shulman, Thomas M. Beline, and Ulrika Kristin Skitarelic Swanson, of Cassidy
Levy Kent (USA) LLP, Washington, D.C., for Consolidated Plaintiffs and
Defendant-Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company,

Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Inc., International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.

L. Misha Preheim, Assistant Director, and Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of counsel on the brief was David W. Richardson, Senior Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Choe-Groves, Judge:  Before the Court is the U.S. Department of Commerce's ("Commerce") second remand redetermination in the antidumping duty investigation of mattresses from Indonesia, filed pursuant to the Court's Remand Order in PT. Zinus Global Indonesia v. United States ("PT. Zinus II"), 48 CIT __, 686 F. Supp. 3d 1349 (2024).  See Final Results of Redetermination Pursuant to Court Remand ("Second Remand Redetermination"), ECF Nos. 87-1, 87-2; see also Mattresses from Indonesia ("Final Determination"), 86 Fed. Reg. 15,899 (Dep't of Commerce Mar. 25, 2021) (final affirmative determination of sales at less than fair value), accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Market Value Investigation of Mattresses from Indonesia ("IDM"), ECF No. 15-4.

In PT. Zinus II, the Court remanded for Commerce to reconsider its inclusion of mattresses in transit from Indonesia at the end of the period of investigation in the calculation of constructed export price and adjustments made to the selling expenses of Plaintiff PT. Zinus Global Indonesia's ("Plaintiff" or "Zinus Indonesia") parent company, Zinus Inc. ("Zinus Korea").  PT. Zinus II, 48 CIT at __, 686 F. Supp. 3d at 1354–57.  Commerce addressed both issues on remand.  See Second Remand Redetermination.  Consolidated Plaintiffs and Defendant-Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Inc., International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("Defendant-Intervenors") filed Defendant-Intervenors' Comments in Opposition to the Department's Remand Redetermination.  Def.-Intervs.' Cmts. Opp'n Dep't's Remand Redetermination ("Def.-Intervs.' Br."), ECF Nos. 91, 92.  Defendant United States ("Defendant") filed Defendant's Response to Comments on Second Remand Redetermination. Def.'s Resp. Cmts. Second Remand Redetermination ("Def.'s Br."), ECF Nos. 93, 94.  Plaintiff filed Plaintiff's Comments in Support of Commerce's Second Remand Redetermination.  Pl.'s Cmts. Supp. Commerce's Second Remand Redetermination ("Pl.'s Br."), ECF Nos. 95, 96.  Defendant-Intervenors filed

Defendant-Intervenors' Reply to Defendant's Comments on the Second Remand Redetermination. Def.-Intervs.' Reply Def.'s Cmts. Second Remand Redetermination ("Def.-Intervs.' Reply"), ECF Nos. 102, 103.

For the following reasons, the Court sustains Commerce's <u>Second Remand Redetermination</u>.

## ISSUES PRESENTED

This case presents the following issues:

1.    Whether Commerce's exclusion of in-transit mattresses from the calculation of constructed export price was in accordance with law and supported by substantial evidence; and

2.    Whether Commerce's exclusion of Zinus Korea's selling expenses from the calculation of normal value was supported by substantial record evidence.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the <u>Second Remand Redetermination</u>. <u>See</u> <u>PT. Zinus II</u>, 48 CIT at __, 686 F. Supp. 3d at 1352–54; <u>PT. Zinus Global Indonesia v. United States</u> ("<u>PT. Zinus I</u>"), 47 CIT __, __, 628 F. Supp. 3d 1252, 1258–59 (2023).

On March 30, 2020, an antidumping duty petition concerning imports of

mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of

Turkey, and the Socialist Republic of Vietnam was filed with Commerce by

Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions,

FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Inc., the

International Brotherhood of Teamsters, and the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO.  Antidumping Countervailing Duty Pet.

("Petition") (Mar. 31, 2020), PR 1–4, CR 1–10.[1]  In response to the Petition,

Commerce initiated on April 24, 2020 an antidumping investigation on mattresses

imported from Indonesia.  Mattresses from Cambodia, Indonesia, Malaysia, Serbia,

Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam, 85 Fed.

Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (initiation of less-than-fair-value

investigations).  The period of investigation was January 1, 2019 through

December 31, 2019, the four most recent financial quarters prior to the filing of the

March 2020 Petition.  Id. at 23,003; Commerce's Decision Mem. Prelim.

Affirmative Determination and Postponement Final Determination Less-Than-

---

[1]  Citations to the administrative record reflect the public record ("PR"), public remand record ("PRR"), confidential record ("CR"), and confidential remand record ("CRR") document numbers filed in this case, ECF Nos. 39, 40, 76, 77, 97, 98.

Fair-Value Investigation Mattresses from Indonesia ("PDM") at 5, PR 226; see
also 19 C.F.R. § 351.204(b)(1).  Zinus Indonesia was selected as the sole
mandatory respondent in the investigation.  Less-Than-Fair-Value Investigation
Mattresses Indonesia Resp. Selection Mem., PR 66, CR 32.

     Because Plaintiff was unable to identify the country of origin of imported
mattresses after merchandise entered Plaintiff's United States warehouse,
Commerce applied a quarterly ratio sales methodology to determine the quantity of
Zinus Indonesia's U.S. sales for purposes of calculating constructed export price.
IDM at 8–9; PDM at 9–10; see also Commerce's Prelim. Determination Margin
Calculation Zinus Indonesia at 1–3 (Oct. 27, 2020), PR 229, CR 258.  The
quarterly ratio was applied to the full universe of Zinus, Inc.'s ("Zinus U.S.")
mattresses, including those mattresses that were in transit and had not yet entered
the United States at the conclusion of the period of investigation.  IDM at 8–9.
Commerce calculated Zinus Indonesia's antidumping duty margin rate at 2.22
percent.  Final Determination, 86 Fed. Reg. at 15,900.

     The Court remanded for Commerce to explain and support its inclusion of
mattresses in transit from Indonesia in its quarterly ratio calculations, Commerce's
adjustments to the selling expenses of Zinus Korea, and Commerce's application
of the Transactions Disregarded Rule.  PT. Zinus I, 47 CIT at __, 628 F. Supp. 3d.
at 1287–88.  On remand, Commerce continued to include in-transit mattresses in

its calculation of constructed export price and to exclude affiliated party transfer payments from its margin calculations.  Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination"), ECF Nos. 59-1, 60-1.  This Court held that information relating to Plaintiff's inventory was missing from the administrative record, and Commerce failed to comply with the requirements of 19 U.S.C. § 1677m(d) to notify Plaintiff of the deficiency and allow an opportunity to cure.  PT. Zinus II, 48 CIT at __, 686 F. Supp. 3d at 1355–56.  Defendant requested that Commerce's determination with respect to the exclusion of Zinus Korea's selling expenses be remanded to address deficiencies and contradictions in the administrative record.  Id. at __, 686 F. Supp. 3d. at 1356–57.  The Court sustained Commerce's application of the Transactions Disregarded Rule and remanded the remaining issues of Commerce's treatment of in-transit mattresses and Zinus Korea's selling expenses.  Id. at __, 686 F. Supp. 3d at 1358.

On second remand, Commerce issued a supplemental questionnaire to Plaintiff.  Remand Suppl. Questionnaire, PRR 1, CRR 1.  The supplemental questionnaire requested Plaintiff to provide data on the quantity and value of the mattresses in Zinus U.S.' inventory at the beginning and end of the period of investigation and Zinus Korea's indirect selling expenses.  Id.  Plaintiff provided a response to the supplemental questionnaire.  Pl.'s Remand Suppl. Questionnaire Resp. ("Plaintiff's Supplemental Questionnaire Response" or "Pl.'s Suppl.

Questionnaire Resp."), PRR 4–5, CRR 2–9.  Defendant-Intervenors submitted

comments in response to Plaintiff's Supplemental Questionnaire Response.  Def.-

Intervs.' Cmts. Pl.'s Remand Suppl. Questionnaire Resp. ("Defendant-Intervenors'

Supplemental Questionnaire Comments" or "Def.-Intervs.' Suppl. Questionnaire

Cmts."), PRR 11, CRR 11.  Commerce released on April 19, 2024 its Draft Second

Remand Redetermination.  Draft Second Remand Redetermination, PRR 15, CRR

13.  In the Draft Second Remand Redetermination, Commerce concluded that the

quantity of mattresses in Zinus U.S.' inventory during the period of investigation

exceeded the quantity of mattresses sold during the same period and that the in-

transit mattresses from Indonesia did not enter Zinus U.S.' inventory during the

period of investigation.  Id. at 5–7.  Commerce excluded the in-transit mattresses

from its calculation and adjusted its quarterly ratio calculation to include only the

specific model numbers produced and sold by Zinus Indonesia during the period of

investigation.  Id. at 6–8.  Commerce also calculated a new variable representing

U.S. indirect selling expenses incurred in Korea based on additional data provided

by Plaintiff.  Id. at 8–12.  This variable was incorporated into the margin

calculation but did not affect the results.  Id. at 12.  Based on these changes,

Commerce calculated a weighted-average dumping margin of 2.35 percent.  Id. at

13.  Plaintiff and Defendant-Intervenors provided comments on the Draft Second

Remand Redetermination.  Pl.'s Cmts. Commerce's Draft Results Redetermination

Pursuant Court Remand, PRR 22, CRR 18–19, 21; Def.-Intervs.' Cmts. Draft
Results Redetermination, PRR 21, CRR 20.

In the Second Remand Redetermination, Commerce again changed its
quarterly ratio methodology for allocating sales to include both Indonesian
mattresses purchased during the period of investigation and Zinus U.S.' existing
inventory.  Second Remand Redetermination at 8.  Commerce did not change its
methodology for calculating Zinus Korea's selling expenses.  Id. at 15–23.
Commerce calculated Plaintiff's remand weighted-average dumping margin at zero
percent.  Id. at 23.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28
U.S.C. § 1581(c), which grant the Court authority to review actions contesting the
final determination in an antidumping duty investigation.  The Court shall hold
unlawful any determination found to be unsupported by substantial evidence on the
record or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).
The Court also reviews determinations made on remand for compliance with the
Court's remand order.  Ad Hoc Shrimp Trade Action Comm. v. United States, 38
CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir.
2015).

## DISCUSSION

### I.    Legal Framework

Commerce imposes antidumping duties on foreign goods if: (1) it determines that the merchandise "is being, or is likely to be, sold in the United States at less than its fair value;" and (2) the International Trade Commission determines that the sale of the merchandise at less than fair value materially injures, threatens, or impedes the establishment of an industry in the United States. 19 U.S.C. § 1673.  Antidumping duties are calculated as the difference between the normal value of subject merchandise and the export price or the constructed export price of the subject merchandise.  Id.

Normal value is ordinarily determined using the sales price of the subject merchandise in the seller's home market.  19 U.S.C. § 1677b(a)(1)(B)(i).  If Commerce determines that normal value cannot be reliably calculated using home market or third-country sales, Commerce may use the subject merchandise's constructed value as an alternative to normal value.  Id. § 1677b(a)(4).  The method for calculating constructed value is defined by statute.  Id. § 1677b(e).  When calculating constructed value, Commerce must utilize the respondent's actual selling, general, and administrative expenses, and profits in the respondent's home market or a third-country market.  Id. § 1677b(e)(2)(A).  If Commerce cannot rely on those data, it may look to:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

Id. § 1677b(e)(2)(B).

Commerce must also calculate export price or constructed export price.

Export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States,

subject to certain adjustments. Id. § 1677a(a). Constructed export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a

> seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter,

subject to certain adjustments.  Id. § 1677a(b).  The price used to calculate

constructed export price is reduced by commissions, selling expenses, further

manufacturing expenses, and the profit allocated to these expenses.  Id. § 1677a(d).

## II.    In-Transit Mattresses

On remand, Commerce determined that record evidence established "two

very important facts," that: (1) a certain quantity of in-transit Indonesian mattress

models that Zinus Korea sold to Zinus U.S. during the period of investigation did

not enter Zinus U.S.' inventory until after the period of investigation had

concluded; and (2) "Zinus U.S. had a sufficient number of the Indonesia model

numbers that were in common with other countries in its physical inventory to

support the U.S. sales of such products reported as non-subject merchandise in its

U.S. sales database."  Second Remand Redetermination at 10–11.  Based on these

facts, Commerce adopted a quarterly ratio calculation based on both Zinus U.S.'

purchase data and existing inventory data for Indonesian model numbers in

common with other countries.  Id. at 8, 12–13.  Defendant-Intervenors argue that

Commerce's decision to exclude in-transit mattresses from the quarterly ratio

calculation is not in accordance with the law and is unsupported by substantial

evidence.  Def.-Intervs.' Br. at 6–17.

## A.    Methodology

As this Court observed in its prior opinion in this case, the "[c]alculation of constructed export price requires Commerce to identify sales of subject merchandise in the United States during the period of investigation[, but] [t]he relevant statutes and regulations provide little guidance on how to allocate merchandise within an inventory that comingles subject and non-subject merchandise." PT. Zinus I, 47 CIT at __, 628 F. Supp. 3d at 1263 (citing Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996)).  The methodology adopted by Commerce to allocate merchandise within an inventory must be a reasonable means of effectuating Commerce's statutory directives.  Tri Union Frozen Prods., Inc. v. United States, 40 CIT __, __, 163 F. Supp. 3d 1255, 1300 (2016), aff'd, 741 F. App'x 801 (Fed. Cir. 2018) (citing Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

In the Draft Second Remand Redetermination, Commerce based its quarterly ratio calculation on only Indonesian model number purchase data.  Draft Second Remand Redetermination at 5–8.  In the Second Remand Redetermination, Commerce changed its methodology to "include not just the purchase data but also the existing inventory data for Indonesian model numbers in common with other countries."  Second Remand Redetermination at 8, 12–13; Mattresses from

Indonesia: Final Remand Results Calculation Mem. PT Indonesia ("Final Results

Calculation Memorandum" or "Calculation Mem.") at Att. 4, PRR 24–29, CRR

27–30. In explaining its reasoning for changing the methodology, Commerce

stated that "applying quarterly ratios calculated using only the Indonesian mattress

models purchased during the [period of investigation] and applying those ratios to

the total sales reported in both U.S. sales databases yields an impossible result" of

the total sales quantity of Indonesian mattresses significantly exceeding the

quantity of purchased Indonesian mattresses. Second Remand Redetermination at

8, 11–12; Calculation Mem. at Att. 3. Commerce represented that a quarterly ratio

methodology based only on purchase data would result in Zinus U.S. possessing an

insufficient inventory to satisfy its sales for multiple model numbers of Indonesian

mattresses. Second Remand Redetermination at 12; Calculation Mem. at Att. 3.

Commerce may change its methodology between the draft and final version

of a determination but must explain the basis for the change and the change must

be supported by substantial evidence and in accordance with the law. Hyundai

Steel Co. v. United States, 42 CIT __, __, 319 F. Supp. 3d 1327, 1343 (2018).

Commerce explained that the problematic results from using only purchase data

were resolved through the inclusion of the quantity of mattresses Zinus U.S. held

in inventory at the beginning of the period of investigation. Second Remand

Redetermination at 12–13. Commerce determined that this approach "results in a

total sales quantity of Zinus U.S.' Indonesian-produced mattresses that is less than

the total quantity of such mattresses that were available for sale from its inventory

during the [period of investigation]." Id. at 13; Calculation Mem. at Att. 4.

Commerce acknowledged that:

> although this approach results in sold quantities being greater than
> purchased quantities for some models, these seemingly incongruous
> results are smoothed out when cumulated, such that the aggregate
> adjusted sales quantity for all Indonesia mattress sales is less than the
> total purchase quantity of these mattress model numbers from
> Indonesia. Therefore, unlike a quarterly ratio calculation based on
> purchase data only, a quarterly ratio calculation based on both purchase
> and inventory data applied to Zinus U.S.' [constructed export price]
> sales transactions results in a sales quantity assigned to Indonesia that
> is less than its total purchase quantity on an aggregate level, which is a
> more plausible result than we reached in the draft remand results.

Second Remand Redetermination at 13.

The Court concludes that the Second Remand Redetermination provides a

reasonable justification for changing Commerce's methodology and not limiting

the quarterly ratio calculation to only purchase data. See Hyundai Steel Co., 42

CIT at __, 319 F. Supp. 3d at 1343. Commerce's determination to include the

mattresses held by Zinus U.S. in inventory at the beginning of the period of

investigation resulted in the more plausible result that Zinus U.S.' sales quantity

was less than its total quantity purchased from Zinus Korea on the aggregate level.

Id. The Court concludes this to be a reasonable means of allocating U.S. sales for

purposes of calculating constructed export price. Tri Union Frozen Prods., Inc., 40

CIT at __, 163 F. Supp. 3d at 1300.  The Court concludes that Commerce's

quarterly ratio methodology incorporating purchase and inventory data is in

accordance with law.

### B.    Exclusion of In-Transit Mattresses

Defendant-Intervenors argue that Commerce's determination that "Zinus

U.S. had a sufficient number of the Indonesia model numbers that were in common

with other countries in its physical inventory to support the U.S. sales of such

products reported as non-subject merchandise in its U.S. sales database," is not

supported by substantial evidence.  Def.-Intervs.' Br. at 6–11.  Defendant-

Intervenors further argue that Commerce's decision to change its quarterly ratio

methodology between the Draft Second Remand Redetermination and the Second

Remand Redetermination was unsupported by substantial evidence.  Id. at 12–15.

In support of both of these arguments, Defendant-Intervenors point to examples of

individual mattress model numbers for which the quantity of sales from Zinus

U.S.' inventory during the period of investigation exceeded the quantity of

mattresses in inventory.  Id. at 6–15.

On remand, Commerce considered data submitted by Zinus Indonesia

regarding Zinus U.S.'s quantity of mattresses in inventory at the start of the period

of investigation and purchase quantity of in-transit constructed export price

mattresses at the end of the period of investigation on a model-specific and

aggregate basis.  Second Remand Redetermination at 5–6; see Pl.'s Suppl.

Questionnaire Resp. at Exs. RS-10, RS-11.  Based on this data, Commerce

determined that "Zinus U.S.' total inventory of relevant mattresses during the

[period of investigation] was sufficient to support its mattress sales during the

[period of investigation]."  Second Remand Redetermination at 6.  Commerce

further determined that, on a model-specific level, the number of Indonesian model

numbers that were either in common with those used by manufacturers in other

countries or were unique to Indonesia exceeded the quantity of sales of Indonesian

mattress model numbers.  Id. at 6; Calculation Mem. at Att. 1 at Chart 2.

Commerce considered the accounting of mattresses in transit at the end of the

period of investigation provided by Zinus Indonesia and determined that Zinus

U.S. had sufficient inventory at the beginning of the period of investigation to

account for the differences between sales and purchases during the period of

investigation.  Second Remand Redetermination at 6–7; see Pl.'s Suppl.

Questionnaire Resp. at Ex. RS-11.

Defendant-Intervenors contend that Commerce's "Ratio Application"

worksheet attached to its calculation memoranda shows that for seven model

numbers, the quantity of sales during the period of investigation exceeded the

quantity of mattresses available in inventory.  Def.-Intervs.' Br. at 6–9; Calculation

Mem. at Att. 5 at Chart 2.  Defendant-Intervenors argue that the existence of these

discrepancies undermines Commerce's determinations to exclude in-transit

mattresses and to alter its quarterly ratio methodology.  Def.-Intervs.' Br. at 9–12.

Commerce determined that an allocation methodology was necessary in this

case because Plaintiff did not maintain records of the country of origin for

mattresses after the merchandise entered Plaintiff's domestic warehouse.  See IDM

at 8–9.  In attempting to recreate an estimated allocation of mattresses within Zinus

U.S.' inventory, Commerce relied upon the data available on the record.  See

Second Remand Redetermination at 5–9.  Commerce is not required to use perfect

data but must explain why its choice was reasonable on the record.  Tenaris Bay

City, Inc. v. United States, 48 CIT __, __, 2024 WL 5056271, at *4 (Dec. 2, 2024)

(citing PT Pindo Deli Pulp and Paper Mills v. United States, 36 CIT 394, 414, 825

F. Supp. 2d 1310, 1327–28 (2012)).  In making its determination, Commerce

acknowledged that its methodology resulted in sold quantities being greater than

purchased quantities for some models, explaining that "these seemingly

incongruous results are smoothed out when cumulated, such that the aggregate

adjusted sales quantity for all Indonesia mattress sales is less than the total

purchase quantity of these mattress model numbers from Indonesia."  Second

Remand Redetermination at 13.

Plaintiff notes that the identified anomalies constitute only 0.16 percent of

the hundreds of thousands of mattresses sold from Zinus U.S.'s inventory during

the period of investigation and that none of the anomalous mattress models were among those in transit at the end of the period of investigation.  Pl.'s Br. at 12–14; compare Calculation Mem. at Att. 5 with Pl.'s Suppl. Questionnaire Resp. at Ex. RS-11.  Considering the relatively minor scale of the discrepancies and the fact that the anomalies were balanced out when mattress sales were considered in the aggregate, the Court concludes that Commerce's methodology is reasonable under the circumstances of this case and would result in only very minor distortions of less than one percent (0.16 percent of hundreds of thousands of mattresses) in the calculation of constructed export price.  Cf. 19 C.F.R. § 351.401(g) ("The Secretary may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided the Secretary is satisfied that the allocation method used does not cause inaccuracies or distortions.").

Because Commerce based its choice of methodology on record evidence and provided a reasonable explanation for any minor discrepancies, the Court concludes that Commerce's determination that Zinus U.S. had a sufficient number of Indonesian model number mattresses in inventory to satisfy its sales during the period of investigation was reasonable and supported by substantial evidence.  The Court also concludes that Commerce's determination to base its quarterly ratio calculation on purchase data and existing inventory data was supported by

substantial evidence.  The Court sustains Commerce's quarterly ratio methodology and its exclusion of in-transit mattresses.

### III.    Zinus Korea's Selling Expenses

In the Final Determination, Commerce considered Zinus Korea to be an affiliate of Zinus Indonesia and deducted only the actual selling expenses incurred by Zinus Korea in its margin calculation.  See IDM at 32; PT. Zinus I, 47 CIT at __, 628 F. Supp. 3d. at 1280.  The Court found that Commerce did not support its determination that Zinus Korea's involvement in Zinus Indonesia's U.S. sales was limited and that Commerce did not address arguments raised by Defendant-Intervenors challenging the application of Korean accounting rules.  PT. Zinus I, 47 CIT at __, 628 F. Supp. 3d. at 1280–82.  On remand, Commerce again determined that Zinus Korea's involvement in the sale of subject mattresses was minimal and continued to treat costs considered "commissions and fees" as payments between related parties and not as selling expenses.  Remand Redetermination at 9–16; see PT. Zinus II, 48 CIT at __, 686 F. Supp. 3d at 1356–57.  Defendant-Intervenors continued to object to Commerce's determination, arguing that record evidence supported Zinus Korea having a more active role in Zinus Indonesia's U.S. sales.  Def.-Intervs.' Cmts. Part. Opp'n Final Results Redetermination at 2–4, ECF Nos. 62, 63.  Defendant acknowledged inconsistencies in the record related to Zinus Korea's selling functions and

requested a remand of the issue to allow for the record to be reopened for

additional information.  Def.'s Resp. Cmts. Remand Redetermination at 15–17,

ECF No. 74, 75.  The Court remanded the issue.  PT. Zinus II, 48 CIT at __, 686 F.

Supp. 3d at 1357.

On second remand, Commerce solicited additional information through its

supplemental questionnaire "regarding Zinus Korea's sales-related activities,

invoicing system, and all indirect selling expenses incurred by Zinus Korea

associated with Zinus Indonesia's U.S. sales."  Second Remand Redetermination at

15; Remand Suppl. Questionnaire.  In its response to Commerce's supplemental

questionnaire, Plaintiff reported that some Zinus Korea employees were involved

in receiving invoices from Zinus Indonesia and forwarding those invoices to

customers in the United States.  Second Remand Redetermination at 15.  These

employees had other responsibilities beyond invoicing for Zinus Indonesia, which

accounted for only a portion of their time.  Id. at 15–16.  Commerce determined

that while Zinus Indonesia determined the sales terms for both export price and

constructed export price sales to U.S. customers, "Zinus Korea's role was limited

to receiving invoices from Zinus Indonesia and forwarding them to affiliated and

unaffiliated U.S. customers."  Id. at 16; Pl.'s Suppl. Questionnaire Resp. at 2–3.

Commerce further determined that Zinus Korea's role in warranty services

was minimal.  Second Remand Redetermination at 16–17.  Zinus Korea did not

provide "logistical services, training services, or technical support" and received requests for defective allowances from U.S. customers only once a year.  Id. at 16. Commerce acknowledged that a few Zinus Korea employees provided monthly sales promotion programs to export price customers in the United States, but determined that only one program concerning a single customer was in effect during the period of investigation.  Id. at 16–17; see Pl.'s Sec. C Questionnaire Resp. at Ex. C-13, PR 119–20, CR 117–20.

Based on Plaintiff's reporting, Commerce concluded that Zinus Korea was not involved in the basic selling functions that were performed by Zinus Indonesia and Zinus U.S., such as providing training services, technical support, inventory management, and logistical services.  Second Remand Redetermination at 17; see Pl.'s Suppl. Questionnaire Resp. at Ex. RS-5 at ## 6–9.  In support of this determination, Commerce relied on sample internal emails and emails with U.S. customers.  Second Remand Redetermination at 17; see Pl.'s Suppl. Questionnaire Resp. at Ex. RS-5 at ## 6–9.

Commerce also reviewed a worksheet provided by Plaintiff reconciling Zinus Korea's indirect selling expenses with Zinus Korea's financial statements. Second Remand Redetermination at 17–18; see Pl.'s Suppl. Questionnaire Resp. at Ex. RS-7; Pl.'s Sec. A. Questionnaire Resp. at Ex. A-11d(1).  The worksheet

reflected Zinus Korea's selling, general, and administrative expenses in six

categories:

> (1) certain expenses which were not incurred on behalf of the sale
> process with Zinus Indonesia, *i.e.*, professional fees (*i.e.*, column B);
> (2) expenses incurred by Zinus Korea that it included in Zinus
> Indonesia's general and administrative [] expenses (*i.e.*, column C);
> (3) expenses related to home market (Korea) sale activities (*i.e.*,
> column D); (4) direct expenses incurred for sales to the United States
> (reported in Zinus U.S.' sales database) (*i.e.*, Column E); (5) direct
> expenses on exports to countries other than the United States (*i.e.*,
> Column F); and (6) expenses only associated with Zinus Korea's
> business operations (*i.e.*, Column G).

Second Remand Redetermination at 18, 20–21; Pl.'s Suppl. Questionnaire Resp. at

Ex. RS-7.  Plaintiff excluded the expenses from its total expense pool during the

period of investigation and identified the portion of its total selling expenses

related to global sales operations, which involved multiple subsidiaries of Zinus

Korea.  Second Remand Redetermination at 18; Pl.'s Suppl. Questionnaire Resp. at

Ex. RS-7.  Plaintiff allocated the total global sales expenses between the various

subsidiaries based on their respective unconsolidated sales revenue and calculated

an indirect selling expenses ratio of Zinus Indonesia's mattresses in the United

States of less than one percent.  Second Remand Redetermination at 18; Pl.'s

Suppl. Questionnaire Resp. at Ex. RS-7.  The ratio was applied to the gross unit

prices reported in Plaintiff's U.S. sales database to determine a new expense

variable.  Second Remand Redetermination at 18; Pl.'s Suppl. Questionnaire Resp.

at Ex. RS-7.  The variable was incorporated into Commerce's margin calculation but did not impact the margin result.  <u>Second Remand Redetermination</u> at 18. Commerce determined that Zinus Korea had only a limited role in the U.S. sale of Zinus Indonesia's mattresses during the period of investigation.  <u>Id.</u> at 21.

Defendant-Intervenors contend that another remand of this issue is appropriate for three reasons.  First, Defendant-Intervenors argue that Commerce improperly excluded certain categories of expenses incurred by Zinus Korea on behalf of Zinus Indonesia and deviated from prior practice.  Def.-Intervs.' Br. at 17–21.  Second, Defendant-Intervenors contend that Plaintiff's allocation methodology is "nonsensical" and distortive.  <u>Id.</u> at 21–23.  Third, Defendant-Intervenors argue that Commerce treated Zinus Korea's indirect selling expenses as in-country selling expenses incurred by Zinus Indonesia.  <u>Id.</u> at 23–24.

### A.    Exclusion of Zinus Korea's Expenses

In the <u>Second Remand Redetermination</u>, Commerce explained that "Zinus Korea is a trading company, not a production entity, such that the [general and administrative] expenses it incurs at its headquarters in Seoul, South Korea, are not production-related."  <u>Second Remand Redetermination</u> at 22.  Defendant-Intervenors argue that this justification is inconsistent with prior determinations by Commerce and U.S. Court of International Trade decisions that have held that general and administrative expenses are those expenses that relate to the general

operations as a whole rather than to the production process. Def.-Intervs.' Br. at

20 (quoting Prestressed Concrete Steel Wire Strand From Tunisia, 86 Fed. Reg.

18,508 (Dep't of Commerce Apr. 9, 2021)) (final affirmative determination of

sales at less than fair value)); see also U.S. Steel Grp. v. United States, 22 CIT 104,

106, 998 F. Supp. 1151, 1154 (1998). Defendant concedes that Commerce's

language was imprecise but argues that Commerce's application was consistent

with its existing practice. Def.'s Br. at 16–17.

　　　Zinus Indonesia submitted additional information to Commerce regarding

"Zinus Korea's sales-related activities, invoicing system, and all indirect selling

expenses incurred by Zinus Korea associated with Zinus Indonesia's U.S. sales."

Second Remand Redetermination at 15; see Pl.'s Suppl. Questionnaire Resp.

Defendant-Intervenors have not identified any record evidence that contradicts the

validity of this data or suggests that particular expenses were improperly excluded

based on a determination that they were related to production rather than sales.

See Def.-Intervs.' Br. at 17–21.

　　　In the Second Remand Redetermination, Commerce considered Zinus

Indonesia's Supplemental Questionnaire Response and other financial documents

provided by Zinus Indonesia. Second Remand Redetermination at 16–23. With

respect to Zinus Indonesia's invoicing, Commerce observed that a small number of

Zinus Korea employees were involved in receiving invoices from Zinus Indonesia

and forwarding the invoices to customers in the United States.  Second Remand
Redetermination at 15; see Pl.'s Suppl. Questionnaire Resp. at 1.  Commerce noted
that these employees had other responsibilities for Zinus Korea and other Zinus
Korea affiliates and spent only a portion of their time on Zinus Indonesia's
invoicing.  Second Remand Redetermination at 15; see Pl.'s Suppl. Questionnaire
Resp. at 1.  Commerce also observed that Zinus Korea's role was limited to
receiving and forwarding invoices and that Zinus Korea processed orders only
once a month.  Second Remand Redetermination at 16; see Pl.'s Suppl.
Questionnaire Resp. at 1–3, 9.

　　　　With regard to other services performed by Zinus Korea, Commerce
determined that Zinus Korea's United States customer requested defective
allowances once per year.  Second Remand Redetermination at 16 (citing Pl.'s
Suppl. Questionnaire Resp. at Ex. RS-5 at # 3-1).  Commerce further determined
that a small number of Zinus Korea employees were involved in certain sales
promotion programs to customers in the United States, but only one of those
programs, pertaining to one customer, was in operation during the period of
investigation.  Id. at 16–17; see Pl.'s Sec. C Questionnaire Resp. at Ex. C-13.
Commerce also considered documents related to the sales functions performed by
Zinus Indonesia and Zinus U.S.  Second Remand Redetermination at 17 (citing
Pl.'s Suppl. Questionnaire Resp. at Ex. RS-5 at ## 7–9).

Commerce reviewed the worksheet provided by Zinus Indonesia reconciling the indirect selling expenses incurred by Zinus Korea with Zinus Korea's financial statements. Second Remand Redetermination at 18, 20–21; Pl.'s Suppl. Questionnaire Resp. at Ex. RS-7. Zinus Korea provided a breakdown of its total selling expenses pool by account code and calculated the portion of its total expenses related to global sales by its subsidiaries. Second Remand Redetermination at 18. A portion of Zinus Korea's global selling expenses was allocated to Zinus Indonesia based on Zinus Indonesia's total unconsolidated revenue relative to the combined total unconsolidated sales revenue of all of Zinus Korea's subsidiaries. Id. at 19. The resulting value was used to calculate Zinus Indonesia's indirect selling expense ratio and a per unit value. Id.

The only argument offered by Defendant-Intervenors to challenge the data provided by Zinus Indonesia was that the worksheet provided by Zinus Indonesia on remand breaking down Zinus Korea's expenses included within its excluded expenses two cost centers with titles suggesting a role in global business operations. Def.-Intervs.' Br. at 17–21. Defendant-Intervenors contend that because Zinus Indonesia acknowledged in its questionnaire responses to Commerce that Zinus Korea and its subsidiaries "closely coordinate with one another to manage global manufacturing, operational, and sales activities," that the identified expenses should be attributed to Zinus Korea's general and

administrative expenses due to its role as a parent company.  Id. at 18–19 (citing Pl.'s Sec. A Questionnaire Resp. at A-11).  This argument amounts to nothing more than speculation on behalf of Defendant-Intervenors.

Zinus Indonesia provided additional information on its sales-related activities, invoicing system, and indirect selling-expenses incurred by Zinus Korea in response to Commerce's request on remand.  Based on the best available information on the record, Commerce allocated selling expenses in order to calculate a dumping margin.  Second Remand Redetermination at 19.  Defendant-Intervenors have identified no record evidence challenging Zinus Indonesia's reporting.  For these reasons, the Court concludes that Commerce properly excluded expenses incurred by Zinus Korea on behalf of Zinus Indonesia and its determination was supported by substantial evidence.

### B.    Allocation Methodology

Defendant-Intervenors argue that Plaintiff's methodology for allocating expenses to Zinus Korea was distortive.  Def.-Intervs.' Br. at 22–23.  Defendant-Intervenors contend that Commerce's allocation ratio divided an expense improperly that did not include intercompany transactions by a total revenue that did include intercompany transactions.  Id.

In calculating a constructed export price, Commerce begins with "the price at which the subject merchandise is first sold (or agreed to be sold) in the United

States before or after the date of importation" and makes certain statutory

adjustments. 19 U.S.C. § 1677a(b), (d). Among the reductions expressly provided

by statute is the amount of selling expenses "incurred by or for the account of the

producer or exporter, or the affiliated seller in the United States, in selling the

subject merchandise." Id. § 1677a(d). In allocating selling expenses, Commerce

must adopt an allocation method that does not result in inaccuracies or distortions.

19 C.F.R. § 351.401(g)(1).

In the Second Remand Redetermination, Commerce explained its allocation

methodology as:

> [u]sing the sales revenues of each entity as a basis for deriving an
> allocation ratio to apply to [Zinus Korea's] total selling expenses is an
> appropriate allocation method for purposes of determining [Zinus
> Korea's] indirect selling expenses associated with sales of subject
> merchandise produced by Zinus Indonesia and sold through [Zinus
> Korea] to the United States during the [period of investigation]. The
> record demonstrates that Zinus Korea's expenses do not include
> expenses incurred by other related companies. Similarly, the sales
> revenue figures are unadjusted for intercompany transactions.
> Therefore, it would be nonsensical to calculate an allocation ratio by
> dividing an expense that does not include intercompany transactions by
> a sales revenue figure that does factor in such transactions.

Second Remand Redetermination at 22. Defendant argues that Commerce erred in

stating that "[t]he record demonstrates that Zinus Korea's expenses do not include

expenses incurred by other related companies" and that Commerce's calculations

actually included intercompany transactions in both the numerator and

denominator of the allocation ratio. Def.'s Br. at 20–21. Defendant cites Exhibit
RS-7 to Zinus Indonesia's Supplemental Questionnaire Response in support of its
contention. Id. (citing Pl.'s Suppl. Questionnaire Resp. at Ex. RS-7). Defendant
notes that the amount reconciliation worksheet reconciles Zinus Korea's total
selling, general, and administrative expenses to the financial statements without an
adjustment to remove intercompany transactions. Id. at 21 (citing Pl.'s Suppl.
Questionnaire Resp. at Ex. RS-7; Pl.'s Sec. A Questionnaire Resp. at A11(d)(1) at
8). Defendant also notes that intercompany transactions were not among the
categories of expenses excluded by Plaintiff. Id. at 22 (citing Pl.'s Suppl.
Questionnaire Resp. at 20–21). Based on this documentation, Defendant contends
that Commerce did include intercompany transfers in the numerator of the
allocation ratio and that doing so was necessary because the record did not contain
sufficient data to allow for intercompany transfers to be excluded from the
denominator. Id.

Although Commerce stated that "[t]he record demonstrates that Zinus
Korea's expenses do not include expenses incurred by other related companies,"
the subsequent sentences and the data relied upon indicate that Commerce utilized
data that included intercompany transfers for both the numerator and denominator
of the allocation ratio. See Second Remand Redetermination at 22; Pl.'s Suppl.
Questionnaire Resp. at Ex. RS-7; Pl.'s Sec. A Questionnaire Resp. at A11(d)(1) at

8.  Because intercompany transactions were included in both the numerator and

denominator of the allocation ration, the approach is not distortive to the

constructed export price calculation.  See 19 C.F.R. § 351.401(g).  Therefore, the

Court concludes that Commerce's methodology is reasonable and supported by

substantial evidence.

### C.    Treatment of Zinus Korea's Expenses as In-Country Expenses

Defendant-Intervenors argue that Commerce treated Zinus Korea's indirect

selling expenses improperly as in-country selling expenses incurred by Zinus

Indonesia.  Def.'s Br. at 23–24.

In the Second Remand Redetermination, Commerce treated U.S. indirect

selling expenses incurred in Korea and U.S. indirect selling expenses incurred in

Indonesia the same in calculating the dumping margin.  Second Remand

Redetermination at 22–23.  Commerce explained that its "general practice is to

treat such expenses as foreign indirect selling expenses (*i.e.*, the same as indirect

selling expenses incurred in the country of manufacture)."  Id. at 23 (citing Certain

Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy, 87 Fed.

Reg. 71 (Dep't of Commerce Jan. 3, 2022) (final admin. determination), and

accompanying Issues and Decisions Memorandum at comment 4).

Commerce is obligated to treat similar situations in a consistent manner and must reasonably explain any deviation from an established practice.  See SKF USA, Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." (internal citation omitted)); M.M. & P. Mar. Advancement, Training, Educ. & Safety Program v. Dep't of Commerce, 729 F.2d 748, 755 (Fed. Cir. 1984) ("An agency is obligated to follow precedent, and if it chooses to change, it must explain why."); Cinsa, S.A. de C.V. v. United States, 21 CIT 341, 349, 966 F. Supp. 1230, 1238 (1997) ("Commerce can reach different determinations in separate administrative reviews but it must employ the same methodology or give reasons for changing its practice.").

In the Second Remand Redetermination, Commerce explained that its "general practice" is to "calculate foreign indirect selling expenses as the sum of the respondent's indirect selling expenses in its own country and the indirect selling expenses of its third country affiliates."  Second Remand Redetermination at 23.  Commerce took the same position in the prior administrative review of Mattresses from Indonesia.  Mattresses From Indonesia, 88 Fed. Reg. 85,240 (Dep't of Commerce Dec. 7, 2023) (final results of antidumping duty administrative review; 2020–2022) and accompanying issues and decisions memorandum at comment 6 ("For [constructed export price] sales, we continued to

treat [Zinus Korea's indirect selling expenses] in the same manner as indirect selling expenses incurred in the domestic market (DINDIRSU) in the margin program, both of which represent expenses incurred on behalf of the U.S. sales in either the country of manufacture or third country.").

In Certain Cold-Drawn Mechanical Tubing and Alloy Steel from Italy, Commerce treated the indirect selling expenses reported for two of the respondent's foreign affiliates as indirect selling expenses incurred in the country of manufacture and explained its:

> general practice [] to treat such expenses as foreign indirect selling expenses (*i.e.*, the same as indirect selling expenses incurred in the country of manufacture). Specifically, we calculate foreign indirect selling expenses as the sum of the respondent's indirect selling expenses in its own country and the indirect selling expenses of its third country affiliates.

Second Remand Redetermination at 23 (citing Certain Cold-Drawn Mechanical Tubing and Alloy Steel from Italy, 87 Fed. Reg. 71 (Dep't of Commerce Jan. 3, 2022) (final results of antidumping administrative review; 2019–2020), and accompanying issues and decisions memorandum at comment 4). Commerce applied the same practice in Dioctyl Terephthalate from the Republic of Korea. See Dioctyl Terephthalate from the Republic of Korea, 82 Fed. Reg. 28,824 (Dep't of Commerce June 26, 2017) (final determination of sales at less than fair value and final negative determination of critical circumstances), and accompanying

issues and decisions memorandum at comment 5 ("Thus, for this final

determination, we have continued to calculate indirect selling expenses incurred in

the country of manufacture for AKP's U.S. sales as the sum of the [indirect selling

expenses] incurred in AKP and its third-country affiliates.").

An established agency practice exists "when a uniform and established

procedure exists that would lead a party, in the absence of notification of a change,

reasonably to expect adherence to the [particular action] or procedure." SeAH

Steel VINA Corp. v. United States, 40 CIT __, __, 182 F. Supp. 3d 1316, 1327

(2016) (quoting Huvis Corp. v. United States, 31 CIT 1803, 1811, 525 F. Supp. 2d

1370, 1378 (2007)).  In its submissions to Commerce, Zinus Indonesia expressed

its expectation that reported indirect selling expenses would be "treated in the same

manner as indirect selling expenses incurred in the domestic market."  Pl.'s Suppl.

Questionnaire Resp. at 12.  Based on Commerce's prior actions, including

consistent determinations that created Zinus Indonesia's expectation upon which it

reasonably relied, the Court finds that Commerce has an established practice to

treat U.S. indirect selling expenses incurred by a third-country affiliate the same as

U.S. indirect selling expenses incurred in the country of manufacture.

In Commerce's margin calculation, U.S. indirect selling expenses incurred

in the country of manufacture were reflected in the field DINDIRSU.  Calculation

Mem.  In the Final Results Calculation Memorandum, Commerce explained that

Zinus Indonesia's reporting included a new variable, DINDIRS2U, "representing indirect selling expenses incurred in Korea." Id. at 2. To calculate DINDIRS2U, Zinus Indonesia allocated a portion of Zinus Korea's total expense pool related to its global sales for all subsidiaries to Zinus Indonesia's operations, based on total combined unconsolidated sales revenue. Second Remand Redetermination at 18–19. The resulting expense figure was divided by the total sales of Zinus Indonesia's mattresses to the United States to calculate an indirect selling expense ratio for U.S. sales made by Zinus Indonesia. Id. at 19. The selling expense ratio was then multiplied by the gross unit prices reported in the U.S. sales database to obtain the pre-unit figures reported in DINDIRS2U. Id. Commerce added the DINDIRS2U variable to DINDIRSU in its margin calculation. Calculation Mem. at 2; Second Remand Redetermination at 23. The Court concludes that Commerce's treatment of Zinus Korea's U.S. indirect selling expenses as U.S. indirect selling expenses incurred in Indonesia was consistent with its established practice.

Defendant-Intervenors argue that following Commerce's normal practice is unreasonable in this case because Zinus Korea did not have sales of subject mattresses to the home market or to third-country markets during the period of investigation and any indirect expenses occurred were necessarily related to sales within the United States. Def.-Interv.'s Br. at 23–24. Defendant contends that

because Commerce's standard margin calculation did not include indirect selling expenses in the country of manufacture in the calculation of U.S. price or normal value, the expenses incurred by Zinus Korea were effectively ignored.  Id.

In calculating constructed export price, Commerce makes adjustments to the price at which goods are sold, or agreed to be sold, for exportation to the United States in order to achieve a fair comparison between U.S. price and foreign market value.  19 U.S.C. § 1677a(b)–(d).  Zinus Korea's indirect selling expenses were incurred during the sale of the subject mattresses and excluding them from Commerce's constructed export price calculation would have distorted the comparison between U.S. price and the foreign market value of the goods. Commerce's statement that inclusion of the DINDIRS2U variable with U.S. indirect selling expenses incurred in the country of manufacture "had no effect on the margin results" did not mean that the data was ignored, merely that it had an inconsequential impact on the calculation as a whole.  See Second Remand Redetermination at 19.  Because Commerce's inclusion of Zinus Korea's U.S. indirect selling expenses with Zinus Indonesia's in-country U.S. indirect selling expenses was reasonable and consistent with Commerce's established practice, the Court concludes that Commerce's determination was in accordance with law.  For the reasons discussed above, the Court sustains Commerce's treatment of Zinus Korea's selling expenses.

## CONCLUSION

For the foregoing reasons, the Court sustains Commerce's <u>Second Remand Redetermination</u> as supported by substantial evidence and in accordance with law. Accordingly, it is hereby

**ORDERED** that the <u>Final Results of Redetermination Pursuant to Court Remand</u>, ECF Nos. 87-1, 87-2, are sustained.

Judgment will be entered accordingly.

                     <u>/s/ Jennifer Choe-Groves</u>
                     Jennifer Choe-Groves, Judge

Dated:   <u>February 18, 2025</u>
       New York, New York

A-560-836
Remand
Slip Op. 24-19
Investigation
~~Business Proprietary Document~~
E&C/OVIII: BS/KJ
**PUBLIC VERSION**

***PT Zinus Global Indonesia and Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO v. United States***
**Consol. Court No. 21-00277, Slip Op. 24-19 (CIT February 20, 2024)**
**Mattresses from Indonesia**

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the second remand order of the U.S. Court of International Trade (the Court) in *PT Zinus Global Indonesia and Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO v. United States*, Consol. Court No. 21-00277, Slip Op. 24-19 (CIT February 20, 2024) (*Second Remand Order*).  These final results of redetermination concern the final determination in the less-than-fair-value investigation of mattresses from Indonesia.[1]

In the *Second Remand Order*, the Court remanded, in part, Commerce's *Final Determination* to reconsider or further address the following issues:

---

[1] *See Mattresses from Indonesia:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 15899 (March 25, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

(1) The Court suggested that Commerce should consider reopening the record to address the missing sales data, inventory, and in-transit mattress issues.[2]

(2) The Court concluded that remand is appropriate to correct the existing deficiencies and contradictions in the record with respect to Zinus Inc.'s (Zinus Korea) selling functions.[3]

On April 19, 2024, we released the Draft Remand Results to interested parties for comment.[4]  On April 26, 2024, we received comments from the petitioners[5] and PT Zinus Global Indonesia (Zinus Indonesia).[6]

## II.    BACKGROUND

On March 6, 2024, Commerce issued a remand questionnaire to Zinus Indonesia.[7]  This questionnaire requested model-specific information for Zinus, Inc.'s (Zinus U.S.) mattresses held in its physical inventory at the beginning of the period of investigation (POI) and mattresses in-transit as of the last date of the POI, as well as documentation showing how these requested data reconciled to Zinus U.S.' financial statement and accounting records.  The questionnaire also requested information pertaining to Zinus Korea's selling expenses, *i.e.*, sales-related activities, invoicing system, and all indirect selling expenses incurred by Zinus Korea associated with

---

[2] *See Second Remand Order* at 13-14.
[3] *Id*. at 16-17.
[4] *See* Draft Results of Remand Redetermination, *PT Zinus Global Indonesia and Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO v. United States*, Consolidated Court No. 21-00277 (CIT February 20, 2024), dated April 19, 2024 (Draft Remand Results).
[5] The petitioners are Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc, Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, the petitioners).
[6] *See* Petitioners' Letter, "Mattress Petitioners' Comments on the Department's Draft Results of Redetermination," dated April 26, 2024 (Petitioners' Comments); and Zinus' Letter, "Zinus' Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand," dated April 26, 2024 (Zinus' Comments).
[7] *See* Commerce's Letter, "Supplemental Questionnaire," dated March 6, 2024 (Remand Questionnaire).

Appx00043

Zinus Indonesia's U.S. sales.  On March 20, 2024, Zinus Indonesia submitted its response to Commerce's questionnaire,[8] and the petitioners submitted rebuttal comments on April 2, 2024.[9]

## III.    REMANDED ISSUES

### Issue 1:  Mattresses In-Transit

*Background*

Commerce included in its analysis the mattresses of Indonesian origin produced by Zinus Indonesia which were purchased by Zinus U.S. during the POI (*i.e.*, January 1, 2019, through December 31, 2019), but had not yet been imported by Zinus U.S.  The record showed that Zinus U.S. made more constructed export price (CEP) sales of subject mattresses "out of inventory" during the POI than were actually contained in the warehouse, indicating that some mattresses that were in transit to the United States were sold during the POI.  The Court remanded to Commerce for further consideration and explanation its determination to include in-transit mattresses in the calculation of CEP.

*Analysis*

In the first remand, Commerce kept the in-transit purchase quantity (*i.e.*, [***] mattresses) in the quarterly ratio calculation.  To reach this conclusion, Commerce included any Zinus Indonesia model that fell within the scope of the less-than-fair-value (LTFV) investigation of mattresses from Indonesia (investigation scope) whether or not produced in Indonesia, which included all mattress model numbers produced by Zinus Indonesia and any models that met the investigation scope but were produced by Zinus Korea's affiliates in other countries.  Such data

---

[8] *See* Zinus Indonesia's Letter, "Zinus' Remand Supplemental Questionnaire Response," dated March 20, 2024 (Remand Response).
[9] *See* Petitioners' Letter, "Resubmission of Mattress Petitioners' Rebuttal Comments on Zinus' Supplemental Questionnaire Response on Remand," dated April 2, 2024.  Petitioners originally submitted rebuttal comments on March 27, 2024.  *See* Commerce's Letter, "Rejection of New Argument in Rebuttal Comments," dated March 29, 2024.

Appx00044

showed that the quantity of Zinus U.S.' CEP inventory sales of Indonesian mattress model numbers and mattresses from other Zinus affiliates meeting the investigation scope during the POI (as reported in Zinus U.S.' sales reconciliation chart)[10] (*i.e.*, [***] mattresses) was greater than Zinus U.S.' purchases of all mattresses sold from inventory meeting the investigation scope regardless of country of origin during the POI (*i.e.*, [***]).  Given that Zinus U.S.' CEP inventory sales of mattress model numbers meeting the investigation scope were greater than its POI purchases of such mattress model numbers sold from inventory by [***], Commerce concluded that the difference must be accounted for by adding an amount for in-transit Indonesian mattress model numbers to the purchase quantity.  Only by making this adjustment to the purchase quantity would the purchase quantity support the sales quantity.

To determine the in-transit quantity of Indonesian mattress model numbers, Commerce took the difference between the quantity of Indonesia-origin mattresses that Zinus Korea sold to Zinus U.S. through the CEP inventory channel during the POI (*i.e.*, [***]) and the quantity of Indonesia-origin mattresses Zinus U.S. indicated it received in its warehouse from Zinus Korea through the CEP inventory channel during the POI (*i.e.*, [***]).[11]  Commerce treated the resulting quantity difference (*i.e.*, [***]) as the in-transit quantity and allocated it proportionally to each of the three applicable quarters during which Zinus U.S. sold Indonesian- origin mattresses out of inventory during the POI.  As a result, the total purchase quantity reflected in Exhibit SA-5 changed from [***] to [***] mattresses in the quarterly ratio calculation.[12]

---

[10] *See* Zinus Indonesia's Letter, "Zinus' Section C Questionnaire Response," dated July 14, 2020 (Zinus Indonesia's CQR), at Exhibit C-2B.

[11] *Id*. at Exhibit C-2A; *see also* Zinus Indonesia's Letter, "Zinus' Section A Supplemental Questionnaire Response," dated August 20, 2020 (Zinus Indonesia's SAQR), at Exhibit SA-5.

[12] *See* Petitioner's Letter, "Mattress Petitioners' Comments Concerning the Preliminary Determination," dated August 20, 2020, at 16.

4

Commerce's margin program then applied the quarterly ratios to the sales quantities Zinus U.S. reported for its U.S. CEP inventory sales. Specifically, for each sales transaction within a particular quarter, the SAS program applied the ratio applicable to that quarter to that sales transaction and adjusted the reported quantity for that sales transaction, accordingly. Commerce applied the quarterly ratios to only Zinus U.S.' CEP inventory sales transactions because it determined Zinus U.S.' first-in, first-out method of sales reporting could not properly account for the country of origin of the mattresses it sold from inventory, and in particular, Indonesia-specific model numbers sourced from multiple countries, which is a methodology that this Court has already affirmed.

Based on the available data on the record for the *Final Determination,* Commerce included the in-transit quantity in the quarterly ratio calculation to ensure that Zinus U.S.' reported quantity of Indonesian-origin mattresses sold through inventory during the POI was supported by the quantity of purchases of Indonesia-origin mattresses Zinus U.S. sold through its inventory during the POI.[13]

The Court remanded this issue to Commerce. The Court stated that it is not evident that Commerce requested information from Zinus Indonesia or Zinus U.S. about the missing sales data and suggested that Commerce should consider reopening the record to address the missing sales data, inventory, and in-transit mattress issues. On remand, we issued to Zinus Indonesia a questionnaire requesting it provide: (1) Zinus U.S.' quantity of mattresses in inventory at the beginning of the POI and its purchase quantity of in-transit CEP inventory mattresses at the end of the POI both on a model-specific and aggregate basis; and (2) documentation to support the

---

[13] *See Final Determination* IDM at Comment 1; *see also* Memorandum, "Final Determination Margin Calculation for Zinus," dated March 18, 2021.

model-specific and aggregate quantity amounts of mattresses in inventory at the beginning of the POI and mattresses in-transit at the end of the POI.[14]

These data are summarized in Attachment 1.[15]  Taking these data into account, Chart 2 of Attachment 1 demonstrates that Zinus U.S.' total inventory of relevant mattresses during the POI was sufficient to support its mattress sales during the POI.  With respect to the aggregate calculation, specifically, taking into account the beginning inventory and in-transit purchase data in Exhibits RS-10 and RS-11 of Zinus Indonesia's Remand Response, Chart 2 shows that Zinus U.S. had [***] mattresses[16] in its physical inventory to support a [***] mattress sales quantity[17] from inventory during the POI.  Similarly, Chart 1 in the Attachment shows on a model-specific level that Zinus U.S.' total inventory quantity of Indonesia model numbers that either were in common with other countries or were unique to Indonesia was sufficient to  support its sales of such mattresses during the POI.  Specifically, Chart 2 shows that Zinus U.S. had [***] mattresses[18] with Indonesia model numbers that either were in common with other countries or were unique to Indonesia.  Moreover, this [***] inventory quantity was more than sufficient to support the [***] sales quantity of Indonesia mattress model numbers.

Finally, Zinus U.S.' accounting records clearly demonstrate that the in-transit quantity of Indonesian mattress model numbers (*i.e.*, [***]) did not enter Zinus U.S.' inventory during

---

[14] *See* Remand Questionnaire at 5.

[15] *See* Memorandum, "Draft Remand Results Calculation Memorandum for PT Zinus Indonesia (Zinus Indonesia)," dated April 18, 2024 (Draft Remand Calculation Memorandum); *see also* Memorandum, "Final Remand Results Calculation Memorandum for PT Zinus Global Indonesia," dated May 17, 2024 (Final Remand Calculation Memorandum).

[16] This figure includes the [***] beginning inventory amount from the Remand Response at Exhibit RS-10 and the [***] purchase quantity amount from Zinus Indonesia's SAQR at Exhibit SA-5.

[17] This figure represents the Zinus U.S.' sales of merchandise under consideration sold through the CEP inventory channel during the POI.  *See* Zinus Indonesia's CQR at Exhibit C-2B.

[18] This figure includes the [***] beginning inventory amount (for Indonesia mattress model numbers of Chinese-origin) from the Remand Response at Exhibit RS-10, the [***] purchase quantity amount (for Indonesia mattress model numbers in common with other countries), and the [***] purchase quantity amount (for Indonesian mattress model numbers unique to Indonesia) from Zinus Indonesia's SAQR at Exhibit SA-5.

6

the POI and Zinus U.S. had sufficient inventory at the beginning of the POI to make up the difference between its sales and purchases with respect to the co-mingled model numbers in common with the Indonesian model numbers.[19]

Consequently, if the [***] in-transit mattress quantity of Indonesia-origin mattresses did not enter Zinus U.S.' inventory during the POI, and the sum of Zinus U.S.' beginning inventory quantity and purchased quantity of mattresses entering its inventory during the POI is greater than its inventory sales of Indonesia mattress model numbers during the POI, then there is no longer a basis to include the in-transit quantity in the quarterly ratio calculation.

As noted above, the quarterly ratio calculation was based on Zinus U.S.' purchases of mattresses from all countries sold from its inventory during the POI.  In other words, except for adding the in-transit purchase quantity of Indonesia-origin mattresses into the quarterly ratio calculation, the remaining purchase data used in the pre-existing quarterly ratio calculation includes all purchases of mattresses that met the investigation scope regardless of country of origin and is not limited to just purchases of Indonesian mattress models numbers that are in common with other countries or were unique to Indonesia.  The data on the record permits Commerce to recalculate the quarterly ratios based solely on the purchase data of specific model numbers that Zinus U.S. purchased from Indonesia.[20]

By limiting the purchase quantity data to just the Indonesia mattress model numbers Zinus Indonesia produced during the POI, we are accounting for only the model numbers produced by Zinus Indonesia and reported as CEP inventory sales during the POI reflecting

---

[19] *See* Remand Response at Exhibit RS-11.
[20] *See* Draft Remand Calculation Memorandum.

Appx00048

Zinus Indonesia's actual production experience.  Attachment 2 shows the revised quarterly ratio calculations that incorporate the monthly purchase data for Indonesian model numbers.[21]

Initially, we concluded that removing the in-transit quantity from the quarterly ratio calculation and basing the calculation on just the Indonesian model number purchase data would theoretically provide a more accurate result, because it eliminates mattresses made in other countries by Zinus Indonesia affiliates which fit the investigation scope language but which Zinus Indonesia did not produce or sell during the POI, as well as mattresses held in inventory that did not share the same model numbers as mattresses produced by and purchased from Zinus Indonesia during the POI.  However, after considering the comments received from the parties on our draft results of redetermination, we have revised the quarterly ratios we calculated for the draft remand to include not just the purchase data but also the existing inventory data for Indonesian model numbers in common with other countries.  As further explained below, applying quarterly ratios calculated using only the Indonesian mattress models purchased during the POI and applying those ratios to the total sales reported in both U.S. sales databases[22] yields an impossible result - a total sales quantity of Indonesian mattresses (*i.e.*, [***]) that is [***] greater than the [***] Indonesian-sourced mattresses that Zinus US purchased from Zinus Korea and which Zinus US had available for sale from its inventory during the POI.  On the other hand, applying quarterly ratios that are based on both the purchase and existing

---

[21] The purchase data on a model-specific and country-of-origin basis is included in Zinus Indonesia's SAQR at Exhibit SA-5.  Zinus' Section C Supplemental Questionnaire dated September 28, 2020, at Exhibit SC2-1 (Zinus Indonesia's Section SCQR) provides the purchase data in Exhibit SA-5 also on a month-specific basis.  The monthly purchase data in Exhibit SC2-1 is necessary for calculating the quarterly ratios.  *See also*, Draft Remand Calculation Memorandum, and Final Remand Calculation Memorandum.

[22] Zinus Indonesia submitted two U.S. sales databases.  One of these sales databases included Zinus U.S.'s POI sales of subject merchandise, *i.e.*, mattresses sourced from Indonesia (along with the subject merchandise sales reported for other Zinus entities related to Zinus Indonesia), whereas the other sales database included Zinus U.S.'s POI sales of non-subject merchandise, *i.e.*, mattresses with Indonesian model numbers that were sourced from countries other than Indonesia.

Appx00049

inventory data of Indonesia model numbers to the total sales reported in both U.S. sales databases yields <u>possible</u> results - a total sales quantity that is less than the quantity of Indonesian-sourced mattresses that Zinus US had in its inventory and available for sale during the POI.

*Zinus' Comments on the Draft Remand Results*:

The following is a verbatim summary of argument submitted by Zinus. For further details, *see* Zinus' Comments at 3-19.

> There are two remaining issues in this litigation. First, whether {Commerce's} inclusion of mattresses in transit as facts otherwise available in the calculation of the quantity of subject {CEP} inventory sales was in accordance with law and supported by substantial evidence. As {Commerce} correctly recognizes in its Draft Remand Results, the record now definitively proves that (1) Zinus held mattresses in inventory at the start of the {POI}, and (2) the mattresses that remained in-transit from Indonesia to the United States at the end of the POI could not have been sold out of U.S. inventory during the POI. Thus, excluding the in-transit mattresses from {Commerce's} analysis of subject mattresses sold from Zinus' U.S. inventory is reasonable, lawful, and supported by substantial evidence, and thereby sufficient to comply with the court's Second Remand Order. There is no reason for {Commerce} to adopt Petitioners' unreasonable proposal for new quarterly ratio calculations that are even more distortive than their initial quarterly ratios (which {Commerce} relied on in the underlying investigation).
>
> As demonstrated herein, the new quarterly ratio calculations utilized in {Commerce's} Draft Remand Results are deeply flawed, resulting in an impossible number of Indonesian-origin CEP inventory sales. The adopted new methodology is decidedly not "more accurate" than its original methodology and it should not be used in {Commerce's} final remand determination. Rather, in its final remand determination, {Commerce} should either simply update its original calculations to remove end of period in-transit merchandise (which would fully address the Court's concerns expressed in the Second Remand Order), or revise its calculation methodology to consider Zinus' purchases and its inventory, which would be consistent with the further developed record in this remand proceeding, and would avoid the obvious problems with {Commerce's} /Petitioners' ratios used in the Draft Remand Results. Proceeding with the calculations in the Draft Remand will simply set this litigation up to proceed to a third remand proceeding.

Appx00050

*Petitioners' Comments on the Draft Remand Results*:

The following is a verbatim summary of argument submitted by the petitioners. For further details, *see* Petitioners' Comments at 4-13.

> The following comments address two issues. In Section II, Mattress Petitioners explain why the quarterly ratio methodology applied in the draft remand results are reasonable and fully addressed the Court's concerns about gaps in the record related to in-transit mattresses. In its prior determination, the Court upheld the purchase-based quarterly ratio methodology as a "valid" approach to deal with Zinus' inability to accurately identify the country of origin of Zinus US' commingled CEP inventory sales. New record data confirming that Zinus US had mattresses in inventory at the start of the period of investigation does not change this fact, nor does it require {Commerce} to remove in-transit mattresses from the quarterly ratio calculations as, regardless of their location, in-transit mattresses were part of Zinus US' purchases from Zinus Korea during the {POI}. However, {Commerce's} determination to remove both in-transit mattresses as well as other mattresses that could not have been of Indonesian origin from the quarterly ratio calculations is nonetheless a reasonable approach to address the Court's specific concerns. Any attempt to reintroduce the FIFO (or any other inventory based) methodology, whether directly or through revised quarterly ratios, defeats the entire purpose of the quarterly ratios, which are reasonable precisely because they are rooted in known, verifiable purchase data rather than unknown assumptions about inventory movements.

**Commerce's Position:** The purpose of this remand redetermination is to consider all the information on the record and to be responsive to the Court's directions by providing a well-reasoned decision on this issue that is supported by the record evidence. First, the information we requested from Zinus Indonesia for this remand, namely Zinus U.S.'s model-specific beginning inventory and in-transit sales data and supporting accounting records, established the following two very important facts that directly impact the accuracy and reliability of the quarterly ratio calculation performed in the *Final Determination*:

(1) The quantity of [***] in-transit Indonesian mattresses models that Zinus Korea sold to

Zinus U.S. during the POI <u>never entered</u> Zinus U.S.'s inventory during the POI; and

(2) Zinus U.S. had a sufficient number of the Indonesia model numbers that were in common with other countries in its physical inventory to support the U.S. sales of such products reported as non-subject merchandise in its U.S. sales database.

Commerce cannot simply disregard this information in good faith as the petitioner suggests Commerce should do. More importantly, given that the beginning inventory and purchase data are now well-established and documented on this record, these data must be incorporated in the quarterly ratio calculation. Otherwise, as now is evident in the results reflected in Attachment 3 of the Final Remand Calculation Memorandum, if only the purchase data are considered and used as a basis to derive quarterly allocation ratios and those ratios are then applied to the total quantity of Zinus U.S.'s reported U.S. sales of Indonesia mattress model numbers, this calculation yields impossible results. Specifically, as Attachment 3 demonstrates, the quarterly ratio calculation (based on purchase data only) that we calculated for the draft remand results generates an Indonesia sales quantity that is [***] greater than the total purchase quantity of Indonesian-origin mattresses Zinus U.S. had in its physical inventory during the POI.[23] Equally important, the respondent also illustrates this impossibility on a model-number-specific basis in its draft remand comments for sales of one of its largest volume model numbers reported in the U.S. sales databases.[24] Specifically, Zinus Indonesia shows that in applying the quarterly ratios as revised for the draft remand results to its sales of model number [***], the quarterly ratios generate a sales quantity of [***] mattresses of Indonesian-origin, when in fact Zinus U.S. only purchased and had in its inventory during the POI [***] Indonesian- sourced mattresses of this model number.[25] While we recognize that applying the quarterly

---

[23] *Id.*

[24] *See* Zinus' Comments at 14-15.

[25] *Id.*

Appx00052

ratios to all of Zinus U.S.'s reported CEP inventory sales will impact some Indonesia mattress models in such a way that their total adjusted sales quantity is greater than the total purchase quantity from Indonesia, such as the result highlighted above for [***], the cumulative effect of applying the ratios to sales of all mattress models results in the calculated sales quantity for Indonesian-sourced mattresses being [***] greater than the actual amount purchased amount from Indonesia.

To further understand this result, Commerce has gone a step further and examined the effect of the revised ratios on a model-specific basis.[26] Specifically, Attachment 3 shows how Zinus U.S. could not have had enough quantity in inventory for multiple Indonesia mattress model numbers to support the adjusted Indonesian sales quantity (by applying the quarterly ratio).[27] The results of this analysis overwhelmingly show a pattern of sales greater than purchases for specific Indonesian mattress model numbers, resulting in a total aggregate sales quantity greater than the number of mattresses Zinus U.S. purchased from Indonesia and had available for sale during the POI. Therefore, it is indisputable that applying the revised quarterly ratios (based on purchase data only) results in an adjusted sales quantity for multiple Indonesia model numbers that is greater than the quantity Zinus U.S. had in inventory for those model numbers.

The only way to avoid such results on both an aggregate and model-number-specific basis is to further revise the quarterly ratio calculations to also include Zinus U.S.'s existing inventory data. Attachment 4 demonstrates how we revised the draft remand results quarterly ratios using both purchase and existing inventory data and how this calculation yields more plausible results. Specifically, this ratio calculation incorporates the beginning POI inventory

---

[26] *See* Final Remand Calculation Memorandum.
[27] *Id.*

and quarterly purchase data and further separates that data by country (*i.e.*, Indonesia and other countries) for purposes of creating a picture that shows how many mattresses Zinus U.S. had to have in stock in order to support its reported POI sales. Adjusting the quarterly ratio calculation in this manner results in a total sales quantity of Zinus U.S.'s Indonesian-produced mattresses that is less than the total quantity of such mattresses that were available for sale from its inventory during the POI. As we noted above, although this approach results in sold quantities being greater than purchased quantities for some models, these seemingly incongruous results are smoothed out when cumulated, such that the aggregate adjusted sales quantity for all Indonesia mattress sales is less than the total purchase quantity of these mattress model numbers from Indonesia. Therefore, unlike a quarterly ratio calculation based on purchase data only, a quarterly ratio calculation based on both purchase and inventory data applied to Zinus U.S.' CEP sales transactions results in a sales quantity assigned to Indonesia that is less than its total purchase quantity on an aggregate level, which is a more plausible result than we reached in the draft remand results.[28]

Finally, in conducting the analysis necessary to go behind the aggregate purchase, inventory, and sales data which are used to calculate the quarterly ratios and apply them to the reported U.S. sales, we noted that Zinus U.S. also reported sales of Indonesia model numbers for mattresses that Zinus U.S. purchased from Indonesia, but which did not enter Zinus U.S.' inventory until after the POI. Attachments 3, 4, and 5 list these model numbers and their respective sales quantities.[29] Record evidence clearly shows that these model numbers purchased from Indonesia did not enter Zinus U.S.'s inventory during the POR and were in fact in the total in-transit quantity (*i.e.*, [***]) which we have removed from the quarterly ratio

---

[28] *See* Final Remand Calculation Memorandum at Attachments 3, 4, and 5.
[29] *Id.*

Appx00054

calculation.[30]  Therefore, we have removed these mattress model numbers from both the U.S.

sales database and also from the aggregate sales quantity used to calculate the quarterly ratios for

these final results of redetermination.  In making this adjustment to the quarterly ratio calculation

(based on purchases and inventory data) and applying these ratios to the sales quantities, the

results, as reflected in Attachment 5, still yield fewer mattress sales allocated to Indonesia than

were purchased on an aggregate level.[31]  We also examined the effect of applying these ratios on

the sales quantities reported for specific mattress model numbers and found that the total

aggregate sales quantity assigned to Indonesian sales was also less Zinus U.S.'s purchase

quantity of Indonesian mattresses during the POI.[32]

  The results of these calculations are an identification of country of origin of mattresses

sold out of inventory based on the percentage of mattresses actually produced by Zinus Indonesia

and in inventory during the POI relative to the quantity of the mattresses produced by affiliates in

other countries also in inventory during each quarter.  Given the fact that Zinus U.S. did not keep

track of the country of origin of mattresses once they entered the warehouse, we find that this

quarterly ratio methodology provides a reasonable method for estimating how many Zinus

Indonesia mattresses were sold from the warehouse during the POI because the number is

proportionate to the number of mattresses in inventory from each of the affiliates in other

countries for each quarter of the POI.  The actual data do not exist because Zinus Indonesia did

not keep track of it.

---

[30] *See* Remand Response at Exhibits RS-10 and RS11; Zinus Indonesia's SAQR at Exhibit SA-5; and Zinus Indonesia's Section SCQR at Exhibit SC2-1.
[31] *See* Final Remand Calculation Memorandum at Attachments 3, 4, and 5.
[32] *See also* Final Remand Calculation Memorandum at Attachment 5.

Appx00055

**Issue 2:  Zinus Korea's Selling Expenses**

*Background*

In the *Final Determination*, consistent with long-standing practice, Commerce included in the margin calculation the expenses Zinus Korea actually incurred to sell the subject merchandise as an affiliated selling agent of Zinus Indonesia.[33]  Commerce found that the record evidence demonstrated that Zinus Indonesia's reporting of Zinus Korea's selling expenses was consistent with Zinus Korea's limited role in selling the Indonesian mattresses to the United States.[34]

However, Commerce acknowledged existing deficiencies and contradictions in the record regarding Zinus Korea's selling functions and requested a remand of this issue to reopen the record for additional information.  The Court concluded that remand was appropriate because Commerce's determination with respect to the exclusion of Zinus Korea's selling expenses was not supported by substantial evidence.[35]

*Analysis*

In the remand questionnaire issued to Zinus Indonesia on March 6, 2024, Commerce requested information regarding Zinus Korea's sales-related activities, invoicing system, and all indirect selling expenses incurred by Zinus Korea associated with Zinus Indonesia's U.S. sales.  With respect to the invoicing process, Zinus Indonesia reported that [***] individuals in the [***] were involved in receiving invoices from Zinus Indonesia and forwarding them to U.S customers during the POI.  However, this was not the sole function of these individuals.  In addition to performing these invoicing activities for a variety of products

---

[33] *See Final Determination* IDM at 32-33.  These expenses consisted of advertising expenses, rebates, and bank charges.
[34] *Id*. at 32.
[35] *See Second Remand Order*.

Appx00056

between the Zinus Korea subsidiaries worldwide, these individuals also had responsibilities for various treasury-related activities for Zinus Korea (*e.g.*, cash management, payment execution, capital raising, cash risk management, investment management, cash forecasting, and foreign exchange management). Therefore, these individuals only spent a portion of their time handling invoices for Zinus Indonesia.

With respect to the transmission of invoices between Zinus Indonesia and the U.S. customers, for certain transactions during the POI, the invoices were manually generated and then sent via email from Zinus Indonesia and Zinus Korea to the customer. Once the SharePoint website, [***] system, was fully incorporated in 2019, Zinus Korea uploaded the invoices to this system.[36] This system is a cloud service which allows for the sharing of files with Zinus Korea employees.[37] Zinus Indonesia was responsible for determining the sales terms for both export price (EP) and CEP sales (*e.g.*, price and quantity); Zinus Korea's role was limited to receiving invoices from Zinus Indonesia and forwarding them to affiliated and unaffiliated U.S. customers.[38] While Zinus U.S. (CEP sales) and Zinus Indonesia (EP sales) process orders daily, Zinus Korea processes orders once a month for all transactions that occurred during that month.[39]

With respect to Zinus Korea's warranty services, its U.S. customer requested payment of defective allowances once a year.[40] Zinus Korea did not provide logistical services, training services, or technical support for Zinus Indonesia's U.S. sales. One or two people at Zinus

---

[36] *See* Remand Response at 2.
[37] *Id*. at 2.
[38] *Id*. at 3.
[39] *Id*. at 9.
[40] *See* Remand Response at Exhibit RS-5, #3-1.

Appx00057

Korea provide certain sales promotion programs monthly to EP customers in the United States. However, only one program was in operation during the POI, and it pertained to one customer.[41]

With respect to the selling functions in Exhibit A-7a, which did not involve Zinus Korea at all (*i.e.*, provision of training services, technical support, or logistical services), Zinus Indonesia provided documentation supporting the role of Zinus Indonesia and Zinus U.S. in these activities. For example, Zinus Indonesia provided a sample email between Zinus U.S. and a customer pertaining to technical support.[42] In addition, Zinus Indonesia provided an internal email supporting inventory space management for Zinus U.S., and a screenshot of the inventory management report for Zinus Indonesia.[43] Along with inventory management, inbound logistic management is performed on a daily basis by Zinus Indonesia and Zinus U.S.[44] Zinus U.S. also managed outbound logistics on a daily basis. As support, Zinus Indonesia provided a logistics management list (Zinus Indonesia) and an email showing outbound loading plans (Zinus U.S.).[45] There is no indication on any of this documentation that Zinus Korea had a role in these selling activities or was even involved in the communications regarding these activities.

Furthermore, in the Remand Response, Zinus Indonesia provided a worksheet that lists by account code the indirect selling expenses incurred by Zinus Korea when it receives and forwards invoices and reconciled these expenses to Zinus Korea's financial statements. Specifically, Exhibit RS-7 shows how the total selling, general and administrative (SG&A) expense (*i.e.*, [***] Korean Won (KRW)) in Zinus Korea's income statement submitted in the AQR[46] reconciles to the amount in Zinus Korea's accounting records (*i.e.*,

---

[41] *See* Zinus Indonesia's CQR at Exhibit C-13.
[42] *See* Remand Response at Exhibit RS-5, #6.
[43] *Id*. at Exhibit RS-5, #7.
[44] *Id*. at Exhibit RS-5, #7, #8.
[45] *Id*. at Exhibit RS-5, #9.
[46] *See* Zinus Indonesia's Letter, "Zinus' Section A Questionnaire Response," dated June 19, 2020 (AQR), at Exhibit A-11d(1).

Appx00058

[***] KRW) and how the reconciled amount is reflected in its indirect selling expense calculation worksheet.  The indirect selling expense calculation worksheet then  separates the total SG&A expense amount reflected in Zinus Korea's income statement into the following categories (expense buckets):  (1) certain expenses which were not incurred on behalf of the sale process with Zinus Indonesia, *i.e.*, professional fees (*i.e.*, column B);[47] (2) expenses incurred by Zinus Korea that it included in Zinus Indonesia's general and administrative (G&A) expenses (*i.e.*, column C); (3) expenses related to home market (Korea) sale activities (*i.e.*, column D); (4) direct expenses incurred for sales to the United States (reported in Zinus U.S.' sales database) (*i.e.*, Column E); (5) direct expenses on exports to countries other than the United States (*i.e.*, Column F); and (6) expenses only associated with Zinus Korea's business operations (*i.e.*, Column G).  After removing the above-referenced expense buckets from its POI total SG&A expense pool of [***] KRW, Zinus Korea identified the portion of its total selling expenses that it considered related to its global sales operations (*i.e.*, [***] KRW).  Specifically, Zinus Korea provided a breakdown of its total selling expenses pool by account code and noted that expenses such as computer usage, electricity, internet, and email correspondence are included in account codes assigned to, for example, supplies, communication, and depreciation SG&A expenses. More importantly, Zinus Korea's total expense pool of [***] KRW included such expenses and Zinus Korea was able to determine that only [***] KRW of its total expense pool related to its global sales operations which involves not just Zinus Indonesia but [***] additional subsidiaries.

---

[47] These fees are related to services related to antidumping duty procedures provided by attorneys and consultants and are excluded in accordance with Commerce practice.  *See Notice of Final Results of Antidumping Duty Administrative Review:  Certain Softwood Lumber Products from Canada*, 70 FR 73437 (December 12, 2005), and accompanying IDM at Comment 11 ("The analysis of the extent to which companies are engaging in unfair trade (*i.e.*, dumping) should be performed without regard to **fees** paid for participation in the proceedings, regardless of whether it relates to AD, CVD, or another type of trade action.  If it were not for the proceedings, these defense costs would not have been incurred.").

Appx00059

However, because these expenses are not related solely to Zinus Indonesia's operations, Zinus Indonesia allocated the [***] KRW expense amount to Zinus Indonesia based on Zinus Indonesia's total unconsolidated revenue relative to the total combined unconsolidated sales revenue of the different Zinus Korea subsidiary companies. The resulting expense figure converted to U.S. dollars (USD) was then divided by the total sales value (in USD) of Zinus Indonesia's mattresses to the United States to obtain an indirect selling expense ratio for U.S. sales made by Zinus Indonesia (*i.e.*, [***] percent). This ratio was then multiplied by the gross unit prices reported in the U.S. sales databases to obtain the per-unit figures reported in a newly created expense variable DINDIRS2U (U.S. indirect selling expenses incurred in Korea). The above-described expense reporting methodology Zinus Korea used to report DINDIRS2U is consistent with that used in the first administrative review of mattresses from Indonesia covering the period November 3, 2020, through April 30, 2022. We incorporated this variable in the margin calculation for the draft results of redetermination.[48] We note that incorporating these indirect selling expenses had no effect on the margin results.

*Petitioners' Comments on the Draft Remand Results*:

The following is a verbatim summary of argument submitted by the petitioners. For further details, *see* Petitioners' Comments at 13-19.

> In Section III, Mattress Petitioners address Zinus' newly provided breakdown of alleged indirect selling expenses incurred by Zinus KR during the POI. First, Mattress Petitioners explain why the new information provided by Zinus confirms that some of the claimed "indirect selling expenses" were not, in fact, indirect selling expenses but rather parent G&A expenses that Zinus failed to accurately report to {Commerce}. Second, Mattress Petitioners explain why Zinus' methodology for allocating Zinus Korea's parent G&A and indirect selling expenses to Zinus Indonesia based on revenue before elimination of inter-company transfers is distortive and why {Commerce's} decision to treat such expenses as indirect selling expenses incurred in Indonesia in its margin program is unreasonable.

---

[48] *See* Draft Remand Calculation Memorandum.

Appx00060

*Zinus' Comments on the Draft Remand Results*:

The following is a verbatim summary of argument submitted by Zinus.  For further details, *see* Zinus' Comments at 20-22.

> Second, whether {Commerce's} exclusion of Zinus Korea's selling expenses from the calculation of normal value was supported by substantial evidence.  In this remand proceeding, {Commerce} collected additional information from Zinus regarding Zinus Korea's selling expenses, including additional supporting documentation to substantiate Zinus Korea's limited role in the sale of Zinus Indonesia's mattresses in the United States.  {Commerce} has incorporated the newly created field DINDIRS2U, in which Zinus has reported the per-unit U.S. indirect selling expenses incurred in Korea, in its margin calculation for the current Draft Remand Results.  Zinus' reporting of indirect selling expenses incurred in Korea is accurate, reasonable, and supported by substantial evidence. Moreover, as {Commerce} recognized, Zinus' methodology for reporting indirect selling expenses incurred by Zinus KR is consistent with Zinus' reporting, as verified by {Commerce}, in the first administrative review proceeding.  Accordingly, {Commerce} has correctly accepted Zinus' reporting and afforded it the same treatment in the margin calculations as {Commerce}did in the first administrative review. {Commerce} should affirm its decision on this issue in its Final Remand Results.

**Commerce's Position:**

As discussed above, Zinus reported indirect selling expenses for Zinus Korea based on Zinus Korea's financial statements for the POI.  Zinus excluded expenses for):  (1) certain expenses which were not incurred on behalf of the sale process with Zinus Indonesia, *i.e.*, professional fees (*i.e.*, column B); (2) expenses incurred by Zinus Korea that it included in Zinus Indonesia's G&A expenses (*i.e.*, column C); (3) expenses related to home market (Korea) sale activities (*i.e.*, column D); (4) direct expenses incurred for sales to the United States (reported in Zinus U.S.' sales database) (*i.e.*, Column E); (5) direct expenses on exports to countries other than the United States (*i.e.*, Column F); and (6) expenses only associated with Zinus Korea's

20

business operations (*i.e.*, Column G).[49]  Except for Direct Expenses reported in Column E,[50] none of these excluded costs are related to Zinus Korea's sales processing for Zinus Indonesia.  The remaining expenses (*e.g.,* [***]) were treated as indirect selling expenses incurred by Zinus Korea.  Based on the discussion in the "Analysis" section, above, Zinus Indonesia substantiated Zinus Korea's limited role in the sale of Zinus Indonesia's mattresses in the United States.

The specific instructions from the Court in the *Second Remand Order* asked Commerce to consider whether the exclusion of Zinus Korea's selling expenses from the calculation of normal value was supported by substantial record evidence.  In their comments on the Draft Remand, the petitioners no longer argue that Zinus Korea's selling expenses associated with Zinus Indonesia's sales to the United States were not appropriately reported in the Remand Response, but now focus on a new topic not at issue in this litigation, *i.e.*, whether the Column E expenses (*i.e.*, [***] Korean Won) incurred by Zinus Korea should be considered part of Zinus Indonesia's G&A expenses.

The petitioners now argue that all the Column G expenses that Zinus identified as related to Zinus Korea's business operations should be treated as G&A expenses because most of the expenses relate to the "Finance" and "Global HR&Admin" cost centers and the names of the cost centers themselves indicate that the expenses are G&A expenses.  Despite the names of the cost centers, these expenses relate to [***].  None of these expenses relate to the production operations of Zinus Indonesia.  They relate to Zinus Korea's business operations,

---

[49] These expenses total [***] Korean Won and are included in the column entitled, "expenses related to Zinus KR only" as reflected in tab 3 included in Exhibit RS-7 of the Remand Response.
[50] These expenses were reported [***].

21

mainly related to the [***], and are properly excluded from the G&A expense calculation. Moreover, Zinus Korea is a trading company, not a production entity, such that the G&A expenses it incurs at its headquarters in Seoul, South Korea, are not production-related. The fact that Zinus Korea and its subsidiaries coordinate with one another to manage global manufacturing, operational, and sales activities does not change the fact that the expenses at issue are selling expenses as opposed to G&A expenses related to production.

With respect to the petitioners' argument that Zinus' method of allocating the indirect selling expenses incurred by Zinus Korea associated with Zinus Indonesia's U.S. sales is distortive, we disagree. Using the sales revenues of each entity as a basis for deriving an allocation ratio to apply to Zinus KR's total selling expenses is an appropriate allocation method for purposes of determining Zinus KR's indirect selling expenses associated with sales of subject merchandise produced by Zinus Indonesia and sold through Zinus KR to the United States during the POI.[51] The record demonstrates that Zinus Korea's expenses do not include expenses incurred by other related companies.[52] Similarly, the sales revenue figures are unadjusted for intercompany transactions.[53] Therefore, it would be nonsensical to calculate an allocation ratio by dividing an expense that does not include intercompany transactions by a sales revenue figure that does factor in such transactions.

Finally, with respect to CEP sales, we treated the U.S. indirect selling expenses incurred in Korea (DINDIRS2U) in the same manner as the U.S. indirect selling expenses incurred in

---

[51] *See Mattresses from Indonesia: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 FR 85240 (December 7, 2023), and accompanying IDM at Comment 6.
[52] *See* AQR at Exhibit A-11d(1), pages 8 and 76.
[53] *See* Remand Response at Exhibit RS-7, tab 3.

Appx00063

Indonesia (DINDIRSU) in the margin program.[54]  While the questionnaire does not explicitly instruct respondents as to how to report indirect selling expenses by a third country affiliate, Commerce's general practice is to treat such expenses as foreign indirect selling expenses (*i.e.*, the same as indirect selling expenses incurred in the country of manufacture).[55]  Specifically, we calculate foreign indirect selling expenses as the sum of the respondent's indirect selling expenses in its own country and the indirect selling expenses of its third country affiliates.[56]  Consistent with our practice, we have continued to include DINDIRSU and DINDIRS2U expenses as foreign indirect selling expenses in our margin calculations.

### III.   FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Second Remand Order*, Commerce has explained its exclusion of mattresses in transit and use of both purchase and existing inventory data in the calculation of quarterly ratios applied to CEP inventory sales, as well Zinus Korea's limited role in the U.S. sales process and its treatment of Zinus Korea's selling expenses associated with this role.  Based on the foregoing explanations, we have made changes to the margin calculations for the mandatory respondent, Zinus Indonesia.

Based on these changes, Commerce determines that the following estimated weighted-average dumping margins exist for the period January 1, 2019, through December 31, 2019:

| Company | *Final Determination* Dumping Margin (percent) | Remand Weighted-Average Dumping Margin (percent) |
|---|---|---|
| PT Zinus Global Indonesia | 2.22 | 0.00 |
| All Others | 2.22 | 0.00 |

---

[54] *See* Final Remand Calculation Memorandum.
[55] *See Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy:  Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 71 (January 3, 2022), and accompanying IDM at Comment 4.
[56] *Id.*

Appx00064

Should the Court affirm the final results of redetermination, Commerce intends to publish a notice of amended final negative determination in the *Federal Register* and revoke the AD order on mattresses from Indonesia.  Commerce will direct U.S. Customs and Border Protection to terminate the suspension of liquidation for shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after November 3, 2020, the publication date of the LTFV preliminary determination, and refund any cash deposits.

5/16/2024

X ~Ryan Majerus signature~

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance

24

Slip Op. 24-19

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PT. ZINUS GLOBAL INDONESIA,**<br><br>        **Plaintiff,**<br><br>**and**<br><br>**BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**<br><br>        **Consolidated Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>        **Defendant,** | **Before: Jennifer Choe-Groves, Judge**<br><br>**Consol. Court No. 21-00277** |

**and**

**BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**

> **Defendant-Intervenors.**

## OPINION AND ORDER

[Sustaining in part and remanding in part Commerce's Final Results of Redetermination Pursuant to Court Order in the U.S. Department of Commerce's antidumping duty investigation of mattresses from Indonesia.]

Dated:  February 20, 2024

J. David Park, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, Kang Woo Lee, and Gina Marie Colarusso, of Arnold & Porter Kaye Scholer, LLP, Washington, D.C., for Plaintiff PT. Zinus Global Indonesia.  With them on the brief were Phyllis L. Derrick and Eric Johnson.

Yohai Baisburd, Jeffrey B. Denning, Chase J. Dunn, and Nicole Brunda, of
Cassidy Levy Kent (USA) LLP, Washington, D.C., for Consolidated Plaintiffs and
Defendant-Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company,
Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett
& Platt, Inc., International Brotherhood of Teamsters, and United Steel, Paper and
Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers
International Union, AFL-CIO.

L. Misha Preheim, Assistant Director, and Kara M. Westercamp, Trial Attorney,
Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C., for Defendant United States.  With them on the brief were
Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M.
McCarthy, Director.  Of counsel on the brief was David W. Richardson, Senior
Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S.
Department of Commerce.

Choe-Groves, Judge:  Before the Court is the U.S. Department of

Commerce's ("Commerce") remand redetermination in the antidumping duty

investigation of mattresses from Indonesia, filed pursuant to the Court's Remand

Order in PT. Zinus Global Indonesia v. United States ("PT. Zinus"), 47 CIT __,

628 F. Supp. 3d 1252 (2023).  See Final Results of Redetermination Pursuant to

Court Remand ("Remand Redetermination"), ECF Nos. 59-1, 60-1; see also

Mattresses from Indonesia ("Final Determination"), 86 Fed. Reg. 15,899 (Dep't of

Commerce Mar. 25, 2021) (final affirmative determination of sales at less than fair

value), accompanying Issues and Decision Memorandum for the Final Affirmative

Determination in the Less-Than-Fair-Market Value Investigation of Mattresses

from Indonesia ("IDM"), ECF No. 15-4.

In PT. Zinus, the Court remanded for Commerce to reconsider its inclusion of mattresses in transit from Indonesia at the end of the period of investigation in the calculation of constructed export price, adjustments made to the selling expenses of Plaintiff PT. Zinus Global Indonesia's ("Plaintiff" or "Zinus Indonesia") parent company, Zinus, Inc. ("Zinus Korea"), and the application of the Transactions Disregarded Rule. PT. Zinus, 47 CIT at __, 628 F. Supp. 3d at 1287–88. Commerce addressed each of these issues on remand. See Remand Redetermination. Plaintiff filed Plaintiff's Comments in Partial Opposition to Commerce's Remand Determination and Plaintiff's Comments in Partial Support of Commerce's Remand Determination. Pl.'s Cmts. Part. Opp'n Commerce's Remand Determination ("Pl.'s Cmts. Part. Opp'n"), ECF Nos. 64, 65; Pl.'s Cmts. Part. Supp. Commerce's Remand Determination ("Pl.'s Cmts. Part. Supp."), ECF No. 73. Defendant-Intervenors filed Defendant-Intervenors' Comments in Partial Opposition to the Final Results of Redetermination and Defendant-Intervenors' Comments in Partial Support of the Final Results of Redetermination. Def.-Intervs.' Cmts. Part. Opp'n Final Results Redetermination ("Def.-Intervs.' Cmts. Part. Opp'n"), ECF Nos. 62, 63; Def.-Intervs.' Cmts. Part. Supp. Final Results Redetermination ("Def.-Intervs.' Cmts. Part. Supp."), ECF Nos. 71, 72. Defendant filed Defendant's Response to Comments of Remand Redetermination. Def.'s Resp. Cmts. Remand Redetermination ("Def.'s Resp."), ECF No. 74, 75. For the

following reasons, the Court sustains in part and remands in part the Remand Redetermination.

## ISSUES PRESENTED

This case presents the following issues:

1.    Whether Commerce's inclusion of mattresses in transit as facts otherwise available in the calculation of constructed export price was in accordance with law and supported by substantial evidence;

2.    Whether Commerce's exclusion of Zinus Korea's selling expenses from the calculation of normal value was supported by substantial record evidence; and

3.    Whether Commerce's use of Indonesian Global Trade Atlas ("GTA") import data to value input purchase transactions involving an affiliated supplier in a non-market economy was supported by substantial evidence and in accordance with law.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the Remand Redetermination.  See PT. Zinus, 47 CIT at __, 628 F. Supp. 3d at 1258–59.

On March 30, 2020, an antidumping duty petition concerning imports of

mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of

Turkey, and the Socialist Republic of Vietnam was filed with Commerce by

Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions,

FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Inc., the

International Brotherhood of Teamsters, and the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO.  Antidumping Countervailing Duty Pet.

("Petition") (Mar. 31, 2020), PR 1–4, CR 1–10.[1]  In response to the Petition,

Commerce initiated on April 24, 2020 an antidumping investigation on mattresses

imported from Indonesia.  Mattresses from Cambodia, Indonesia, Malaysia, Serbia,

Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam, 85 Fed.

Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (initiation of less-than-fair-value

investigations).  The period of investigation was January 1, 2019 through

December 31, 2019, the four most recent financial quarters prior to the filing of the

March 2020 Petition.  Id. at 23,003; Commerce's Decision Mem. Prelim.

Affirmative Determination and Postponement Final Determination Less-Than-

---

[1] Citations to the administrative record reflect the public record ("PR") and
confidential record ("CR") document numbers filed in this case, ECF Nos. 39, 40,
76, 77.

Fair-Value Investigation Mattresses from Indonesia ("PDM") at 5, PR 226; see

also 19 C.F.R. § 351.204(b)(1).  Zinus Indonesia was selected as the sole

mandatory respondent in the investigation.  See Less-Than-Fair-Value

Investigation Mattresses Indonesia Resp. Selection Mem., PR 66, CR 32.

Because Plaintiff was unable to identify the country of origin of imported

mattresses after merchandise entered Plaintiff's United States warehouse,

Commerce applied a quarterly ratios sales methodology to determine the quantity

of Zinus Indonesia's U.S. sales for purposes of calculating constructed export

price.  See IDM at 8–9; PDM at 9–10; see also Commerce's Prelim. Determination

Margin Calculation Zinus Indonesia at 1–3 (Oct. 27, 2020), PR 229, CR 258.  The

quarterly ratio was applied to the full universe of Zinus, Inc.'s ("Zinus U.S.")

mattresses, including those mattresses that were in transit and had not yet entered

the United States at the conclusion of the period of investigation.  IDM at 8–9.

Commerce calculated Zinus Indonesia's antidumping duty margin rate at 2.22

percent.  Final Determination, 86 Fed. Reg. at 15,900.

The Court remanded for Commerce to explain and support its inclusion of

mattresses in transit from Indonesia in its quarterly ratio calculations, Commerce's

adjustments to the selling expenses of Zinus Korea, and Commerce's application

of the Transactions Disregarded Rule.  PT. Zinus, 47 CIT at __, 628 F. Supp. 3d. at

1287–88.  On remand, Commerce continued to include in transit mattresses in its

calculation of constructed export price and to exclude affiliated party transfer payments from its margin calculations.  Remand Redetermination.  Commerce also continued to use the market import data for inputs into Indonesia.  Id.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final determination in an antidumping duty investigation.  The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i). The Court also reviews determinations made on remand for compliance with the Court's remand order.  Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.    Legal Framework

Commerce imposes antidumping duties on foreign goods if "(1) it determines that the merchandise 'is being, or is likely to be, sold in the United States at less than its fair value,' and (2) the International Trade Commission determines that the sale of the merchandise at less than fair value materially injures, threatens, or impedes the establishment of an industry in the United

States." <u>Diamond Sawblades Mfrs. Coal. v. United States</u>, 866 F.3d 1304, 1306

(Fed. Cir. 2017).  Antidumping duties are calculated as the difference between the

normal value of subject merchandise and the export price or the constructed export

price of the subject merchandise.  19 U.S.C. § 1673.

Normal value is ordinarily determined using the sales price of the subject

merchandise in the seller's home market.  19 U.S.C. § 1677b(a)(1)(B)(i).  If

Commerce determines that normal value cannot be reliably calculated using home

market or third-country sales, Commerce may use the subject merchandise's

constructed value as an alternative to normal value.  <u>Id.</u> § 1677b(a)(4).  The

method for calculating constructed value is defined by statute.  <u>Id.</u> § 1677b(e).

When calculating constructed value, Commerce must utilize the respondent's

actual selling, general, and administrative expenses, and profits in the respondent's

home market or a third-country market.  <u>Id.</u> § 1677b(e)(2)(A).  If Commerce

cannot rely on those data, it may look to:

> (i) the actual amounts incurred and realized by the specific exporter or
> producer being examined in the investigation or review for selling,
> general, and administrative expenses, and for profits, in connection
> with the production and sale, for consumption in the foreign country,
> of merchandise that is in the same general category of products as the
> subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred and realized
> by exporters or producers that are subject to the investigation or review
> (other than the exporter or producer described in clause (i)) for selling,
> general, and administrative expenses, and for profits, in connection

with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

Id. § 1677b(e)(2)(B).

Commerce must also calculate export price or constructed export price.

Export price is:

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States,

subject to certain adjustments. Id. § 1677a(a). Constructed export price is:

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter,

subject to certain adjustments. Id. § 1677a(b). The price used to calculate

constructed export price is reduced by commissions, selling expenses, further

manufacturing expenses, and the profit allocated to these expenses. Id. § 1677a(d).

## II.    Facts Available Analysis

Plaintiff alleges that Commerce failed to comply with the statutory requirements under 19 U.S.C. § 1677e and 19 U.S.C. § 1677m(d) before applying adverse facts available against Zinus Indonesia.  Plaintiff argues that Commerce failed to request missing data regarding Zinus U.S.' inventory, and Commerce violated its statutory obligations when it filled in factual gaps regarding in transit subject merchandise and improperly applied adverse facts available.  Pl.'s Cmts. Part. Opp'n at 17–20.  The Government contends that it did not apply an adverse inference to Zinus Indonesia under 19 U.S.C. § 1677e(b).   Def.'s Resp. at 8–9.  The Government does not assert that it used neutral facts otherwise available under 19 U.S.C. § 1677e(a), but merely argues that it did not apply adverse facts available.  See id.

The Court notes at the outset that Commerce did not make any determinations in its Remand Redetermination under 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d) about the use of facts otherwise available, or under 19 U.S.C. § 1677e(b) about the use of an adverse inference.

Section 1677e(a) requires the use of facts otherwise available when necessary information is not available on the record, or a respondent withholds information that has been requested by Commerce, fails to provide the requested information by the deadlines in the form and manner requested, significantly

impedes a proceeding, or provides the requested information but the information

cannot be verified.  19 U.S.C. § 1677e(a).  Commerce explained in the Remand

Redetermination that Zinus U.S.' data in Exhibit SA-5 showed that the purchased

quantity of mattresses in inventory was less than the quantity Zinus U.S. reported

that it sold out of inventory during the period of investigation.  Remand

Redetermination at 6.  Thus, it appears that substantial evidence supports

Commerce's determination that certain data was missing because Zinus U.S. sold

more mattresses than it purchased and the data did not account for those missing

mattress quantities.

     19 U.S.C. § 1677e(a) specifies that if necessary information is not available

on the record, Commerce shall use facts otherwise available subject to 19 U.S.C.

§ 1677m(d).  It is not apparent from the Remand Redetermination that Commerce

requested information from Zinus Indonesia or Zinus U.S. about the missing sales

data subject to the requirements of 19 U.S.C. § 1677m(d).  The Remand

Redetermination does not mention Commerce's requests to Zinus Indonesia or

Zinus U.S. for the missing information, nor does it mention responses or a failure

to respond to such requests by the Zinus entities.  The Court agrees with Plaintiff's

argument that:

> [i]f Commerce had any doubt, or considered this information missing
> from the record, it had an obligation to ask Zinus for this information.
> It failed to do so.  Even if it were the case that Zinus had failed to

> provide necessary information or otherwise satisfied 19 U.S.C.
> § 1677e(a), Commerce failed to observe the notice requirements of 19
> U.S.C. § 1677m(d).

Pl.'s Cmts. Part. Opp'n at 18.  The Government does not address the facts

available issue under 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d) in its brief,

only arguing that Commerce did not apply adverse facts available.  See Def.'s

Resp. at 9.

It is clear that Commerce failed to comply with the requirements under 19

U.S.C. § 1677m(d) to inform Zinus Indonesia of the nature of a deficiency and

provide Zinus Indonesia with an opportunity to remedy or explain the deficiency.

See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382–83 (Fed. Cir. 2003)

("[T]he statute requires a factual assessment of the extent to which a respondent

keeps and maintains reasonable records and the degree to which the respondent

cooperates in investigating those records and in providing Commerce with the

requested information").  Because Commerce failed to make the necessary

determinations to comply with its statutory obligations under 19 U.S.C. § 1677e(a)

and 19 U.S.C. § 1677m(d), the Court holds that Commerce's determination to use

in transit mattress information as facts otherwise available is neither in accordance

with law nor supported by substantial evidence.  The Court remands this issue for

further consideration and explanation.  The Court suggests that on remand,

Commerce should consider reopening the record to address the missing sales data,

inventory, and in transit mattress issues as Commerce fulfills its obligations under

19 U.S.C. § 1677m(d), especially because Commerce is requesting a remand to

reopen the record on a different issue, as discussed below.

### III.    Zinus Korea's Actual Selling Expenses

In the Final Determination, Commerce included Zinus Korea's actual

incurred selling expenses as a component of its margin calculation.  IDM at 32–33.

The Court remanded to Commerce for further explanation the question of Zinus

Korea's involvement in the sale of subject mattresses and the treatment of selling

expenses under the Korean-version International Financial Reporting Standards

("K-IFRS").  PT. Zinus, 47 CIT at __, 628 F. Supp. 3d at 1280–83.  On remand,

Commerce determined that Zinus Korea's involvement in the sale of subject

mattresses was minimal and continued to treat costs considered "commissions and

fees" under K-IFRS as payments between related parties and not as selling

expenses.  Remand Redetermination at 9–16.

In the Remand Redetermination, Commerce cited record evidence to support

its determination that Plaintiff reported that Zinus Korea's involvement in the sale

of subject mattresses to the United States during the period of investigation "was

limited to document and invoice management, i.e., receiving invoices from Zinus

Indonesia and forwarding them to affiliated and unaffiliated U.S. customers, as

even Zinus Korea's invoices were generated by Zinus Indonesia as part of Zinus

Indonesia's operations and sales process." Id. at 9–10; see Zinus Indonesia's Sec.

A Questionnaire Resp. (June 18, 2020) at A-15, PR 97–102, CR 36–39; Zinus

Indonesia's Sec. A Supp. Questionnaire Resp. (Aug. 20, 2020) at 9–10, PR 165,

CR 154.  Commerce cited to the selling functions chart provided as an exhibit to

Zinus Indonesia's Section A Questionnaire Response.  Remand Redetermination at

10; see Zinus Indonesia's Sec. A Questionnaire Resp. at Ex. A-7a.  Commerce

determined that the chart indicated that for constructed export price sales from

inventory and back-to-back constructed export price sales, Zinus Korea's

involvement was limited to minimal order input and processing.  Remand

Redetermination at 10; see Zinus Indonesia's Sec. A Questionnaire Resp. at Ex. A-

7a.  Commerce determined that for export price sales, Zinus Korea was involved in

sales promotion, order input, and warranty services.  Remand Redetermination at

10.  Commerce also cited examples in the record supporting its determination that

Zinus Indonesia performed the majority of selling activities, including arranging

shipments and providing technical and sales support.  Id. at 11; see Zinus

Indonesia's Sec. A Supp. Questionnaire Resp. at 10; Zinus Indonesia's Sec. C.

Questionnaire Resp. (Jul. 13, 2020) at Ex. C-16, PR 119–20; CR 96–97, 104–05,

117–20 (example of freight arrangements arranged by Zinus Indonesia); Zinus

Indonesia's Sec. A. Supp. Questionnaire Resp. at SA-6b (email regarding online

training); Zinus Indonesia's Sec. A Questionnaire Resp. at Ex. A-7b (sample

documents relating to categories of sale reflected in Zinus Indonesia's selling functions chart).

Defendant-Intervenors disagree with Commerce's determination, arguing that record documents demonstrate that Zinus Korea took a more active role in all sales of subject mattresses. Def.-Intervs.' Cmts. Part. Opp'n at 2–3 (citing Zinus Indonesia's Sec. A Questionnaire Resp. at A-8). Defendant-Intervenors point to Zinus Indonesia's Section A Questionnaire Response as contrary record evidence showing that for both constructed export price sales and export price sales, Zinus Indonesia sold subject mattresses to Zinus Korea, which resold the subject mattresses to affiliated or unaffiliated customers in the United States. Id. at 3; see Zinus Indonesia's Sec. A Questionnaire Resp. at A-18–A-19. Defendant-Intervenors also argue that record evidence shows that Plaintiff referred to export price sales as sales by Zinus Korea. Def.-Intervs.' Cmts. Part. Opp'n at 4; see Zinus Indonesia's Sec. A Questionnaire Resp. at A-3; Zinus Indonesia's Sec. A Supp. Questionnaire Resp. at 11. Defendant-Intervenors contend that it would be commercially unreasonable for Zinus Korea to be responsible for a significant number of sales while not incurring expenses for sales staff or administrative overhead. Def.-Intervs.' Cmts. Part. Opp'n at 4.

The Government acknowledges existing deficiencies and contradictions in the record with regard to Zinus Korea's selling functions and requests a remand of

this issue to reopen the record for additional information.  Def.'s Resp. at 15–17.

The Court concludes that remand is appropriate on this issue because Commerce's

determinations with respect to the exclusion of Zinus Korea's selling expenses are

not supported by substantial evidence.

## IV.    Transactions Disregarded Rule

Commerce determined that during the period of investigation, Zinus

Indonesia obtained ten types of material inputs from affiliated suppliers in the

People's Republic of China.  IDM at 16–18; Remand Redetermination at 16.

Because the suppliers were in a non-market economy, Commerce determined that

it was unable to use the affiliated suppliers' prices and costs in calculating normal

value.  IDM at 17; Remand Redetermination at 16–17.  In the Preliminary

Determination, Mattresses From Indonesia, 85 Fed. Reg. 69,597 (Dep't of

Commerce Nov. 3, 2020) (preliminary affirmative determination of sales at less

than fair value, postponement of final determination, and extension of provisional

measures), Commerce calculated and applied an average of the market prices of

GTA import data for Brazil, Indonesia, Malaysia, Mexico, Romania, Russia, and

Turkey.  IDM at 17–18; Commerce's Cost Production Constructed Value

Calculation Adjustments Prelim. Determination (Oct. 27, 2020) at 1–2, PR 231,

CR 262.  In the Final Determination, Commerce changed its approach and adopted

only GTA data from Indonesia to calculate normal value.  IDM at 18.  Commerce

interpreted the phrase "market under consideration" in 19 U.S.C. § 1677b(f)(2) to only refer to the market under review in the investigation.  Id.  The Court found this interpretation to be overly narrow and remanded for Commerce to provide further explanation or to reconsider whether Commerce's selection of Indonesia constituted a reasonable method to confirm that the affiliated prices reflect arm's length transactions under 19 U.S.C. § 1677b(f)(2).  PT. Zinus, 47 CIT at __, 628 F. Supp. 3d at 1287.

On remand, Commerce continued to use the Indonesian GTA data "because actual market import prices into Indonesia are more likely to be available to our Indonesian respondent than market import prices into other countries."  Remand Redetermination at 16–23.

Under the Transactions Disregarded Rule, Commerce may disregard the transfer price of inputs provided to a respondent by an affiliated supplier and instead use the input's market price in calculating normal value.  19 U.S.C. § 1677b(f)(2).  Commerce applies the Transactions Disregarded Rule through a multi-step process.  Best Mattresses Int'l Co. v. United States ("Best Mattresses"), 47 CIT __, __, 622 F. Supp. 3d 1347, 1383–84 (2023).  First, Commerce looks at whether the respondent purchased the input from an affiliated supplier.  Id. at 1383.  If that information is not available, Commerce looks to sales of the input by the affiliated supplier to an unaffiliated buyer.  Id.  When no other information is

available, Commerce looks to a reasonable source of market value available on the

record.  Id.  As the Court previously noted, when resorting to a "reasonable source

for market value," if "a market price is not available, Commerce has developed a

consistent and predictable approach whereby it may use an affiliate's total cost of

providing the [good or service] as information available for a market price."  PT.

Zinus, 47 CIT at __, 628 F. Supp. 3d at 1285 (quoting Best Mattresses, 47 CIT at

__, 622 F. Supp. 3d at 1383–84).  The phrase "market under consideration" is

purposefully broad to allow Commerce to choose a market that allows for a

reasonable source for market value to confirm that the affiliated prices reflect

arm's length transactions.  Id.

Defendant-Intervenors argue that Commerce has not sufficiently explained

or supported its change in practice to use only GTA data from Indonesia.  Def.-

Intervs.' Cmts. Part. Opp'n at 9–12.  Defendant-Intervenors contend that

Commerce has an established practice of calculating market price in a manner that

best represents the respondent's own experience in the market under consideration.

Id. at 9–10 (citing Unicatch Indus. Co. v. United States, 45 CIT __, __, 539 F.

Supp. 3d 1229, 1249 (2021)).

In a situation in which transactions are performed between two affiliates and

not at arm's length, Commerce must attempt to determine an amount that would

have occurred if the parties had not been affiliated.  19 U.S.C. § 1677b(f)(2).  As

Commerce explained in the Remand Redetermination, adoption of the Indonesian GTA data allowed for the calculation of a market rate that Zinus Indonesia would have experienced but for its affiliation to its suppliers. Remand Redetermination at 19–20. Because a reasonable market price was available on the record, it was not necessary for Commerce to consider other available options, such as the average of other country GTA data. The Court concludes that Commerce's reliance on the Indonesian GTA data was reasonable, in accordance with law, and supported by substantial evidence. The Court sustains Commerce's application of the Transactions Disregarded Rule.

## CONCLUSION

Accordingly, it is hereby

**ORDERED** that the Court sustains Commerce's application of the Transactions Disregarded Rule; and it is further

**ORDERED** that the Remand Redetermination is remanded to Commerce to reconsider consistent with this opinion the inclusion of mattresses in transit; and it is further

**ORDERED** that the Remand Redetermination is remanded to Commerce to reconsider consistent with this opinion Zinus Korea's selling expenses; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1)  Commerce shall file its remand determination on or before April 19,

2024;

(2) Commerce shall file the administrative record on or before May 3, 2024;

(3) Comments in opposition to the remand determination shall be filed on or

before June 17, 2024;

(4) Comments in support of the remand determination shall be filed on or

before July 17, 2024; and

(5) The joint appendix shall be filed on or before July 26, 2024.

  /s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:   February 20, 2024
         New York, New York



**UNITED STATES DEPARTMENT OF COMMERCE**
Office of the General Counsel
OFFICE OF THE CHIEF COUNSEL FOR
TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C.  20230

June 9, 2023

**<u>FILED ELECTRONICALLY VIA CM/ECF</u>**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY  10278-0001

Re:     Redetermination Pursuant to Court Remand Order in PT
        *Zinus Global Indonesia v. United States*,
        Court No. 21-00277

Dear Mr. Toscano:

    Pursuant to the Court's orders of March 20, 2023, and May 8, 2023, please find attached
the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-
captioned action.  The Department's remand redetermination is a business proprietary
document.  Attached are both the BPI and Public versions of the remand.

    In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for
the remand proceeding will follow under separate cover.  Should you have any questions
concerning the matter, please contact me at (301) 675-2324.

                    Respectfully submitted,


                    /s David W. Richardson
                     David W. Richardson
                       Senior Counsel
                     Office of the Chief Counsel
                       for Trade Enforcement & Compliance

Attachments

Mr. Mario Toscano
June 9, 2023
Page 2

cc: by CM/ECF

Henry David Almond
Daniel Robert Wilson
Gina Marie Colarusso
Jaehong David Park
Kang Woo Lee
Lynn Marie Fischer Fox
Arnold & Porter Kaye Scholer LLP
601Massachusetts Avenue, N.W.
Washington, DC  20001
(202) 942-5999

Yohai Baisburd
Chase J. Dunn
Mary Jane Alves
Nicole Brunda
Sarah E. Shulman
Thomas Martin Beline
Ulrika Kristin Skitarelic Swanson
Cassidy Levy Kent (USA), LLP
900 19th Street N.W.
Suite 400
Washington, DC 20006
(202) 567-2300

Kara Marie Westercamp
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC  20044
(202) 305-7571

A-560-836
Remand
Slip Op. 23-39
Investigation
~~Business Proprietary Document~~
E&C/OVIII:  KJ
**PUBLIC VERSION**

***PT Zinus Global Indonesia and Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO v. United States***
**Consol. Court No. 21-00277, Slip Op. 23-39 (CIT March 20, 2023)**
**Mattresses from Indonesia**

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court) in *PT Zinus Global Indonesia and Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO v. United States*, Consol. Court No. 21-00277, Slip Op. 23-39 (CIT March 20, 2023) (*Remand Order*).  These final results of redetermination concern the final determination in the less-than-fair-value investigation of mattresses from Indonesia.[1]

In the *Remand Order*, the Court remanded, in part, Commerce's *Final Determination* to reconsider or further address the following issues:

---

[1] *See Mattresses from Indonesia:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 15899 (March 25, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

(1) Commerce failed to provide sufficient explanation or citations to record evidence to support its inclusion of mattresses in transit in the calculation of constructed export price (CEP).[2]

(2) Commerce did not provide an explanation or cite to record evidence to support its determination that Zinus Korea had a limited role as an invoicing party in Zinus U.S.'s sales process. In addition, Commerce did not address the petitioners'[3] arguments on the application of the Korean version International Financial Reporting Standards (K-IFRS) to Zinus Korea's selling expenses and it is unclear how Commerce accounted for costs considered to be commissions and fees in Zinus Korea's reporting.[4]

(3) Commerce needs to provide further explanation or reconsider whether its selection of Indonesian data constituted a reasonable method to confirm that the affiliated input prices reflect arm's-length transactions under section 773(f)(2) of the Tariff Act of 1930, as amended (the Act).[5]

On April 28, 2023, we released the Draft Remand Results to interested parties for comment.[6] On May 9, 2023, we received comments from the petitioners and PT Zinus Global Indonesia (Zinus).[7]

---

[2] *See Remand Order* at 23.
[3] Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, the petitioners).
[4] *See Remand Order* at 63.
[5] *Id*. at 69-71.
[6] *See* Draft Results of Remand Redetermination, *Ellwood City Forge Co., Ellwood National Steel Co., Ellwood Quality Steels Co., and A. Finkl & Sons v. United States*, Consolidated Court No. 21-00077 (CIT November 8, 2022), dated January 31, 2023 (Draft Remand Results).
[7] *See* Petitioners' Letter, "Mattress Petitioners' Comments on Commerce's Draft Results of Redetermination Pursuant to Court Remand," dated May 9, 2023 (Petitioners' Comments); and Zinus' Letter, "Zinus' Comments on the Department's Draft Remand Results," dated May 9, 2023 (Zinus' Comments).

2

**Issue 1: Mattresses In Transit**

*Background*

Commerce included in its analysis Zinus mattresses of Indonesian origin that were purchased by Zinus U.S. during the period of investigation (POI) January 1, 2019, through December 31, 2019, but had not been imported, because the record showed that Zinus U.S. made more CEP sales of subject mattresses "out of inventory" during the POI than were actually contained in the warehouse, indicating that some mattresses in transit to the United States were sold during the POI.

*Analysis*

The Court remanded to Commerce for further consideration and explanation of its determination to include mattresses in transit in the calculation of CEP. Although PT Zinus Global Indonesia (Zinus Indonesia) argues that Commerce should exclude mattresses that it purchased because they had not yet been imported into the United States and were not yet physically in inventory, there is no requirement that a product be imported and actually physically in inventory in the warehouse before it is considered to be "in inventory" to be sold and included in a CEP sales database. Section 772(b) of the Act defines a CEP sale as a sale to an unaffiliated party, "*before* or after importation" (emphasis added). The record facts demonstrate that Zinus U.S. actually sold more mattresses of the type that are subject merchandise than they had in inventory during the POI.[8] This means that Zinus U.S. must have been treating the in-transit mattresses at issue as "in inventory," and available for sale. Indeed, Zinus U.S. actually sold some of the in-transit mattresses because Zinus U.S. had more sales of

---

[8] *See* Zinus Indonesia's Letters, "Zinus' Section C Questionnaire Response, dated July 14, 2020 (CQR), at Exhibit C-2b (C.R. 97); and "Zinus' Section A Supplemental Questionnaire Response, dated August 20, 2020 (SAQR), at Exhibit SA-5 (C.R. 154).

the relevant mattress than were in physical inventory during the POI. Zinus U.S. treated them as "subject merchandise in inventory for sale" even though they had not yet been imported. As a result, including the sales of in-transit mattresses in the calculation of CEP as if they were in inventory is reasonable and consistent with Zinus U.S.'s actual treatment of the sales and the statutory definition of a CEP sale.

Moreover, Zinus U.S. made other types of CEP sales other than those "from inventory" that were shipped directly from Zinus Indonesia to the customer, and never entered a warehouse.[9] These sales were included in Commerce's calculations as CEP sales even though the mattresses were imported after sale to the unaffiliated customer. It would be internally inconsistent for Commerce to treat the in-transit, "in inventory" mattresses different from the in-transit, "direct shipment to the customer" mattresses. As a result, Commerce has continued to include in the calculation of CEP, the mattresses in transit that Zinus Indonesia owned but had not yet imported into the United States nor entered into its warehouse.

*Zinus' Comments*:[10]

- Commerce's explanation in the Draft Remand Results continues to fail to address the actual issue Zinus raised on appeal, the court's *Remand Order*, or the substantial record evidence that belies Commerce's explanation.
- The question before the Court is whether Commerce's decision to include certain mattresses in transit in its quarterly ratio calculation was reasonable and supported by substantial evidence.
- While Commerce declined to use Zinus' first in first out (FIFO) methodology, the issue remained that Commerce needed to apportion some of the sales from U.S. inventory to Indonesia, while excluding others as non-subject.
- By definition, the relevant universe of sales at issue were those physically held in U.S. inventory and available for sale out of inventory to unaffiliated U.S. customers; merchandise in transit was not even available for sale, much less sold, to unaffiliated customers during the POI.
- Moreover, there is no question as to the country of origin of products in transit from Indonesia directly to the United States, and therefore the quantity of merchandise in

---

[9] *See* CQR at Exhibit C-2B.
[10] *See* Zinus' Comments at 3-16.

transit from Indonesia should never be included in the quarterly ratio calculation, given its indisputable country of origin.

- Commerce speculates, without evidence, that Zinus U.S. sold some of the in-transit mattresses, appearing to suggest that some of the merchandise that was still enroute to the United States was actually sold out of inventory before it arrived in the United States, let alone before it arrived in inventory.

- The underlying logic for Commerce's speculation is that some of the mattresses that were being shipped to Zinus U.S., and had not yet entered the United States, could somehow have been among the sales reported in the U.S. sales databases.

- However, with respect to CEP inventory sales, Zinus included in the U.S. sales databases only those sales that were invoiced or shipped from the U.S. warehouse during the POI, in accordance with Commerce's standard reporting requirements.

- Commerce need not speculate whether mattresses that were still on the water at the end of 2019 may have already been invoiced; they could not have been, as demonstrated by (1) the sales reconciliation materials that show all POI invoices were captured in the reporting; and (2) the sales databases that show that all pertinent sales were shipped out of the U.S. warehouse prior to that date.

- The only exhibits that Commerce cites to do not support its provided justification for concluding that that there must have been some sales of mattresses from inventory that were in transit.  Neither of these exhibits includes the total number of mattresses held in Zinus' U.S. warehouse.

- Furthermore, neither of these exhibits address inventory already held at the beginning of the POI, which must be considered prior to drawing any conclusion regarding the accuracy of the sales quantities sold and reported by Zinus.

- Commerce speculates, without evidence, that Zinus U.S. must have been treating the in-transit merchandise as inventory, because it reported more sales during the POI than existed in inventory.  However, Commerce is conflating the different reporting requirements for the different sales channels.

- Because all of the reportable U.S. inventory sales were shipped out of U.S. inventory within the POI, the merchandise in transit necessarily had not been invoiced, could not have dates of sale in the POI, and were simply non-reportable products that had not been sold to an unaffiliated U.S. customer.

- Commerce's explanation also ignores the accounting treatment of Zinus' CEP inventory sales and shipments.  If Zinus U.S. had sold the product, it would no longer be classified as either merchandise in transit or finished goods inventory – it would be sold merchandise and classified as such.

- Commerce should use quarterly ratios exclusive of merchandise that had not yet entered the United States, or simply use the FIFO reporting that Zinus originally reported.

*Petitioners' Comments*:[11]

- The petitioners agree with Commerce's explanation of its decision to continue relying on sales of in-transit mattresses as subject merchandise available for sale for the purposes of

---

[11] *See* Petitioners' Comments at 2.

its quarterly ratios methodology.

**Commerce's Position:**

The data included in the AQR and the CQR responses clearly indicate that certain models of subject mattresses in transit should be included in the quarterly ratio calculation given that the quantity of mattresses with subject merchandise model numbers that Zinus purchased for inventory during the POI (*i.e.*, [***]) is less than the quantity of subject merchandise mattresses Zinus sold from inventory during the POI (*i.e.*, [***]).[12]  To calculate the [***] figure, we relied on Zinus' own data presented in Exhibit SA-5.[13]  We included in our calculation only the purchased quantities for specific mattress model numbers that Zinus reported could have been purchased from either Indonesia, China, [***], as reflected in Exhibit SA-5.  *See* Remand Attachment 1, which demonstrates how we derived the quantity of [***] mattresses purchased for inventory during the POI.  In comparing this quantity to the quantity of mattresses Zinus sold out of inventory during the POI (*i.e.*, [***]) as reflected in Exhibit C-2b, we observed that, according to Zinus' own reported data, the purchased quantity in inventory was less than the quantity Zinus reported that it sold out of inventory during the POI.[14]  Therefore, we reasonably concluded that the difference could only be accounted for by the mattresses in transit.  According to Zinus' own reporting, these mattresses were sold during the POI.  Therefore, they should be included in the quarterly ratio calculation.

Zinus argues that Commerce is speculating in making this decision, but that is not true - Commerce is not speculating.  Zinus' own data demonstrate that it sold more of the relevant mattresses from its warehouse than were contained in its warehouse during the POI.

---

[12] *See* SAQR at Exhibit SA-5; and CQR at Exhibit C-2b.
[13] *See* SAQR at Exhibit SA-5.
[14] *See* CQR at Exhibit C-2b.

Zinus argues that mattresses in transit were not available for sale.  However, they must have been available for sale because Zinus sold more of the relevant mattresses than it had in its warehouse during the POI.

Zinus argues that the record shows that the in-transit mattresses' country of origin was known, and because those mattresses were not invoiced, Commerce should not have included those mattresses in its quarterly ratio calculation.  Zinus claims that it reported all sales that were invoiced and shipped from the warehouse during the POI, and those sales did not include the in-transit mattresses.

Commerce does not find Zinus' argument in this regard to support its contentions. Whether the in-transit mattresses originated in Indonesia is irrelevant because the record shows that Zinus sold more of the relevant types of mattresses during the POI than it had in its warehouse during the POI.  Zinus has provided no evidence that it had sufficient mattresses in inventory to satisfy the number of the relevant types of mattresses sold during the POI. Accordingly, we conclude that it is reasonable to presume that some of the mattresses that were invoiced during the POI must have been shipped and were destined for the U.S. warehouse during the POI because, again, Zinus' reported data show more sales than the number of the relevant mattresses in inventory during the POI.

Zinus argues that the sales reconciliation and all pertinent sales were shipped prior to the end of the POI, demonstrating that the in-transit mattresses could not have been "invoiced." That argument is not correct.  Zinus' own data established that it sold more of the relevant mattresses during the POI than it had in inventory.  Therefore, whether or not invoiced, Zinus made such U.S. sales during the POI that must be included in the calculations.

Zinus argues that Commerce's calculations are wrong because they do not include the

total mattresses in inventory.  First, we are concerned here only with the mattresses that meet the definition of the scope of the investigation, regardless of country of origin, not the mattresses that do not meet the scope definition.  Because Zinus' total quantity of mattresses in Exhibit SA-5 includes mattresses that do not meet the scope definition, those out-of-scope mattresses would not be considered in our analysis.[15]  Second, Zinus has cited no record data to show that there was inventory of relevant mattresses that were not accounted for by Commerce's calculation. Therefore, the record does not support a finding that the difference at issue is accounted for by mattresses allegedly already in inventory at the beginning of the POI.

Zinus argues that Commerce is improperly combining sales across sales channels.  Zinus is incorrect.  Commerce only included in its CEP inventory analysis the mattresses in the warehouse and in transit to the warehouse.  Commerce did not include in its CEP inventory analysis any mattresses for direct sales or back-to-back CEP sales, as reflected in Zinus' own data to which Commerce cites as the basis for its CEP inventory sales analysis.  Specifically, the [***] figure from Section 4.1 (CEP Inventory Sales) in Exhibit C-2b is identified by Zinus as the number of relevant in-scope mattresses sold from inventory.[16]  As mentioned above, the [***] figure is calculated from Zinus' own data reported in Exhibit SA-5 and identified as the "mattresses Zinus US purchased for its inventory during the POI" on page 8 of the August 20, 2020, Section A Supplemental Questionnaire Response.[17]  Furthermore, we note that there was no inventory of Indonesian-origin mattresses at the beginning of the POI because the record

---

[15] *See* SAQR at Exhibit SA-5.
[16] *See* CQR at Exhibit C-2b.
[17] *See* Zinus' Letter, "Zinus' Section A Questionnaire Response," dated June 19, 2020, (AQR) at 8.

shows that Zinus Indonesia did not start producing mattresses for commercial sale until after the beginning of the POI.[18]

**Issue 2:  Zinus Korea's Selling Expenses**

*Background*

In the *Final Determination*, consistent with long-standing practice, Commerce included in the margin calculation the expenses Zinus Korea actually incurred to sell the subject merchandise as an affiliated selling agent of Zinus Indonesia.[19]  Commerce found that the record evidence demonstrated that Zinus Indonesia's reporting of Zinus Korea's selling expenses was consistent with Zinus Korea's limited role in selling the Indonesian mattresses to the United States.[20]

*Analysis*

The Court remanded this issue to Commerce for further consideration of record evidence or explanation regarding the extent of Zinus Korea's involvement in the sale of subject mattresses and to address the petitioners' arguments in the *Final Determination* regarding the treatment of such selling expenses under K-IFRS, as well as how Commerce accounted for costs considered commissions and fees in Zinus Korea's reporting.

Zinus Indonesia reported that, during the POI, Zinus Korea's involvement in the sale of subject merchandise was limited to document and invoice management, *i.e.*, receiving invoices from Zinus Indonesia and forwarding them to affiliated and unaffiliated U.S. customers, as even Zinus Korea's invoices were generated by Zinus Indonesia as part of Zinus Indonesia's

---

[18] *See* SAQR at 3.
[19] *See Final Determination* IDM at 32-33.  These expenses consisted of advertising expenses, rebates, and bank charges.
[20] *Id*. at 32.

Appx00097

operations and sales process.[21]  Further, the respondent reported that, although Zinus Korea's name appears on some of the sample sales documents provided in the questionnaire response, *i.e.*, the purchase order from the customer to Zinus Inc. (Korea) and the invoice and packing list from Zinus Inc. (Korea) to the customer, Zinus Korea's invoices were prepared and generated by Zinus Indonesia and simply issued under the name of Zinus Korea.[22]  Sample email correspondence between Zinus Indonesia and Zinus Korea shows that Zinus Indonesia provided Zinus Indonesia's invoice to Zinus Korea and Zinus Korea's invoice to its U.S. customer at the same time, demonstrating that Zinus Indonesia was the entity performing order input/processing.[23]

That Zinus Korea's role in the sales process is minimal is further supported by information presented in section A of the questionnaire response regarding level of trade, *i.e.*, the selling functions chart and supporting documentation.[24]  Zinus Indonesia reported that for two out of the three U.S. sales channels through which it sold subject merchandise during the POI, *i.e.*, CEP sales from inventory and back-to-back CEP sales, Zinus Korea was involved in only one selling activity (*i.e.*, order input/processing), which it performed to a minor degree.[25]  With respect to export price sales, Zinus Korea was involved in three selling activities (*i.e.*, sales promotion, order input/processing, and warranty servicing) at similarly low levels of intensity.[26]

Furthermore, Zinus Indonesia provided documentation to demonstrate that it, rather than Zinus Korea, was responsible for other selling activities listed in the selling functions chart.  For the provision of logistical and training services, Zinus Indonesia provided support for its

---

[21] *See* AQR, at A-15.
[22] *See* SAQR at 9-10.
[23] *Id*. at 9.
[24] *See* AQR at Exhibit A-7a.
[25] *Id*.
[26] *Id*.

assertion that it alone was responsible for these functions.  Specifically, for both Inbound and

Outbound Logistics Management, Zinus Indonesia provided source documentation indicating

that it is the party responsible for making these freight arrangements, including payment for

these services.[27]  Likewise, Zinus Indonesia provided support documentation for an example of

the type of personnel training in which Zinus Indonesia participated with respect to one of its

major customers.[28]  Regarding sales support, Zinus Indonesia provided an example of a weekly

forecast report prepared by the sales and demand planning teams.[29]  For sales-related

administrative activities, Zinus Indonesia submitted a purchase order received from its

customer.[30]  For technical support, Zinus Indonesia provided an email exchange with one of its

customers regarding the transmission of a purchase order between Zinus U.S.'s Enterprise

Resource Planning (*i.e.*, ERP) system and the customer's system.[31]  Thus, Zinus Indonesia

confirmed that Zinus Korea had no involvement in these selling activities.

Regarding the petitioners' arguments concerning potentially contrary evidence on the

record showing that Zinus Korea engaged in more significant selling activities than the

preparation of invoices, the petitioners do not explain the relevance of its observation that Zinus

Indonesia and Zinus Korea share a common senior official.  Similarly, the facts that Zinus Korea

lists its activities as "Sale {*sic*} and Marketing"[32] and the parent company and its

wholly/majority owned subsidiaries coordinated with one another to manage global

manufacturing, operational, and sales activities are not at all specific to sales of mattresses to the

United States or indicative of Zinus Korea's role in such sales.  Zinus Korea reported all sales

---

[27] *See* SAQR at 10; *see also* CQR at Exhibits C-16 and C-17.
[28] *See* SAQR at Exhibit SA-6b.
[29] *See* AQR at Exhibit A-7b.
[30] *Id*.
[31] *Id*.
[32] *See* AQR at Exhibit A-4.

expenses associated with U.S. sales and all relevant general and administrative (G&A) expenses (*e.g.*, salary expenses) as requested by Commerce.

With respect to the petitioners' argument that it is unclear how Commerce accounted for costs considered to be "commissions and fees" according to K-IFRS, Commerce does not treat such payments as selling expenses in the margin calculation when they occur between affiliated parties, which is the case here.  Payments between related parties are inherently subject to manipulation by a respondent and could distort the selling expenses and, thus, the dumping calculations.[33]  That is the reason why Commerce's antidumping questionnaire requests that respondents report the actual expenses of any affiliated selling agents, *e.g.*, salaries, electricity, rent, travel for sales purposes, *etc.*, rather than any commissions paid to those agents.[34] Commerce only uses actual expenses in such situations and does not include the affiliated party transfers of commissions and fees in its calculations even if the accounting rules on which the respondent relies do include them.  Therefore, the fact that the K-IFRS includes such items as selling expenses does not require Commerce to treat them the same.  If Commerce were to treat affiliated transfers in that manner, it would provide respondents with the ability to distort Commerce's dumping calculations.

*Petitioners' Comments*:[35]

- Commerce's Draft Remand Results fail to cite to record evidence supporting its conclusion that all of Zinus Korea's actual expenses, and in particular its indirect selling expenses, were accurately reported and accounted for in the margin calculation.
- Similarly, Commerce fails to cite record evidence demonstrating that Zinus Indonesia, rather than Zinus Korea, was responsible for various sales activities.  In

---

[33] *See Certain Hot-Rolled Steel Flat Products from Brazil:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 FR 53424 (August 12, 2016) (*Hot-Rolled Steel from Brazil*) and accompanying IDM at Comment 7.
[34] *See Final Determination* IDM at 32 (citing Commerce's Letter, "AD Questionnaire Issued to Zinus," dated May 14, 2020, at C-21).
[35] *See* Petitioners' Comments at 3-9.

fact, many of the documents cited by Commerce compel the opposite conclusion.

- The email correspondence cited by Commerce in Exhibit SA-6a does not demonstrate that Zinus Indonesia was the sole entity involved in performing order/input processing or that all of Zinus Korea's actual expenses have been accounted for.  In addition, Commerce failed to identify where on the record these expenses are reported.

- Documentation cited by Commerce in Exhibits SA-6b and Exhibit A-7b does not prove that Zinus Indonesia staff participated in certain activities, nor does it demonstrate that Zinus Korea did not participate in certain activities.

- It defies logic that Zinus could have an entire class of sales that it describes as Zinus Korea's sales to unaffiliated U.S. customers for which Zinus Korea staff performed no sales activities.  Record evidence demonstrates that Zinus Korea staff were unambiguously involved in selling activities for such sales.

- With respect to commissions and fees earned by Zinus Korea, Commerce has previously explained that it does not deduct commissions paid by exporters to affiliates from CEP because this would lead to double counting, as such expenses have already been captured as indirect selling expenses of the affiliate and deducted from CEP.

- In this case, the actual indirect selling expenses incurred by the affiliated selling agent, Zinus Korea, have neither been reported nor deducted from U.S. price so there is no risk of double counting and therefore no reason to ignore affiliated commission payments.

- Ignoring such payments between related parties puts respondents in a position to distort the dumping calculations because it allows respondents to ensure that various selling expenses incurred by a third country selling agent are not included in the margin calculation.

*Zinus' Comments*:[36]

- Zinus Indonesia provided documentation demonstrating that during the POI Zinus Korea's role in the sales process was limited to document and invoice management.
- Zinus Korea reported all sales expenses associated with U.S. sales and all relevant G&A expenses as requested by Commerce.
- Furthermore, regardless of how the K-IFRS treats commissions and fees, Commerce does not treat such payments as selling expenses in the margin calculation when they occur between affiliated parties, as is the case here.
- Commerce only uses actual expenses in such situations and does not include the affiliated party transfers of commissions and fees, or price mark-ups, in its calculations even if the accounting rules the respondent relies on include them.
- Zinus Korea's recognition of revenue for its resales of products purchased from Zinus Indonesia and sold to the United States, either to Zinus U.S. or to an unaffiliated U.S. customer, does not make it a commissioned agent.  It means that Zinus Korea earned a profit by purchasing and reselling Zinus Indonesia's product.
- The financial statements and account details provided during the investigation

---

[36] *See* Zinus' Comments at 16-19.

confirm that Zinus Indonesia did not pay sales commissions.

- Commerce has consistently determined that price mark-ups between affiliates do not qualify as commissions.
- The fact that Zinus Korea recognizes the revenue from its intra-company sales in accordance with K-IFRS does not turn its revenues into commissions nor does it turn Zinus Korea into a commissioned sales agent.
- The text of the K-IFRS simply indicates that for purposes of financial statement presentation, when a company has back-to-back sales it should only report the profit (*i.e.*, markup) as revenue.  Specifically, the company simply eliminates the purchase price from the cost of goods sold and likewise reduces the revenue by the same amount.
- This standard accounting rule does not change Zinus Korea's sales and accounting ledgers that show that it made sales at the full invoice price.

**Commerce's Position:**

 The petitioners argue that Commerce failed to cite record evidence demonstrating that Zinus Indonesia, rather than Zinus Korea, was responsible for various sales activities. Specifically, the petitioners maintain that certain documents cited by Commerce support the petitioners' conclusion that Zinus Korea was responsible for various sales activities.  We disagree.  First, the petitioners cite to Exhibit SA-6a and claim that this exhibit does not demonstrate that Zinus Indonesia was the only entity involved in performing order input/processing or that all of Zinus Korea's actual expenses have been accounted for.  The petitioners' statement is pure speculation and not supported by evidence on the record.  The petitioners have not identified a single record document that impugns the validity of the submitted statement.  There is no record evidence indicating that the documents in this exhibit are not an accurate portrayal of the sales process.  Exhibit SA-6a contains the invoices from Zinus Indonesia to Zinus Korea and from Zinus Korea to Zinus U.S., as well as an email from Zinus Indonesia to Zinus Korea forwarding the invoices.[37]  As explained in the AQR, for all U.S. sales transactions, Zinus Korea's role is limited to document and invoice management (receiving

---

[37] *See* SAQR at Exhibit SA-6a.

invoices from Zinus Indonesia and forwarding invoices to affiliated/unaffiliated U.S. customers, as even Zinus Korea's invoices are generated by Zinus Indonesia as part of Zinus Indonesia's operations and sales process).[38]

The petitioners further argue that documentation cited by Commerce in Exhibits SA-6b and Exhibit A-7b does not prove that Zinus Indonesia staff participated in certain activities, nor does it demonstrate that Zinus Korea did not. However, these exhibits pertain to training, sales and demand planning, and management of U.S. warehouse space.[39] According to the selling functions chart, none of these activities are performed by Zinus Korea.[40] Therefore, the selling functions chart is record evidence that Zinus Indonesia performed these activities. Zinus Korea was only involved in order input/processing during the POR, as discussed in the "Analysis" section, above. The petitioners' unsupported arguments do not overcome this record evidence.

Furthermore, the petitioners argue that it defies logic that Zinus Indonesia could have an entire class of sales, *i.e.*, export price sales, for which Zinus Korea staff performed no sales activities. This statement is contradicted by the selling functions chart which shows that Zinus Korea was involved in sales to each sales channel, *i.e.*, export price sales, back-to-back CEP sales, and CEP inventory sales – albeit very minimally – as discussed above.[41] Zinus Indonesia reported, where applicable, Zinus Korea's actual expenses incurred on behalf of U.S. sales (*i.e.*, advertising, rebates, and bank charges) in its U.S. sales database.[42] In addition, Zinus Indonesia added an allocated portion of Zinus Korea's G&A expenses (*i.e.,* salaries of key management personnel) as part of Zinus Indonesia's G&A expenses, as requested by Commerce in a

---

[38] *See* AQR at A-15.
[39] *See* AQR at A-7b and SAQR at Exhibit SA-6b.
[40] *See* AQR at Exhibit A-7a.
[41] *Id*.
[42] *See* Zinus' Letter, "Zinus' Section C Supplemental Questionnaire Response (part 2)," dated September 28, 2020.

supplemental questionnaire.[43]  The petitioners have not identified any record evidence to impugn the reported expenses.

With respect to costs considered to be "commissions and fees," the petitioners argue that ignoring such payments between related parties puts respondents in a position to distort the dumping calculations because it allows respondents to ensure that various selling expenses incurred by a third country selling agent are not included in the margin calculation.  However, as explained in the Draft Remand Results, Commerce does not treat such payments between affiliated parties as selling expenses in the margin calculation because such intra-company payments are subject to manipulation by a respondent and could distort the reported selling expenses and the dumping calculations.  Commerce only includes actual expenses, not amounts transferred between affiliated parties, as this ensures that we only include actual expenses and not transfers of funds above the actual expense amount between affiliates which can be manipulated depending on the intended outcome.[44]  Therefore, we maintain that it was appropriate to exclude affiliated party transfer payments from the margin calculation, regardless of how such payments may be treated according to international accounting standards such as K-IFRS.

**Issue 3:  Transactions Disregarded Rule**

*Background*

As discussed in the *Final Determination*,[45] Zinus Indonesia reported it obtained 10 types of material inputs from two affiliated suppliers located in China during the POI.  Because the inputs were produced by, and purchased from, affiliated suppliers in a non-market economy

---

[43] *See* Zinus' Letter, "Zinus' Section D Supplemental Questionnaire Response," dated September 23, 2020 (SDQR) at Exhibit SD-25.
[44] *See Hot-Rolled Steel from Brazil* IDM at Comment 7
[45] *See Final Determination* IDM at 16-18.

(NME) country, China, we could not use the affiliated Chinese suppliers' prices or costs in our calculations.[46]  The respondent also did not purchase the inputs from unaffiliated market economy suppliers.[47]  The only information available on the record that could reasonably be used to test the arm's-length nature of the transfer prices from affiliates was the publicly available Global Trade Atlas (GTA) data.[48]  Accordingly, we considered it reasonable in this case to rely on the GTA data on the record to fill the gaps where market prices were not available.  We obtained GTA data for various materials from the following countries:  Indonesia, Romania, Russia, Malaysia, Turkey, Mexico, and Brazil.[49]  For the *Final Determination*, Commerce selected the data from Indonesia stating, pursuant to the statutory language "market under consideration," the market under consideration was the Indonesian market.[50]

In its March 20, 2023 opinion, the Court found that the "market under consideration" did not mean just the market under review.  The Court remanded this issue for Commerce to further explain its reasoning or reconsider whether its selection of Indonesian data constituted a reasonable method to confirm that the affiliated prices reflect arm's-length transactions under section 773(f)(2) of the Act.[51]

*Analysis*

As summarized above, the Court remanded Commerce's *Final Determination* to provide further explanation that Commerce is not limited by law in using only the market under investigation or review as the "market under consideration" and, thus, held on that basis that it

---

[46] *Id.* at 17.
[47] *Id.* at 17-18; *see also* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – PT Zinus Global Indonesia," dated October 27, 2020, at 2.
[48] *See* SDQR at D-6 to D-13 and Exhibits SD-8 and SD-9.
[49] *See Final Determination* IDM at 16-18.
[50] *Id.* at 18.
[51] *See Remand Ord*er at 69-71.

could not sustain Commerce's use of only the country under investigation in this context.[52]  In

its opinion, the Court cited *Best Mattresses* by way of further explanation:

> To be clear, today's holding does not prevent Commerce from selecting Cambodia
> as the "market under consideration" for purposes of the Transactions Disregarded
> Rule on remand.  Where Commerce erred is that it hinged its reasoning on a faulty
> reading of the statute that presumed that "market under consideration" referred to
> the country subject to investigation …[53]

The purpose of the transactions disregarded exercise is to ensure that the respondent's

costs reflect a market value to the extent it is available on the record.[54]  Use of affiliated

transaction prices that are not at arm's length would distort the dumping calculation results.

Commerce's preference is to determine a market value based on the respondent's own purchases

of the input from unaffiliated suppliers.  When market prices are not available to test affiliated

party transactions, Commerce looks to the affiliated supplier's sales of the input to unaffiliated

parties, and, lacking that, to the cost of production (COP) of the affiliated supplier.  In the instant

case, because these transactions were between Zinus Indonesia and NME-based affiliated

suppliers, Commerce was unable to use the NME-based affiliated suppliers' sales or COP as a

substitute for market price.[55]  Therefore, Commerce sought to obtain market-based surrogate

price information that would allow us to fulfill the requirements of the statute under section

773(f)(2) of the Act based on the record.  Indeed, there is a preference for the respondent's actual

purchases from unaffiliated companies, but as the above test implied and this case demonstrates,

in the absence of respondent's actual purchases from unaffiliated companies, Commerce may use

other sources, including data from other countries, to fill in any gaps.[56]

---

[52] *Id.*
[53] *Id.* at 71 (citing *Best Mattresses Int'l. Co. v. United States*, Consol. Court 21-00281, Slip Op. 23-19 (CIT February 17, 2023) (*Best Mattresses*), at 52)).
[54] *See* Def.'s Resp. to Pls.' Mots. For J. on Agency Record at 58, ECF No. 34; *see also Final Determination* IDM at 16-19.
[55] *See Final Determination* IDM at 16-19.
[56] *Id.*; *see also* section 773(f)(2) of the Act.

Similar to *Best Mattresses*, this Court limited its holding in that Commerce cannot "presume{} that the phrase 'market under consideration' means the country under investigation or review"[57] when clearly there are circumstances under which the appropriate market value may be different from the market where the subject merchandise is produced.

We do not disagree.  Commerce acknowledges that, while there is a preference to use the data available to the respondent in the country in which its production is located, there are sometimes circumstances under which such data may not be available, may be flawed and cannot be used, or where the best available information is in fact from a market *other* than the market where the subject merchandise is produced.[58]  As a result, other data, including data from other countries, may be used for this purpose under the statute.  Such findings are necessarily heavily dependent on what data are available on the record of each individual segment of the proceeding.[59]

With the foregoing in mind, in this case, the goal of the transactions disregarded analysis is to arrive at a market price for the inputs which would be available to the respondent to the extent the record contains such information.  It is clearly less reflective of the respondent's experience to use prices and/or costs in other countries which are not necessarily available to the respondent.  However, record data limitations may require the use of such data.

In this case, we have on the record Indonesian GTA data that reflect market economy imports of the relevant inputs into Indonesia which could reasonably be expected to be available

---

[57] *See Remand Order* at 71 (citing *Best Mattresses*, Slip Op. 23-19 at 52).
[58] *See Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (explaining a reviewing court determines not whether "the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."); *see also Final Determination* IDM at 16-19; section 773(f)(2) of the Act.
[59] *Id.*

to the respondent.[60]  Import prices into other countries would not necessarily be available to our Indonesian respondent.  Therefore, because actual market import prices into Indonesia are more likely to be available to our Indonesian respondent than market import prices into other countries, we continue to find it appropriate to use the market import data for the relevant inputs into Indonesia, rather than an average of Indonesia's import data with that of other countries.

*Zinus' Comments*:[61]

- The Court remanded Commerce's *Final Determination* with respect to this issue to provide further explanation for its reliance on Indonesian GTA import data in its transactions disregarded analysis that is not contingent on a supposedly limited reading of the statute.
- The Court found that Commerce's interpretation of "market under consideration," as used in section 773(f)(2) of the Act, as only the market under investigation was unreasonably narrow.
- As Commerce states, the goal of the transactions disregarded analysis is to arrive at a market price for the inputs purchased from affiliated suppliers that would be available to the respondent to the extent such information is available.  The statute does not prescribe a specific methodology by which Commerce is to select the information available to use.
- Commerce's explanation is reasonable because actual market import prices into Indonesia are more likely to be available to the Indonesian respondent than market import prices into other countries.
- It is impractical and unreasonable to assume that imported products into other countries would be just as available to Zinus as those being imported into Indonesia.
- Even though the materials at issue were sourced from an NME, Commerce's decision to utilize exclusively Indonesian import data implicitly recognizes the fundamental differences between a market-economy country and an NME country such as the People's Republic of China.
- Commerce recognizes that although it has a preference to use the data available to the respondent in the country in which its production is located, there are circumstances under which such data may not be available or may be flawed and cannot be used.
- That is, Commerce recognizes the flexibility permitted by the statute.  However, in this case, given the available information and the absence of any flaws or distortions in the Indonesian GTA data, Commerce correctly chose to rely on the import prices that are more likely to be available to the respondent in the country in which its production is located rather than prices available in other, unrelated countries (or an

---

[60] *See* Draft Remand Results at 11; *see also* Zinus DSQR at D-6 to D-13 and Exhibits SD-8 and SD-9 and *Final Determination* Zinus *at 17.*
[61] *See* Zinus' Comments at 19-23.

average of all available prices).

*Petitioners' Comments*:[62]

- Commerce's practice for establishing a fair market price is to first look to the respondent's purchases of the same input from unaffiliated suppliers and, where the record contains no such transactions, to then turn to sales of the input by the affiliated supplier to other unaffiliated parties.  In the absence of either, Commerce looks to the affiliated supplier's COP.
- While each of these methodologies is distinct, they all share Commerce's longstanding focus on choosing a market benchmark based on the respondent's unique purchasing experiences.  Yet in its Draft Remand Results, Commerce jettisoned this prior reasoning, concluding where transactions occur between a respondent and an NME-based affiliated supplier, Commerce should not focus on the respondent's own experience in acquiring inputs, but rather on what prices could reasonably be expected to be available to the respondent had the respondent sought to source the inputs in Indonesia.
- Commerce failed to explain why it departed from its past policy of basing the market value benchmark on the respondents' unique purchasing experiences.[63]
- Commerce failed to explain why relying on a proxy for Indonesian market prices is reasonable when Zinus purchased the inputs in question from Chinese affiliates.
- To be consistent with its prior practice of using the affiliates' COP (regardless of the country in which they are located), Commerce should not rely on GTA data for imports into Indonesia to establish a market benchmark, but rather utilize the six-country average of GTA import data from Romania, Russia, Malaysia, Turkey, Mexico, and Brazil.
- In *Best Mattresses*,[64] Commerce's interpretation of the major inputs rule[65] to allow use of third country surrogate data as "information available" for determining the COP of a major input purchased from an affiliated NME-based supplier was reasonable and warrants deference.
- Commerce failed to explain why use of an identical methodology to determine the COP of a minor input purchased from an NME-based supplier was not similarly reasonable information available for the purposes of applying the transactions disregarded rule.
- Commerce appears to eschew this approach because import prices into the other countries would not necessarily be available to the Indonesian respondent.  But the six-country average of GTA data are not intended to reflect import prices into other countries.  Instead, it is intended as a surrogate for the COP of Zinus' Chinese affiliate.

---

[62] *See* Petitioners' Comments at 9-13.
[63] *Id. at* 11; *see also Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1377 n.5 (Fed. Cir. 2007) (*Nippon*); *see also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 57 (1983) (*Motor Vehicle Mfrs*) ("{A}n agency changing its course must supply a reasoned analysis.") (Internal quotation and citation omitted).
[64] *See Best Mattresses*.
[65] *See* section 773(f)(3) of the Act.

**Commerce's Position:**

In the Draft Remand Results, Commerce explained that "market under consideration," under section 773(f)(2) of the Act, does not limit Commerce by law to use only the market under investigation or review as the "market under consideration."   In any event, given that the goal of the transactions disregarded analysis is to arrive at a market price for the inputs which would be available to the respondent to the extent the record contains such information, because actual market import prices into Indonesia are more likely to be available to the Indonesian respondent than market import prices into other countries, we continue to find it appropriate to use the market import data for the relevant inputs into Indonesia.[66]

Moreover, we disagree with the petitioners that we jettisoned our prior reasoning and practice with respect to choosing a market value benchmark based on the respondents' unique purchasing experiences.[67]   In fact, in selecting GTA data from Indonesia as the market value benchmark, we accounted for both the respondent's potential purchasing experience, where the respondent in this case purchased a hundred percent of certain minor inputs from an affiliated NME-based supplier, and our practice.   In the instant case, import prices into Indonesia are more likely to be available to the Indonesian respondent and represent inputs relevant to the respondent's purchasing experience.[68]   Further, in considering the limited gap filling information on the record of this case, Commerce reasonably determined that the use of market price GTA data from Indonesia is appropriate, as this source closely mirrors Commerce's preference of

---

[66] *See* Draft Remand Results at 8-11.
[67] *See* Petitioners' Comments at 11-13; *see also Nippon*, 494 F.3d 1371 at 1377 n.5;  *Motor Vehicle Mfrs.*, 463 U.S. 29 at 57 ("{A}n agency changing its course must supply a reasoned analysis.") (internal quotation and citation omitted).
[68] *See* Draft Remand Results at 8-11.

Appx00110

using respondents' purchases of inputs from unaffiliated parties and is more likely to be available to the Indonesian respondent.[69]

Further, the petitioner claims that Commerce failed to explain why the use of third country surrogate data to determine the COP in applying the major input rule for purchases from an NME-based supplier was not similarly reasonable information available for the purposes of applying the transactions disregarded rule.[70]  As noted above, the goal of the transactions disregarded analysis is to arrive at a market price for the inputs which would be available to the respondent.  Commerce acknowledges that there are circumstances under which it may be appropriate to use data from a different market from the market where the subject merchandise is produced, or where it is preferable to calculate an average price from several countries as the petitioners suggest.  However, considering the record data sources and that Commerce's preference is to first determine a market value, under section 773(f)(2) of the Act, based on data available to the respondent in the country in which its production is located, we consider it reasonable to rely on the GTA data from Indonesia to fill the gaps where market prices were not available.[71]  Further, the Indonesian GTA import data provided by Zinus excluded imports from China based on Commerce's instructions.[72]

## III.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, Commerce has further explained its inclusion of mattresses in transit in the calculation of CEP, Zinus Korea's limited role in the U.S. sales process and its treatment of Zinus Korea's selling expenses associated with this role, and its selection of Indonesian GTA data in its application of the transactions disregarded rule.  Based

---

[69] *Id.*
[70] *See* Petitioners' Comments at 11-13.
[71] *See Final Determination* IDM at 18.
[72] *Id.* at 18-19.

Appx00111

on the foregoing explanations, we have made no changes to the margin calculations for the

mandatory respondent, Zinus.

6/9/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

# REMAND ATTACHMENT 1

## (*Business Proprietary Data Not Capable of Public Summary*)

**Slip Op. 23-39**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA, | |
| Plaintiff, | |
| and | |
| BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, | |
| Consolidated Plaintiffs, | Before: Jennifer Choe-Groves, Judge |
| v. | Consol. Court No. 21-00277 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, | |
| Defendant-Intervenors. | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's

final affirmative determination of sales at less than fair value on mattresses from

Indonesia.]

Dated:  March 20, 2023

J. David Park, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, Kang Woo
Lee, and Gina Marie Colarusso, of Arnold & Porter Kaye Scholer, LLP,
Washington, D.C., for Plaintiff PT. Zinus Global Indonesia.  With them on the
brief were Phyllis L. Derrick and Eric Johnson.

Yohai Baisburd, Jeffery B. Denning, Chase J. Dunn, and Nicole Brunda, of
Cassidy Levy Kent (USA) LLP, Washington, D.C., for Consolidated Plaintiffs and
Defendant-Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company,
Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett
& Platt, Incorporated, International Brotherhood of Teamsters, and United Steel,
Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service
Workers International Union, AFL-CIO.

L. Misha Preheim, Assistant Director, and Kara M. Westercamp, Trial Attorney,
Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C., for Defendant United States.  With them on the brief were
Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M.
McCarthy, Director.  Of counsel on the brief was David W. Richardson, Senior
Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S.
Department of Commerce.

Choe-Groves, Judge:  Plaintiff PT. Zinus Global Indonesia ("Plaintiff" or

"Zinus Indonesia") challenges the final affirmative determination of the U.S.

Department of Commerce ("Commerce") in the antidumping duty investigation on

mattresses from Indonesia.  Mattresses from Indonesia ("Final Determination"), 86

Fed. Reg. 15,899 (Dep't of Commerce Mar. 25, 2021) (final affirmative

determination of sales at less than fair value).  Before the Court is Plaintiff's Rule

56.2 Motion for Judgment Upon the Agency Record of Plaintiff PT. Zinus Global

Indonesia ("Plaintiff's Motion").  Pl.'s R. 56.2 Mot. J. Agency R., ECF Nos. 22,

23.  Defendant United States and Consolidated Plaintiffs and Defendant-

Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort

Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Inc.,

the International Brotherhood of Teamsters, and the United Steel, Paper and

Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO (collectively, "Brooklyn Bedding") oppose

Plaintiff's Motion.  Brooklyn Bedding's Resp. Br. Opp'n Pl.'s Mot. J. Agency R.

("Brooklyn Bedding's Resp."), ECF Nos. 29, 30; Def.'s Resp. Pl.'s Mots. J.

Agency R. ("Def.'s Resp."), ECF Nos. 33, 34.  Also before the Court is Brooklyn

Bedding's Motion for Judgment on the Agency Record ("Brooklyn Bedding's

Motion").  Brooklyn Bedding's Mot. J. Agency R., ECF Nos. 24, 25.  Plaintiff and

Defendant oppose Brooklyn Bedding's Motion.  Pl.'s Resp. Br. Opp'n Consol.

Pl.'s Mot J. Agency R. ("Pl.'s Resp."), ECF Nos. 31, 32; Def.'s Resp.

     For the reasons discussed below, the Court grants in part and remands in part

Plaintiff's Motion and grants in part and remands in part Brooklyn Bedding's

Motion.

## ISSUES PRESENTED

This case presents the following issues:

1. Whether Commerce's use of a quarterly ratios sales methodology and rejection of Zinus Indonesia's proposed first-in-first-out methodology for determining the quantity of Indonesian mattresses sold during the period of investigation was supported by substantial evidence;

2. Whether Commerce's use of Emirates Sleep Systems Private's financial statements rather than the financial statements of Indonesian producers in the calculation of constructed value was supported by substantial evidence;

3. Whether Commerce's calculation of a profit cap was in accordance with the law;

4. Whether Commerce's adjustments to the reported sales deductions of Zinus, Inc. ("Zinus U.S.") were supported by substantial evidence;

5. Whether Commerce's decision to adjust selling expenses attributable to Zinus, Inc. ("Zinus Korea") to account for actual selling expenses only was supported by substantial evidence;

6. Whether Commerce's use of Indonesian Global Trade Atlas ("GTA") import data to value input purchase transactions involving an

affiliated supplier in a non-market economy was supported by

substantial evidence and in accordance with the law; and

7.      Whether Commerce's decision to not require Zinus Indonesia to

submit a U.S. sales reconciliation was supported by substantial

evidence.

## BACKGROUND

On March 30, 2020, an antidumping duty petition concerning imports of

mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of

Turkey, and the Socialist Republic of Vietnam was filed with Commerce by

Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions,

FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Inc., the

International Brotherhood of Teamsters, and the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO.  Antidumping Countervailing Duty Pet.

("Petition") (Mar. 31, 2020), PR 1–4, CR 1–10.[1]  In response to the Petition,

Commerce initiated on April 24, 2020 an antidumping investigation on mattresses

imported from Indonesia.  Mattresses from Cambodia, Indonesia, Malaysia, Serbia,

Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam, 85 Fed.

---

[1]  Citations to the administrative record reflect the public record ("PR") and
confidential record ("CR") document numbers filed in this case, ECF Nos. 39, 40.

Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (initiation of less-than-fair-value

investigations).  The period of investigation was January 1, 2019 through

December 31, 2019, the four most recent financial quarters prior to the filing of the

March 2020 Petition.  Id. at 23,003; Commerce's Decision Mem. Prelim.

Affirmative Determination and Postponement Final Determination Less-Than-

Fair-Value Investigation Mattresses from Indonesia ("Preliminary Determination

Memo" or "PDM") at 5, PR 226; see also 19 C.F.R. § 351.204(b)(1).  Zinus

Indonesia was selected as the sole mandatory respondent in the investigation.  See

Less-Than-Fair-Value Investigation Mattresses Indonesia Respondent Selection

Mem. ("Selection Memo"), PR 66, CR 32.

        Prior to the investigation, Zinus Korea and Zinus U.S. participated in an

antidumping duty investigation covering mattresses produced in the People's

Republic of China ("China").  See Mattresses from the People's Republic of China

("Mattresses from China"), 84 Fed. Reg. 56,761 (Dep't of Commerce Oct. 23,

2019) (final affirmative determination of sales at less than fair value, and final

affirmative determination of critical circumstances, in part).  Commerce requested

that Zinus Indonesia place on the record certain business proprietary information

submitted by Zinus Xiamen in the Mattresses from China investigation.  See

Commerce's Request Additional Information at 3, PR 207.

On November 3, 2020, Commerce published its preliminary determination.

Mattresses from Indonesia ("Preliminary Determination"), 85 Fed. Reg. 69,597

(Dep't of Commerce Nov. 3, 2020) (preliminary affirmative determination of sales

at less than fair value, postponement of final determination, and extension of

provisional measures); see also PDM.  In the Preliminary Determination,

Commerce applied a quarterly ratios sales methodology proposed by Brooklyn

Bedding to determine the quantity of Zinus Indonesia's U.S. sales.  See PDM at 9–

10; see also Commerce's Prelim. Determination Margin Calculation Zinus

Indonesia at 1–3 (Oct. 27, 2020), PR 229, CR 258.

In calculating constructed value profit and selling expenses in the

Preliminary Determination, Commerce used the financial statements of Emirates

Sleep Systems Private ("Emirates"), a producer that manufactured mattresses in

India.  PDM at 13.  Commerce's calculation did not include the costs of certain

inputs purchased by Zinus Indonesia from two affiliated Chinese suppliers.  PDM

at 12; Commerce's Cost Calculation Mem. (Oct. 27, 2020) at 1–2, PR 231, CR

262.  Commerce calculated the cost of inputs using the average of GTA data for

Brazil, Indonesia, Malaysia, Mexico, Romania, Russia, and Turkey.  Commerce's

Cost Calculation Mem. at 1–2, Att. 2a.  Commerce also calculated constructed

export price based on Zinus U.S.' expenses, increasing the starting price by the

amount of billing adjustments and making deductions for rebates, movement

Consol. Court No. 21-00277                                                    Page 8

expenses, and selling expenses.  PDM at 10.  Commerce calculated a dumping

margin of 2.61 percent for Zinus Indonesia.  Preliminary Determination, 85 Fed.

Reg. at 69,598.

 Following the Preliminary Determination, Commerce issued supplemental

questionnaires to Zinus Indonesia.  Commerce's Post-Prelim. Supp. Questionnaire

(Dec. 2, 2020), PR 249, CR 267.  The parties to the investigation submitted

additional briefing.  Zinus Indonesia's Admin. Case Br. (Feb. 10, 2021), PR 275,

CR 292; Brooklyn Bedding's Admin. Case Br. (Feb. 9, 2021), PR 274, CR 291;

Brooklyn Bedding's Rebuttal Admin. Case Br. (Feb. 16, 2021), PR 276, CR 293;

Zinus Indonesia's Rebuttal Admin. Case Br. (Feb. 17, 2021), PR 277, CR 294.

Commerce published its Final Determination on March 25, 2021.  See Final

Determination, 86 Fed. Reg. at 15,899; Issues and Decision Memo Final

Affirmative Determination Less-Than-Fair-Market Value Investigation Mattresses

from Indonesia ("IDM"), ECF No. 15-4.

 In the Final Determination, Commerce continued to apply the quarterly

ratios methodology for assigning country of origin to mattresses sold from Zinus

U.S.' constructed export price inventory and continued to calculate constructed

value profit and selling expenses based on the financial statements of Emirates.

IDM at 8–9, 20–25.  Commerce also made adjustments to constructed export price

sales based on sales deductions of Zinus U.S. and Best Price Mattress, Inc. ("Best

Price Mattress"), an affiliated company, during the period of investigation.  Id. at

15.  Zinus Indonesia's antidumping margin was calculated at 2.22 percent.  Final

Determination, 86 Fed. Reg. at 15,900.

The antidumping duty order was published on May 14, 2021.  Mattresses

from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey,

and the Socialist Republic of Vietnam ("Antidumping Duty Order"), 86 Fed. Reg.

26,460 (Dep't of Commerce May 14, 2021) (antidumping duty orders and

amended final affirmative antidumping determination for Cambodia).  Zinus

Indonesia timely filed this action.  See Summons, ECF No.1; Compl., ECF No. 5.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).

The Court will hold unlawful any determination found to be unsupported by

substantial evidence on the record or otherwise not in accordance with the law. 19

U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Legal Framework

Commerce imposes antidumping duties on foreign goods if "(1) it

determines that the merchandise 'is being, or is likely to be, sold in the United

States at less than its fair value,' and (2) the International Trade Commission

determines that the sale of the merchandise at less than fair value materially

injures, threatens, or impedes the establishment of an industry in the United

States." Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306

(Fed. Cir. 2017).  Antidumping duties are calculated as the difference between the

normal value of subject merchandise and the export price or the constructed export

price of the subject merchandise.  19 U.S.C. § 1673.

        Normal value is ordinarily determined using the sales price of the subject

merchandise in the seller's home market.  19 U.S.C. § 1677b(a)(1)(B)(i).  If

Commerce determines that normal value cannot be reliably calculated using home

market or third-country sales, Commerce may use the subject merchandise's

constructed value as an alternative to normal value.  Id. § 1677b(a)(4).  The

method for calculating constructed value is defined by statute.  Id. § 1677b(e).

When calculating constructed value, Commerce must utilize the respondent's

actual selling, general, and administrative expenses, and profits in the respondent's

home market or a third-country market.  Id. § 1677b(e)(2)(A).  If Commerce

cannot rely on those data, it may look to:

> (i) the actual amounts incurred and realized by the specific exporter or
> producer being examined in the investigation or review for selling,
> general, and administrative expenses, and for profits, in connection
> with the production and sale, for consumption in the foreign country,
> of merchandise that is in the same general category of products as the
> subject merchandise,

(ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

Id. § 1677b(e)(2)(B).

Commerce must also calculate export price or constructed export price

(collectively, "U.S. price"). Export price is:

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States,

subject to certain adjustments. Id. § 1677a(a). Constructed export price is:

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter,

subject to certain adjustments. Id. § 1677a(b). The price used to calculate export

price and constructed export price is reduced by commissions, selling expenses,

further manufacturing expenses, and the profit allocated to these expenses.  Id. § 1677a(d).

## II.    Quantity of Mattresses Methodology

During the period of investigation, Zinus U.S. purchased mattresses produced in Indonesia and three other countries, which were comingled in warehouses maintained by Zinus U.S. or third parties.  IDM at 8; Zinus Indonesia's Section A Questionnaire Resp. (Jun. 19, 2020) at A-5–A-6, PR 97–102, CR 36–39. Zinus Indonesia reported to Commerce that Zinus Korea was able to track the country of origin for mattresses sold and shipped directly to unaffiliated United States customers, but Zinus U.S. did not track the country of origin for sales of mattresses held in its United States warehouses.  IDM at 8; Zinus Indonesia's Section A Questionnaire Resp. at A-4–A-7.

In order to calculate a quantity of subject mattresses sold from its United States inventory, Zinus Indonesia advocated for Commerce to adopt a first-in-first-out methodology, which Zinus Indonesia used in its responses.  IDM at 8; see also Zinus Indonesia's Section A Questionnaire Resp. at A-6–A-7; Zinus Indonesia's Supp. Section C Questionnaire Resp (Sept. 21, 2020). at SC1-10–SC1-11, PR 193, CR 167.  In support of this methodology, Zinus Indonesia provided Commerce with a monthly breakdown of mattresses imported into the United States, which identified imports by country of origin, month, and model.  See Zinus Indonesia's

Second Supp. Section C Questionnaire Resp. (Sept. 28, 2020), Ex. SC2-1, PR 200, CR 214.  Brooklyn Bedding argued during the administrative investigation that the first-in-first-out methodology was distortive of total constructed export price inventory sales and proposed that Commerce apply a quarterly ratios methodology in which the quantity of mattresses purchased by Zinus U.S. for each quarter under review was apportioned based on country.  IDM at 8; Brooklyn Bedding's Pre-Prelim. Cmts. (Oct. 9, 2020) at 6–10, 15–17, PR 210, CR 219.  The percentage assigned to Indonesia-origin mattresses was applied to Zinus U.S.' total sales for the corresponding quarter.  IDM at 9; PDM at 10; see also Brooklyn Bedding's Pre-Prelim. Cmts. at 15.

In the Preliminary Determination, Commerce adopted the quarterly ratios methodology.  PDM at 10.  In discussing the first-in-first-out methodology, Commerce stated that "[q]uestions remain about the accuracy of this methodology with respect to [constructed export price] sales reporting" and that Commerce would "continue to examine this issue for purposes of the final determination."  Id. In the Final Determination, Commerce continued to apply the quarterly ratios methodology, finding it to be the preferrable methodology because "it applies quarterly ratios grounded in purchase data to the full universe of Zinus U.S.' sales from inventory during the [period of investigation], it is neutral in terms of

determining which sales to report as subject merchandise sales," and "is less susceptible to manipulation." IDM at 8–9.

Plaintiff argues that Commerce erred in adopting a quarterly ratios methodology for determining the quantity of subject constructed export price inventory sales over Plaintiff's proposed first-in-first-out methodology. Pl.'s Mem. Supp. Pl.'s Mot. J. Agency R. ("Pl.'s Br.") at 12–26, ECF Nos. 22-1, 23-1. Plaintiff presents two arguments. Id.

First, Plaintiff contends that Commerce's decision to adopt the quarterly ratios methodology proposed by Brooklyn Bedding over the first-in-first-out methodology proposed by Plaintiff was not supported by substantial evidence. Id. at 15–20. Plaintiff argues that Commerce failed to address the merits of the first-in-first-out methodology and misconstrued the record evidence in weighing the reimbursement of warranty claims and the payment of commissions. Id. at 16–19. Plaintiff contends that it provided evidence on the record demonstrating that the first-in-first-out methodology was accurate, reasonable, and "vastly superior to [the] quarterly import ratios, which do not correlate to the model- and time-specific import patters [sic] and result in widespread distortions and inaccuracies." Id. at 18–19. Plaintiff further argues that Commerce acted unreasonably in rejecting the first-in-first-out methodology without soliciting additional information and documentation related to Commerce's concerns. Id. at 19–20. Plaintiff contends

that record evidence demonstrated that commissions and warranties were not paid

on subject mattresses during the period of investigation because Zinus Indonesia

did not use selling agents for the subject mattresses and warranties were not

offered, only "defective allowances." Id. at 16–17.

Defendant and Brooklyn Bedding raise multiple arguments in opposition to

Plaintiff's position.  First, Defendant and Brooklyn Bedding contend that Plaintiff

was given an opportunity to defend the first-in-first-out methodology and failed to

carry its burden of convincing Commerce.  Brooklyn Bedding's Resp. at 12–17;

Def.'s Resp. at 24–25.  Specifically, issues regarding the first-in-first-out

methodology were raised by Brooklyn Bedding during the investigation and

Commerce solicited responses to two questionnaires following the Preliminary

Determination.  Brooklyn Bedding's Resp. at 12–17; Def.'s Resp. at 24.  Second,

Defendant and Brooklyn Bedding argue that Plaintiff did not adequately explain

how the first-in-first-out methodology functions or address record evidence that the

methodology was distortive.  Def.'s Resp. at 22–23; Brooklyn Bedding's Resp. at

14–17.  Third, Defendant and Brooklyn Bedding argue that Plaintiff's opposition

to Commerce's focus on the payment of warranties and commissions ignores the

relevant point of whether Plaintiff was capable of tracking the country of origin for

constructed export price inventory sales.  Def.'s Resp. at 23–24; Brooklyn

Bedding's Resp. at 17–19.  Regardless of whether commissions were paid and if

certain payments were classified as "warranties" or "defective allowances,"
Defendant and Brooklyn Bedding contend that the record did not explain how
Zinus U.S. could seek reimbursement from its suppliers or grant commissions on
non-subject merchandise without tracking the country of origin.  Def.'s Resp. at
23–24; Brooklyn Bedding's Resp. at 17–19.

        Second, Plaintiff argues that even if Commerce's use of the quarterly ratios
methodology was supported by substantial evidence, the inclusion of mattresses
still in-transit from Indonesia to the United States at the end of the period of
investigation was unreasonable.  Pl.'s Br. at 21–26.  Plaintiff contends that
Brooklyn Bedding's calculations, which were adopted by Commerce, were based
on the quantity of mattresses shipped from Indonesia and not the quantity of
mattresses that entered the United States during the period of investigation.  Id. at
21–23.  Plaintiff submitted evidence showing that mattresses were sold by Zinus
Korea to Zinus U.S. using free on board shipping terms, under which title passed
from Zinus Korea to Zinus U.S. at the time of shipment.  Zinus Indonesia's Second
Supp. Section C Questionnaire Resp. at 1–2.  Plaintiff contends that any
identification of constructed export price inventory sales must be limited to the
inventory actually received by Zinus U.S. and that substantial record evidence does
not support the inclusion of in-transit mattresses.  Pl.'s Br. at 23–25.  Plaintiff also
argues that Commerce failed to consider and address Plaintiff's arguments

regarding the inclusion of in-transit mattresses or to explain its reasoning for

adopting the figures offered by Brooklyn Bedding.  Id. at 25–26.

    Brooklyn Bedding argues that Plaintiff has provided no factual or legal

support for its position that mattresses in-transit could not have been sold from

Zinus U.S.' inventory.  Brooklyn Bedding's Resp. at 22.  Defendant and Brooklyn

Bedding contend that record evidence demonstrates that sales were made of

mattresses before the mattresses entered the United States.  Id. at 22–23; Def.'s

Resp. at 26.  Brooklyn Bedding notes that Zinus Korea never took physical

possession of mattresses before shipment to Zinus U.S. and that "back-to-back"

sales were reported using a date based on shipment from Indonesia to the United

States.  Brooklyn Bedding's Resp. at 23.  Brooklyn Bedding also notes that

Plaintiff has offered no internal policy precluding the sale of mattresses before

importation, which is seemingly permitted under Plaintiff's accounting practices.

Id. at 24.  Defendant and Brooklyn Bedding cite the language of 19 U.S.C.

§ 1677a(b), which defines "constructed export price," and contemplates sales to

purchasers within the United States before the physical importation of goods.  Id.

at 23; Def.'s Resp. at 26; see also 19 U.S.C. § 1677a(b).

    In determining whether subject merchandise was sold at less than fair value,

Commerce compares "the export price or constructed export price and normal

value."  19 U.S.C. § 1677b(a).  Because Zinus Indonesia did not have home market

or third country sales, normal value was based on constructed value.  Id.
§ 1677b(a)(1); see also Zinus Indonesia's Notification Non-Viable Home Market
(May 28, 2020), PR 82; PDM at 8–9, 12–13.  Constructed export price is the price
at which subject merchandise is first sold in the United States by a seller affiliated
with the producer or exporter to a non-affiliated purchaser.  19 U.S.C. § 1677a(b).

Calculation of constructed export price requires Commerce to identify sales
of subject merchandise in the United States during the period of investigation.  See
id.  The relevant statutes and regulations provide little guidance on how to allocate
merchandise within an inventory that comingles subject and non-subject
merchandise.  Commerce has discretion in determinations "involv[ing] complex
economic and accounting decisions of a technical nature."  See Fujitsu Gen. Ltd. v.
United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citation omitted).  Commerce
still "must [ ] explain [cogently] why it has exercised its discretion in a given
manner."  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463
U.S. 29, 48 (1983) (citation omitted).  The methodology adopted by Commerce
must be a reasonable means of effectuating the statutory purpose.  Tri Union
Frozen Prods., Inc. v. United States, 40 CIT __, __, 163 F. Supp. 3d 1255, 1301
(2016), aff'd, 741 F. App'x 801 (Fed. Cir. 2018) (citing Ceramica Regiomontana,
S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd,
810 F.2d 1137, 1139 (Fed. Cir. 1987)).  A party proposing a methodology bears the

burden of establishing that the allocation is "as specific a basis as is feasible,

and . . . does not cause inaccuracies or distortions." 19 C.F.R. § 351.401(g)(2); see

also Koyo Seiko Co. v. United States, 551 F.3d 1286, 1293 (Fed. Cir. 2008)

(importer has the burden to prove its proposed methodology is "calculated on as

specific a basis as is feasible" and is free of distortions). The Court will affirm

Commerce's choice of a methodology even if substantial evidence supports

multiple options. See Fujitsu Gen. Ltd., 88 F.3d at 1044.

Commerce has discretion in selecting the methodology for allocating goods

in an investigation but must base its methodology on the best available information

in order to establish antidumping margins as accurately as possible. Tri Union

Frozen Prods., 40 CIT at __, 163 F. Supp. 3d at 1267; see also Shakeproof

Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d

1376, 1382 (Fed. Cir. 2001). Commerce justified its adoption of the quarterly

ratios methodology by explaining that the methodology "applies quarterly ratios

grounded in purchase data to the full universe of Zinus U.S.' sales from inventory

during the [period of investigation]," "is neutral in terms of determining which

sales to report as subject merchandise sales," and "is less susceptible to

manipulation." IDM at 9. In support of its determination, Commerce stated that it

agreed with Brooklyn Bedding's Pre-Preliminary Comments regarding the

accuracy of the quarterly ratios methodology. Id. (citing Brooklyn Bedding's Pre-

Prelim. Cmts. at 15–17).  In the cited submission, Brooklyn Bedding explained the

process of calculating the quarterly ratios methodology as beginning with

quantities reported in Zinus Indonesia's Section C Questionnaire Response and

adjusting the quantities to reflect the total number of mattresses shipped by Zinus

Indonesia to Zinus Korea during the period of investigation based on Zinus

Korea's sales reconciliation.  Brooklyn Bedding's Pre-Prelim. Cmts. at 15.  Using

these figures, Brooklyn Bedding calculated the ratios of Indonesian-origin

mattresses to the total product shipped for each quarter and applied the ratios to the

constructed export price inventory reported by Zinus Indonesia.  Id.  Brooklyn

Bedding explained that the quarterly ratios methodology was more accurate and

less susceptible to variation than a first-in-first-out approach or last-in-last-out

approach.  Id. at 16–17.

     With respect to the alternative first-in-first-out methodology proposed by

Plaintiff, Commerce explained that the first-in-first-out methodology did "not

accurately or appropriately capture a sufficient number of sales of subject

merchandise" and there were inconsistencies between Plaintiff's ability to offer

warranties and commissions and Plaintiff's claimed inability to track the country of

origin for mattresses sold.  IDM at 9.  In questioning the reliability of Zinus

Indonesia's reporting, Commerce determined that the first-in-first-out

methodology:

> [did] not accurately or appropriately capture a sufficient number of
> sales of subject merchandise.  To come to any other conclusion would
> be inconsistent with the commercially realistic business practices of a
> multinational company engaged in the production and sale of a
> consumer product such as mattresses that provides commissions on
> certain sales from its inventory.

Id.

The Court concludes that Commerce expressed reasonable concerns

regarding the accuracy of the first-in-first-out methodology.  The Court notes that

Commerce was not required to adopt the first-in-first-out methodology proposed

by Plaintiff over the valid alternative quarterly ratios methodology.  See Fujitsu

Gen. Ltd., 88 F.3d at 1044.  Commerce explained that the quarterly ratios

methodology was preferable because it was grounded in Zinus U.S.' purchase data,

was applied to the totality of the subject mattresses available for sale during the

period of investigation, and was neutral in determining which sales to designate as

subject merchandise.  IDM at 9 (citing Brooklyn Bedding's Pre-Prelim. Cmts. at

15–17).  In the absence of accurate records maintained by Zinus Indonesia and

Zinus U.S., the Court concludes that Commerce's use of the quarterly ratios

methodology was reasonable because Commerce determined that it more

accurately identified the quantity of subject mattresses sold than the alternate

proposed method that Commerce deemed questionable.  The Court sustains

Commerce's use of the quarterly ratios methodology.

Plaintiff argues that if the Court were to sustain the use of the quarterly ratios methodology, it should remand this case to Commerce with instructions to exclude from the constructed export price calculation mattresses that had not yet arrived in the United States at the end of the period of investigation.  Pl.'s Br. at 21–26.  Plaintiff contends that Commerce's inclusion of mattresses in-transit from Indonesia at the end of the period of investigation was unsupported by record evidence that demonstrated that mattresses classified as in-transit could not have been shipped to customers during the period of investigation.  Id.  Brooklyn Bedding and Defendant argue that Commerce was correct to include mattresses in-transit because the relevant statute contemplates sales before importation into the United States and the record supports that mattresses were sold to United States customers despite being classified as in-transit.  Brooklyn Bedding's Resp. at 22–24; Def.'s Resp. at 26–27.

Section 1677a(b) of title 19 defines "constructed export price" as:

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States *before or after the date of importation* by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

19 U.S.C. § 1677a(b) (emphasis added).  This statutory definition expressly contemplates the potential for goods to be sold in the United States before physical importation.  Id.

Commerce acknowledged Zinus Indonesia's objection to the inclusion of mattresses still in-transit from Indonesia at the end of the period of investigation but did not provide express reasons for or specific record evidence in support of rejecting the argument, stating only that "[w]e therefore agree with the petitioners that the quarterly ratio sales reporting methodology used in the Preliminary Determination, along with the quantity of mattresses that Zinus U.S. purchased from [Zinus Korea], is preferable in this case."  IDM at 8–9.  Though inclusion of goods sold or agreed to be sold in-transit prior to importation might be permissible under 19 U.S.C. § 1677a(b), Commerce failed to provide sufficient explanation or citations to record evidence to support its inclusion of in-transit pre-importation goods sold in this case.  The Court remands to Commerce for further consideration and explanation of its determination to include mattresses in-transit in the calculation of constructed export price.

### III.    Constructed Value Profit Calculations

Commerce based the calculation of normal value on constructed value.  IDM at 21.  Because Zinus Indonesia lacked a viable home or third-country market, Commerce calculated constructed value profit and selling expenses under 19

U.S.C. § 1677b(e)(2)(B), which provides three methods:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

19 U.S.C. § 1677b(e)(2)(B).  Commerce eliminated options (i) and (ii) because "[Zinus Indonesia did] not have sales of the general category of merchandise in the home market and there [were] no other respondents being investigated in this proceeding" and applied option (iii).  IDM at 21; see also Zinus Indonesia's Notification Non-Viable Home Market.

Commerce considered financial statements for eight companies provided by the parties to the investigation: PT Graha Seribusatu Jaya ("Graha"), an Indonesian producer of mattresses; PT Ecos Jaya Indonesia ("Ecos"), an Indonesian producer

of mattress and sleep products; PT Inocycle ("Inocycle"), an Indonesian producer

of non-woven and staple fiber and materials recycling; PT Chitose International

("Chitose International"), an Indonesian producer of furniture for homes, schools,

restaurants, and hospitals; PT Boston Furniture Industries ("Boston Furniture"), an

Indonesian producer of wood furniture and special construction or repairs; Luxury

Sleep Products, a Malaysian producer of bedroom furniture; Slarafija Trade, a

Serbian producer of mattresses; and Emirates, an Indian producer of mattresses.

IDM at 21–24.  Upon consideration of the submitted financial statements,

Commerce selected Emirates to be the best available surrogate for calculating

constructed value profit.  Id. at 25.

     Commerce also determined that it was unable to calculate a profit cap in

accordance with section 1677b(e)(2)(B)(iii) "because the record [did] not contain

any information for making such a calculation."  Id. at 25.  Noting that Commerce

may apply section 1677b(e)(2)(B)(iii) on the basis of facts available, Commerce

determined Emirates to be "the best option for determining the profit cap as facts

available" and adopted Emirates' profit information as a "reasonable profit cap."

Id.  Plaintiff challenges Commerce's (A) use of Emirates financial statements as

surrogate date; (B) rejection of Indonesian manufactures in selecting surrogate

financial data; and (C) calculation, or lack of calculation, of the statutorily required

profit cap.  Pl.'s Br. at 26–36.

### A.    Emirates Sleep Systems Private Limited

Plaintiff argues that Commerce's selection of Emirates as a surrogate data source was unsupported because Emirates' financial statement was not specific to the subject merchandise, the respondent, foreign market, or period of investigation. Pl.'s Br. at 30; see Brooklyn Bedding's Submission Concerning Constructed Value Profit Selling Expenses (Aug. 17, 2020) at Att. 2-B ("Emirates' Financial Statement"), PR 154, CR 136.  Specifically, Plaintiff points to Emirates' lack of sales in Indonesia and Emirates' lack of business operations, products, and a customer base similar to that of Zinus Indonesia.  Pl.'s Br. at 29.  Plaintiff also notes that Emirates generated roughly 25 percent of its revenue through the sale of services and had missing annexures from its financial statements.  Id. at 29–30.

Brooklyn Bedding argues that Commerce's use of Emirates was permissible under 19 U.S.C. § 1677b(e)(2)(B) and consistent with existing precedent. Brooklyn Bedding's Resp. at 38.  Brooklyn Bedding argues that Commerce has greater freedom in selecting a surrogate under 1677b(e)(b)(iii) than under subsections (i) and (ii).  Id. at 38–39.  Brooklyn Bedding also disputes Plaintiff's contentions regarding the portion of Emirates' business related to services, noting that Commerce determined the services in question to be of a nature appropriate for a company engaged in the manufacture and sale of mattresses.  Id. at 39–40. Brooklyn Bedding highlights that Commerce addressed the issue of Emirates'

missing annexures at the time of the <u>Final Determination</u> and determined Emirates'

Financial Statement to be complete.  <u>Id.</u> at 40.

Defendant contends that Commerce's use of Emirates' Financial Statement

was supported by the record.  Def.'s Resp. at 39–40.  Defendant argues that

Commerce was not required to select a company from Indonesia and acted within

its authority in selecting financial statements deemed more accurate and reliable,

even when the financial statements were not fully contemporaneous.  <u>Id.</u> at 40–44.

In selecting a surrogate data source, Commerce considered four criteria:

> (1) similarity of the potential surrogate companies' business operations
> and products to the respondent's business operations and products;
> (2) the extent to which the financial data of the surrogate company
> reflect sales in the home market and do not reflect sales to the United
> States; (3) the contemporaneity of the data to the [period of
> investigation]; . . . [and (4)] the extent to which the customer base of
> the surrogate company and that of the respondent are similar.

IDM at 22; <u>see also</u> <u>Mid Continent Steel & Wire, Inc. v. United States</u> ("<u>Mid</u>

<u>Continent II</u>"), 941 F.3d 530, 542–43 (Fed. Cir. 2019) (concluding that

Commerce's analysis applying the four part framework was a reasonable

interpretation of the statute).  Commerce also reviewed the provided financial

statements to ensure that they "(1) reflect[ed] a net profit; (2) [were] complete (i.e.,

all of the financial statements [were] included with the auditor's report showing an

unqualified opinion and all accompanying footnotes were provided); and (3)

[were] fully translated."  IDM at 22.  Based on these criteria, Commerce

eliminated all financial statements other than those of Emirates and Inocycle.  Id. at
23.

In comparing the financial statements of Emirates and Inocycle, Commerce
noted that "[t]he specific language of both the preferred and alternative methods
[(19 U.S.C. § 1677b(e)(2)(A) & (B))] appear to show a preference that the profit
and selling expenses reflect: (1) production and sales in the foreign country; and
(2) the foreign like product, i.e., the merchandise under consideration."  Id. at 23.
Emirates is an Indian-based manufacturing company that primarily manufactures
mattresses, bases, and other sleep-related products and derives the majority its
revenue from manufacturing mattresses.  Id. at 23–24; Emirates' Financial
Statement.  Inocycle is an Indonesian-manufacturer that derives six percent of its
revenue from the production of mattresses.  IDM at 23; Zinus Indonesia's
Constructed Value Profit Submission at Ex. 3 ("Inocycle's Financial Statement"),
PR 156–63, CR 137–44.

In its administrative case brief before Commerce, Zinus Indonesia argued
that Emirates' Financial Statement was not sufficiently contemporaneous to the
period of investigation.  Zinus Indonesia's Admin. Case Br. at 33–38.  That a
financial statement does not fully overlap the period of investigation does not
defeat its contemporaneity for purposes of section 1677b(e)(b)(iii).  See DuPont
Teijin Films China Ltd. v. United States, 38 CIT 1282, 1291–92, 7 F. Supp. 3d

1338, 1349 (2014) (Commerce's decision to rely on data that overlapped with two

months only of the period of investigation was reasonable).  Commerce may opt to

prioritize factors such as accuracy or reliability over contemporality as long as the

adopted financial statement overlaps with the period of investigation.  See Qingdao

Sea-Line Trading Co., Ltd. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014)

(Commerce's decision to use more accurate but less contemporaneous data was

reasonable).  In this case, the period of investigation was January 1, 2019 through

December 31, 2019.  IDM at 2.  Emirates' Financial Statement covered fiscal year

April 2018 through March 2019.  See Emirates' Financial Statement at 1.  Because

Emirates' Financial Statement overlapped the first three months of the period of

investigation, the Court concludes that Commerce was reasonable in its

determination that the financial statement was sufficiently contemporaneous.

Commerce considered Zinus Indonesia's argument that Emirates was not a

comparable business because 23.29 percent of its revenue was derived from

advertising, marketing, and promotional services.  IDM at 24; see Emirates'

Financial Statement at Annexure A.  Emirates was "a manufacturing company

basically into the manufacturing of all types and kinds of mattresses, bases, and

other sleep related products and systems.  The company [was] also into trading

both wholesale and retail, of such manufactured products.  The company

provide[d] advertising, marketing, and promotional services to its holding

company." Emirates' Financial Statement at Independent Auditor's Report, note 1.

Commerce observed that the majority of Emirates' activities related to the

manufacturing of mattresses and concluded that "marketing, promotion, and

trading activities related to mattresses and sleep systems [was] a completely

appropriate activity for a company engaged in the manufacturing and sale of

mattresses." IDM at 24. Commerce also determined that the record did not

include any evidence suggesting that the expenses related to these activities was

not properly included in Emirates' profit calculation. Id. Commerce limited its

calculation of constructed value selling expenses to transportation expenses and

excluded costs associated with retail, marketing, advertising services, and

commissions. Id.

Emirates' business activities related to the wholesale and retail sale of

mattresses and the majority of Emirates' business activities were the same as those

of Zinus Indonesia. IDM at 23–25; see also PDM at 13. The only other candidate

determined acceptable by Commerce, Inocycle, was predominantly engaged in the

processing of non-woven fibers and the manufacture of artificial stable fibers.

IDM at 23–25; see Inocycle's Financial Statement. Inocycle's manufacture of

homeware products, including pillows, bolsters, mattresses, blankets, carpets,

mattress protectors, and bed cover sets for sale in the Indonesian market was a

minority of its business operations. IDM at 23–24; see Inocycle's Financial

Statement.  The Court concludes that Commerce's determination that the products

and business operations of Emirates were sufficiently similar to those of Zinus

Indonesia, and were preferable over Inocycle, was reasonable and supported by the

record.

Missing from Emirates' Financial Statement were annexures referenced in

the auditor's notes.  IDM at 25; see Emirates' Financial Statement at Independent

Auditor's Report, notes 6, 8, 12, 13.  In a footnote in its administrative case brief,

Zinus Indonesia argued before Commerce that the missing annexures rendered the

financial statement incomplete.  IDM at 25; Zinus Indonesia's Admin. Case Br. at

36, n.51.  Commerce reviewed Emirates' Financial Statements, including the

Independent Auditor's Report.  IDM at 24–25; Emirates' Financial Statement at

Independent Auditor's Report.  Upon its review, Commerce determined that the

information provided for Emirates included a full audit report, each of the financial

statements, and all of the accompanying footnotes.  Id. at 25.  Commerce also

determined that none of the referenced annexures referred to information that

would call into question the amounts on the income statement or the related profit

and selling expenses and that the annexures were referenced in the auditor's notes

that already detailed the corresponding balance sheet items.  Id.; see Emirates'

Financial Statement at Independent Auditor's Report, notes 6, 8, 12, 13.

Commerce reasonably rejected Plaintiff's annexure argument because Emirates provided a full audit report, financial statements, and accompanying footnotes and none of the missing annexures called into question the reflected profit and selling expenses.  IDM at 25.  Because the annexures did not undermine the reliability or accuracy of Emirates' Financial Statement, the Court concludes that Commerce's acceptance of the financial statements was reasonable.

As Commerce determined, Emirates was a mattress producer with similar business operations, products, and customer base to Zinus Indonesia.  Id. at 25. Commerce reasonably determined that Emirates' financial documents were sufficiently contemporaneous to the period of investigation and the record did not include any reason to question the financial documents' reliability or accuracy.  Id. at 24.  Commerce's determination that Emirates provided the best option for calculating constructed value was consistent with its established criteria.  The Court concludes that Commerce's choice of Emirates as an acceptable surrogate data source was supported by substantial evidence.

## B.     PT Graha Seribusatu Jaya and PT Ecos Jaya Indonesia

Plaintiff argues that Commerce erroneously rejected the financial statements of two Indonesian mattress producers, Graha and Ecos.  Pl.'s Br. at 31–34. Commerce considered Graha's 2018 and 2019 financial statements.  IDM at 23; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 1; Brooklyn

Bedding's Submission Concerning Constructed Value Profit Selling Expenses at

Att. 1; Graha's Section A Questionnaire Resp. (Jun. 19, 2020) at Ex. A-27–A32,

PR 103, CR 44.  Commerce rejected Graha's 2018 financial statement as not

contemporaneous to the period of investigation and Graha's 2019 financial

statement as not audited.  IDM at 23.  Plaintiff contends that even if Commerce's

rejection of Graha's 2019 financial statement as incomplete was reasonable,

Commerce should have adopted Graha's 2018 financial statement over Emirates'

2018–2019 financial statement because the specificity of Graha's information for

the Indonesian market should have outweighed the limited contemporaneity of the

three months of overlap of Emirates' Financial Statement with the period of

investigation.  Pl.'s Br. at 32–33.  Commerce considered and rejected Ecos' 2019

financial statement because it contained a qualified opinion by the auditor relating

to estimated future liabilities pertaining to post-employment benefit obligations.

Id. at 22; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 2.

Plaintiff argues that Commerce failed to consider the significance of the auditor's

comment on the calculation of Ecos' profit and the auditor's indication that Ecos

would meet its obligations.  Id. at 33–34.

    Brooklyn Bedding and Defendant contend that Commerce's rejection of the

financial statements of Graha as not contemporaneous and unaudited was

consistent with Commerce's established practice and that the applicable statute

does not impose an obligation on Commerce to prioritize geographic proximity.

Brooklyn Bedding's Resp. at 41; Def.'s Resp. at 44–45.  Brooklyn Bedding and

Defendant also argue that Commerce's rejection of Ecos' financial statements

because of a qualified auditor's report was consistent with Commerce's existing

practice of not looking beyond surrogate financial statements and was reasonable

in light of Commerce's inability to seek clarification from the company or auditor.

Brooklyn Bedding's Resp. at 42–43; Def.'s Resp. at 45–46.  Brooklyn Bedding

and Defendant do not agree with Plaintiff's suggestion that the qualification was

trivial and unable to adversely affect the dumping margin calculation, and they

note that Commerce addressed the point in the Final Determination.  Brooklyn

Bedding's Resp. at 42–43; Def.'s Resp. at 45–46.  Finally, Brooklyn Bedding notes

that Plaintiff advanced no arguments before the Court rebutting Commerce's

analysis rejecting the other considered Indonesia companies: Inocycle, Chitose

International, and Boston Furniture.  Brooklyn Bedding's Resp. at 43.

Commerce is tasked with approximating a respondent's home market

experience and selecting data that permits it "to estimate, reasonably and fairly, a

profit rate that [the respondent] would have realized from sales in its home

market."  Mid Continent Steel & Wire, Inc. v. United States ("Mid Continent I"),

41 CIT __, __, 203 F. Supp. 3d 1295, 1310 (2017).  As discussed above,

Commerce identified multiple factors that it considered in determining what

surrogate financial information to use in its calculation, including the

contemporaneity of the available financial information with the period of

investigation.  IDM at 22; see Mid Continent II, 941 F.3d at 542–43.  The

administrative record included two financial statements for Graha covering the

year ending on December 31, 2018 and the year ending on December 31, 2019.

See Graha's Section A Questionnaire Resp. at Exs. A-27–A-28; Zinus Indonesia's

Constructed Value Profit Submission at Ex. 1A.  Commerce disregarded Graha's

2018 financial statement as not contemporaneous with the period of investigation.

IDM at 23.

　　　Commerce rejected Graha's 2019 financial statement because it was not

audited and Ecos' financial statement because its audit included a qualified

opinion.  Id.  Commerce noted that the qualification in Ecos' financial statement,

which concerned a deviation from the requirements of the generally accepted

accounting principles ("GAAP") of Indonesia, had the potential to impact the

constructed value calculation.  Id.  Because an audit supports the reliability of the

financial data, Commerce was within its discretion to favor an audited opinion over

an unaudited opinion.  See SeAH Steel VINA Corp. v. United States, 41 CIT __,

__, 269 F. Supp. 3d 1335, 1351–52 (2017).  Similarly, Commerce was within its

discretion to favor an unqualified auditor's opinion over a qualified auditor's

opinion.  See Golden Dragon Precise Copper Tube Grp., Inc. v. United States, 40

CIT __, __, 2016 WL 4442163, at *5 (2016).

In selecting a constructed value surrogate, Commerce was tasked with

comparing the options presented and their "comparative deficiencies."  See Mid

Continent II, 941 F.3d at 544 (in determining a surrogate for constructed value,

"[t]he size of any subsidies would obviously be relevant, as would the comparative

deficiencies of the alternative sources.").  Plaintiff argues that Commerce, despite

the deficiencies in the reported data of Graha and Ecos, should have prioritized the

manufacturers from Indonesia over an out-of-country manufacturer in order to

reach a more accurate constructed value calculation.  Though option (ii) of

§ 1677b(e)(2)(B) contains a geographic restriction for data from the home country

market, no similar restriction is included in option (iii).  Compare 19 U.S.C.

§ 1677b(e)(2)(B)(ii) with id. § 1677b(e)(2)(B)(iii); see also Thai I-Mei Frozen

Foods Co. v. United States, 31 CIT 334, 345–46, 477 F. Supp. 2d 1332, 1343

(2007).  In fact, to impose such a requirement on section (iii) would effectively

nullify the language "any other reasonable method."  The language of the statute

provides Commerce with discretion to weigh the individual factors and to identify

the best available information.  Because Commerce is not required to select a

manufacturer from the respondent's home market and the record supports the

rejection of the financial statements provided for Graha and Ecos, the Court

concludes that Commerce's determination was reasonable and supported by

substantial evidence.

### C. Profit Cap

Commerce determined that the record did not contain information necessary

to calculate a profit cap as required by 19 U.S.C. § 1677b(e)(2)(B)(iii).  IDM at 25.

In the alternative, Commerce applied facts available and adopted Emirates' profit

information as a profit cap for the Final Determination.  Id.  Using Emirates'

information, a constructed value profit rate of 18.36 percent was calculated.  See

PDM at 13; Prelim. Cost Calculation Mem. at 2, PR 231, CR 262; Final Cost

Calculation Mem. at 1–2, PR 286, CR 295.

Plaintiff contends that Commerce's failure to apply a profit cap in

accordance with section 1677b(e)(2)(B)(iii) caused the calculation of constructed

value to be unlawful.  Pl.'s Br. at 34–36.  Plaintiff argues that Commerce could

have utilized the financial records of the considered Indonesian companies to

establish a profit cap and that the information provided by Ecos suggests that the

ceiling for profit in the Indonesian market for mattresses was only 10.78 percent.

Id. at 34.  In recognizing a profit rate of 18.36 percent, Plaintiff argues, Commerce

ignored its obligation to apply an accurate and representative profit cap.  Id. at 34–

35.

Brooklyn Bedding and Defendant dispute Plaintiff's argument that Commerce failed to apply a profit cap in accordance with section 1677b(e)(2)(B)(iii) and note that Commerce did apply a profit cap based on the financial statements of Emirates.  Brooklyn Bedding's Resp. at 44; Def.'s Resp. at 47.  Defendant contends that it would have been inappropriate for Commerce to use the rejected financial statements of the Indonesian companies because usable information existed on the record in the form of Emirates' Financial Statement. Def.'s Resp. at 47–48.  Brooklyn Bedding and Defendant contend that Commerce complied with its statutory obligations in establishing a profit cap and that the use of Emirates' profit data was supported by substantial evidence on the record. Brooklyn Bedding's Resp. at 44–47; Def.'s Resp. at 48.

Section 1677b(e)(2)(B)(iii) of title 19 instructs that if Commerce relies on "any other reasonable method" for determining a respondent's expenses and profits in calculating constructed value, the amount allowed for profit is limited to "the amount normally realized by exporters or producers . . . in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise."  19 U.S.C. § 1677b(e)(2)(B)(iii).  This section requires that Commerce apply an "upward limit for profit commonly termed the 'profit cap.'"  SeAH Steel Corp. v. United States, 45 CIT __, __, 513 F. Supp. 3d 1367, 1398 (2021) (quoting Atar S.r.l. v. United

States, 730 F.3d 1320, 1322 (Fed. Cir. 2013)).  The statute provides that the profit

cap should be based on the profit on sales in the foreign country of merchandise in

the same general category of products as the subject merchandise.  19 U.S.C.

§ 1677b(e)(2)(B)(iii).  Commerce cannot sidestep its obligation without providing

an adequate explanation.  Husteel Co. v. United States, 39 CIT __, __, 98 F. Supp.

3d 1315, 1348 (2015).  When Commerce determines that it cannot calculate a

profit cap because the record lacks relevant information of sales in respondent's

home country of merchandise in the same general category of the subject

merchandise by home country producers, it must attempt to calculate a profit cap

based on facts available.  Id.

As an initial matter, Plaintiff's argument is incorrect that Commerce did not

calculate a profit cap.  In the Final Determination, Commerce determined that it

was:

> unable to calculate the amount realized by exporters or producers in
> connection with the sale, for consumption in the foreign country, of the
> merchandise in the same general category of products as the subject
> merchandise (i.e., the "profit cap"), in accordance with section
> 773(e)(2)(B)(iii) of the Act, because the record does not contain any
> information for making such a calculation.

IDM at 25.  In order to establish a profit cap, Commerce resorted to facts available.

Id.  Commerce determined that the financial statements of Indonesian

manufacturers on the record could not be used because "[n]one of the suggested

financial statements reflect profit only on sales of the general category of products in the foreign country under investigation." Id.  After eliminating the Indonesian companies, Commerce concluded that Emirates provided the best available information and that Emirates' profits served as a reasonable profit cap.  Id.

The record included financial statements from five Indonesian producers: Graha, Ecos, Inocycle, Chitose, and Boston Furniture.  Graha's Section A Questionnaire Resp. at Ex. A-27–A-28; Zinus Indonesia's Constructed Value Profit Submission at Exs. 2–5.  Chitose was an Indonesian producer of multiple types of furniture for use in homes, schools, and hospitals.  IDM at 22; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 4.  Boston Furniture was an Indonesian producer of wood furniture and special construction or repairs.  IDM at 22; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 5. Commerce determined that both Chitose and Boston Furniture produced goods not comparable to Zinus Indonesia.  IDM at 23.  Similarly, mattress manufacture and sales represented only a minority of Inocycle's business, which was predominantly dedicated to the production of fiber.  Id.; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 3.  Commerce acknowledged that Graha's financial statements might have reflected the necessary production and sales in Indonesia, but the statements suffered from a lack of contemporaneity and a lack of an

accompanying audit, and it was unclear if Graha made sales predominantly to the United States.  IDM at 25, n.153.

Plaintiff argues that Commerce should have adopted the profit information of Ecos in determining a profit cap, despite the qualified opinion of the auditor. Pl.'s Br. at 34–35.  Commerce disregarded the financial statement of Ecos because it contained a qualified audit.  IDM at 22–23.  The qualification was due to Ecos not calculating its estimated liabilities for post-employment employee benefits in accordance with Indonesian accounting standards.  Id.; see also Zinus Indonesia's Constructed Value Profit Submission at Ex. 2.  Plaintiff contends that Ecos' employment benefit liability was understated and translated into an overstatement of profits.  Pl.'s Br. at 33–34; see also Zinus Indonesia's Admin. Case Br. at 39– 40.  Plaintiff argues that if Commerce had used the financial statements of Ecos, it would have calculated a profit cap of 10.78 percent, which should represent the ceiling for Indonesian profit rates.  Pl.'s Br. at 34; see also Zinus Indonesia's Admin. Case Br. at 42–43.  Plaintiff contends that Commerce's calculation of an 18.36 percent profit rate using Emirates' data was unreasonable.  Pl.'s Br. at 34– 35.

The Court notes that Plaintiff has not provided record support for its assertion that the 10.78 percent profit rate derived from Ecos' data is more representative of the Indonesian market than the 18.36 percent profit rate derived

from Emirates' data, beyond Plaintiff's preference for Ecos' financial report that Commerce determined to be flawed.  Commerce expressly disagreed with Zinus Indonesia's contention that the qualified opinion would not impact the calculation of period costs, revenues, expenses, cash flow, profits, or selling expenses, and concluded that because the opinion relates to future obligations, Ecos' qualified financial report could either increase or decrease the current costs of Ecos.  IDM at 23.  Even if Emirates' profit rate was higher than those of the other companies considered, Commerce identified reasonable grounds for determining that the profit rates of the Indonesian companies did not represent merchandise in the same general category of the subject merchandise.

Based on its review of the financial statements on the record, Commerce determined that Emirates provided the best available option for the profit cap using facts available.  Id. at 25.  The Court observes that Commerce chose between several imperfect options.  The Court does not review whether Commerce used the best available information, but rather whether Commerce's determination of the best available information was reasonable.  See Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011).  Because Commerce examined numerous financial statements on the record and explained its determination sufficiently, Commerce has satisfied its statutory requirement to apply a profit cap and has articulated a reasonable justification for using Emirates'

profit data.  The Court sustains Commerce's use of Emirates' Financial Statement for the calculation of constructed value and the profit cap.

## IV.    Adjustment to Zinus U.S.' Report of Sales Deductions

During the investigation, Brooklyn Bedding alleged that Zinus Indonesia attempted to mask dumping of subject mattresses by shifting sales deductions to non-subject merchandise sold through Best Price Mattress.  See Brooklyn Bedding's Pre-Prelim. Cmts. at 2–3.  Commerce determined that "questions remain as to the commercial practicality of [Zinus Indonesia's] reporting of its sales practices with regard to commissions and certain other sales allowances" and that a price adjustment to U.S. sales was appropriate.  IDM at 13–14.  Commerce calculated the adjustment by combining the sales deductions, net of discounts, and returns of Zinus U.S. and Best Price Mattress, and dividing the sum by the combined gross sales of Zinus U.S. and Best Price Mattress.  Id. at 15.  Commerce applied the resulting ratios to the gross unit price of all constructed export price sales.  Id.  Plaintiff contends that Commerce's application of the price adjustment was unlawful and unsupported by the record.  Pl.'s Br. at 36–46.

### A.    Facts Available

Plaintiff argues that Commerce unlawfully relied upon facts available in reaching its determination to apply the adjustment to Zinus U.S.' constructed export price sales prices without satisfying the statutory prerequisites.  Pl.'s Br. at

36, 39–41.  Plaintiff alleges that Commerce could not have relied on facts available

because Zinus Indonesia provided all requested information relating to sales

allowances, commissions, and deductions, and Commerce did not advise Zinus

Indonesia of any reporting deficiencies prior to the <u>Final Determination</u>.  <u>Id.</u> at 38,

39–41.

      Brooklyn Bedding and Defendant contend that Plaintiff claims incorrectly

that Commerce relied on facts available in its determination to apply the price

adjustment.  Brooklyn Bedding's Resp. at 25, 29–30; Def.'s Resp. at 31–32.

Brooklyn Bedding and Defendant assert that Commerce instead adjusted its

methodology.  Brooklyn Bedding's Resp. at 27, 30–34; Def.'s Resp. at 31–32.

Brooklyn Bedding argues that Commerce was not required to solicit additional

information because Commerce's use of the phrase "questions remain" did not

relate to necessary information missing from the record.  Brooklyn Bedding's

Resp. at 25–26, 29–30.

      Commerce may apply "facts available" if:

      (1) necessary information is not available on the record, or

      (2) an interested party or any other person—

> (A)    withholds information that has been requested by the
> administering authority or the Commission under this subtitle,

> (B)    fails to provide such information by the deadlines for
> submission of the information or in the form and manner

> requested, subject to subsections (c)(1) and (e) of section 1677m
> of this title,
>
> (C)   significantly impedes a proceeding under this subtitle, or
>
> (D)   provides such information but the information cannot be
> verified as provided in section 1677m(i) of this title.

19 U.S.C. § 1677e(a).  The statute provides two paths through which Commerce

can rely on facts otherwise available.  The first is when information is absent from

the administrative record, regardless of the reason for the absence.  Id.

§ 1677e(a)(1).  The second requires a party's act or omission to negatively impact

the administrative record or impede the proceeding.  Id. § 1677e(a)(2).  Before

Commerce can rely on facts otherwise available, it must notify the party

responsible for submitting the relevant information of the deficiency and afford, to

the extent practicable, the party an opportunity to cure the deficiency.  Id.

§ 1677m(d).

Plaintiff alleges that Commerce's use of Best Price Mattress' cost data

constituted a facts available approach to the assessment of the price adjustment.

Pl.'s Br. at 39–41; Pl.'s Reply Br. Supp. R. 56.2 Mot. J. Agency R. ("Pl.'s Reply")

at 22–23, ECF Nos. 37, 38.  Plaintiff has not identified what facts Commerce

relied upon that were not in the administrative record.  Commerce issued

supplemental questionnaires following the Preliminary Determination that included

requests for information on commission costs for Zinus Indonesia, Zinus U.S., and

Zinus Korea; sales and business records of Zinus U.S. and Best Price Mattress;

changes in commissions practices following the Mattresses from China

investigation; and tracking inventory and country of origin.  See Zinus Indonesia's

Post-Prelim. Supp. Questionnaire Resp. (Dec. 15, 2020), PR 256, CR 271;

Commerce's Post-Prelim. Supp. Questionnaire in-lieu of Verification (Jan. 19,

2021), PR 262; CR 277.  Commerce acknowledged that Zinus Indonesia fully

responded to the questionnaires but determined that "questions remain as to the

commercial practicality of Zinus' reporting of its sales practices with regard to

commissions and certain other sales allowances."  IDM at 14; see also Zinus

Indonesia's Post-Prelim. Supp. Questionnaire Resp. (Dec. 15, 2020), PR 256, CR

271; Zinus Indonesia's Supp. Verification Questionnaire Resp. (Jan 28, 2021), PR

269; CR 278–79, 281.

Commerce identified multiple elements of Zinus Indonesia's responses that

it found inconsistent or suspicious:

> First, with respect to [constructed export price] inventory sales, as noted above in Comment 1, it is not clear how Zinus is able to identify which of the non-subject mattresses it sold from inventory earned commissions if it does not know the country of origin of the merchandise sold out of inventory.  In our Post-Preliminary Supplemental Questionnaire, we asked Zinus to explain why the company apparently changed its selling practices with respect to commissions on U.S. sales of the subject merchandise though Zinus U.S. since the time of the Mattresses from China investigation.  In response, Zinus stated that "Zinus U.S.'s customers to whom it paid a commission in the China investigation simply did not purchase

Indonesian mattresses during the [period of investigation], and thus did not earn commissions under the terms of the agreements based on sales of subject mattresses." However, Zinus did not explain why some of Zinus U.S.'s customers would agree to purchase mattresses of Indonesian origin on which they would earn no commissions when they could receive commissions from Zinus U.S. on mattresses manufactured in other countries.

Moreover, in its response to our Post-Preliminary Supplemental Questionnaire, Zinus also stated that Zinus U.S. sold subject merchandise to corporate customers whose affiliates purchased nonsubject merchandise from both Zinus U.S. and [Best Price Mattress] and earned commissions on these sales. Furthermore, for a particular customer, Zinus stated that, as of March 2019 (i.e., a month before Zinus U.S. began purchasing mattresses from Zinus), it no longer paid commissions to this customer and that Zinus began selling Indonesian mattresses to this customer in November 2019. Zinus again did not explain why it ceased paying commissions to this customer or whether the sourcing of the mattresses had any influence on this decision.

The fact that [Best Price Mattress'] financial statements on the record show disproportionate changes between [Best Price Mattress'] overall sales deductions and its revenues between 2018 and 2019 raises further questions about the reliability of Zinus' reporting with respect to its sales practices regarding the payment of commissions. For these reasons, we find it appropriate to make an adjustment to the prices of Zinus' [constructed export price] sales to ensure that all sales allowances and deductions are accounted for in the margin calculation.

IDM at 14. Commerce did not indicate that it was looking beyond the information on the administrative record to make its determination. In fact, during the investigation, Brooklyn Bedding argued for the application of facts otherwise available before Commerce, Brooklyn Bedding's Admin. Case Br. at 13–17; IDM

10–11, but Commerce declined to adopt this proposal in the <u>Final Determination</u>.

IDM at 14–15.

      The Court observes that Commerce's reference to the phrase "questions remain" did not relate to factual information missing from the record but to "the commercial practicality" of Zinus Indonesia's reporting.  IDM at 14.  Because no factual information was absent from the record necessary for Commerce to reach its determination to apply an adjustment, Commerce did not unlawfully apply facts otherwise available and was not required to solicit additional information.

## B.      Reasonableness of Commerce's Adjustment

      Plaintiff contends that Commerce's application of the price adjustment was unsupported by the record.  Plaintiff argues that Commerce was provided with all of Zinus Indonesia's requested sales and rebate information, but that Commerce disregarded this evidence and concluded without support that Zinus U.S. shifted expenses to Best Price Mattress.  Pl.'s Br. at 41–44.  Plaintiff challenges Commerce's characterization that Best Price Mattress' financial statements showed disproportionate changes in sales deductions and revenue between 2018 and 2019 and that these changes suggested impropriety.  <u>Id.</u> at 42.  Plaintiff argues that the sales deductions and revenue of Best Price Mattress were irrelevant to the matter before Commerce and should not have been considered in applying the adjustment.  <u>Id</u>.  Even if the information was relevant, Plaintiff contends that it does not call

into question the reliability of Zinus Indonesia's reporting.  Id. at 43–44.  Plaintiff

further contends that Commerce should alter its calculation to consider only

mattress-specific sales information and not company-wide sales information.  Id. at

45–46.

Brooklyn Bedding and Defendant contend that Commerce's determination

to apply a price adjustment was reasonable and supported by evidence, suggesting

that Zinus Indonesia shifted costs between Zinus U.S. and Best Price Mattress in

order to lower Zinus Indonesia's dumping margin.  Brooklyn Bedding's Resp. at

27–36; Def.'s Resp. at 27–30.  Brooklyn Bedding argues that Commerce has broad

discretion in imposing adjustments and that Commerce acted reasonably based on

the record evidence.  Brooklyn Bedding's Resp. at 27, 30–34.  Defendant argues

that the record reflected suspicious changes in Zinus U.S. and Best Price Mattress'

commissions policy and payments between the Mattresses from China

investigation and the period of investigation.  Def.'s Resp. at 28–29.  Defendant

asserts that Zinus Indonesia's claimed inability to track country of origin is

inconsistent with Zinus Indonesia's claim that commissions were only paid on non-

subject merchandise.  Def.'s Resp. at 31.  Brooklyn Bedding and Defendant also

contend that Plaintiff's implication that its customers agreed to purchase subject

mattresses on which no commissions were offered when those customers could

have earned commissions on non-subject mattresses is commercially impractical.

Id. at 29–30; see Brooklyn Bedding's Resp. at 27.  Defendant further argues that

Commerce did not disregard certain sales data but determined that the data did not

reflect a proper allocation based on other record evidence.  Def.'s Resp. at 32–33.

Brooklyn Bedding and Defendant assert that Commerce acted within its

available discretion in using company-wide data, rather than mattress-specific data,

and that the use of company-wide data was reasonable.  Brooklyn Bedding's Resp.

at 34–36; Def.'s Resp. at 33–34.  Defendant asserts that Plaintiff's suggestion to

use only mattress-specific sales is not practical because Commerce used the total

sales deductions and sales of both Zinus U.S. and Best Price Mattress in order to

put the companies in an equivalent position.  Def.'s Resp. at 33.  Defendant

contends that artificially reducing the denominator of the ratio to only Zinus U.S.'

sales of subject mattresses would distort the allocation.  Id.

In calculating constructed export price, Commerce makes a deduction of

costs and expenses related to selling subject merchandise in the United States.  19

U.S.C. § 1677a(d)(1).  The statute is silent as to how Commerce is to calculate

those expenses and Commerce has discretion in developing methodologies for

administering antidumping laws.  See Vicentin S.A.I.C. v. United States, 44 CIT

__, __, 466 F. Supp. 3d 1227, 1238 (2020).  The methodology adopted by

Commerce must be reasonable and not distortive, but Commerce need not exclude

all non-subject merchandise.  United States Steel Corp. v. United States, 34 CIT

252, 257, 712 F. Supp. 2d 1330, 1337 (2010); Acciai Speciali Terni S.p.A. v.

United States, 25 CIT 245, 277–78, 142 F. Supp. 2d 969, 1000–01 (2001); see also

19 C.F.R. § 351.401(g)(4).

The adjustment methodology adopted by Commerce combined Zinus U.S.'

and Best Price Mattress' 2019 sales deductions, net of discounts, and returns, and

divided the sum by the companies' combined gross sales.  IDM at 15; Final Sales

Calculation Mem. at 5–6, Att. 2, PR 287, CR 296.  The resulting ratio was applied

to all gross sales made by Zinus U.S.  IDM at 15; Final Sales Calculation Mem. at

5–6.  This methodology was designed to "tak[e] into consideration the sales

deduction experience of both [Zinus U.S. and Best Price Mattress] during the

[period of investigation]."  IDM at 15.

Commerce agreed with Brooklyn Bedding that a price adjustment was

appropriate because evidence showed that Zinus Indonesia was:

> masking dumping of Indonesian mattresses during the [period of
> investigation] by shifting sales deductions that would have been
> incurred by Zinus U.S. for sales of Indonesian mattresses to sales of
> non-subject merchandise made through a different affiliated reseller,
> [Best Price Mattress], the U.S. reseller at issue in the Mattresses from
> China investigation.

IDM at 13; see also Brooklyn Bedding's Post-Prelim. Cmts. (Nov. 19, 2020) at

7–9, PR 240, CR 265; Brooklyn Bedding's Admin. Case Br. at 7–11.  Commerce's

discussion of this issue focused on reported commissions paid by Zinus U.S. and

Best Price Mattress.  IDM at 13–14.

        During the Mattresses from China investigation, commissions were paid on

the sales of mattresses to certain United States customers.  See Brooklyn Bedding's

Post-Prelim. Cmts. at 7–9; Zinus Indonesia's Resp. Brooklyn Bedding's Post-

Prelim. Cmts. (Nov. 30, 2020) at 4–6, PR 243, CR 266; see also Zinus Indonesia's

Sub. Zinus Xiamen's Proprietary Info. Mattresses from China Investigation (Oct.

14, 2020), PR 212, CR 222–27, 247.  During the period of investigation, only

Zinus Korea, Zinus U.S., and Keetsa made sales of subject mattresses to the United

States, though Best Price Mattress continued to sell other mattresses produced by

Zinus affiliates.  Zinus Indonesia's Section A Questionnaire Resp. at A-1–A-2, A-

8–A-9.  Zinus Indonesia claimed that commissions were paid only on non-subject

mattresses during the period of investigation.  See Zinus Indonesia's Resp.

Brooklyn Bedding's Post-Prelim. Cmts. at 5–6.  In response to Commerce's

request to explain the change in commissions policy between the Mattresses from

China investigation, which covered January through June 2018, and the period of

investigation, Zinus Indonesia stated that "Zinus U.S.' customers to whom it paid a

commission in the China investigation simply did not purchase Indonesian

mattresses during the [period of investigation], and thus did not earn commissions

under the terms of the agreements based on sales of subject mattresses."  IDM at

13–14; Zinus Indonesia's Post-Prelim. Supp. Questionnaire Resp. at 4.  Commerce

also noted one instance in which Zinus U.S. ceased paying commissions without

explanation to a particular customer shortly before that customer began to purchase

subject mattresses.  IDM at 14; Zinus Indonesia's Post-Prelim. Supp.

Questionnaire Resp. at 5.

     Corresponding to the apparent change in commissions policy, Commerce

observed disproportionate changes between Best Price Mattress' sales deductions

and revenues between 2018 and 2019.  IDM at 14.  Commerce noted that these

discrepancies called into question Zinus Indonesia's reporting with regard to Zinus

Indonesia's sales practices.  Id. (citing Zinus Indonesia's Post-Prelim. Supp.

Questionnaire Resp. at 11).  Plaintiff argues that Best Price Mattress' sales

information for 2018 and 2019 was irrelevant to Commerce's considerations

because Best Price Mattress was not involved in the manufacture and sale of the

subject mattresses.  Pl.'s Br. at 42; Pl.'s Reply at 21–23.  Best Price Mattress, like

Zinus U.S., was wholly-owned by Zinus Korea and was involved in the selling of

mattresses to customers in the United States.  See IDM at 13–14;  Zinus

Indonesia's Section A Questionnaire Resp. at A-9, Ex. A-3.  Because Zinus U.S.

and Best Price Mattress shared a common parent and were involved in similar or

identical sales of mattresses in the United States under the direction of that parent,

it was reasonable for Commerce to include Best Price Mattress in its consideration

of whether Zinus U.S. was shifting costs in order to mask dumping.

Plaintiff contends that even if Commerce's consideration of Best Price

Mattress was appropriate, the record did not support Commerce's conclusion that

costs were being shifted.  Pl.'s Br. at 42–44.  Commerce relied on information

contained in a chart titled "Total Sales of [Best Price Mattress] by Product Group"

included in Zinus Indonesia's Post-Preliminary Supplemental Questionnaire

Response.  IDM at 14; Zinus Indonesia's Post-Prelim. Supp. Questionnaire Resp.

at 11.  The chart reflected a sizable disparity between the change in total sales

claimed by Best Price Mattress between 2018 and 2019 and the change in sales

deductions during the same period.  IDM at 14; see Zinus Indonesia's Post-Prelim.

Supp. Questionnaire Resp. at 11.  Citing to Zinus Indonesia's Ministerial Error

Comments, Plaintiff alleges that Commerce mischaracterized the chart data in light

of other information on the record.  Pl.'s Br. at 44 (citing Zinus Indonesia's

Ministerial Error Cmts. (Mar. 30, 2021), PR 293, CR 299).

The record included two relevant sources of Best Price Mattress' financial

information in 2018 and 2019: Best Price Mattress' June 2018 Balance Sheet and

Best Price Mattress' 2019 Financial Statement.  Zinus Indonesia's Supp. Section A

Questionnaire Resp. at Ex. SA-4c ("Best Price Mattress' 2019 Financial

Statement"), PR 165, CR 154; Zinus Indonesia's Sub. Zinus Xiamen's Proprietary

Info. Mattresses from China Investigation at Att. 1, Ex. A-10m ("Best Price

Mattress' 2018 Balance Sheet").  Plaintiff contends that a review of these

documents showed that Best Price Mattress' commission payments fell as a

percentage of both merchandise sales and total revenue between 2018 and 2019,

eliminating Commerce's reasoning for applying the price adjustment.  Pl.'s Br. at

43–44; see also Zinus Indonesia's Ministerial Error Cmts. at 11–15.

    The Court observes that Commerce's determination regarding the

inconsistencies in Best Price Mattress' reported sales deductions and revenues

between 2018 and 2019 was based on Zinus Indonesia's submission in direct

response to Commerce's request for information regarding the change in Best Price

Mattress' sales between 2018 and 2019.  See IDM at 14; Zinus Indonesia's Post-

Prelim. Supp. Questionnaire Resp. at 10–11.  The Total Sales of Best Price

Mattress by Product Group chart included in Zinus Indonesia's response to

Commerce showed a significant change between the period of investigation and

the prior year.  IDM at 14; Zinus Indonesia's Post-Prelim. Supp. Questionnaire

Resp. at 11.  Commerce did not discuss the other sources of Best Price Mattress'

financial information available on the record, but those sources covered different

durations of time and treated "sales deductions" differently than the Total Sales of

Best Price Mattress by Product Group chart.  Compare Zinus Indonesia's Post-

Prelim. Supp. Questionnaire Resp. at 11, with Best Price Mattress' 2018 Balance

Sheet, and Best Price Mattress' 2019 Financial Statement.  Because Commerce's

decision to apply a price adjustment was based on record information provided by

Zinus Indonesia in response to Commerce's inquiry into Best Price Mattress' 2018

and 2019 sales experience, the Court concludes that Commerce's determination

was supported by substantial record evidence.

Plaintiff argues that if Commerce's application of the price adjustment was

correct, it should still be required to revise its calculation to consider only mattress-

specific sales and not company-wide sales.  Pl.'s Br. at 45–46.  In Commerce's

calculation, the adjustment to U.S. sales deduction was represented as the variable

DEDUCT and served as the denominator in the ratio applied to the gross unit price

of all sales made by Zinus U.S.  Final Sales Calculation Mem. at 2, 6, Att. 2; see

IDM at 15.  The calculation of the DEDUCT variable incorporated total sales by

Zinus U.S. and Best Price Mattress, including non-mattress merchandise.  IDM at

15; Final Sales Calculation Mem. at Att. 2.

Commerce has discretion in the methodology it adopts in calculating

adjustments under 19 U.S.C. § 1677a(d) but the chosen methodology must be

reasonable.  United States Steel Corp., 34 CIT at 257, 712 F. Supp. 2d at 1337.

Commerce made an adjustment with a goal of "ensur[ing] that all sales allowances

and deductions [were] accounted for in the margin calculation."  IDM at 14.

Commerce expressly rejected a methodology proposed by Brooklyn Bedding

because it used the sales deductions of only one company.  Id. at 14–15.

Commerce instead "calculated a different adjustment that [took] into consideration

the sales deduction experiences of both [Zinus U.S. and Best Price Mattress]

during the [period of investigation]."  Id. at 15.

Selling expenses, such as commissions, are costs incurred by a company as a

whole and are typically not distinguishable to a singular product.  In fact, though

the 2018 and 2019 financial statements provided by Zinus Indonesia for Best Price

Mattress treated commissions differently, neither separated commissions paid or

other sales expenses by type of merchandise.  See Best Price Mattress' 2018

Balance Sheet; Best Price Mattress' 2019 Financial Statement; Zinus Indonesia's

Post-Prelim. Supp. Questionnaire Resp. at Ex. SQ-2.  Commerce's methodology

used the combined sales deductions, net of discounts, and returns of Zinus U.S. and

Best Price Mattress as its numerator.  IDM at 15.  Reducing the denominator to

consider only sales related to mattresses would create a distortion to the allocation.

The Court concludes that Commerce's inclusion of Zinus U.S.' and Best Price

Mattress' company-wide sales was reasonable and supported by substantial

evidence.  The Court sustains Commerce's price adjustment.

## V.    Zinus Korea's Selling Expenses

Brooklyn Bedding contends that Commerce failed to consider record

evidence of Zinus Korea's selling activities and argues for an adjustment to U.S.

price to account for Zinus Korea's selling expenses.  Brooklyn Bedding's Mem.

Points Law Fact Supp. R. 56.2 Mot. J. Agency R. ("Brooklyn Bedding's Br.") at

8–22, ECF No. 24, 25.  Zinus Indonesia and Defendant argue that Commerce

properly limited the selling expenses attributable to Zinus Korea's actual selling

expenses.  Def.'s Resp. at 48–52; Pl.'s Resp. Br. Opp'n Brooklyn Bedding's Mot.

J. Agency R. ("Pl.'s Resp.") at 13–28, ECF Nos. 31, 32.

　　　Commerce considered Zinus Korea to be an affiliate of Zinus Indonesia and

determined that Commerce's practice is to not view price markups between

affiliates as commissions and to not deduct those adjustments from U.S. price.

IDM at 32; see also Oil Country Tubular Goods from Mexico, 64 Fed. Reg. 13,962

(Dep't of Commerce Mar. 23, 1999) (final results of antidumping duty admin.

review) and accompanying Issues and Decision Mem. at cmt. 4.  Commerce

determined that it is Commerce's practice to deduct only the actual expenses

incurred by the affiliate.  IDM at 32.  Commerce must consistently apply

methodologies across administrative reviews and provide a reasoned explanation

for deviating from its past practice.  Polyethylene Retail Carrier Bag Comm. v.

United States, 29 CIT 1418, 1447 (2005).

　　　Commerce stated that its calculation included three categories of selling

expenses for Zinus Korea: advertising expenses, rebates, and bank charges.  IDM

at 32 n.213.  Commerce explained that this information was solicited by

Commerce and was considered "consistent with respect to [Zinus Korea's] reportedly limited role as an invoicing party in Zinus' U.S. sales process."  Id. at 32; see Commerce's Initial Section C Questionnaire at C-21, PR 67.  Brooklyn Bedding contends that Commerce failed to consider record evidence demonstrating that Zinus Korea had more than a minimal role in the selling of subject mattresses.  Brooklyn Bedding's Br. 12–16.  Commerce's determination is not supported by substantial evidence when Commerce fails to consider and address record evidence that clearly supports an alternative result.  See SeAH Steel VINA Corp. v. United States, 40 CIT __, __, 182 F. Supp. 3d 1316, 1336 (2016).

Commerce stated that Zinus Indonesia reported Zinus Korea's actual expenses incurred on behalf of U.S. sales in the U.S. sales database, but Commerce did not cite any record evidence to support this statement.  IDM at 32.  Commerce stated that Zinus Indonesia reported that Zinus Korea's general and administrative expenses were an element of Zinus Indonesia's expenses, citing Zinus Indonesia's questionnaire response at SD-25 and exhibit SD-25.  IDM at 32.  Commerce determined that "the reporting of such expenses [was] also consistent with respect to Zinus [Korea]'s reportedly limited role as an invoicing party in Zinus' U.S. sales process," without citing any evidence to support this statement.  Id.  Notably, the Court observes that Commerce did not provide an explanation or cite record

evidence to support its determination that Zinus Korea had a limited role as an invoicing party in Zinus U.S.' sales process.

Brooklyn Bedding contends that Commerce ignored potentially contrary evidence on the record showing that Zinus Korea engaged in more significant selling activities than the preparation of invoices. Brooklyn Bedding's Br. at 16–17. During the administrative proceeding, Brooklyn Bedding identified several facts within the record supporting its contention. For example, Brooklyn Bedding noted that Zinus Korea and Zinus U.S. shared a common senior official. Brooklyn Bedding's Admin. Case Br. at 23–38; see also Zinus Indonesia's Section A Questionnaire Resp. at Ex. A-6. In a chart of office locations provided to Commerce, the functions of both Zinus Korea and Zinus U.S. were identified as "Sale and Marketing." Brooklyn Bedding's Admin. Case Br. at 23; Zinus Indonesia's Section A Questionnaire Resp. at Ex. A-4. In its Section A Questionnaire Resp., Zinus Indonesia advised Commerce that "[w]ith respect to business relationships among the companies, [Zinus Korea] as the parent company, and its wholly/majority owned subsidiaries, closely coordinate[d] with one another to manage global manufacturing, operational, and sales activities." Brooklyn Bedding's Admin. Case Br. at 24; Zinus Indonesia's Section A Questionnaire Resp. at Ex. A-11. Zinus Indonesia also asserted in a response to Commerce "[a]gain, as Zinus has made clear throughout its responses . . . the Zinus entities

actually making the U.S. sales to unaffiliated customers reported in the sales

database are [Zinus Korea] or Zinus U.S."  Brooklyn Bedding's Admin. Case Br.

at 24; Zinus Indonesia's 8/20 Rebuttal Cmts. at 5, PR 166, CR 158.

Brooklyn Bedding also suggests that record evidence showed that Zinus

Korea was directly responsible for handling sales to unaffiliated customers of

mattresses purchased from Zinus Indonesia.  Brooklyn Bedding's Br. at 14–16; see

Zinus Indonesia's Section A Questionnaire Resp. at Exs. A-7b (purchase order

from customer to Zinus Korea), A-9 (master sales agreement); Zinus Indonesia's

Supp. Section A Questionnaire Resp. at Ex. SA-8A (purchase order from customer

to Zinus Korea and purchase order from Zinus Korea to Zinus Indonesia).

Commerce acknowledged Brooklyn Bedding's arguments in the final

determination but did not discuss or consider any of the identified facts or

arguments.  See IDM at 30–32.

Commerce determined that Zinus Indonesia provided all requested

information relating to Zinus Korea's selling expenses, but Commerce failed to

provide sufficient explanations or citations to record evidence to support

Commerce's determination that Zinus Korea had a minimal role in the U.S. sales

of mattresses.  Moreover, the Court agrees with Defendant-Intervenors that

Commerce did not discuss or consider record evidence suggesting that Zinus

Korea's role in the sale of the subject mattress was potentially more significant

than the mere processing of invoices.  Because Commerce did not support its

statements with sufficient citations to record evidence and did not consider

potentially contrary record evidence concerning Zinus Korea's selling activities,

the Court concludes that Commerce's determinations regarding Zinus Korea's

selling activities and adjustments to U.S. price to account for Zinus Korea's selling

expenses were not supported by substantial evidence.

Brooklyn Bedding also argues that Commerce failed to apply appropriate

accounting rules to Zinus Korea's financial information.  Brooklyn Bedding's Br.

at 17–19.  Commerce normally calculates costs and expenses using the records of

the party if those records are maintained in accordance with GAAP.  See 19 U.S.C.

§ 1677b(f)(1); Husteel Co. v. United States, 45 CIT __, __, 520 F. Supp. 3d 1296,

1306 (2021).  Commerce may depart from this practice if it determines that the

GAAP-compliant records do not "reasonably reflect the costs associated with the

production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1); Husteel Co., 45

CIT at __, 520 F. Supp. 3d at 1306.

The Korean-version International Financial Reporting Standards ("K-IFRS")

Part 1115 provides:

> An entity is an agent if the entity's performance obligation is to arrange
> for the provision of the specified good or service by another party. . . .
> When (or as) an entity that is an agent satisfies a performance
> obligation, the entity recognises revenue in the amount of any fee or
> commission to which it expects to be entitled in exchange for arranging

for the specified goods or services to be provided by the other party. An entity's fee or commission might be the net amount of consideration that the entity retains after paying the other party the consideration received in exchange for the goods or services to be provided by that party.

K-IFRS, Part 1115; Zinus Indonesia's Section C Supp. Resp. at SC2-5, PR 199, CR 213. Brooklyn Bedding contends that under K-IFRS, Zinus Korea qualified as an agent and that Commerce was obligated to include commissions received for its role in selling the subject mattresses in calculating selling expenses. Brooklyn Bedding's Br. at 18–19. Specifically, Brooklyn Bedding contends that any markup to the price of mattresses sold by Zinus Korea that would normally be excluded from Zinus Korea's actual expenses should be included. Id.

Commerce did not address Brooklyn Bedding's arguments on the application of K-IFRS to Zinus Korea's selling expenses and it is unclear how Commerce accounted for costs considered "commissions and fees" in Zinus Korea's reporting. Because Commerce did not provide any explanation, the Court remands this issue to Commerce for further consideration of record evidence or explanation regarding the extent of Zinus Korea's involvement in the sale of subject mattresses and the application of K-IFRS.

## VI.  GTA Import Data Pursuant to the Transactions Disregarded Rule

When calculating cost of production for purposes of normal value, Commerce may adjust prices between affiliates under the "transactions

disregarded" rule, which permits prices of inputs from affiliated suppliers "if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration."  19 U.S.C. § 1677b(f)(2).  Commerce's practice is to adjust the price of the transferred input or service to reflect the market price.  See Rebar Trade Action Coal. v. United States, 42 CIT __, __, 337 F. Supp. 3d 1251, 1259 (2018).  In order to determine "the amount usually reflected in sales of merchandise under consideration in the market under consideration," Commerce looks to any purchases of the same inputs or services by the respondent from an unaffiliated supplier and any sales by the supplier of the same inputs or services to an unaffiliated buyer.  See Unicatch Indus. Co. v. United States, 45 CIT __, __, 539 F. Supp. 3d 1229, 1248–49 (2021); Diamond Sawblades Mfrs. Coal. v. United States, 38 CIT __, __, 2014 WL 5463307 at *2 n.4 (Oct. 29, 2014).  If such transactions are not available, the statute provides that Commerce may consider "information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated."  19 U.S.C. § 1677b(f)(2).

During the period of investigation, Zinus Indonesia received inputs from affiliated suppliers in China.  IDM at 16–17; see Final Cost Calculation Mem. at Att. 1a.  The majority of these inputs were received only from affiliated suppliers.

IDM at 16–17; see Final Cost Calculation Mem. at Att. 1a; Zinus Indonesia's

Supp. Section D Resp. at Ex. SD-8 (schedule of inputs purchased from affiliated

suppliers by item code).  In the Preliminary Determination, for those inputs that

Zinus Indonesia received from both affiliated and unaffiliated suppliers,

Commerce analyzed the prices paid for the same inputs from the unaffiliated

suppliers.  See Prelim. Cost Calculation Mem. at 1–2.  Commerce continued this

approach in the Final Determination.  See Final Cost Calculation Mem. at 1–2.

    Commerce was faced with a challenge in analyzing the remaining

transactions that were only sourced from affiliates in China.  Because China is a

non-market economy, Commerce stated that it was not able to consider the

affiliated suppliers' cost of production.  IDM at 17.  In order to make a

determination based on information available, Commerce solicited surrogate input

price information.  Id.  Commerce determined that GTA import data was the most

reliable information for Commerce's purposes because it was "readily available

and reasonably specific to the voluminous number of affiliated [non-market

economy] inputs."  Id.  Commerce requested GTA data from countries considered

economically similar to China: Brazil, Malaysia, Mexico, Romania, Russia, and

Turkey.  Id.  At Commerce's request, Zinus Indonesia also placed GTA data for

Indonesia on the record.  Id.; Zinus Indonesia's Section D Supp. Resp. at SD6–

SD13, Exs. SD-8, SD-9, PR 196, CR 204–05.  In the Preliminary Determination,

Commerce calculated and applied an average of the market prices of GTA import

data for Brazil, Malaysia, Mexico, Romania, Russia, and Turkey.  IDM at 17–18;

Prelim. Cost Calculation Mem. at 1–2.  In the <u>Final Determination</u>, Commerce

changed its approach and considered only GTA data from Indonesia.  IDM at 18.

Commerce explained its change in approach by citing 19 U.S.C.

§ 1677b(f)(2), which states that "[a] transaction . . . between affiliated persons may

be disregarded if . . . the amount representing that element does not fairly reflect

the amount usually reflected in sales of merchandise under consideration in the

market under consideration."  <u>Id.</u> (quoting 19 U.S.C. § 1677b(f)(2)).  Commerce

interpreted this language to direct it to consider only the market under

investigation—Indonesia—when testing an affiliated supplier's price against a

market price.  IDM at 18.  Brooklyn Bedding argues that Commerce's

determination under the Transactions Disregarded Rule is not in accordance with

the law and not supported by substantial evidence.  Brooklyn Bedding's Br. at 27–

37.

Brooklyn Bedding draws a distinction between the two sentences of 19

U.S.C. § 1677b(f)(2).  <u>Id.</u>  The first sentence reads "[a] transaction directly or

indirectly between affiliated persons may be disregarded if, in the case of any

element of value required to be considered, *the amount representing that element*

*does not fairly reflect the amount usually reflected in sales of merchandise under*

*consideration in the market under consideration*." 19 U.S.C. § 1677b(f)(2)

(emphasis added).  The second sentence reads: "[i]f a transaction is disregarded

under the preceding sentence and no other transactions are available for

consideration, *the determination of the amount shall be based on the information*

*available as to what the amount would have been if the transaction had occurred*

*between persons who are not affiliated*." Id. (emphasis added).  Brooklyn Bedding

argues that the first sentence relates to situations in which the considered inputs

were provided by both affiliated and unaffiliated suppliers and "instructs

Commerce to use the values of 'sales of merchandise under consideration in the

market under consideration' when such data is available on the record."  Brooklyn

Bedding's Br. at 29.  The second sentence concerns situations in which unaffiliated

transactions are not available and "instructs Commerce to determine a market price

based on 'the information available as to what the amount would have been if the

transaction had occurred between persons who are not affiliated.'"  Id.  Brooklyn

Bedding contends that the phrase "in the market under consideration" used in the

first sentence should not be read to limit the "information available" under the

second sentence.  Id. at 30.

Brooklyn Bedding argues that applying Commerce's limitation to only the

country under investigation was inconsistent with prior investigations in which

Commerce adopted a broader reading of "information available," see Heavy

Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of

Korea, 86 Fed. Reg. 35,060 (Dep't of Commerce July 1, 2021) (final results of

antidumping duty admin. review: 2018–2019) and accompanying Issues and

Decisions Mem. at cmt. 7 (interpreting "information available" to include "an

affiliate's total cost of providing the service [or input]"), and in which it considered

costs of production for affiliates located in a different country from the respondent,

see Stainless Steel Sheet and Strip in Coils from Mexico, 70 Fed. Reg. 3677 (Dep't

of Commerce Jan. 26, 2005) (final results of antidumping duty admin. review) and

accompanying Issues and Decisions Mem. at cmt. 14 (using cost of production of a

United States affiliate to estimate market value transactions with a Mexican

respondent in the context of the major input rule, 19 U.S.C. § 1677b(f)(3)).

Brooklyn Bedding's Br. at 30.  Brooklyn Bedding contends further that

Commerce's approach in this case was inconsistent with its practice of relying on a

supplier's cost of production when unaffiliated transaction data was not available.

Id. at 31–32 (citing Antifriction Bearings (Other Than Tapered Roller Bearings)

and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United

Kingdom, 62 Fed. Reg. 2081 (Dep't of Commerce Jan. 15, 1997) (final results of

antidumping duty admin. review) and accompanying Issues and Decisions Mem. at

sec. d, cmt. 1).

Plaintiff and Defendant disagree with Brooklyn Bedding's proposed bifurcation of the statutory language.  Pl.'s Resp. at 32; Def.'s Resp. at 57–59. Plaintiff argues for an interpretation of the statute in which the first and second sentences are read together to allow "Commerce to craft a surrogate price based on information available from the same market, in the absence of identical inputs purchased in that market from unaffiliated suppliers."  Pl.'s Resp. at 32.  Plaintiff contends "that the statute directs [Commerce] to assess whether the input purchases reflected market value in Indonesia."  Id. at 32–33.  Plaintiff asserts that Commerce has previously read 19 U.S.C. § 1677b(f)(2) to create a preference for the price that a respondent paid to an unaffiliated supplier.  Id. at 33 (citing Certain Cut-To-Length Carbon-Quality Steel Plate Products from Korea, 64 Fed. Reg. 73,196 (Dep't of Commerce Dec. 29, 1999) (notice of final determination of sales at less than fair value); Low Enriched Uranium from France, 70 Fed. Reg. 54,359 (Dep't of Commerce Sept. 14, 2005) (notice of final results of antidumping duty admin. review) and accompanying Issues and Decisions Mem. at cmt. 3). Defendant argues that reading "in the market under consideration" into the second sentence of the provision allows Commerce to determine the amounts paid by the manufacturer of the subject merchandise and furthers the goal of the provision to allow Commerce to determine the manufacturing and cost experience of the respondent to determine if dumping has occurred.  Def.'s Resp. at 58–59.

This court has considered the Transactions Disregarded Rule as follows:

Commerce has expressed a preference for how to establish market value. First, it looks at whether respondent purchased the input from an unaffiliated supplier; if unavailable, it looks to sales of the input between an affiliate supplier and an unaffiliated party, and as a final resort, to a reasonable source for market value available on the record.

Rebar Trade Action Coal. v. United States, 43 CIT __, __, 398 F. Supp. 3d 1359, 1372 (2019) (internal citation omitted). The Court has specified that when resorting to a "reasonable source for market value," if "a market price is not available, Commerce has developed a consistent and predictable approach whereby it may use an affiliate's total cost of providing the [good or service] as information available for a market price." Best Mattresses Int'l Co. Ltd. v. United States ("Best Mattresses"), 47 CIT __, __, 2023 WL 2198803, at *21 (2023) (quoting Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea, 86 Fed. Reg. 35,060 and accompanying Issues and Decisions Mem. at cmt. 24). The Court has explained that the phrase "market under consideration" is purposefully broad to allow Commerce to choose a market that allows for a "reasonable source for market value" to confirm that the affiliated prices reflect arm's length transactions. Id. at __, 2023 WL 2198803, at *21 (citing Rebar Trade Action Coal., 43 CIT at __, 398 F. Supp. 3d at 1372 and Diamond Sawblades Mfrs. Coal., 38 CIT at __, 2014 WL 5463307, at *2 n.2). Here, Commerce determined that "the statute indicates that the item being tested

should reflect a market price in the country under consideration, which is Indonesia

in the instant case." IDM at 18. The Court concludes that Commerce's

interpretation of "market under consideration" as only the market under

investigation is unreasonably narrow and not in accordance with the law. Similar

to Best Mattresses, in which the Court noted that the "holding does not prevent

Commerce from selecting Cambodia as the 'market under consideration' for

purposes of the Transactions Disregarded Rule on remand," Best Mattresses, 47

CIT at__ , 2023 WL 2198803, at *21, here Commerce might choose Indonesia as

the "market under consideration" on remand after the agency explains its

reasoning.

    The Court concludes that Commerce's determination regarding the

Transactions Disregarded Rule was not in accordance with the law or supported by

substantial evidence, and remands for Commerce to provide further explanation or

to reconsider whether Commerce's selection of Indonesia constituted a reasonable

method to confirm that the affiliated prices reflect arm's length transactions under

19 U.S.C. § 1677b(f)(2).

## VII.  Sales Reconciliation

    Brooklyn Bedding argues that Commerce erred in not requiring Zinus

Indonesia to submit a sales reconciliation of its reported U.S. sales and its audited

financial statement. Brooklyn Bedding's Br. at 33–42. Plaintiff and Defendant

argue that Brooklyn Bedding waived this argument by failing to raise it in the

administrative case brief.  Pl.'s Resp. at 38; Def.'s Resp. at 61–62.

Commerce issued to Zinus Indonesia its standard antidumping questionnaire,

which requested that Zinus Indonesia provide "a reconciliation of the sales

reported in your U.S. sales databases to the total sales listed in your financial

statements (profit and loss/income statement)."  Commerce's Initial Section C

Questionnaire at C-4.  In response, Zinus Indonesia provided only reconciliations

for Zinus Korea and Zinus U.S.  Zinus Indonesia's Section C Questionnaire Resp.

at C-7, Exs. C-2A, C-2B, PR 119–20, CR 117–20.  During the investigation,

Brooklyn Bedding raised the lack of Zinus Indonesia's U.S. sales reconciliation

multiple times.  Brooklyn Bedding's Deficiency Cmts. re Zinus Section C

Questionnaire Resp. at 3–5, 26, PR 147, CR 130–31; Brooklyn Bedding's Resp.

Zinus Cmts. at 4–5, PR 170, CR 161; Brooklyn Bedding's Post-Prelim. Cmts. at

11–13.  Brooklyn Bedding did not raise this argument in its administrative case

brief.  See Brooklyn Bedding's Admin. Case Br.

A party is generally prohibited from raising arguments with the Court that

were not first raised with the administrative agency.  See Rhone Poulenc, Inc. v.

United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); Dillinger France S.A. v.

United States, 42 CIT __, __, 350 F. Supp. 3d 1349, 1371–72 (2018); see also 28

U.S.C. § 2637(d) ("In any civil action not specified in this section, the Court of

International Trade shall, where appropriate, require the exhaustion of

administrative remedies."). Commerce's regulations provide parties to an

antidumping investigation an opportunity to raise arguments through

administrative case briefs. 19 C.F.R. § 351.309. The regulation is clear that

administrative case briefs "must present all arguments that continue in the

submitter's view to be relevant to [Commerce's] final determination or final

results, including any arguments presented before the date of publication of the

preliminary determination or preliminary results." Id. § 351.309(c)(2).

In its Reply Brief filed in this case on appeal, Brooklyn Bedding argues that

the futility exception should excuse its failure to exhaust administrative remedies.

Brooklyn Bedding's Reply Br. ("Brooklyn Bedding's Reply") at 16–20, ECF No.

35, 36. The futility exception is narrow and "requires a party to demonstrate that

exhaustion would require it to go through obviously useless motions in order to

preserve its rights." Zhongce Rubber Grp. Co. v. United States, 42 CIT __, __,

352 F. Supp. 3d 1276, 1279 (2018). When additional comment would serve no

purpose, exhaustion is not required. Brooklyn Bedding raised the issue of Zinus

Indonesia's U.S. sales reconciliation multiple times throughout the administrative

process and Commerce was put on notice of the issue. Brooklyn Bedding also

notes that briefing before Commerce was completed after verification and 30 days

before the statutory deadline for Commerce's final determination. Brooklyn

Bedding's Reply at 16, 19.  Nonetheless, Brooklyn Bedding could have raised the

issue in its administrative case brief, the Court is not convinced that doing so

would have been a fruitless endeavor, and the Court concludes that Brooklyn

Bedding has not met the stringent requirements to apply the narrow exception to

administrative exhaustion.  Because Brooklyn Bedding failed to raise its argument

in its administrative case brief, Brooklyn Bedding's arguments are waived in this

Court by the failure to exhaust its administrative remedies.

Defendant contends that even if the issue were not waived, the argument is

unconvincing.  Def.'s Resp. at 62–63.  Brooklyn Bedding argues that in not

requiring Zinus Indonesia to submit a U.S. sales reconciliation, Commerce broke

from a "longstanding practice" of requiring named parties to submit a

reconciliation of U.S. sales.  Brooklyn Bedding's Br. at 37.  It is true that

Commerce must provide consistent treatment across investigations or provide an

explanation for deviating from established practice.  See Save Domestic Oil, Inc. v.

United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004).  Commerce routinely

requests sales reconciliations in its antidumping questionnaire.  See Commerce's

Initial Section C Questionnaire at C-4.  Brooklyn Bedding has not demonstrated

that Commerce has an established practice of requiring a named party to provide a

reconciliation when alternate reconciliations are provided by affiliates responsible

for selling the subject merchandise in the United States.  In this case, Zinus

Indonesia advised Commerce that sales of the subject mattresses within the United

States were performed by Zinus Korea and Zinus U.S.  See Zinus Indonesia's

Section C Questionnaire Resp. at C-7; see also Zinus Indonesia's 8/20 Rebuttal

Cmts. at 5.  Zinus Indonesia provided U.S. sales reconciliations for these entities.

Zinus Indonesia's Section C Questionnaire Resp. at Exs. C-2A, C-2B.  These

reconciliations provided the information requested by Commerce, "a reconciliation

of the sales reported in your U.S. sales databases to the total sales listed in your

financial statements (profit and loss/income statement)."  See Commerce's Initial

Section C Questionnaire at C-4.  Zinus Indonesia notes that in the Mattresses from

China investigation, similar to this case, Commerce was satisfied with only

reconciliations from Zinus Korea and Zinus U.S. and did not require a separate

reconciliation from the named respondent.  Pl.'s Resp. at 39; see also Zinus

Indonesia's Sub. Zinus Xiamen's Proprietary Info. Mattresses from China

Investigation.

     Aside from the administrative exhaustion issue, the Court is not convinced

that Commerce deviated from its established practice in not requiring Zinus

Indonesia to provide a financial reconciliation.  Commerce was reasonable in not

requiring Zinus Indonesia to provide a reconciliation of its U.S. sales when

reconciliations were provided for Zinus Korea and Zinus U.S. that supplied the

information sought by Commerce.  Nonetheless, the Court holds that Commerce's

determination to not require Zinus Indonesia to file a U.S. sales reconciliation is

not properly before the Court due to Brooklyn Bedding's waiver of the issue

through its failure to exhaust its administrative remedies.

## CONCLUSION

Accordingly, it is hereby

**ORDERED** that Plaintiff's motion for judgment on the agency record is

granted in part and remanded in part; and it is further

**ORDERED** that Brooklyn Bedding's motion for judgment on the agency

record is granted in part and remanded in part; and it is further

**ORDERED** that the Court sustains Commerce's use of a quarterly ratios

methodology to determine the quantity of subject mattresses sold; and it is further

**ORDERED** that the Court sustains Commerce's determination to use

Emirates Sleep Systems Private's financial information in calculating constructed

value; and it is further

**ORDERED** that the Court sustains Commerce's calculation and application

of a profit cap; and it is further

**ORDERED** that the Court sustains Commerce's adjustment to reported

sales deductions of Zinus U.S.; and it is further

**ORDERED** that the <u>Final Determination</u> is remanded to Commerce to reconsider consistent with this opinion the inclusion of mattresses in-transit from Indonesia at the end of the period of investigation; and it is further

**ORDERED** that the <u>Final Determination</u> is remanded to Commerce to reconsider consistent with this opinion Commerce's adjustments to the selling expenses of Zinus Korea to account for actual selling expenses; and it is further

**ORDERED** that the <u>Final Determination</u> is remanded to Commerce to reconsider consistent with this opinion Commerce's application of the Transactions Disregarded Rule; and it is further

**ORDERED** that that this case shall proceed according to the following schedule:

(1) Commerce shall file its remand determination on or before May 19, 2023;

(2) Commerce shall file the administrative record on or before June 2, 2023;

(3) Comments in opposition to the remand determination shall be filed on or before July 18, 2023;

Consol. Court No. 21-00277                                                        Page 78

(4) Comments in support of the remand determination shall be filed on or

   before August 17, 2023; and

(5) The joint appendix shall be filed on or before August 31, 2023.


                                          /s/ Jennifer Choe-Groves
                                         Jennifer Choe-Groves, Judge


Dated:    March 20, 2023
            New York, New York



Tariff Schedule of the United States (HTSUS) under subheading 7308.20.0020 or 8502.31.0000. Wind towers of iron or steel are classified under HTSUS 7308.20.0020 when imported separately as a tower or tower section(s). Wind towers may be classified under HTSUS 8502.31.0000 when imported as combination goods with a wind turbine (*i.e.,* accompanying nacelles and/or rotor blades). While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.

## Appendix II

**List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Scope Comments
IV. Scope of the Investigation
V. Injury Test
VI. Subsidies Valuation
VII. Use of Facts Otherwise Available and Adverse Inferences
VIII. Analysis of Programs
IX. Recommendation

[FR Doc. 2021–06196 Filed 3–24–21; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

**International Trade Administration**

[A–560–836]

**Mattresses From Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that imports of mattresses from Indonesia are being, or are likely to be, sold in the United States at less than fair value (LTFV) for the period of investigation January 1, 2019, through December 31, 2019.

**DATES:** Applicable March 25, 2021.

**FOR FURTHER INFORMATION CONTACT:** Janae Martin or Brian Smith, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0238 or (202) 482–1766, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

On November 3, 2020, Commerce published the *Preliminary Determination* in the LTFV investigation of mattresses from Indonesia, in which we also postponed the final

determination until March 18, 2021.[1] We invited interested parties to comment on the *Preliminary Determination.* A summary of the events that occurred since Commerce published the *Preliminary Determination,* may be found in the Issues and Decision Memorandum.[2] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/index.html.*

### Scope of the Investigation

The products covered by this investigation are mattresses from Indonesia. For a complete description of the scope of this investigation, *see* Appendix I.

### Scope Comments

In Commerce's Preliminary Scope Decision Memorandum, we set aside a period of time for parties to raise issues regarding product coverage (*i.e.,* scope) in scope case briefs or other written comments on scope issues.[3] Certain interested parties commented on the scope of the investigation as it appeared in the Preliminary Scope Decision Memorandum, unchanged from the *Initiation Notice.*[4] For a summary of the product coverage comments and rebuttal responses submitted to the record for this final determination, and accompanying discussion and analysis of all comments timely received, *see* the Final Scope Memorandum.[5] In the Final

Scope Memorandum, Commerce determined that it is not modifying the scope language as it appeared in the *Initiation Notice. See* Appendix I.

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs that were submitted by parties in this investigation are addressed in the Issues and Decision Memorandum. A list of the issues addressed in the Issues and Decision Memorandum is provided in Appendix II.

### Verification

Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation. However, we took additional steps in lieu of an on-site verification to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Tariff Act of 1930, as amended (the Act).[6]

### Changes Since the Preliminary Determination

Based on our review and analysis of the comments received from interested parties, we made adjustments to PT Zinus Global Indonesia's (Zinus) cost of production and U.S. sales prices. For a discussion of these changes, see the Issues and Decision Memorandum.

### All-Others Rate

Section 735(c)(5)(A) of the Act provides that the estimated weighted-average dumping margin for all other producers and exporters not individually investigated shall be equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated excluding rates that are zero, *de minimis,* or determined entirely under section 776 of the Act. Commerce calculated an individual estimated weighted-average dumping margin for Zinus, the only individually examined exporter/producer in this investigation. Because the only individually calculated dumping margin is not zero, *de minimis,* or based entirely on facts otherwise available, the estimated weighted-average dumping margin calculated for Zinus is the margin assigned to all other producers and

---

[1] *See Mattresses from Indonesia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 85 FR 69597 (November 3, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, ''Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Mattresses from Indonesia,'' dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, the Socialist Republic of Vietnam, and the People's Republic of China: Scope Comments Decision Memorandum for the Preliminary Determination,*'' dated October 27, 2020 (Preliminary Scope Decision Memorandum).

[4] *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations,* 85 FR 23002 (April 24, 2020) (*Initiation Notice*).

[5] *See* Memorandum, ''Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic

of Turkey, the Socialist Republic of Vietnam, and the People's Republic of China: Final Scope Decision Memorandum,'' dated concurrently with, and hereby adopted by, this notice (Final Scope Memorandum).

[6] *See* Commerce's Letter, ''Antidumping Duty Investigation of Mattresses from Indonesia: Supplemental Questionnaire in Lieu of On-Site Verification,'' dated January 19, 2021.

exporters, pursuant to section 735(c)(5)(A) of the Act.

### Final Determination

The final estimated weighted-average dumping margins are as follows:

| Exporter/producer | Estimated weighted-average dumping margin (percent) |
| --- | --- |
| PT Zinus Global Indonesia ......... | 2.22 |
| All-Others .................................. | 2.22 |

### Disclosure

We intend to disclose to parties in this proceeding the calculations performed for this final determination within five days of the date of publication of this notice, in accordance with 19 CFR 351.224(b).

### Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, Commerce will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all appropriate entries of mattresses from Indonesia, as described in Appendix I of this notice, which are entered, or withdrawn from warehouse, for consumption on or after November 3, 2020, the date of publication of the *Preliminary Determination* in the **Federal Register**.

Pursuant to section 735(c)(1)(B)(ii) of the Act and 19 CFR 351.210(d), upon publication of this notice, Commerce will instruct CBP to require a cash deposit equal to the estimated weighted-average dumping margin or the estimated all-others rate, as follows: (1) The cash deposit rate for the respondent listed above will be equal to the company-specific estimated weighted-average dumping margin determined in this final determination; (2) if the exporter is not a respondent identified above but the producer is, then the cash deposit rate will be equal to the company-specific estimated weighted-average dumping margin established for that producer of the subject merchandise; and (3) the cash deposit rate for all other producers and exporters will be equal to the all-others estimated weighted-average dumping margin. These suspension-of-liquidation instructions will remain in effect until further notice.

### International Trade Commission Notification

In accordance with section 735(d) of the Act, we will notify the International Trade Commission (ITC) of the final

affirmative determination of sales at LTFV. Because Commerce's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports or sales (or the likelihood of sales) for importation of mattresses from Indonesia no later than 45 days after this final determination. If the ITC determines that such injury does not exist, this proceeding will be terminated, and all cash deposits posted will be refunded and suspension of liquidation will be lifted. If the ITC determines that such injury does exist, Commerce will issue an antidumping duty order directing CBP to assess, upon further instruction by Commerce, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation, as discussed above in the "Continuation of Suspension of Liquidation" section.

### Notification Regarding Administrative Protective Orders (APO)

This notice will serve as a reminder to the parties subject to APO of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

### Notification to Interested Parties

This determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Act, and 19 CFR 351.210(c).

Dated: March 18, 2021.

**Christian Marsh,**

*Acting Assistant Secretary for Enforcement and Compliance.*

### Appendix I

#### Scope of the Investigation

The products covered by this investigation are all types of youth and adult mattresses. The term "mattress" denotes an assembly of materials that at a minimum includes a "core," which provides the main support system of the mattress, and may consist of innersprings, foam, other resilient filling, or a combination of these materials. Mattresses may also contain: (1) "upholstery," the material between the core and the top panel of the ticking on a single-sided mattress; or

between the core and the top and bottom panel of the ticking on a double-sided mattress; and/or (2) "ticking," the outermost layer of fabric or other material (*e.g.,* vinyl) that encloses the core and any upholstery, also known as a cover.

The scope of this investigation is restricted to only "adult mattresses" and "youth mattresses." "Adult mattresses" are frequently described as "twin," "extra-long twin," "full," "queen," "king," or "California king" mattresses. "Youth mattresses" are typically described as "crib," "toddler," or "youth" mattresses. All adult and youth mattresses are included regardless of size and size description.

The scope encompasses all types of "innerspring mattresses," "non-innerspring mattresses," and "hybrid mattresses." "Innerspring mattresses" contain innersprings, a series of metal springs joined together in sizes that correspond to the dimensions of mattresses. Mattresses that contain innersprings are referred to as "innerspring mattresses" or "hybrid mattresses." "Hybrid mattresses" contain two or more support systems as the core, such as layers of both memory foam and innerspring units.

"Non-innerspring mattresses" are those that do not contain any innerspring units. They are generally produced from foams (*e.g.,* polyurethane, memory (viscoelastic), latex foam, gel- infused viscoelastic (gel foam), thermobonded polyester, polyethylene) or other resilient filling.

Mattresses covered by the scope of this investigation may be imported independently, as part of furniture or furniture mechanisms (*e.g.,* convertible sofa bed mattresses, sofa bed mattresses imported with sofa bed mechanisms, corner group mattresses, day-bed mattresses, roll-away bed mattresses, high risers, trundle bed mattresses, crib mattresses), or as part of a set in combination with a "mattress foundation." "Mattress foundations" are any base or support for a mattress. Mattress foundations are commonly referred to as "foundations," "boxsprings," "platforms," and/or "bases." Bases can be static, foldable, or adjustable. Only the mattress is covered by the scope if imported as part of furniture, with furniture mechanisms, or as part of a set in combination with a mattress foundation.

Excluded from the scope of this investigation are "futon" mattresses. A "futon" is a bi-fold frame made of wood, metal, or plastic material, or any combination thereof, that functions as both seating furniture (such as a couch, love seat, or sofa) and a bed. A "futon mattress" is a tufted mattress, where the top covering is secured to the bottom with thread that goes completely through the mattress from the top through to the bottom, and it does not contain innersprings or foam. A futon mattress is both the bed and seating surface for the futon.

Also excluded from the scope are airbeds (including inflatable mattresses) and waterbeds, which consist of air- or liquid-filled bladders as the core or main support system of the mattress.

Also excluded is certain multifunctional furniture that is convertible from seating to

sleeping, regardless of filler material or components, where that filler material or components are upholstered, integrated into the design and construction of, and inseparable from, the furniture framing, and the outermost layer of the multifunctional furniture converts into the sleeping surface. Such furniture may, and without limitation, be commonly referred to as "convertible sofas," "sofabeds," "sofa chaise sleepers," "futons," "ottoman sleepers" or a like description.

Also excluded from the scope of this investigation are any products covered by the existing antidumping duty orders on uncovered innerspring units from China or Vietnam. *See Uncovered Innerspring Units from the People's Republic of China: Notice of Antidumping Duty Order,* 74 FR 7661 (February 19, 2009); *Antidumping Duty Order: Uncovered Innerspring Units from the Socialist Republic of Vietnam,* 73 FR 75391 (December 11, 2008).

Also excluded from the scope of this investigation are bassinet pads with a nominal length of less than 39 inches, a nominal width less than 25 inches, and a nominal depth of less than 2 inches.

Additionally, also excluded from the scope of this investigation are "mattress toppers." A "mattress topper" is a removable bedding accessory that supplements a mattress by providing an additional layer that is placed on top of a mattress. Excluded mattress toppers have a height of four inches or less.

The products subject to this investigation are currently properly classifiable under HTSUS subheadings: 9404.21.0010, 9404.21.0013, 9404.29.1005, 9404.29.1013, 9404.29.9085, and 9404.29.9087. Products subject to this investigation may also enter under HTSUS subheadings: 9404.21.0095, 9404.29.1095, 9404.29.9095, 9401.40.0000, and 9401.90.5081. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the merchandise subject to this investigation is dispositive.

## Appendix II

**List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Period of Investigation
IV. Changes From the Preliminary Determination
V. Discussion of the Issues
    Comment 1: Zinus' Reporting of Constructed Export Price (CEP) Inventory Sales
    Comment 2: Zinus' Reporting of Sales Deductions
    Comment 3: Transactions Disregarded Adjustments
    Comment 4: Financial Statements Used To Value Constructed Value (CV) Profit and Selling Expenses
    Comment 5: Startup Adjustment
    Comment 6: Region in Cohen's *d* Test
    Comment 7: Level of Trade (LOT) in Cohens *d* Test
    Comment 8: Treatment of Intra-Company Payments
    Comment 9: Clerical Error Corrections

VI. Recommendation

[FR Doc. 2021–06195 Filed 3–24–21; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–557–818]

### Mattresses From Malaysia: Final Affirmative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that imports of mattresses from Malaysia are being, or are likely to be, sold in the United States at less than fair value (LTFV). The period of investigation is January 1, 2019, through December 31, 2019.

**DATES:** Applicable March 25, 2021.

**FOR FURTHER INFORMATION CONTACT:** Dennis McClure, AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–5973.

**SUPPLEMENTARY INFORMATION:**

### Background

On November 3, 2020, Commerce published in the **Federal Register** the *Preliminary Determination* of sales at LTFV of mattresses from Malaysia and invited interested parties to comment.[1] Commerce established a deadline of November 24, 2020 for the submission of case briefs in response to the *Preliminary Determination.* No case briefs were submitted. As no parties filed comments and no facts have changed, we have made no changes to the *Preliminary Determination* in this final determination, and, therefore, there is no unpublished Issues and Decision Memorandum accompanying this notice.

### Scope of the Investigation

The products covered by this investigation are mattresses from Malaysia. For a full description of the scope of this investigation, *see* the "Scope of the Investigation," in the Appendix to this notice.

### Scope Comments

In Commerce's Preliminary Scope Decision Memorandum, we set aside a period of time for parties to raise issues regarding product coverage (*i.e.,* scope) in scope case briefs or other written comments on scope issues.[2] Certain interested parties commented on the scope of the investigation as it appeared in the Preliminary Scope Decision Memorandum, unchanged from the *Initiation Notice.*[3] For a summary of the product coverage comments and rebuttal responses submitted to the record for this final determination, and accompanying discussion and analysis of all comments timely received, *see* the Final Scope Memorandum.[4] In the Final Scope Memorandum, Commerce determined that it is not modifying the scope language as it appeared in the *Initiation Notice. See* the scope in the appendix to this notice.

### Verification

As stated in the *Preliminary Determination,* two of the mandatory respondents, Delandis Furniture (M) Sdn Bhd (Delandis) and Vision Foam Ind. Sdn Bhd. (Vision Foam), did not participate in the investigation and a third mandatory respondent, Far East Foam Industries Sdn Bhd (Far East Foam), discontinued its participation in the investigation.[5] Accordingly, Commerce based the *Preliminary Determination* on total adverse facts available (AFA), and did not conduct verification under section 782(i) of the Tariff Act of 1930, as amended (the Act).

### Use of Adverse Facts Available

The mandatory respondents Delandis, Vision Foam, and Far East Foam failed to cooperate in this investigation.[6] Therefore, in the *Preliminary Determination,* pursuant to sections 776(a)(1), 776(a)(2)(A)–(C), and 776(b) of the Act, we assigned to Delandis, Vision Foam and Far East Foam an estimated

---

[1] *See Mattresses from Malaysia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 85 FR 69574–69575 (November 3, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See* Memorandum, "Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, the Socialist Republic of Vietnam, and the People's Republic of China: Scope Comments Decision Memorandum for the Preliminary Determination," dated October 27, 2020 (Preliminary Scope Decision Memorandum).

[3] *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations,* 85 FR 23002 (April 24, 2020) (*Initiation Notice*).

[4] *See* Memorandum, "Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, the Socialist Republic of Vietnam, and the People's Republic of China: Final Scope Decision Memorandum," dated concurrently with, and hereby adopted by, this notice (Final Scope Memorandum).

[5] *See Preliminary Determination* PDM at 5–10.

[6] *Id.*

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-560-836
Investigation
POI: 1/1/2019-12/30/2019
**Public Document**
E&C/OVIII: JCM/BCS

March 18, 2021

**MEMORANDUM TO:**     Christian Marsh
                                       Acting Assistant Secretary
                                         for Enforcement and Compliance

**FROM:**                        James Maeder
                                       Deputy Assistant Secretary
                                         for Antidumping and Countervailing Duty Operations

**SUBJECT**:                    Issues and Decision Memorandum for the Final Affirmative
                                       Determination in the Less-Than-Fair-Value Investigation of
                                       Mattresses from Indonesia

---

## I.        SUMMARY

The Department of Commerce (Commerce) finds that mattresses from Indonesia are being, or
are likely to be, sold in the United States at less than fair value (LTFV), as provided in section
735 of the Tariff Act of 1930, as amended (the Act). One company, PT Zinus Global Indonesia
(Zinus), was individually examined. The estimated weighted-average dumping margins are
shown in the "Final Determination" section of the accompanying *Federal Register* notice.

As a result of our analysis and consideration of the comments submitted by interested parties, we
have made certain changes to the *Preliminary Determination*.[1]  We recommend that you approve
the positions described in the "Discussion of the Issues" section of this memorandum. Below is
a complete list of the issues for which we received comments from the interested parties:

> Comment 1:   Zinus' Reporting of Constructed Export Price (CEP) Inventory Sales
> Comment 2:   Zinus' Reporting of Sales Deductions
> Comment 3:   Transactions Disregarded Adjustments
> Comment 4:   Financial Statements Used to Value Constructed Value (CV) Profit and
>                        Selling Expenses
> Comment 5:   Startup Adjustment
> Comment 6:   Region in Cohen's *d* Test
> Comment 7:   Level of Trade (LOT) in Cohens *d* Test
> Comment 8:   Treatment of Intra-Company Payments
> Comment 9:   Clerical Error Corrections

---

[1] *See Mattresses from Indonesia: Preliminary Affirmative Determination of Sales at Less Than Fair Value,
Postponement of Final Determination and Extension of Provisional Measures*, 85 FR 69597 (November 3, 2020)
(*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

Appx00195

INTERNATIONAL
**T R A D E**
ADMINISTRATION

## II.     BACKGROUND

On November 3, 2020, Commerce published in the *Federal Register* its *Preliminary Determination*.

On December 2, 2020, Commerce issued a supplemental questionnaire to Zinus, to which Zinus timely responded.[2]  On January 19, 2021, Commerce issued a questionnaire requesting additional information from Zinus in lieu of performing an on-site verification, in accordance with section 782(i) of the Act, to which Zinus timely responded.[3]  On January 29, 2021, we invited parties to comment on the *Preliminary Determination*.[4]  On February 9, 2021, we received case briefs from the petitioners[5] and Zinus.[6]  On February 16, 2021, we received rebuttal briefs from the petitioners and Zinus.[7]  On March 8, 2021, the petitioners and Zinus withdrew their requests for a hearing, respectively.[8]  On March 8 and 9, 2021, we held *ex-parte* meetings with the petitioners and Zinus, respectively.[9]

## III.    PERIOD OF INVESTIGATION

The period of investigation (POI) is January 1, 2019, through December 31, 2019.  This period corresponds to the most recently completed fiscal quarters prior to the month of the filing of the Petition, which was March 2020.

---

[2] *See* Commerce's Letter to Zinus, "Antidumping Duty Investigation of Mattresses from Indonesia:  Zinus Post-Preliminary Supplemental Questionnaire," dated December 2, 2020 (Post-Preliminary Supplemental Questionnaire); *see also* Zinus' Letter, "Mattresses from Indonesia:  Zinus' Post-Preliminary Supplemental Questionnaire Response (questions 1-4)," dated December 14, 2020 (Post-Preliminary SQR - Pt 1); and Zinus' Letter, "Mattresses from Indonesia:  Zinus' Response to Question 5 of the Post-Preliminary Supplemental Questionnaire," dated December 18, 2020.

[3] *See* Commerce's Letter to Zinus, "Antidumping Duty Investigation of Mattresses from Indonesia:  Supplemental Questionnaire in Lieu of On-Site Verification," dated January 19, 2021 (Zinus January 19, 2021, Verification Questionnaire); *see also* Zinus' Letter, "Mattresses from Indonesia:  Zinus' Response to Supplemental Questionnaire in Lieu of Verification," dated January 28, 2021 (ILOV QR).

[4] *See* Commerce's Letter, dated January 21, 2021.

[5] The petitioners are Corsicana Mattress Company, Elite Comfort Solutions, Future Foam, Inc., FXI, Inc, Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Incorporated, Serta Simmons Bedding, LLC, Tempur Sealy International, Inc., and International Brotherhood of Teamsters, and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, the petitioners).

[6] *See* Petitioners' Letter, "Mattresses from Indonesia:  Petitioners' Case Brief," dated February 9, 2021 (Petitioners' Case Brief); *see also* Zinus' Letter, "Mattresses from Indonesia:  Case Brief," dated February 9, 2021 (Zinus' Case Brief).

[7] *See* Petitioners' Letter, "Mattresses from Indonesia:  Petitioner's Rebuttal Brief," dated February 16, 2021 (Petitioners' Rebuttal Brief); *see also* Zinus' Letter, "Mattresses from Indonesia:  Rebuttal Brief," dated February 16, 2021 (Zinus' Rebuttal Brief).

[8] *See* Petitioners' Letter, "Mattress Petitioners' Withdrawal of Request for a Public Hearing" dated March 8, 2021; and Zinus' Letter, "Mattresses from Indonesia:  Withdrawal of Request for Hearing," dated March 8, 2021.

[9] *See* Memorandum, "Antidumping Duty Investigation of Mattresses from Indonesia:  *Ex Parte* Meeting with Petitioners' Counsel," dated March 16, 2021; *see also* Memorandum, "Antidumping Duty Investigation of Mattresses from Indonesia:  *Ex Parte* Meeting with Respondent's Counsel," dated March 16, 2021.

## IV.    CHANGES FROM THE PRELIMINARY DETERMINATION[10]

- We made a price adjustment to all of Zinus' CEP sales.  *See* Comment 2.
- We revised Zinus' direct material costs using only Indonesian import data from Global Trade Atlas (GTA) as the basis for market price, where applicable.  *See* Comment 3.
- We made corrections in how we applied the transactions disregarded rule.  *See* Comment 9.
- We found one LOT in the U.S. market and incorporated our findings in our differential pricing analysis.  *See* Comment 7.
- We corrected the U.S. direct selling expense and CEP selling expense calculation for export price (EP) and CEP sales transactions, as appropriate.  *See* Comment 9.
- We revised Zinus' reported U.S. packing expenses.
- We adjusted the U.S. price for reported billing adjustments which we inadvertently did not take into account in the *Preliminary Determination*.

## V.    DISCUSSION OF THE ISSUES

## Comment 1: Zinus' Reporting of CEP Inventory Sales

*Zinus' Case Brief:*[11]
- Zinus fully explained and supported the fact that Zinus, Inc.'s (Zinus US's) inventory tracking during the POI did not permit the company to retrospectively identify the country of origin for prior sales, and Commerce's initial questionnaire acknowledges that there will be situations where a respondent does not have records to identify with certainty the country of origin.[12]
- In prior cases, Commerce has accepted first-in, first-out (FIFO)-based methodologies to identify the country of origin.[13]
- As Zinus previously explained, the FIFO methodology ensures that older product is picked up in the reporting, consistent with inventory movement principles that seek to sell off older product first to ensure that product does not stay in inventory in perpetuity while newer product is continuously sold out first.
- The U.S. International Trade Commission has stated (when addressing critical circumstances and inventory stockpiling issues) "the three-to-six-month shelf life of

---

[10] *See* Memoranda, "Antidumping Duty Investigation of Mattresses from Indonesia:  Final Determination Margin Calculation for Zinus" (Zinus Final Determination Calculation Memorandum), and "Antidumping Duty Investigation of Mattresses from Indonesia:  Final Cost Calculation Memorandum for Zinus" (Zinus Final Cost Calculation Memorandum), both dated concurrently with this memorandum.

[11] *See* Zinus' Case Brief at 4-23.

[12] *Id*. at 11 (citing Zinus' Letter, "Mattresses from Indonesia:  Zinus' Section A Questionnaire Response," dated June 19, 2020 (Zinus AQR), at A-4 to A-5).

[13] *Id*. (citing *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 26912 (June 12, 2017), and accompanying Issues and Decision Memorandum (IDM) at Comment 3).

{mattresses in boxes} would limit the ability of importers to stockpile subject imports in a way that could undermine the remedial effect of the order."[14]

- Given this limited shelf life of mattresses, especially of mattresses sold compressed in boxes, the only prudent inventory management strategy is one that limits overall time in inventory, meaning that older stock would be pulled out and sold first to avoid unnecessary product degradation.

- As Zinus explained, "under Zinus US's SAP inventory management system, when moving inventory for sales, the system uses a FIFO stock removal strategy."[15]  Given Commerce's requirements that companies adhere to their normal accounting practices for preparing responses, Zinus was required to use the FIFO methodology to identify a country of origin for CEP inventory sales.

- Although this methodology does not identify the actual country of origin for each sale, the methodology is reasonable and closely correlates to actual inventory and sales. As explained in Zinus' Section A response, where mattresses are moved into the warehouse for reasons other than normal purchases, or are identified as a result of inventory stock-taking, the methodology assigns a country of origin based on the inventory balance by country of origin at that time.

- The record also confirms that applying simple quarterly averages utterly fails to identify sales of Indonesian origin products reasonably for two reasons:  1) using the quarterly ratios results in the absurd outcome where sales are treated as Indonesian origin before the model was ever imported from Indonesia; and 2) applying the quarterly ratios results in more units being sold than were imported.

- By applying the quarterly ratios used in the *Preliminary Determination*, Commerce classified more than double the number of mattresses Zinus US had received from Indonesia as CEP inventory sales of Indonesian origin.

- Among these two competing alternatives, the FIFO methodology is superior to the quarterly import ratios, which do not correlate to the model- and time-specific import patterns and result in widespread distortions and inaccuracies.

- The petitioners' quarterly ratio methodology and calculations first identified a ratio of subject and non-subject CEP inventory sales based on the overall reported inventory quantities, then increased the number of Indonesian mattresses to base the ratios instead on the number of mattresses sold by the Korean parent company, Zinus Inc. (Zinus KR) to an affiliated reseller, Zinus US.  However, the petitioners ignore the fact that many of Zinus KR's sales were still in transit from Indonesia to the United States.

- Any identification of CEP inventory sales must start with Zinus US's inventory actually received in the United States during the POI.  The difference between Zinus KR's POI sales to Zinus US and Zinus US's POI receipt of mattresses in inventory in the United States is simply the result of timing associated with trans-global shipments.

---

[14] *Id*. at 12 (citing Petitioners' Letter, "Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam:  Responses to Petition Supplemental Questionnaires," dated April 8, 2020, at Exhibit I-Supp-2).

[15] *Id*. (citing Zinus' Letter, "Mattresses from Indonesia:  Zinus' Section C Supplemental Questionnaire Response (part 2)," dated September 28, 2020 (Zinus CSQR 9-28-2020), at SC2-8).

4

Appx00198

*Petitioners' Rebuttal Brief*:[16]

- Given the record evidence, Commerce properly rejected the FIFO methodology that was created for purposes of this investigation to segregate individual sales into subject and non-subject merchandise.

- The petitioners have demonstrated that Zinus' FIFO methodology to assign origin to specific sales of commingled mattresses undercounts POI CEP inventory sales and is distortive to the Cohen's *d* test.[17]

- The petitioners proposed that Commerce apply ratios to all potential sales of subject merchandise — an approach Commerce has previously applied in other cases, such as *Circular Welded Pipe from Mexico* and *Softwood Lumber from Canada*.[18]

- The quarterly ratios methodology is appropriate for the following reasons: (1) it uses the correct "starting point" of all Indonesian mattresses sold to Zinus US; (2) it has been demonstrated to be non-distortive; and (3) it is agnostic in terms of determining which sales to report as subject merchandise.

- Zinus expects Commerce to consider only the "imported CEP inventory quantity" as sales for purposes of evaluating and determining the Indonesian portion of Zinus US's commingled sales. However, nothing in the statute or in Zinus' books and records support this unprecedented "in-transit" loophole, where sales are subject to the investigation but are unavailable for use in the margin calculations because they are "in transit."

- Furthermore, Zinus fails to provide any operational reason why goods "in transit" could not be sold to unaffiliated customers and fails to define "in transit." Thus, the opportunities for manipulation arising from this unprecedented "in-transit" exception are limitless.

- Section 772(b) of the Act defines CEP to be "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter … ."

- Pursuant to the SAA, if, before or after the time of importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter, then Commerce will base its calculation on CEP.[19]

---

[16] *See* Petitioners' Rebuttal Brief at 5-32.

[17] *Id*. at 5 (citing Petitioners' Letter, "Mattresses from Indonesia: Mattress Petitioners' Comments Concerning the Preliminary Determination," dated October 9, 2020 (Petitioners' Pre-Preliminary Comments), at 2-3 and 6-10; and Petitioners' Letter, "Mattresses from Indonesia: Mattress Petitioner's Deficiency Comments Concerning Zinus' Section C Questionnaire Response – Part 1: Reconciliation and Country of Origin," dated August 10, 2020, at 20-25).

[18] *Id*. at 6 (citing *Certain Circular Welded Non-Alloy Steel Pipe from Mexico: Final Results of Antidumping Duty Administrative Review*, 76 FR 36086 (June 21, 2011) (*Circular Welded Pipe from Mexico*), and accompanying IDM at Comment 3; and *Notice of Final Results of Countervailing Duty Administrative Review and Rescission of Certain Company-Specific Reviews: Certain Softwood Lumber Products from Canada*, 69 FR 75921 (December 20, 2004) (*Softwood Lumber from Canada*), and accompanying IDM at Comment 8).

[19] *Id*. at 11 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) (SAA) at 822).

- Commerce's "Glossary of Terms" defining EP and CEP explains that "constructed export price applies even if the sale occurs before importation, unless the U.S. affiliate performs only clerical functions in connection with the sale."[20]
- Zinus has not claimed that Zinus US performs only clerical functions, and it has provided no documentation indicating that mattresses cannot be sold to unaffiliated customers until after they are no longer in transit. Accordingly, all sales made to Zinus US, whether prior to importation or after importation, are inventory of subject merchandise available for sale and should be taken into account when assigning origin.
- As Zinus is a multinational company with experience in antidumping duty investigations, Zinus was on notice that it would need to address country of origin tracing before the first mattress was shipped from Zinus. Record evidence suggests Zinus KR began planning for production in Indonesia in reaction to the *Mattresses from China*[21] investigation.
- Zinus relies on the *Diamond Sawblades* cases as support for the use of FIFO, but in those cases the U.S. Court of International Trade (CIT) affirmed Commerce's application of AFA, saying "Bosun did not provide Commerce the requested direct country of origin information, which is 'unquestionably necessary to distinguish U.S. sales of subject merchandise and to determining accurate duty margins' and 'among the most basic data necessary for {that} calculation.'"[22]
- Though Zinus provided a U.S. sales reconciliation in Zinus CQR[23] at Exhibit C-2B, no "additional materials" worksheets or steps detailing how Zinus' SAP system allocates specific SKUs were provided. Furthermore, Zinus does not reveal anywhere in the Zinus KR reconciliation that it is not using the total Zinus KR sales to Zinus US as the "starting point" for its FIFO analysis.
- If Zinus intended to disregard the reconciliation value and instead rely on "import" volume and value as opposed to "sales volume and value," it should have included a reconciliation adjustment in the original (or resubmitted) Zinus KR reconciliation.
- In the *Preliminary Determination*, Commerce properly rejected Zinus' FIFO methodology for determining subject merchandise within commingled CEP inventory sales.
- Furthermore, despite a clear signal from Commerce in the *Preliminary Determination* that it had concerns about the FIFO methodology, Zinus took no steps to supplement the record to demonstrate accuracy. Typically, Commerce changes a preliminary determination only if new information is placed on the record that alters the preliminary analysis.[24] That has not occurred here.

---

[20] *Id.* (citing Commerce's webpage, "Glossary of Terms: Glossary of AD Terms for Market and Non-Market Economy Cases" (last updated: September 30, 2004; accessed February 13, 2021)).

[21] *See Mattresses from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 FR 56761 (October 23, 2019) (*Mattresses from China*).

[22] *Id.* at 13 (*citing Diamond Sawblades Mfrs.' Coal. v. United States*, 415 F. Supp. 3d 1365, 1371 (Ct. Int'l Trade 2019)).

[23] *See* Zinus' Letter, "Mattresses from Indonesia: Zinus' Section C Questionnaire Response" dated July 14, 2020 (Zinus CQR).

[24] *Id.* at 21 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2015-2016*, 83 FR 16829 (April 17, 2018), and accompanying IDM at Comment 6).

6

- Under applicable regulations, the party using an allocation bears the burden to establish that its chosen allocation is not distortive.[25] Zinus has made no attempt to demonstrate meaningfully that use of the FIFO allocation was non-distortive and record evidence shows that it is distortive.

- Zinus' assertion that FIFO is used in the normal course of business is not supported with record evidence and is contradictory to certain notes to the Zinus US audited financial statement addressing inventories.

- In accordance with section 773(f)(1)(A) of the Act, Commerce normally relies on data from a respondent's normal books and records where those records are prepared in accordance with Generally Accepted Accounting Principles (GAAP) of the exporting country and reasonably reflect the costs associated with the production and sales of the merchandise. In this instance, the normal GAAP methodology is not FIFO.

- In *Stainless Steel Bar from Italy*, Commerce refused to accept an inventory change adjustment that "is not recorded in {respondent's} normal books and records."[26]

- Mattress shelf life is not relevant in selecting an allocation methodology and it is at odds with Zinus' claims that it cannot track country of origin: if shelf life were a driving factor, then tracking mattress country of origin would be necessary because of differences in days in transit from the various production facilities.

- Record evidence shows that the number of days in inventory is not driven by the mattresses shelf life but, rather, by market demand.

- As indicated in its Section A response, Zinus loses traceability once a mattress is inventoried on a pallet.[27] Therefore, Zinus cannot accurately determine the sale of a mattress on first in first out basis.

- The *Diamond Sawblades* appeal and remand determination do not sanction FIFO over other methods, but do show that experienced respondents must track country of origin and Commerce will not accept distortive country of origin allocation methodologies.

- When requesting an explanation for how Zinus determined country of origin, Commerce did not "acknowledge that there will be situations where a respondent does not have records to identify with certainty the country of origin."

- Commerce should determine sales of subject merchandise using the quarterly ratios, as it did in the *Preliminary Determination*.

- Commerce should not adjust the quarterly methodology used in the *Preliminary Determination* by using an understated value for POI CEP inventory sales because physical inventory in the United States does not equal saleable inventory.

- Specifically, moving off sales and shipment date to using "import date" creates at least two distortions: (1) it reduces the "starting point" of sales to Zinus US; and (2) shifts the dates forward in time (meaning the transaction volume associated with a given sales invoice and shipment date may be reported with an earlier "import date").

- Zinus has failed to reconcile the "month-by-month" and "country-by-country" "imported CEP quantity" or "total number of models entered into U.S. inventory" data to sales or warehouse data for all countries involved in the FIFO analysis. In fact, the record is still

---

[25] *Id.* (citing 19 CFR 351.401(g)(2); and *Chlorinated Isocyanurates from Spain: Final Results of Antidumping Duty Administrative Review*, 72 FR 64194 (November 5, 2007), and accompanying IDM at Comment 7).

[26] *Id.* at 25 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar from Italy*, 67 FR 3155 (January 23, 2002) (*Stainless Steel Bar from Italy*), and accompanying IDM at Comment 49).

[27] *Id.* at 28 (citing Zinus AQR at 6).

7

unclear as to the specific date used to identify the quantity of CEP inventory of Indonesian mattresses.

**Commerce's Position:**

During the POI, Zinus' affiliated reseller, Zinus US, purchased mattresses from affiliates located in various countries, but Zinus claimed that its inventory management and sales systems do not track the country of origin for its CEP inventory sales in the normal course of business.[28] Furthermore, Zinus claimed that its third-party warehouses do not provide sufficient details to trace sales back to inbound shipments to the warehouse.[29]  In order to allocate certain CEP inventory sales to shipments from Indonesia for the purpose of reporting its subject merchandise sales to Commerce, Zinus applied a FIFO methodology to determine which of these sales should be attributed to sales of the subject merchandise, which it reported in its U.S. sales database, along with its EP and back-to-back CEP sales.  Zinus also provided a separate sales database containing all sales made out of inventory during the POI from which it derived the subset of reported CEP inventory sales.[30]

Throughout the investigation, the petitioners have argued that the FIFO methodology is distortive, claiming that it leads to the underreporting of total CEP inventory sales.[31]  We preliminarily rejected Zinus' FIFO methodology in favor of a  methodology devised by the petitioners that applies quarterly ratios based on purchase data to all sales of mattresses held in inventory (*i.e.*, both subject and non-subject)[32] and stated the following:

> "Questions remain about the accuracy of this {FIFO} methodology with respect to CEP sales reporting.  Thus, for purposes of the preliminary determination, we applied quarterly ratios, calculated based on the proportion of mattresses purchased from Indonesia during the POI, to the universe of Zinus U.S.'s warehouse sales.  Commerce will continue to examine this issue for purposes of the final determination."[33]

After the *Preliminary Determination*, we sent a supplemental questionnaire requesting information as to whether Zinus US and another affiliated U.S. reseller, Best Priced Mattress (BPM), commingled merchandise before the POI, and if so, how they tracked the country of origin of their sales.[34]  In response, Zinus noted that Zinus US only purchased mattresses from Chinese affiliate, Zinus Xiamen, prior to the POI, meaning the country of origin was clear prior to the POI.[35]  This statement is confirmed by the auditor's notes to Zinus US's 2018 financial statement.[36]  Regarding BPM, Zinus states that, similar to Zinus US during the POI, BPM only

---

[28] *See* Zinus AQR at A-5 to A-7; *see also* Zinus CQR at C-2 to C-3.
[29] *Id.* at A-6.
[30] *See* Zinus CQR at Exhibit C-1B; *see also* Zinus CSQR 9-28-2020 at Exhibit SC-1B.
[31] *See* Petitioners' Pre-Preliminary Comments at 6-10.
[32] *Id.*
[33] *See* *Preliminary Determination* PDM at 9-10.
[34] *See* Post-Preliminary Supplemental Questionnaire at 3.
[35] *See* Post-Preliminary SQR - Pt 1 at 6.
[36] *See* Zinus AQR at Exhibit A-11(b)2.

Filed By: Janae Martin, Filed Date: 3/19/21 12:51 PM, Submission Status: Approved

tracks the country of origin for its purchases of mattresses from Zinus KR, but does not track it once the merchandise is in inventory in the United States.

Zinus reported that it pays warranty claims for defective and damaged merchandise on a customer-specific basis.[37]   Zinus also reported that it only paid commissions on sales of non-subject merchandise during the POI.[38]   However, there is no information on the record demonstrating how Zinus US can be reimbursed by the manufacturer for warranty claims or grant commissions on its sales if it does not know the origin of the merchandise sold out of inventory.  Specifically, while Zinus has explained on the record how it reimburses its U.S. customers for warranty claims,[39] there is nothing on the record concerning how Zinus US is able to seek reimbursement from its own suppliers when warranty claims are made if it does not know the country of origin of the defective merchandise.  Similarly, while Zinus claims that it paid commissions only on non-subject merchandise sales during the POI,[40] there is nothing on the record concerning how Zinus US grants commissions on sales of non-subject merchandise if it does not know the country of origin of the merchandise it sells out of inventory.  We find that these two claims – Zinus' claim about lack of knowledge about the country of origin of merchandise in its inventory and Zinus US's granting of commissions on sales of non-subject merchandise -- are inconsistent. Either Zinus is aware of the country of origin of merchandise in inventory, and can grant commissions on the sales of certain merchandise based on that knowledge, or it does not, and therefore should not be able to grant commissions based on the country of origin of the merchandise.

Accordingly, we find that Zinus' reported FIFO-based sales methodology does not accurately or appropriately capture a sufficient number of sales of subject merchandise.  To come to any other conclusion would be inconsistent with the commercially realistic business practices of a multinational company engaged in the production and sale of a consumer product such as mattresses that provides commissions on certain sales from its inventory.

We therefore agree with the petitioners that the quarterly ratio sales reporting methodology used in the *Preliminary Determination*, along with the quantity of mattresses that Zinus US purchased from Zinus KR, is preferable in this case.  Because it applies quarterly ratios grounded in purchase data to the full universe of Zinus US's sales from inventory during the POI, it is neutral in terms of determining which sales to report as subject merchandise sales.[41]   Therefore, it is less susceptible to manipulation.  Accordingly, we have continued to apply it in the final determination.  Furthermore, we encourage Zinus to revisit its reported U.S. inventory practices so that this issue does not arise in any future segments of the proceeding, if this investigation results in an antidumping duty (AD) order.

**Comment 2:  Zinus' Reporting of Sales Deductions**

*Petitioner's Brief*[42]

---

[37] *See* Zinus CQR at C-37 to C-38 and C-41.
[38] *See* Post-Preliminary SQR - Pt 1 at 4.
[39] *See* Zinus CQR at C-58.
[40] *See* Post-Preliminary SQR - Pt 1 at 2-3.
[41] *See* Petitioners' Pre-Preliminary Comments at 15-17.
[42] *See* Petitioners' Case Brief at 5-18.

9

- After being assigned high preliminary and final margins in *Mattresses from China*, the Korean parent company, Zinus KR, "hopped" from China to Indonesia and continued selling dumped mattresses into the United States with impunity.

- While Zinus KR changed the final production location, it kept making sales of the same products (mattresses), using the same supply chain as the Chinese affiliate.

- The first Indonesian factory began production in February 2019, just before imposition of provisional measures in *Mattresses from China*.[43]

- Zinus obtained inputs from the China non-market economy (NME) supply stream, including multiple manufacturers and trading companies specializing in mattress inputs.[44]

- In February of 2019, when filing its section A response in *Mattresses from China*, Zinus failed to mention production in Indonesia, although two factories were operating in Indonesia by September 2019.

- Commerce has statutory and regulatory tools to address this and the overarching requirement to calculate dumping margins as accurately and equitably as possible.[45]

- In *Mattresses from China*, Zinus' U.S. sales were handled by four entities, Zinus KR, Zinus US, BPM, and Keetsa, Inc., while in this POI, BPM made no sales of subject merchandise, although it still sells mattresses.

- Zinus has never straightforwardly explained why BPM sells no subject mattresses, and it has not explained its allocation of selling expenses.

- The manipulation of selling expenses is accomplished through deceptively simple changes to sales channels and selling practices involving the strategic use of affiliated resellers and multi-country sourcing to shift commission expenses to merchandise produced outside of Indonesia.

- Commerce recently reiterated its policy that "money is fungible within a single integrated company and its use for one purpose may free up money to benefit another purpose."[46] While Commerce has generally applied the "money is fungible" principle to financial expenses, the principle applies equally here. From Zinus KR's perspective it does not matter if commission-based selling expenses are traced to transactions made by BPM, Zinus US, or itself.

- For the six months of sales reviewed in *Mattresses from China*, Zinus KR, Zinus US, and BPM paid commissions on U.S. sales. In this investigation, no commissions were paid on any U.S. sales of subject merchandise, and no subject merchandise was sold through BPM. Furthermore, most of BPM's 2019 mattress sales were made to certain customers that also purchased Indonesian-origin mattresses.

- There is a disproportionate relationship between BPM's deductions and total sales between 2018 and 2019.[47] This appears to be how Zinus managed to achieve a 2.61

---

[43] *Id*. at 5 (citing Zinus' Letter, "Mattresses from Indonesia: Zinus' Section D Questionnaire Response," dated July 7, 2020 (Zinus DQR), at D-3).

[44] *Id*. (citing Zinus DQR at D-5 and Exhibit D-4; Zinus' Letter, "Mattresses from Indonesia: Zinus' Section A Questionnaire Response," dated Jun 19, 2020 (Zinus AQR), at 9 and Exhibit A-3; and Zinus' Letter, "Mattresses from Indonesia: Zinus' Section D Supplemental Questionnaire Response, dated September 23, 2020 (Zinus DSQR), at Exhibit SD-8).

[45] *Id*. at 6 (citing *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013)).

[46] *Id*. at 9 (citing *Countervailing Duty Investigation of Fine Denier Polyester Staple Fiber from India: Final Affirmative Determination*, 83 FR 3122 (January 23, 2018), and accompanying IDM at Comment 9; and *Stainless Steel Wire Rod From Taiwan; Final Results of Antidumping Duty Administrative Review*, 66 FR 52587 (October 15, 2001), and accompanying IDM at Comment 1).

[47] *Id*. (citing Post-Preliminary SQR - Pt 1 at 11).

Appx00204

percent preliminary dumping margin in this investigation after earning a 192 percent final margin in *Mattresses from China*, barely a year earlier.

- Commerce has the discretion and authority to rely on facts otherwise available (FA) pursuant to section 776(a) of the Act when necessary information is missing from the record.

- Rather than provide a full and complete response as to why its commission practices changed, Zinus simply stated that no sales of subject merchandise involved commissions. Given Commerce's limited time and resources, there is now insufficient time for additional factfinding in this investigation.

- Accordingly, Commerce should apply FA to fill in the gaps of missing information and should reallocate sales expenses and/or commission expenses on sales to purchasers of subject and non-subject merchandise.

- In selecting and applying neutral FA, Commerce may use information available on the record, including information provided by respondents[48] or information contained in the petition.[49]

- In applying FA, consistent with the use of consolidated customer codes and the definition of "price adjustments" set forth in 19 CFR 351.102(b)(38), Commerce's sales expenses and commissions analysis should focus on "the purchaser's net outlay" when purchasing mattresses from Zinus—whether the seller is Zinus KR, Zinus US, or BPM and whether the sales are technically made to the parent or one of the parent's affiliates.

- Furthermore, because commission income is simply money that is fungible, as discussed above, in this instance commission payments to customers should be viewed at the consolidated customer level.

- The record contains necessary data to calculate a Zinus/BPM sales deduction rate from reported revenue and expenses that have been pushed to BPM's sales of non-Indonesian origin mattresses. As neutral facts available, Commerce should apply the Zinus/BPM sales deduction rate to the gross unit price of Zinus US customers that are included in the sales value used to allocate the expense. Commerce should then deduct the resulting expense from the U.S. price.

- Section 351.401(g)(4) of Commerce's regulations provides that the "Secretary will not reject an allocation method solely because the method includes expenses incurred, or price adjustments made, with respect to sales of merchandise that does not constitute subject merchandise or a foreign like product (whichever is applicable)."

- Furthermore, the CIT has affirmed that Commerce may accept allocation methodologies that include expenses or price adjustments on non-subject merchandise so long as the methodology is not distortive.[50]

- Thus, the petitioners' proposed adjustment method cannot be rejected simply because expenses attributable to BPM's sales on non-Indonesian mattresses are commingled with expenses relating to subject merchandise.

---

[48] *Id*. at 14 (citing *Steel Wire Garment Hangers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 FR 47587, 47590 (August 14, 2008); and *Silicon Metal from Norway: Affirmative Final Determination of Sales at Less Than Fair Value, Final Determination of No Sales, and Final Negative Determination of Critical Circumstances*, 83 FR 9829 (March 8, 2018), and accompanying IDM at Comment 6).
[49] *Id*. at 15 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from South Korea*, 65 FR 41437 (July 5, 2000), and accompanying IDM at Comments 3-4).
[50] *Id*. at 16 (citing *Acciai Speciali Terni S.P.A. v. United States*, 142 F. Supp. 2d 969, 989 (CIT 2001)).

11

*Zinus' Rebuttal Brief:*[51]

- The petitioners' allegation that Zinus "hopped" from China ignores the fact that Zinus was already in the process of establishing Indonesian operations prior to the filing of the China AD petition.
- The petitioners' theory of commission-shifting contradicts the record.
- The petitioners grossly misrepresent the information Zinus presented in its December 14, 2020, supplemental questionnaire response regarding sales by BPM in 2019. That response actually shows that the "sales deductions" amount cited by the petitioners consists of "sales return, allowances, commission and *etc.*," which covers considerably more than "commissions." Moreover, that figure pertains to all BPM sales, and not just sales of mattresses.
- The Zinus US 2019 financial statements show that total commission expenses in 2019 were similar to commission expenses reported in 2018. However, because no commissions were paid with respect to Indonesian-origin sales, Zinus did not report commissions for {the commingled} sales reported in the non-subject sales database for these sales of non-subject China-origin mattresses.
- Record information confirms that sales deductions as a percentage of 2018 Zinus US revenue increased from 2018 to 2019.[52] Moreover, the BPM sales deduction percentage is on a par with that of Zinus US in 2019. Thus, record information confirms that Zinus US's sales deductions (including commissions) did not decrease in the POI and that BPM's sales deductions were effectively the same as that of Zinus US during the POI.
- Under the petitioners' theory, accepting the burden of the alleged commission-shifting would have had to significantly lower BPM's profit. However, BPM's profit rate was essentially the same in 2019 as it was in 2018.[53]
- As the petitioners noted, Zinus US and BPM made sales to Customer 1[54] in 2019. However, they fail to recognize that the breakdown of commissions paid on U.S. sales reported in *Mattresses from China* in Attachment 1 to their case brief demonstrates that Zinus US did not pay any commissions with respect to sales to Customer 1, while BPM did. Furthermore, Zinus US did not pay commissions on Chinese mattress sales in 2018 and Indonesian mattresses sales in 2019. Thus, no commission expenses were shifted from Zinus US to BPM.
- With regard to Customer 2, neither Zinus US nor BPM incurred commission expenses on sales to this customer during the *Mattresses from China* investigation. With respect to this customer, which makes up the bulk of BPM's mattress business, there simply was no commission "shifting" because BPM paid no commissions on Chinese-origin mattresses in the first place.
- Based on the petitioners' proposed calculations, the commission expenses attributed to Customer 2 allegedly shifted to BPM from Zinus US were greater than the total value of Zinus US's sales to Customer 2. Furthermore, the petitioners calculated an average

---

[51] *See* Zinus' Rebuttal Brief at 3-19.

[52] *Id*. at 10 (citing Zinus' Letter, "Mattresses from Indonesia: Zinus' Section A Questionnaire Response," dated June 19, 2020 (Zinus AQR), at Exhibit A-11b(1) and A-11b(2)).

[53] *Id*. at 11 (citing Zinus AQR at Exhibit A-11e(1)).

[54] As customer names are business proprietary information, we refer to particular customers named by Zinus as Customers 1, 2, and 3.

12

commission rate for Zinus US sales to Customer 3 that would yield a commission amount higher than the total amount of BPM's sales deductions in 2019 to all customers.

- The petitioners argue that any financial hit taken by U.S. customers for higher-priced Indonesian mattresses purchased from Zinus US is being offset by high commission payments paid by BPM for sales of non-subject merchandise. Commerce's practice is to require more than general circumstances even to investigate such an accusation of masking dumping, let alone to make an affirmative finding.[55]

- The application of the petitioners' proposed deduction to the U.S. price would not be "neutral" facts available because the petitioners propose an invented U.S. direct selling expense called a "Zinus/BPM Selling Deduction Rate" based on the financial information of BPM, a U.S. affiliate that has been confirmed not to have been involved with sales of the merchandise under investigation.[56]

- Any determination that concludes, against all record evidence, that BPM was involved in any way with sales of the merchandise under investigation is not a determination based on "facts available."

- There is nothing "neutral" about an adjustment that assumes a U.S. direct selling expense where no additional U.S. direct selling expenses associated with sales of the merchandise under investigation exist.

**Commerce's Position:**

We agree with the petitioners that a price adjustment in the final calculations is appropriate.

Throughout the investigation, the petitioners have argued that Zinus is attempting to avoid high margins imposed in the *Mattresses from China* investigation by moving its mattress production from China to Indonesia.[57] Zinus took initial steps toward establishing its factory in Indonesia in 2018 and began shipping to the United States in April 2019.[58] The *Mattresses from China* investigation was ongoing during this period, and the POI for this investigation covers the 2019 calendar year. Specifically, the petitioners allege that Zinus was masking dumping of Indonesian mattresses during the POI by shifting sales deductions that would have been incurred by Zinus US for sales of Indonesian mattresses to sales of non-subject merchandise made through a different affiliated reseller, BPM, the U.S. reseller at issue in the *Mattresses from China* investigation.

As noted above, Zinus claimed that it only paid commissions on non-subject merchandise.[59] In response to the petitioners' concerns on this matter, Commerce requested, via supplemental

---

[55] *Id*. at 14 (citing *Stainless Steel Plate in Coils from Belgium: Antidumping Duty Administrative Review*, 2010-2011, 77 FR 73013 (December 7, 2012), and accompanying IDM at 4).

[56] *Id*. at 7 (citing Zinus AQR at A-9; Zinus' Letter, "Mattresses from Indonesia: Zinus' Section A Supplemental Questionnaire Response," dated August 20, 2020 (Zinus ASQR), at 5; Zinus CSQR 9-28-2020 at SC2-6 and Exhibit SC-12; and Zinus' Letter, "Mattresses from Indonesia: Response to Petitioners' Post-Preliminary Comments," dated November 27, 2020, at 2-4).

[57] *See, e.g*., Petitioners' Pre-Preliminary Comments at 2-3; *see also Mattresses from China*, 84 FR at 56763, where Zinus Inc., Zinus Xiamen Inc., and Zinus Zhangzhou Inc. received an estimated weighted-average dumping margin of 192.02 percent.

[58] *See* Zinus AQR at Exhibit A-11a(1) and A-11a(2).

[59] *See* Post-Preliminary SQR - Pt 1 at 4.

Filed By: Janae Martin, Filed Date: 3/19/21 12:51 PM, Submission Status: Approved

Appx00207

questionnaires and our in-lieu-of-verification (ILOV) questionnaire, extensive documentation on BPM, the *Mattresses from China* investigation, commission expenses incurred by Zinus, Zinus US, and Zinus KR, and the sales agreements of Zinus US and BPM.[60]  Zinus provided all the information requested.  However, questions remain as to the commercial practicality of Zinus' reporting of its sales practices with regard to commissions and certain other sales allowances.

First, with respect to CEP inventory sales, as noted above in Comment 1, it is not clear how Zinus is able to identify which of the non-subject mattresses it sold from inventory earned commissions if it does not know the country of origin of the merchandise sold out of inventory. In our Post-Preliminary Supplemental Questionnaire, we asked Zinus to explain why the company apparently changed its selling practices with respect to commissions on U.S. sales of the subject merchandise though Zinus US since the time of the *Mattresses from China* investigation.[61]  In response, Zinus stated that "Zinus US's customers to whom it paid a commission in the China investigation simply did not purchase Indonesian mattresses during the POI, and thus did not earn commissions under the terms of the agreements based on sales of subject mattresses."[62]  However, Zinus did not explain why some of Zinus US's customers would agree to purchase mattresses of Indonesian origin on which they would earn no commissions when they could receive commissions from Zinus US on mattresses manufactured in other countries.

Moreover, in its response to our Post-Preliminary Supplemental Questionnaire, Zinus also stated that Zinus US sold subject merchandise to corporate customers whose affiliates purchased non-subject merchandise from both Zinus US and BPM and earned commissions on these sales.[63] Furthermore, for a particular customer, Zinus stated that, as of March 2019 (*i.e.*, a month before Zinus US began purchasing mattresses from Zinus), it no longer paid commissions to this customer and that Zinus began selling Indonesian mattresses to this customer in November 2019.[64]  Zinus again did not explain why it ceased paying commissions to this customer or whether the sourcing of the mattresses had any influence on this decision.

The fact that BPM's financial statements on the record show disproportionate changes between BPM's overall sales deductions and its revenues between 2018 and 2019 raises further questions about the reliability of Zinus' reporting with respect to its sales practices regarding the payment of commissions.[65]  For these reasons, we find it appropriate to make an adjustment to the prices of Zinus' CEP sales to ensure that all sales allowances and deductions are accounted for in the margin calculation.

The petitioners' proposed price adjustment involves calculating the ratio of BPM's 2018 sales deductions over its 2018 sales revenue and applying that ratio to BPM's 2019 revenue.  The petitioners argue that this calculation would yield the theoretical 2019 sales deduction for BPM, were it not for the alleged shifting of commission expenses.  The petitioners propose taking the difference between this theoretical sales deduction and the sales deduction that BPM actually

---

[60] *See* Post-Preliminary Supplemental Questionnaire; and Commerce's Letter, "Antidumping Duty Investigation of Mattresses from Indonesia:  Supplemental Questionnaire in Lieu of On-Site Verification," dated January 19, 2021.
[61] *Id.*
[62] *See* Post-Preliminary SQR - Pt 1 at 4.
[63] *Id.* at 4-5.
[64] *Id.* at 5.
[65] *Id.* at 11.

reported in 2019 and deriving a deduction rate using sales made by Zinus US. The petitioners would then have us apply this deduction rate to the reported gross unit prices of Zinus US's subject merchandise sales to in-common customers with BPM. This proposal presents challenges for two reasons, however. First, the sales deduction rate is derived using BPM's financial information from 2018 (*i.e.*, before the POI). Second, the petitioners base their calculation solely on BPM's experience regarding sales deductions without taking into account Zinus' experience as well.

For these reasons, we calculated a different adjustment that takes into consideration the sales deduction experience of both companies during the POI. Specifically, we combined Zinus US's and BPM's 2019 (*i.e.*, POI) sales deductions, net of discounts and returns, and divided by the companies' combined gross sales, as reported in their respective financial statements. We then applied this ratio to the gross unit price of all sales made by Zinus US (*i.e.*, all CEP sales).[66] To avoid double counting reported expenses to the extent possible, we did not adjust these U.S. prices for certain rebates. We did not make a similar adjustment for EP sales because we did not have the information on the record with which to do so.

## Comment 3: Transactions Disregarded Adjustments

*Zinus' Case Brief*[67]
- Commerce should not use Global Trade Atlas (GTA) import data to calculate the transaction disregarded rule (TD rule) adjustment, but if Commerce does rely on GTA import data, it must rely on Indonesia GTA import data only, rather than using the average GTA import data for Indonesia, Brazil, Malaysia, Mexico, Romania, Russia, and Turkey.[68]
- The statute pertaining to the TD rule adjustment does not give Commerce unlimited discretion to select substitute values or adjustments to the reported data. Market value necessarily pertains to the market under consideration, in this case Indonesia.[69]
- Zinus provided all the data that Commerce required and has traditionally used in its arm's-length analysis. Together, with the purchases of inputs from unaffiliated suppliers, these data confirm that Zinus' purchases of inputs from affiliated Chinese suppliers are at market values.[70]

*Petitioner's Case Brief*[71]
- Commerce should modify the TD rule adjustment to exclude Indonesian import GTA data from its market price average to avoid distortive and inaccurate results in the final determination.[72]

---

[66] *See* Zinus Final Determination Calculation Memorandum.
[67] *See* Zinus' Case Brief at 24-30.
[68] *Id.* at 24.
[69] *Id.* at 24-25.
[70] *Id.* at 27-28.
[71] *See* Petitioners' Case Brief at 19-23.
[72] *Id.* at 19.

Filed By: Janae Martin, Filed Date: 3/19/21 12:51 PM, Submission Status: Approved
Appx00209

- Commerce should not use the Indonesia GTA import data because record evidence shows the Indonesia data may be distorted and inaccurate due to circularity problems and acknowledged misclassifications of HTS codes on certain inputs[73]

*Zinus' Rebuttal Brief*[74]
- The submitted Indonesian GTA import data are not distorted because the data already exclude imports from China based on Commerce's instructions, and there is no evidence to suggest that the imports from Zinus' Chinese affiliates have not been classified as Chinese.[75]
- There is no supportive evidence that purchases from Zinus' Chinese affiliates may somehow still be included in Indonesian GTA data even though imports from China are excluded from the Indonesian GTA data. This argument is not based on any evidence and it can apply to any of the other countries' (*i.e.*, Brazil, Malaysia, Mexico, Romania, Russia, and Turkey) GTA import data as well.[76]
- When a market price is not available, Commerce should use the affiliated suppliers' cost of production (COP)[77]as a market price.
- Zinus provided and explained more appropriate HTS codes for determining the market value of the input in the section D supplemental questionnaire response.[78]

*Petitioner's Rebuttal Brief*[79]
- Commerce should use only the Brazil, Malaysia, Mexico, Romania, Russia, and Turkey average GTA import data when establishing an Indonesia market price because they are reasonable sources for market value.[80]
- Zinus' assertions as to the use of its Chinese affiliates' COP is not reasonable, as these costs were incurred in an NME, where Commerce has long recognized that costs and prices are inherently suspect.[81]

**Commerce's Position:**

Background:

Zinus obtained ten types of minor inputs from NME-based affiliated suppliers. In the *Preliminary Determination*,[82] we analyzed these transactions in accordance with the TD rule at section 773(f)(2) of the Act:

---

[73] *Id.* at 20-22.
[74] *See* Zinus' Rebuttal Brief at 20-26.
[75] *Id*. at 21.
[76] *Id*. at 22-23.
[77] *Id*. at 27-28.
[78] *Id*. at 24-26; *see also* Zinus DSQR at SD-13 and 22 and Exhibit SD-8 and SD-9b.
[79] *See* Petitioners' Rebuttal Brief at 33-39.
[80] *Id*. at 33-35.
[81] *Id*. at 35.
[82] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – PT Zinus Global Indonesia," dated October 27, 2020 (Preliminary Cost Memorandum).

*773(f)(2) TRANSACTIONS DISREGARDED.—A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.*

The record evidence shows that Zinus did not purchase many of these material inputs from unaffiliated suppliers.[83] Thus, Commerce was without a market price against which to test the affiliated party purchases for many items. When market prices are not available to test affiliated party transactions, Commerce will often solicit the affiliated supplier's COP for use as a surrogate for market price. However, because these transactions were between Zinus and NME-based affiliated suppliers, Commerce was unable to use the NME-based affiliated suppliers' COP for use as a substitute for market price. Commerce decided to not apply an NME factors of production methodology analysis to the respondents' minor inputs obtained from NME-based affiliated suppliers, as section 773(c) of the Act specifically addresses the issue of determining a normal value (NV) for NME-based respondents rather than a COP for NME suppliers of market economy-based respondents, and for the practical reason that a complex NME analysis of the many NME-sourced affiliated inputs would not be administrable given the significant resources required and strict deadlines of the case.

Therefore, Commerce sought to obtain surrogate price information that would allow it to fulfill the requirements of the statute under section 773(f)(2) of the Act. It was determined that the most reasonably available information to the parties for this purpose would be GTA import data, as it is readily available and reasonably specific to the voluminous number of affiliated NME inputs. Further, to narrow the request, and given that the affiliated suppliers are from an NME country, we determined to solicit GTA import data from countries economically similar to the affiliated suppliers' NME country. Thus, Commerce requested and obtained from the parties GTA import data for the countries that are currently used by Commerce as potential surrogate sources for the particular NME country (*i.e.*, Brazil, Malaysia, Mexico, Romania, Russia, and Turkey).[84] In addition, Commerce requested, and Zinus placed on the record, GTA import data for Indonesia.[85]

At the *Preliminary Determination*,[86] Commerce made the following decisions. Where available, we compared the price paid to Zinus' affiliated supplier (*i.e.*, the transfer price) to prices paid by Zinus for the same inputs to unaffiliated suppliers (*i.e.*, market prices).[87] For affiliated inputs where Zinus did not purchase the same input from an unaffiliated supplier, we determined a

---

[83] *See* Zinus DSQR at D-6 to D-13 and Exhibits SD-8 and SD-9.
[84] *Id.*
[85] *Id.*
[86] *See* Preliminary Cost Memorandum.
[87] *Id.*

Filed By: Janae Martin, Filed Date: 3/19/21 12:51 PM, Submission Status: Approved
Appx00211

market price using the average of the GTA import data for seven countries (*i.e.*, Indonesia, Brazil, Malaysia, Mexico, Romania, Russia, and Turkey).[88]

<u>Market Price for Inputs Under the TD Rule</u>:

We disagree with Zinus that Commerce should not use GTA import data as a means to determine surrogate market prices in applying the TD rule.[89] The statute directs Commerce to test the arm's-length nature of affiliated transactions to determine whether they reflect a market value and does not specify a particular methodology for determining market values. Commerce's preference is to determine a market value based on the respondent's own purchases of the input from unaffiliated suppliers. When no such purchases are available, Commerce looks to the affiliated supplier's sales of the input to unaffiliated parties, and, lacking that, to any reasonable source for market value, for example the COP of the affiliated supplier.[90] In the instant case, because for raw material inputs where there are no comparable transactions with unaffiliated suppliers, the only information available that can reasonably be used to test the arms-length nature of the transfer prices from affiliates is the publicly available GTA data. Accordingly, we consider it reasonable in this case to rely on the GTA data on the record to fill the gaps where market prices are not available. In varying combinations for various inputs and raw material types, we have on the record GTA data from the following countries: Indonesia, Romania, Russia, Malaysia, Turkey, Mexico, and Brazil.[91] Commerce requested these data in the section D supplemental questionnaire for use as a possible market price source where input market prices were not available.[92]

In using the GTA data as a best available information source for market values, we must decide which country's (or countries') GTA data to use. We agree with Zinus that the statute directs Commerce to look to the market under consideration when testing the affiliated supplier transfer price against a market price. As noted above, section 773(f)(2)– Transactions Disregarded Rule, states that, "A transaction … between affiliated persons may be disregarded if … the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." Thus, the statute indicates that the item being tested should reflect a market price in the country under consideration, which is Indonesia in the instant case. Accordingly, the Indonesian GTA data best reflect market prices for the market under consideration in those instances where market prices directly from an unaffiliated supplier are not available.

We agree with the petitioners that because we are testing transactions from the respondent's affiliated Chinese suppliers whose exports to Zinus are necessarily included in the Indonesian GTA data, there is good cause to exclude the China export data included in the Indonesian GTA

---

[88] *Id.*

[89] *Id.* at 24.

[90] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 FR 17413 (March 26, 2012) (*Refrigerators from Korea*), and accompanying IDM at Comment 17; and, *Final Results of Antidumping Duty Administrative Review: Silicomanganese from Brazil*, 69 FR 13813 (March 24, 2004), and accompanying IDM at Comment 7.

[91] *See* Zinus DSQR at D-6 to D-13 and Exhibits SD-8 and SD-9.

[92] *Id.*

18

Appx00212

data to avoid a clear circularity of using the same affiliated transactions to test the affiliated transfer prices. However, the Indonesian GTA import data provided by Zinus already exclude imports from China based on Commerce's instructions.[93] In addition, contrary to the petitioners' assertion, there is no evidence to suggest that the imports from Zinus' Chinese affiliates have been classified as being from non-Chinese sources and thus are somehow still included in the Indonesian GTA data, even though imports from China are excluded from the Indonesian GTA data.[94] As to the petitioners' allegation that Zinus misclassified a certain HTS code related to certain inputs, we disagree. Zinus simply provided and explained in the section D supplemental questionnaire response,[95] that it may be more appropriate to use more specific HTS categories and codes for determining the market value of certain inputs. This does not call into question the accuracy or reliability of the Indonesian GTA data as a whole. Therefore, for the final determination,[96] we first compared the affiliated party transfer prices to prices paid to unaffiliated parties for the same input. For affiliated party inputs where prices paid to an unaffiliated party are not available, we determined the market price using Indonesia GTA data.

**Comment 4: Financial Statements Used to Value CV Profit and Selling Expenses**

*Zinus' Case Brief*[97]
- Commerce should reject Emirates Sleep Systems Private Limited (Emirates)'s financial statements because Emirates' financial statements do not meet the following criteria: Emirates is not an Indonesian company, its financial statements do not reflect production and sales in the country under investigation, its business operation is not similar to Zinus' business operation, and its financial statements are contemporaneous with the POI for only three months.[98]
- Emirates does not have similar business operations because its operations rely heavily (in terms of revenue and input sourcing) on its overseas holding company. Alternatively, Commerce should classify the "marketing fee" transfer payment reported on the financial statements as non-operating revenue and exclude it from the profit calculation.[99]
- Commerce should use the financial statements of PT Graha Seribusatu Jaya (Graha) or PT Ecos Jaya Indonesia (Ecos) to value CV profit and selling expenses in the final determination because they are producers of identical or comparable merchandise in the home market.[100]
- Graha is a voluntary respondent in Commerce's investigation and it produces identical merchandise in the home market.[101]
- Although Ecos' financial statements have a qualified opinion from its auditor, that opinion relates to the treatment of estimated future liabilities pertaining to post-employment benefit obligations of the company. The basis of the qualification on the

---

[93] *See* Zinus' Rebuttal Brief at 20-26; *see also* Supp DQR at D-6 to D-13 and Exhibits SD-8 and SD-9.
[94] *See* Zinus' Case Brief at 22-23.
[95] *See* Zinus DSQR at SD-13 and 22 and Exhibit SD-8 and SD-9b; *see also* Petitioners' Case Brief at 20-22.
[96] *See* Zinus Final Cost Calculation Memorandum.
[97] *See* Zinus' Case Brief at 30-43.
[98] *Id*. at 33-38.
[99] *Id*. at 37-38.
[100] *Id*. at 38-43.
[101] *Id*. at 38-39.

auditor's opinion at issue here has essentially no bearing on the calculation of period costs, revenues, expenses, cash flows, profits or selling expenses.[102]

- Alternatively, Commerce could also rely on the financial statements of PT Innocycle, PT Chitose International, and PT Boston Furniture Industries because they are Indonesian companies and manufacture products in the same general category of the merchandise under consideration.[103]

- Commerce erred by using Emirates' CV profit rate as the profit cap consistent with section 773(e)(2)(B)(iii) of the Act because the record ostensibly contains profit information on sales in Indonesia of products in the same general category of merchandise as mattresses, in particular the financial statements of Ecos.[104]

- If Commerce is considering third country sources, Commerce should also include the financial statements of Malaysian producer Luxury Sleep Products and Serbian producer Slarafija Trade to establish a profit cap.[105]

*Petitioner's Rebuttal Brief*[106]

- Commerce should continue to rely on the financial statements of Emirates to value CV profit and selling expenses in the final determination. Commerce will use third country financial statements if they are the best information available.[107]

- Emirates is a producer of identical merchandise and has similar business operations as Zinus. In addition, Emirates' financial statements are contemporaneous with three months of the POI.[108]

- Alternatively, if Commerce determines that Graha can serve as a basis for CV profit and selling expense rates, it should rely on Graha's submitted home market sales and cost data made in the ordinary course of trade, not its financial statements.[109]

- Commerce's policy is to reject financial statements that contain a qualified auditor's opinion (*i.e.*, Ecos' financial statements).[110]

- Commerce should continue to rely on Emirates' financial statements to establish a profit cap in the final determination.[111]

**Commerce's Position:**

For the final determination,[112] we have continued to use the Emirates financial statement, under section 773(e)(2)(B)(iii) of the Act, as a surrogate source for the CV profit ratio and selling expenses for Zinus. As explained below, after considering the record evidence and all the arguments in the parties' case and rebuttal briefs, we continue to find that Emirates' CV profit and selling expenses constitute the best source for CV profit and selling expense data on the record of this proceeding.

---

[102] *Id*. at 39-40.
[103] *Id*. at 40-41.
[104] *Id*. at 41-43.
[105] *Id*. at 43.
[106] *See* Petitioners' Rebuttal Brief at 39-55.
[107] *Id*. at 39-42.
[108] *Id*. at 42-48.
[109] *Id*. at 49-50.
[110] *Id*. at 50-51.
[111] *Id.* at 53-55.
[112] *See* Zinus Final Cost Calculation Memorandum.

Filed By: Janae Martin, Filed Date: 3/19/21 12:51 PM, Submission Status: Approved
Appx00214

Zinus did not have a viable home or third-country market during the POI.  Thus, because Zinus did not have home or third-country market sales to serve as a basis for NV, NV must be based on CV in accordance with section 773(a)(4) of the Act.  Likewise, absent a viable home or third-country market, we are unable to calculate CV profit and selling expenses using the preferred method under section 773(e)(2)(A) of the Act (*i.e.*, based on the respondents own home market or third-country sales made in the ordinary course of trade).  In situations where we cannot calculate CV profit under section 773(e)(2)(A) of the Act, section 773(e)(2)(B) of the Act sets forth three alternatives:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise;

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country; or

> (iii) the amounts incurred and realized . . . for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise (*i.e.*, the "profit cap").

The statute does not establish a hierarchy for selecting among the alternatives for calculating CV profit and selling expenses.[113]  Moreover, as noted in the SAA, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data."[114] In this case options (i) and (ii) are not possible.  Zinus does not have sales of the general category of merchandise in the home market and there are no other respondents being investigated in this proceeding.  Thus, the only option available to Commerce is (iii), any other reasonable method.

Interested parties submitted financial statements for eight companies as possible options for CV profit under section 773(e)(2)(B)(iii) of the Act.  Interested parties have argued for the following possible sources from which to calculate CV profit and selling expenses for the final determination:  (1) financial statements of Graha, a voluntary respondent mattress producer;[115]

---

[113] *See* SAA at 840 ("At the outset, it should be emphasized, consistent with the Antidumping Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference among these alternative methods.  Further, no one approach is necessarily appropriate for use in all cases.").

[114] *Id.*

[115] *See* Zinus' Letter, "Mattresses from Indonesia:  Constructed Value Profit and Selling Expense Information and Comments," dated August 18, 2020 (Zinus' CV Profit), at Exhibit 1 and  Petitioners; Letter, "Mattresses from Indonesia:  Mattress Petitioners' Submission Concerning CV Profit and Selling Expenses," dated August 17, 2020 (Petitioners' CV Profit), at Attachment 1; *see also* Zinus' Case Brief at 38-39 (relying on Graha's financial

(2) financial statements of Ecos, an Indonesian producer of mattresses and other sleep products;[116] (3) financial statements of Innocycle, an Indonesian producer of non-woven and staple fiber, and materials recycling;[117] (4) financial statements of Chitose, an Indonesian producer of all kinds of furniture for homes, schools, restaurants, and hospitals;[118] (5) financial statements of Boston, an Indonesian producer of wood furniture and special construction or repairs;[119] (6) financial statements of Luxury, a Malaysian producer of bedroom furniture including mattresses;[120] (7) financial statements of Slarafija, a Serbian producer of mattresses;[121] and (8) financial statements of Emirates, an Indian producer of mattresses.[122]

In evaluating each of the available alternatives under section 773(e)(2)(B)(iii) of the Act, we followed the analysis established in *Pure Magnesium from Israel*.[123]  In *Pure Magnesium from Israel*, Commerce set out three criteria for choosing among surrogate data under section 773(e)(2)(B)(iii) of the Act: 1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; 2) the extent to which the financial data of the surrogate company reflect sales in the home market and do not reflect sales to the United States; and, 3) the contemporaneity of the data to the POI.  In *CTVs from Malaysia*, Commerce added a fourth criterion which is the extent to which the customer base of the surrogate company and that of the respondent are similar (*e.g.*, original equipment manufacturers versus retailers).[124]  These four criteria have been followed in subsequent cases to assess the appropriateness of using various financial statements on the record of a given case to determine CV profit and selling expenses under section 773(e)(2)(B)(iii) of the Act.[125]

Based on the above criteria and Commerce's practice, we reviewed each of the submitted financial statements to ensure that they:  (1) reflect a net profit; 2) are complete (*i.e.*, all of the financial statements are included with the auditor's report showing an unqualified opinion and all accompanying footnotes were provided); and 3) are fully translated.  We disregarded the following financial statements.  For Slarafija, we do not have the complete financial statements, and the financial statements and auditor's opinion are not fully translated.[126]  Ecos's financial statement has a qualified opinion.[127]  Although Zinus argues that the qualified opinion does not impact the calculation of period costs, revenues, expenses, cash flows, profits or selling

---

statements) and Petitioners' Rebuttal Brief at 49-50 (relying on Graha's submitted home market sales and cost data made in the ordinary course of trade).
[116] *See* Zinus' CV Profit at Exhibit 2.
[117] *Id.* at Exhibit 3.
[118] *Id.* at Exhibit 4.
[119] *Id.* at Exhibit 5.
[120] *Id.* at Exhibit 6.
[121] *Id.* at Exhibit 7.
[122] *See* Petitioners' CV Profit at Attachment 2.
[123] *See Notice of Final Determination of Sales at Less Than Fair Value:  Pure Magnesium from Israel*, 66 FR 49349 (September 27, 2001) (*Pure Magnesium from Israel*), and accompanying IDM at Comment 8.
[124] *See Notice of Final Determination of Sales at Not Less Than Fair Value:  Certain Color Television Receivers from Malaysia*, 69 FR 20592 (April 16, 2004), and accompanying IDM at Comment 26 (CTVs from Malaysia).
[125] *See, e.g., Certain Oil country Tubular Goods from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstance*, 79 FR 41983 (July 18, 2018) (*OCTG from Korea*), and accompanying IDM at Comment 1.
[126] *See* Zinus' CV Profit at Exhibit 7.
[127] *Id.* at Exhibit 2.

expenses,[128] we disagree. The qualified opinion relates to estimated future liabilities pertaining to post-employment benefit obligations of the company. This qualification could very well impact the current costs recognized by the company, either increase or decrease them, had the company followed the requirements of the GAAP of Indonesia. As such, there is no evidence to confirm that the qualified opinion does not impact the calculation of period costs, revenues, expenses, cash flows, profits or selling expenses. Luxury and Slarafija's 2018 financial statements are not contemporaneous with the POI.[129] For Chitos, an Indonesian producer of all kinds of furniture for homes, schools, restaurants, and hospitals, and Boston, an Indonesian producer of wood furniture and special construction or repairs, we note that they both produce and sell products [130] that are not comparable to mattresses. For Graha, we disagree with both parties' suggestion that we run a margin program on the home market sales and cost information this company submitted solely to obtain a profit.[131] We disagree that it is appropriate to rely on the voluntary respondent's submitted home market sales and cost information, because Commerce chose not to investigate this company and the information it submitted has not been reviewed or analyzed by Commerce. Regarding Graha's financial statements, Graha's 2018 financial statements are not contemporaneous with the POI and Graha's 2019 financial statements are not audited.[132] As a result, we are left with two possible alternatives, the financial statements of Innocycle and Emirates. Both of these financial statements: 1) reflect a net profit; 2) are complete (*i.e.*, all of the financial statements are included with the auditor's report showing an unqualified opinion and all accompanying footnotes were provided); and 3) are fully translated. Furthermore, neither financial statement reflects sales predominantly to the United States.[133]

The specific language of both the preferred and alternative methods appear to show a preference that the profit and selling expenses reflect: 1) production and sales in the foreign country; and 2) the foreign like product, *i.e.*, the merchandise under consideration. However, when selecting a profit rate from available record evidence, we may not be able to find a source that reflects both factors. In addition, there may be varying degrees to which a potential profit source reflects the merchandise under consideration. Emirates is an Indian-based manufacturing company that primarily manufactures all types and kinds of mattresses, bases, and other sleep related products and systems. Even though Innocycle is an Indonesian producer of mattresses, only six percent of its revenue is from mattresses, so it is clearly not predominantly a mattress producer as Emirates is.[134] Rather, Innocycle is predominantly a producer of non-woven and staple fiber, and materials recycling.[135] Therefore, in weighing the available information and determining which source of information to use under alternative (iii), we must consider both of these important criteria (both the market and the product produced). In the instant case, Emirates is an out-of-country producer (*i.e.*, Indian producer), however it predominantly produces and sells the

---

[128] *See* Zinus' Case Brief at 39-40.
[129] *See* Zinus' CV Profit at Exhibit 6 and 7.
[130] *Id.* at Exhibit 4 and 5.
[131] *See* Zinus' Case Brief at 38-43; *see also* Petitioners' Rebuttal Brief at 49-50.
[132] *See* Zinus' CV Profit at Exhibit 1; *see also* Petitioners' CV Profit at Attachment 1.
[133] *See* Petitioners' CV Profit at Attachment 2; *see also* Zinus' CV Profit at Exhibit 3.
[134] *See* Zinus' CV Profit at Exhibit 3.
[135] *Id.*

comparable merchandise (*i.e.*, mattresses).[136]  Innocycle, is an in-country producer, however, it predominantly produces non-comparable merchandise.

Zinus argues that Emirates' financial statements are only contemporaneous with the first three months of the POI.[137]  The petitioner disagrees that Emirates' financial statements are not contemporaneous to the POI.[138]  Because our periods of investigation and review do not normally coincide with the calendar year or other fiscal years typically adopted by companies, Commerce regularly accepts as contemporaneous a statement that overlaps the POI by some amount.  Furthermore, Commerce has been reluctant to exclude one financial statement over another for the sole reason that one of them covers more months of the POI.  Therefore, while Commerce prefers to use contemporaneous financial statements for CV profit, Commerce does not require a financial statement's reporting period to be identical to the POI to be considered contemporaneous.[139]  We agree with the petitioners that in selecting surrogate financial statements for CV profit, as long as the financial statement period overlaps the POI, we consider it contemporaneous and, if the information is useful, we consider it as potential source for our selection.

In addition, Zinus argue that Emirates generates a significant portion of its revenues through sales of services which are intercompany charges for providing advertising, marketing, and promotional services related to retail operations.[140]  However, we disagree with the assertion that these activities would disqualify Emirates from consideration.  The Emirates' financial statements show that 76.71 percent of the company's activities relate to manufacturing of mattresses, while only 23.29 percent relate to marketing.[141]  Further, in addition to explaining that the "company basically {is} into the manufacturing of all types and kinds of mattresses and other sleep related products and systems", at Note 1, the Emirates' financial statements state "The company is also into trading both wholesale and retail of such manufactured products" and "The company provides advertising, marketing, and promotion services to its holding company," Dubai Furniture Manufacturing LLC.[142]  We believe that the marketing, promotion, and trading activities related to mattresses and sleep systems is a completely appropriate activity for a company engaged in the manufacturing and sale of mattresses.  Additionally, there is no record evidence, nor has it been shown by the respondents, that the expenses related to these revenues are missing from the calculation of profit on the Emirates financial statements.[143]  Finally, we note that when calculating selling expenses for CV, we did not include the retail, marketing and advertising service or commission costs, but rather only included transportation expenses as a selling expense.[144]

---

[136] *See* Petitioners' CV Profit at Attachment 2.
[137] *See* Zinus' Case Brief at 33-38.
[138] *See* Petitioners' Rebuttal Brief at 42-48.
[139] *See, e.g., Pure Magnesium from Israel* IDM at Comment 8.
[140] *See* Zinus' Case Brief at 37-38.
[141] *See* Petitioners' CV Profit at Attachment 2.
[142] *Id.*
[143] *Id.*
[144] *Id.*

24

Zinus also argues that the financial statements of Emirates are incomplete because they are missing some annexures that are specifically referenced in the financial statement notes.[145] We disagree that the Emirates' financial statements are incomplete because they include the full audit report, each of the financial statements, and all of the accompanying footnotes.[146] None of the annexures refer to information that would bring into question any of the amounts on the income statement which affect the profit or selling expenses.[147] Each of the annexure references are in footnotes that already detail the affected balance sheet items.[148]

In summary, Commerce is faced with choosing among two alternatives, Innocyle and Emirates, for calculating CV profit and selling expenses in this investigation. Emirates is a mattress producer that has business operations, products, and a customer base that are very similar to that of the respondent, an Indonesian mattress producer.[149] Innocycle, on the other hand, as a producer of non-woven and staple fiber, and materials recycling products, which are not comparable merchandise, is less representative of an Indonesian mattress producer' business operations, products, and customer base.[150] Therefore, after considering the record evidence and the arguments raised in the parties' case and rebuttal briefs, we have continued to use Emirates' CV profit and selling expense ratios for the final determination.

Further, we are unable to calculate the amount realized by exporters or producers in connection with the sale, for consumption in the foreign country, of the merchandise in the same general category of products as the subject merchandise (*i.e.*, the "profit cap"), in accordance with section 773(e)(2)(B)(iii) of the Act, because the record does not contain any information for making such a calculation. However, the SAA makes clear that Commerce might have to apply alternative (iii) on the basis of facts available.[151] We disagree with Zinus that any of its submitted financial statements meet the specific criteria in the law for the profit cap.[152] When establishing a profit cap, the law specifies that we use the profit on sales in the foreign country for the "merchandise in the same general category of products as the subject merchandise." None of the suggested financial statements reflect profit only on sales of the general category of products in the foreign country under investigation.[153] As Emirates was found to be the best available option for calculating CV profit, we likewise consider it the best option for determining the profit cap as facts available. Therefore, we continue to find that Emirates' profit information serves as a reasonable profit cap for the final determination.[154]

## Comment 5: Startup Adjustment

---

[145] *See* Zinus' Case Brief at 36 (footnote 51).
[146] *See* Petitioners' CV Profit at Attachment 2.
[147] *Id.*
[148] *Id.*
[149] *See* Petitioners' CV Profit at Attachment 2;
[150] *See* Zinus' CV Profit at Exhibit 3.
[151] *See* SAA at 840.
[152] *See* Zinus' Case Brief at 41-43.
[153] Although Graha's financial statements may reflect the production and sale of merchandise in the same general category of products as the subject merchandise, its financial statements are 1) not contemporaneous within the POI (2018 financial statements); not audited (2019 financial statements); and 3) as voluntary respondent, Graha's sales may be made predominantly to the United States.
[154] *See* Zinus Final Cost Calculation Memorandum.

Filed By: Janae Martin, Filed Date: 3/19/21 12:51 PM, Submission Status: Approved
Appx00219

*Zinus' Case Brief*[155]
- Zinus' startup cost adjustment is reasonable and meets the criteria of a startup adjustment under the statute.[156]
- Zinus seeks to exclude from its general and administrative (G&A) ratio calculation the one-time incurred expenses necessary to bring its new facility online and to test its new foam production machine. Zinus recognized the related input material purchase costs as research and development (R&D) material costs and maintains that if these costs are not excluded altogether, they should be allocated over an eight-year period.[157]

*Petitioners' Rebuttal Brief*[158]
- Commerce properly rejected the R&D-based startup adjustment because, although Zinus asserts its entitlement to a startup adjustment, it has failed to demonstrate its entitlement to such an adjustment.[159]

**Commerce's Position:**

We agree with the petitioners that the proposed startup adjustment reported by Zinus for its R&D material costs should be rejected. Zinus failed to meet at least one of the two criteria in the two-pronged test required under section 773(f)(1)(c)(ii) of the Act.[160] Section 773(f)(1)(c)(ii) of the Act permits adjustments for a startup operation if: 1) a producer is using new production facilities or producing a new product that requires substantial investment; and 2) production levels are limited by technical factors associated with the initial phase of commercial production.[161] Although Zinus may have satisfied the first criterion because its facility was new, it failed to meet the second criterion. Specifically, it failed to: 1) demonstrate that production levels were limited; 2) explain how the purchase and testing of new equipment delayed production; 3) identify technical factors encountered; and 4) explain how its R&D expenses constitute technical difficulties.[162] Accordingly, the claimed startup adjustment is not supported by record evidence. The full amount of the R&D expense was recognized in the current period in accordance with the respondent's normal books and records. As it is not unreasonable for a company to recognize R&D costs incurred in the current year in full, we have continued to include the full amount of the related R&D expenses in the G&A rate calculation for the final determination.[163]

**Comment 6: Region in Cohen's *d* Test**

*Zinus' Case Brief*:[164]

---

[155] *See* Zinus' Case Brief at 43-45.
[156] *Id.* at 44.
[157] *Id.* at 45.
[158] *See* Petitioners' Rebuttal Brief at 56-58.
[159] *Id.* at 56-58.
[160] *Id.*
[161] *See* Section 773(f)(1)(c)(ii) of the Act.
[162] *See* Zinus DQR at D-19 to D-21 and D-25, and Exhibits D-11and D-13; *see also* Zinus DSQR at D-26 to D-27 and Exhibit SD-25.
[163] *See* Zinus Final Cost Calculation Memorandum.
[164] *See* Zinus' Case Brief at 45-57.

26

Appx00220

- In the *Preliminary Determination*, Commerce relied on the ZIP code reported in the field DESTU to determine the existence of a pattern of prices that differ significantly among regions.
- In response to Commerce's question, Zinus reported in field DEST1U the ZIP code associated with the U.S. port of entry, which is "closest to the final destination that is managed by Zinus."
- Zinus originally reported the U.S. ZIP code in the DESTU field. In the Zinus CQR, Zinus stated, "For EP sales and back-to-back CEP sales, Zinus has reported the ZIP code of the customers to whom Zinus US issued its invoices as Zinus has no other information on the final destination."[165]
- In response to questions raised in Commerce's supplemental questionnaire, Zinus created a new field, DEST1U, to record the U.S. port where the mattresses from Indonesia entered in its ERP system for back-to-back CEP sales. Zinus explained, "Even if this is not a final destination (such as a customer's warehouse), Zinus believes it is the most appropriate information as this address is closest to the final destination that is managed by Zinus."[166]
- The DEST1U ZIP code clearly offers an improved correlation to the U.S. region to which the merchandise was actually sold and shipped. For the final determination, Commerce therefore should rely on the ZIP code information reported in the field DEST1U, rather than DESTU.

*Petitioners' Rebuttal Brief*:[167]
- Commerce should reject Zinus' argument that Commerce should revise its differential pricing analysis to rely on DEST1U rather than DESTU to define region in the Cohen's *d* test.
- Commerce requests multiple destinations, both ZIP codes and states, and has the discretion to choose from the available destinations.
- Zinus does not know the final destination of the subject merchandise for its EP and CEP back-to-back sales.[168] Therefore, neither DESTU nor DEST1U provide the final destination. In fact, the destination in DEST1U is representative of Zinus' location, not that of the customer.
- Information on both DESTU and DEST1U was on the record prior to the *Preliminary Determination*, and Commerce chose to use DESTU to define the region for the Cohen's *d* test. As no other information has been placed on the record, no reason exists for Commerce to revise its decision in the final determination.

**Commerce's Position:**

We agree with the petitioners. Section 777A(d)(1)(B)(i) of the Act directs Commerce to identify whether there is a pattern of prices that differ significantly "among purchasers, regions, or periods of time." With respect to identifying a pattern of prices, Commerce stated in the

---

[165] *Id*. at 46 (citing Zinus CQR C-53).
[166] *Id*. at 47 (citing Zinus' Letter, "Mattresses from Indonesia: Zinus' Section C Supplemental Questionnaire Response (part 1)," dated September 21, 2020 (Zinus CSQR 9-21-2020), at SC1-18).
[167] *See* Petitioners' Rebuttal Brief at 58-59.
[168] *Id*. at 59 (citing Zinus CSQR 9-21-2020 at SC1-18).

27

*Preliminary Determination*, as part of the Cohen's *d* test, that "{r}egions are defined using the reported destination code, *i.e.*, ZIP code, and are grouped into regions based upon standard definitions published by the U.S. Census Bureau."[169] While Zinus reported additional destination information for a limited number of U.S. sales prior to the *Preliminary Determination* under DEST1U, we have determined it is appropriate to continue to use Zinus' original destination information, which was reported on a consistent basis for the overwhelming majority of its U.S. sales quantity during the POI. Accordingly, for the final determination, we have continued to use the original destination variable DESTU, as reported by Zinus, to define region in the Cohen's *d* test.

## Comment 7: LOT in Cohen's *d* Test

*Zinus' Case Brief* [170]
- In conducting the Cohen's *d* test as part of the differential pricing analysis, Commerce inadvertently did not consider the LOT as reported in Zinus' U.S. sales data.[171]
- Commerce must include LOT as part of the Cohen's *d* test because it did not indicate in the *Preliminary Determination* that the two LOTs reported in the U.S. market constitute one LOT.[172]
- Commerce should rely on Zinus' reporting of LOT in the field LOTU in its U.S. sales data.[173]

*Petitioners' Rebuttal Brief* [174]
- Commerce correctly conducted its differential pricing analysis in the *Preliminary Determination*, as LOT should not be conflated with sales type and LOT is also not a requirement in every situation.[175]
- LOT is examined in conjunction with comparing US sale prices to NVs, whereas the Cohen's *d* test compares prices within just the U.S. market.[176]
- Given there is no viable home market in this investigation, a LOT analysis is irrelevant.[177]
- There is a one-to-one correlation between sale type and LOT in Zinus' reported U.S. sales data.
- Because Commerce "is correctly treating sales type (SALEU), and sales type and level of trade have the same value, and level of trade is not required or needed in this case, Zinus' suggestion would erroneously add distortion into the {dumping analysis}."[178]

## Commerce's Position:

---

[169] *See Preliminary Determination* PDM at 6.
[170] *See* Zinus' Case Brief at 48-49.
[171] *Id.* at 48.
[172] *Id.* at 48-49.
[173] *Id.* at 49.
[174] *See* Petitioners' Rebuttal Brief at 59-60.
[175] *Id.* at 59.
[176] *Id.* (citing section 773(a)(7) of the Act).
[177] *Id.* at 59.
[178] *Id.* at 60.

28

We agree with Zinus that Commerce erroneously omitted LOT from the Cohen's *d* test in the *Preliminary Determination*. Accordingly, we have included LOT, in general, as part of our dumping analysis for the final determination. Further, we find that Zinus' U.S. sales were all made at a single LOT for this final determination.

Section 777A(d)(1)(B)(i) of the Act directs Commerce to identify whether there is a pattern of prices that differ significantly "for comparable merchandise." In describing the differential pricing analysis, including the Cohen's *d* test in the *Preliminary Determination*, we defined comparable merchandise as follows:

> For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.[179]

Section 773(a) of the Act states that "{i}n order to achieve a fair comparison with the export price or constructed export price, normal value shall be determined as" the comparison market price "at the same level of trade as the export price or constructed export price."[180] When NV is alternatively based on CV, the selling, general and administrative (SG&A) expenses, and profit are generally determined by LOT.[181] Accordingly, LOT is one of the characteristics which define "comparable merchandise" in the Cohen's *d* test and which define the U.S. sales grouped into each test and comparison group to determine whether there exists a pattern of prices that differ significantly.

We disagree with petitioners that "without a home market, the LOT serves no purpose"[182] and that "{l}evel of trade is intended to address differences between markets, not within markets."[183] Beyond the obvious that LOT applies to third-country market sales used as a basis for NV,[184] LOT is also instrumental to determining the appropriate SG&A expenses and profit when calculating CV. Additionally, beyond the comparison of U.S. price with NV, LOT is considered relevant as part of the arm's-length test, where prices to an affiliated comparison market customer are compared with prices to all unaffiliated customers.[185] The arm's-length test groups prices by product, LOT, and other characteristics as might be relevant, such as the designation of the product as prime/non-prime or the manufacturer of the product. Accordingly, the petitioners' claim that LOT is irrelevant for the dumping analysis for Zinus in this investigation is meritless.

We additionally disagree with the petitioners that LOT is irrelevant because there is a direct correlation between LOT and sale type (*i.e.*, whether a U.S. sale price is calculated based on EP or CEP). Whether U.S. sale price is calculated based on EP or CEP is determined by the statute

---

[179] *See Preliminary Determination* PDM at 6.
[180] *See* section 773(a)(1)(B)(i) of the Act.
[181] *See Preliminary Determination* PDM at 11 ("When NV is based on CV, the NV level of trade (LOT) is that of these sales from which we derive selling expenses and profit."); *see also* section 773(e)(2)(A) of the Act.
[182] *See* Petitioners' Rebuttal Brief at 59.
[183] *Id.*
[184] *See* sections 773(a)(1)(B)(ii)(I) and 773(a)(1)(C)(i) of the Act.
[185] *See* Macro Program at HM3_ARMSLENGTH (included in Zinus Final Determination Calculation Memorandum at Attachment 1).

29

in sections 772(a) and 772(b) of the Act, respectively, which examine the specifics of the sale, such as the time of the U.S. sale relative to the importation of the merchandise or the actual physical location where the U.S. sale was consummated. Separately, LOT addresses the price comparability where 19 CFR 351.412(c)(2) provides that different LOTs represent "different marketing stages" which can be represented by different selling activities. Commerce rejects the petitioners' assertion that there is a correlation between sale type and LOT for Zinus and that LOT "serves no purpose." In fact, these two characteristics of U.S. sales are distinct and serve different purposes.

For the *Preliminary Determination*, we inadvertently did not perform a LOT analysis because this necessity was not realized as a result of calculating NV based entirely on CV where the SG&A expenses and profit ratios are based on financial statements with no information concerning LOT. Therefore, for the final determination, we have conducted an LOT analysis on Zinus' reported U.S. sales. Based on our analysis, further discussed below, we find only one LOT in the U.S. market.

With respect to the U.S. market, Zinus reported that it made: (1) CEP sales to a U.S. affiliate (U.S. Channel 1); (2) EP sales (U.S. Channel 2); and (3) back-to-back CEP sales (U.S. Channel 2); and reported two LOTs.[186] Zinus also stated in the Zinus AQR that there are no meaningful differences between these two U.S. LOTs with respect to the selling activities performed on its U.S. sales outside of the United States through any of the three sales channels.[187] Based on Zinus' selling functions chart and accompanying narrative in its AQR, we also find that no significant differences existed in Zinus' performance of technical support, logistical services, and sales-related administrative activities for all U.S. sales regardless of selling channel.[188] Moreover, we also find these activities were performed at the same level of intensity in both channels.[189] Therefore, for purposes of the final determination, we determine that Zinus' sales to the U.S. market during the POI were made at one LOT

**Comment 8: Treatment of Intra-Company Payments**

*Petitioners' Case Brief*[190]
- Commerce should adjust U.S. prices for commissions earned by Zinus KR for selling activities on U.S. sales in accordance with applicable accounting rules.[191]
- Record evidence does not support Zinus' claims that Zinus KR's role in the sales process is minimal but rather shows that Zinus KR conducts significant selling activities on all US sales and incurs significant expenses associated with those activities; and they must be captured in the margin calculations used for the final determination.[192] The petitioners refer to selling activities, Zinus KR's 2019 annual report, a shared office location chart,

---

[186] *See* Zinus' Letter, "Mattresses from Indonesia: Zinus' Section A Questionnaire Response," dated June 19, 2021, at Exhibit A-7a.
[187] *Id*. at A-17.
[188] *Id*. at A-14 through A-17 and Exhibit A-7a.
[189] *Id*.
[190] *See* Petitioners' Case Brief at 23-37.
[191] *Id*. at 23.
[192] *Id*. at 23-24 and 27.

Zinus KR's coordination of activities with its subsidiaries, and Zinus KR's U.S sales reporting to support its claim.[193]

- Zinus KR indicated that it issues sales invoices to unaffiliated customers and to Zinus US which is evidence that it was involved with some aspect of every sale of subject merchandise examined in this investigation.[194]

- Some portion of the Zinus KR's salary line item included in Note 31 (SG&A) to the Zinus KR Audit Report covers salaries for sales personnel handling US sales.[195]

- Zinus KR also directly negotiates some master sales agreements, program agreements, and rebate programs.[196]

- Zinus KR is a commission agent and has failed to report its commission agent expenses or sales agent status as required under applicable Korean-version International Financial Reporting Standards (K-IFRS).[197]

- Commerce should identify an amount for selling expenses and treat this amount as fees or commissions associated with K-IFRS for both Zinus' EP and CEP sales in the final determination.[198]

- Despite its claim that Zinus does not pay Zinus KR a commission or that Zinus KR is not a sales agent, it is irrelevant that this record does not contain a demand for commission payment from Zinus and a corresponding remittance to Zinus KR considering the fact that Zinus KR is acting as an agent and that the revenue earned by Zinus KR when in that capacity is a "fee or commission" per the IFRS rule.[199]

- This issue and commission expense were neither resolved nor accounted for in *Mattresses from China*, and these expenses should be deducted from the U.S. sales in this investigation to calculate an accurate margin regardless of what occurred in the China investigation.[200]

*Zinus' Rebuttal Brief*[201]

- At no point has Commerce requested that Zinus revise its reporting in any way and its standard reporting requirements instruct respondents to report payments to unaffiliated parties only.[202]

- Zinus KR reported all sales expenses associated with U.S. sales and all relevant G&A expenses (*e.g.*, salary expenses) as requested by Commerce's initial and supplemental questionnaires.[203]

- Contrary to the petitioners' claim suggesting otherwise, the record confirms that the role of and expenses incurred by Zinus KR are minimal.[204]

---

[193] *Id.* at 24.
[194] *Id.* at 24-25.
[195] *Id.* at 26.
[196] *Id.* at 24-25 and 27.
[197] *Id.* at 28-31.
[198] *Id.* at 28 and 31-34
[199] *Id* at 35-36.
[200] *Id.* at 36-38.
[201] *See* Zinus' Rebuttal Brief at 26-46.
[202] *Id.* at 27-28.
[203] *Id.* at 28-29.
[204] *Id.* at 29.

Appx00225

- Commerce does not normally treat price mark-ups between affiliated parties as commissions but rather as intra-company transfers which are part of the general operating expenses of the affiliated party.[205]
- Record evidence demonstrates that none of the Zinus companies (located in Indonesia, Korea, or the United States) charge each other commissions.[206]
- Under the applicable IFRS rule for reporting revenues and costs, Zinus KR determines its profit on the sale by eliminating the purchase price it paid (as recorded in its books and records) from both the cost of goods sold and sales revenue, such that the amount the petitioners are alleging represents a commission paid to Zinus KR is in fact its profit.[207]
- Commerce examined the same sales process in *Mattresses from China* and did not treat any affiliated party's price mark-up as a commission.[208]
- The petitioners' commission calculation is distortive and overstates the applicable expenses, which do not apply to EP or CEP sales.[209]
- If Commerce decides to treat the price mark-up as an expense, Commerce should treat any such expense as an overseas indirect selling expense, (*i.e.*, DINDIRS2U).[210]

**Commerce's Position:**

We agree with Zinus that it is Commerce's practice to use the affiliate's actual expenses, not the affiliated party commissions, in its calculations.[211] Specifically, Commerce's current AD questionnaire requests a respondent to report the expenses of any affiliated selling agents instead of the commissions paid to those agents.[212]

In this investigation, Zinus reported, where applicable, Zinus KR's actual expenses[213] incurred on behalf of U.S. sales in the U.S sales database. In addition, Zinus reported, as requested, Zinus KR's G&A expenses (*i.e.*, salary expenses) as an element of Zinus' G&A expenses.[214] We find that the reporting of such expenses is also consistent with respect to Zinus KR's reportedly limited role as an invoicing party in Zinus' U.S. sales process.

As for Zinus KR's mark up in the price it charges to Zinus US, Commerce's practice is not to treat such price mark ups as commissions but rather to require the affiliated party charging the price mark up to report its actual expenses associated with the sale.[215] As noted above, Zinus KR reported all of its relevant expenses.

---

[205] *Id.* at 30.
[206] *Id.* at 32-33.
[207] *Id.* at 34-36.
[208] *Id.* at 36-38.
[209] *Id.* at 38-45.
[210] *Id.* at 45-46.
[211] *See, e.g.*, *Fresh Tomatoes from Mexico: Final Determination of Sales at the Less Than Fair Value*, 84 FR 57,401 (October 25, 2019), and accompanying IDM at Comment 17.
[212] *See* Commerce's AD Questionnaire issued to Zinus, dated May 14, 2020, at C-21.
[213] These expenses were reported as advertising expenses (ADVERTU), rebates (REBATE3U, REBATE5U), and bank charges (BANKCHARU) in the U.S. sales database.
[214] *See* Zinus' Sept. 23, 2020, SDQR at SD-25 and Exhibit SD-25.
[215] *See, e.g.*, *Oil Country Tubular Goods from Mexico: Final Results of Antidumping Duty Administrative Review*, 64 FR 13962, 13968 (Comment 4) (March 23, 1999).

Filed By: Janae Martin, Filed Date: 3/19/21 12:51 PM, Submission Status: Approved

Finally, as Zinus KR has reported all of its relevant expenses associated with the U.S. sales under investigation, we find that no adjustment as prescribed by the petitioners or otherwise is necessary or required for the final determination.

**Comment 9:  Clerical Error Corrections**

*Petitioners' Case Brief* [216]
- Commerce misclassified certain selling and advertising expenses when deducting them from EP and CEP sales transactions in the preliminary determination SAS margin program.[217]
- Using the proposed SAS language will correct this error and also result in correctly calculating CEP profit.[218]
- Instead of using the higher of transfer price or market price, Commerce used exclusively the market price, whether it was higher or lower, to adjust costs in accordance with the TD rule in the *Preliminary Determination*.[219]

*Zinus did not comment on either clerical error allegation noted above.*

**Commerce's Position:**

In the *Preliminary Determination*, we mistakenly did not deduct certain selling expenses from the U.S. price reported for Zinus' CEP sales and did not include them in the CEP expense pool used to derive CEP profit.  For the final determination, we have corrected these errors by incorporating the SAS language proposed by the petitioners into the margin program.[220]

In addition, we agree with the petitioners that we erred in applying the TD rule as described above and have corrected this error in the final determination.  Specifically, we recalculated the TD adjustment using the higher of the transfer price or market price,[221] by item type.

**VI.    RECOMMENDATION**

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final determination of the investigation and the final estimated weighted-average dumping margins in the *Federal Register*.

☒                                ☐
_____            _____
Agree                           Disagree

---

[216] *See* Petitioners' Case Brief at 38-40.
[217] *Id.* at 38-39.
[218] *Id.*
[219] *Id.* at 40-41.
[220] *See* Zinus Final Determination Calculation Memorandum.
[221] *See* Zinus Final Cost Calculation Memorandum.

33

3/18/2021

X

Signed by: CHRISTIAN MARSH

Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance

34



existing antidumping duty orders on uncovered innerspring units from China or Vietnam. *See Uncovered Innerspring Units from the People's Republic of China: Notice of Antidumping Duty Order,* 74 FR 7661 (February 19, 2009); *Uncovered Innerspring Units from the Socialist Republic of Vietnam,* 73 FR 75391 (December 11, 2008).

Also excluded from the scope of this investigation are bassinet pads with a nominal length of less than 39 inches, a nominal width less than 25 inches, and a nominal depth of less than 2 inches.

Additionally, also excluded from the scope of this investigation are "mattress toppers." A "mattress topper" is a removable bedding accessory that supplements a mattress by providing an additional layer that is placed on top of a mattress. Excluded mattress toppers have a height of four inches or less.

The products subject to this investigation are currently properly classifiable under HTSUS subheadings: 9404.21.0010, 9404.21.0013, 9404.29.1005, 9404.29.1013, 9404.29.9085, and 9404.29.9087. Products subject to this investigation may also enter under HTSUS subheadings: 9404.21.0095, 9404.29.1095, 9404.29.9095, 9401.40.0000, and 9401.90.5081. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the merchandise subject to this investigation is dispositive.

## Appendix II

**List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Period of Investigation
IV. Affiliation and Collapsing of Affiliates
V. Affirmative Preliminary Determination of Critical Circumstances, In Part
VI. Discussion of the Methodology
VII. Particular Market Situation
VIII. Recommendation

[FR Doc. 2020–24301 Filed 11–2–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

**International Trade Administration**

[A–560–836]

**Mattresses From Indonesia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) preliminarily determines that mattresses from Indonesia are being, or are likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is January 1, 2019 through December 31, 2019. Interested parties

are invited to comment on this preliminary determination.

**DATES:** Applicable November 3, 2020.

**FOR FURTHER INFORMATION CONTACT:** Janae Martin or Rebecca Trainor, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0238 or (202) 482–4007, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

This preliminary determination is made in accordance with section 733(b) of the Tariff Act of 1930, as amended (the Act). Commerce published the notice of initiation of this investigation on April 24, 2020.[1] On August 11, 2020, Commerce postponed the preliminary determination of this investigation and the revised deadline is now October 27, 2020.[2] For a complete description of the events that followed the initiation of this investigation, *see* the Preliminary Decision Memorandum.[3] A list of topics included in the Preliminary Decision Memorandum is included as Appendix II to this notice. The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/.* The signed and the electronic versions of the Preliminary Decision Memorandum are identical in content.

---

[1] *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations,* 85 FR 23002 (April 24, 2020) (*Initiation Notice*).

[2] *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations,* 85 FR 48505 (August 11, 2020); *see also* Petitioners' Letter, "Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam: Request to Extend Preliminary Results and Align the Countervailing Duty Investigation with the Concurrent Antidumping Duty Investigations," dated July 30, 2020.

[3] *See* Memorandum, "Decision Memorandum for the Preliminary Affirmative Determination and Postponement of Final Determination in the Less-Than-Fair-Value Investigation of Mattresses from Indonesia" (dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

### Scope of the Investigation

The product covered by this investigation is mattresses from Indonesia. For a full description of the scope of this investigation, *see* Appendix I.

### Scope Comments

In accordance with the preamble to Commerce's regulations,[4] the *Initiation Notice* set aside a period of time for parties to raise issues regarding product coverage (*i.e.,* scope).[5] Certain interested parties commented on the scope of the investigation as it appeared in the *Initiation Notice.* For a summary of the product coverage comments and rebuttal responses submitted to the record for this preliminary determination, and accompanying discussion and analysis of all comments timely received, *see* the Preliminary Scope Decision Memorandum.[6] In the Preliminary Scope Decision Memorandum, Commerce determined that it is not preliminarily modifying the scope language as it appeared in the *Initiation Notice. See* the scope in Appendix I to this notice.

The Preliminary Scope Decision Memorandum establishes a deadline to submit scope case briefs, and indicates that there will be no further opportunity for comments on scope-related issues.[7]

### Methodology

Commerce is conducting this investigation in accordance with section 731 of the Act. Commerce has calculated export prices in accordance with section 772(a) of the Act. Constructed export prices have been calculated in accordance with section 772(b) of the Act. Normal value (NV) is calculated in accordance with section 773 of the Act. For a full description of the methodology underlying the preliminary determination, *see* the Preliminary Decision Memorandum.

### All-Others Rate

Sections 733(d)(1)(ii) and 735(c)(5)(A) of the Act provide that in the preliminary determination Commerce

---

[4] *See Antidumping Duties; Countervailing Duties, Final Rule,* 62 FR 27296, 27323 (May 19, 1997).

[5] *See Initiation Notice.*

[6] *See* Memorandum, "Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, the Socialist Republic of Vietnam, and the People's Republic of China: Scope Comments Decision Memorandum for the Preliminary Determination," (Preliminary Scope Decision Memorandum), dated concurrently with this preliminary determination.

[7] Case briefs, other written comments, and rebuttal briefs submitted in response to this preliminary determination should not include scope-related issues. *See* Preliminary Scope Decision Memorandum; and "Public Comment" section of this notice.

Barcode:4050968-01 A-560-836 INV - Investigation -

shall determine an estimated all-others rate for all exporters and producers not individually examined. This rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely under section 776 of the Act.

Commerce calculated an individual estimated weighted-average dumping margin for PT Zinus Global Indonesia (Zinus), the only individually examined exporter/producer in this investigation. Because the only individually calculated dumping margin is not zero, *de minimis,* or based entirely on facts otherwise available, the estimated weighted-average dumping margin calculated for Zinus is the margin assigned to all other producers and exporters, pursuant to section 735(c)(5)(A) of the Act.

**Preliminary Determination**

Commerce preliminarily determines that the following estimated weighted-average dumping margins exist:

| Exporter/producer | Estimated weighted-average dumping margin (percent) |
| --- | --- |
| PT Zinus Global Indonesia ......... | 2.61 |
| All Others .................................... | 2.61 |

**Suspension of Liquidation**

In accordance with section 733(d)(2) of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to suspend liquidation of entries of subject merchandise, as described in Appendix I, entered, or withdrawn from warehouse, for consumption on or after the date of publication of this notice in the **Federal Register**. Further, pursuant to section 733(d)(1)(B) of the Act and 19 CFR 351.205(d), Commerce will instruct CBP to require a cash deposit equal to the estimated weighted-average dumping margin, as follows: (1) The cash deposit rate for the respondent listed above will be equal to the company-specific estimated weighted-average dumping margin determined in this preliminary determination; (2) if the exporter is not a respondent identified above, but the producer is, then the cash deposit rate will be equal to the company-specific estimated weighted-average dumping margin established for that producer of the subject merchandise; and (3) the cash deposit rate for all other producers and exporters will be equal to the all-others

estimated weighted-average dumping margin. These suspension of liquidation instructions will remain in effect until further notice.

**Disclosure**

Commerce intends to disclose its calculations and analysis performed to interested parties in this preliminary determination within five days of any public announcement or, if there is no public announcement, within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

**Verification**

Commerce is currently unable to conduct on-site verification of the information relied upon in making its final determination in this investigation. Accordingly, we intend to take additional steps in lieu of on-site verification. Commerce will notify interested parties of any additional documentation or information required.

**Public Comment**

Case briefs or other written comments on non-scope issues may be submitted to the Assistant Secretary for Enforcement and Compliance. Interested parties will be notified of a timeline for the submission of such case briefs and written comments at a later date. Rebuttal briefs, limited to issues raised in case briefs, may be submitted no later than seven days after the deadline date for case briefs.[8] Note that Commerce has temporarily modified certain of its requirements for serving documents containing business proprietary information until further notice.[9] Pursuant to 19 CFR 351.309(c)(2) and (d)(2), parties who submit case briefs or rebuttal briefs in this investigation are encouraged to submit with each argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, within 30 days after the date of publication of this notice. Requests should contain the party's name, address, and telephone number, the

number of participants, whether any participant is a foreign national, and a list of the issues to be discussed. If a request for a hearing is made, Commerce intends to hold the hearing at a time and date to be determined. Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled hearing date.

**Postponement of Final Determination and Extension of Provisional Measures**

Section 735(a)(2) of the Act provides that a final determination may be postponed until not later than 135 days after the date of the publication of the preliminary determination if, in the event of an affirmative preliminary determination, a request for such postponement is made by exporters who account for a significant proportion of exports of the subject merchandise, or in the event of a negative preliminary determination, a request for such postponement is made by the petitioner. Section 351.210(e)(2) of Commerce's regulations requires that a request by exporters for postponement of the final determination be accompanied by a request for extension of provisional measures from a four-month period to a period not more than six months in duration.

On October 15, 2020, pursuant to 19 CFR 351.210(e), Zinus requested that Commerce postpone the final determination and that provisional measures be extended to a period not to exceed six months.[10] In accordance with section 735(a)(2)(A) of the Act and 19 CFR 351.210(b)(2)(ii), because: (1) The preliminary determination is affirmative; (2) the requesting exporter accounts for a significant proportion of exports of the subject merchandise; and (3) no compelling reasons for denial exist, Commerce is postponing the final determination and extending the provisional measures from a four-month period to a period not greater than six months. Accordingly, Commerce will make its final determination no later than 135 days after the date of publication of this preliminary determination.

**International Trade Commission Notification**

In accordance with section 733(f) of the Act, Commerce will notify the International Trade Commission (ITC) of its affirmative preliminary determination. If the final determination is affirmative, the ITC will determine before the later of 120 days after the date

[8] *See* 19 CFR 351.309; *see also* 19 CFR 351.303 (for general filing requirements).
[9] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19,* 85 FR 17006 (March 26, 2020); and *Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).
[10] *See* Zinus's Letter, "Mattresses from Indonesia: Request for Postponement of Final Determination," dated October 15, 2020.

of this preliminary determination or 45 days after the final determination whether these imports materially injure, or threaten material injury to, the U.S. industry.

**Notification to Interested Parties**

This determination is issued and published in accordance with sections 733(f) and 777(i)(1) of the Act and 19 CFR 351.205(c).

Dated: October 27, 2020.

**Jeffrey I. Kessler,**

*Assistant Secretary for Enforcement and Compliance.*

**Appendix I**

Scope of the Investigation

The products covered by this investigation are all types of youth and adult mattresses. The term "mattress" denotes an assembly of materials that at a minimum includes a "core," which provides the main support system of the mattress, and may consist of innersprings, foam, other resilient filling, or a combination of these materials. Mattresses may also contain: (1) "Upholstery," the material between the core and the top panel of the ticking on a single-sided mattress; or between the core and the top and bottom panel of the ticking on a double-sided mattress; and/or (2) "ticking," the outermost layer of fabric or other material (*e.g.*, vinyl) that encloses the core and any upholstery, also known as a cover.

The scope of this investigation is restricted to only "adult mattresses" and "youth mattresses." "Adult mattresses" are frequently described as "twin," "extra-long twin," "full," "queen," "king," or "California king" mattresses. "Youth mattresses" are typically described as "crib," "toddler," or "youth" mattresses. All adult and youth mattresses are included regardless of size and size description.

The scope encompasses all types of "innerspring mattresses," "non-innerspring mattresses," and "hybrid mattresses." "Innerspring mattresses" contain innersprings, a series of metal springs joined together in sizes that correspond to the dimensions of mattresses. Mattresses that contain innersprings are referred to as "innerspring mattresses" or "hybrid mattresses." "Hybrid mattresses" contain two or more support systems as the core, such as layers of both memory foam and innerspring units.

"Non-innerspring mattresses" are those that do not contain any innerspring units. They are generally produced from foams (*e.g.*, polyurethane, memory (viscoelastic), latex foam, gel- infused viscoelastic (gel foam), thermobonded polyester, polyethylene) or other resilient filling.

Mattresses covered by the scope of this investigation may be imported independently, as part of furniture or furniture mechanisms (*e.g.*, convertible sofa bed mattresses, sofa bed mattresses imported with sofa bed mechanisms, corner group mattresses, day-bed mattresses, roll-away bed mattresses, high risers, trundle bed mattresses, crib mattresses), or as part of a set

in combination with a "mattress foundation." "Mattress foundations" are any base or support for a mattress. Mattress foundations are commonly referred to as "foundations," "boxsprings," "platforms," and/or "bases." Bases can be static, foldable, or adjustable. Only the mattress is covered by the scope if imported as part of furniture, with furniture mechanisms, or as part of a set in combination with a mattress foundation.

Excluded from the scope of this investigation are "futon" mattresses. A "futon" is a bi-fold frame made of wood, metal, or plastic material, or any combination thereof, that functions as both seating furniture (such as a couch, love seat, or sofa) and a bed. A "futon mattress" is a tufted mattress, where the top covering is secured to the bottom with thread that goes completely through the mattress from the top through to the bottom, and it does not contain innersprings or foam. A futon mattress is both the bed and seating surface for the futon.

Also excluded from the scope are airbeds (including inflatable mattresses) and waterbeds, which consist of air- or liquid-filled bladders as the core or main support system of the mattress.

Also excluded is certain multifunctional furniture that is convertible from seating to sleeping, regardless of filler material or components, where that filler material or components are upholstered, integrated into the design and construction of, and inseparable from, the furniture framing, and the outermost layer of the multifunctional furniture converts into the sleeping surface. Such furniture may, and without limitation, be commonly referred to as "convertible sofas," "sofabeds," "sofa chaise sleepers," "futons," "ottoman sleepers" or a like description.

Also excluded from the scope of this investigation are any products covered by the existing antidumping duty orders on uncovered innerspring units from China or Vietnam. *See Uncovered Innerspring Units from the People's Republic of China: Notice of Antidumping Duty Order*, 74 FR 7661 (February 19, 2009); *Uncovered Innerspring Units from the Socialist Republic of Vietnam*, 73 FR 75391 (December 11, 2008).

Also excluded from the scope of this investigation are bassinet pads with a nominal length of less than 39 inches, a nominal width less than 25 inches, and a nominal depth of less than 2 inches.

Additionally, also excluded from the scope of this investigation are "mattress toppers." A "mattress topper" is a removable bedding accessory that supplements a mattress by providing an additional layer that is placed on top of a mattress. Excluded mattress toppers have a height of four inches or less.

The products subject to this investigation are currently properly classifiable under HTSUS subheadings: 9404.21.0010, 9404.21.0013, 9404.29.1005, 9404.29.1013, 9404.29.9085, and 9404.29.9087. Products subject to this investigation may also enter under HTSUS subheadings: 9404.21.0095, 9404.29.1095, 9404.29.9095, 9401.40.0000, and 9401.90.5081. Although the HTSUS subheadings are provided for convenience and customs purposes, the written

description of the merchandise subject to this investigation is dispositive.

**Appendix II**

List of Topics Discussed in the Preliminary Decision Memorandum

I. Summary
II. Background
III. Period of Investigation
IV. Discussion of the Methodology
V. Particular Market Situation
VI. Recommendation

[FR Doc. 2020–24297 Filed 11–2–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**National Institute of Standards and Technology**

[Docket No. 201023–0280]

**Request for Comments on Federal Information Processing Standard (FIPS) 201–3**

**AGENCY:** National Institute of Standards and Technology (NIST), Commerce.

**ACTION:** Notice; request for comments.

**SUMMARY:** The National Institute of Standards and Technology (NIST) requests comments on Draft Federal Information Processing Standard (FIPS) 201–3, Personal Identity Verification (PIV) of Federal Employees and Contractors (Standard). This Standard defines common credentials and authentication mechanisms offering varying degrees of security for both logical and physical access applications. The draft revision proposes changes to FIPS 201–2, Standard for Personal Identity Verification of Federal Employees and Contractors to include: Expanding specification on the use of additional PIV credentials known as derived PIV credentials, procedures for supervised remote identity proofing, the use of federation as a means for a relying system to interoperate with PIV credentials issued by other agencies, alignment with the current practice/policy of the Federal Government and specific changes requested by Federal agencies and implementers. Before recommending these proposed changes to the Secretary of Commerce for review and approval, NIST invites comments from all interested parties.

**DATES:** Comments on FIPS 201–3 must be received on or before February 1, 2021.

**ADDRESSES:** The draft of FIPS 201–3 is available for review and comment on the NIST Computer Security Resource Center website at *https://csrc.nist.gov* and at *https://www.regulations.gov/*. Comments on FIPS 201–3 may be sent

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-560-836
Investigation
**Public Document**
E&C/OVIII: JCM

October 27, 2020

**MEMORANDUM TO**: Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

**FROM:** James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**SUBJECT:** Decision Memorandum for the Preliminary Affirmative
Determination and Postponement of Final Determination in the
Less-Than-Fair-Value Investigation of Mattresses from Indonesia

## I. SUMMARY

The Department of Commerce (Commerce) preliminarily determines that mattresses from
Indonesia are being, or are likely to be, sold in the United States at less than fair value (LTFV), as
provided in section 733 of the Tariff Act of 1930, as amended (the Act). The estimated
weighted-average dumping margins are shown in the "Preliminary Determination" section of
the accompanying *Federal Register* notice.

## II. BACKGROUND

On March 31, 2020, Commerce received an antidumping duty (AD) petition concerning imports
of mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey
(Turkey), and the Socialist Republic of Vietnam (Vietnam) and a countervailing duty (CVD)
petition concerning imports of mattresses from the People's Republic of China (China), filed in
proper form by the Brooklyn Bedding, Corsicana Mattress Company, Elite Comfort Solutions,
FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Incorporated, the
International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO
("USW") (collectively, the petitioners), domestic producers of mattresses.[1]  On April 20, 2020,

---

[1] *See* Petitioners' Letter, "Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and
Vietnam: Antidumping and Countervailing Duty Petitions," dated March 31, 2020 (Petition).



INTERNATIONAL
**T R A D E**
ADMINISTRATION

Commerce initiated the AD investigation of mattresses from Indonesia.[2]  The Petition identified 13 producers and/or exporters of the subject merchandise in Indonesia.[3]

In the *Initiation Notice*, Commerce notified the public that, where appropriate, it intended to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports under the appropriate Harmonized Tariff Schedule of the United States numbers listed in the "Scope of the Investigations," in the appendix.[4]  Accordingly, Commerce released the CBP entry data to interested parties under an administrative protective order and requested comments regarding the data and respondent selection.[5]  On April 29, 2020, Commerce received comments on behalf of the petitioners and PT Zinus Global Indonesia (Zinus).[6]

On May 13, 2020, Commerce selected Zinus for individual examination as the mandatory respondent in this investigation.[7]  Zinus is the producer/exporter with the largest volume of subject exports during the period of investigation (POI) based on the CBP data we received.[8]  Accordingly, we issued the AD questionnaire to Zinus.[9]  Though PT Graha Seribusatu Jaya (PT Graha) requested voluntary respondent treatment,[10] Commerce decided not to select a voluntary respondent in this investigation because doing so would be unduly burdensome and inhibit the timely completion of this investigation.[11]

On May 15, 2020, the U.S. International Trade Commission (ITC) preliminarily determined that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of mattresses from Indonesia.[12]

In the *Initiation Notice*, Commerce notified parties of an opportunity to comment on the appropriate physical characteristics of mattresses to be reported in response to Commerce's AD questionnaire.[13]  Between May 11 and 21, 2020, we received comments and rebuttals thereto

---

[2] *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 85 FR 23002 (April 24, 2020) (*Initiation Notice*).

[3] *See* Petition, Volume XVI at 1.

[4] *See Initiation Notice*, 85 FR at 23006.

[5] *See* Memorandum, "Antidumping Duty Petition on Mattresses from Indonesia: Release of Customs Data from U.S. Customs and Border Protection," dated April 14, 2020.

[6] *See* Petitioners' Letter, "Mattresses from Indonesia: Mattress Petitioners' Comments on US Customs and Border Protection Data," dated April 29, 2020; *see also* Zinus's Letter, "Mattresses from Indonesia: Zinus' Respondent Selection Comments," dated April 29, 2020.

[7] *See* Memorandum, "Less-Than-Fair-Value Investigation of Mattresses from Indonesia: Respondent Selection," dated May 13, 2020.

[8] *Id.*, at Attachment.

[9] *See* Commerce's Letter, "Request for Information: Antidumping Duty Investigation: PT Zinus Global Indonesia: Indonesia Mattresses," dated May 14, 2020.

[10] *See* PT Graha's Letter, "Mattresses from Indonesia: Request for Voluntary Respondent Treatment," dated May 8, 2020.

[11] *See* Memorandum, "Less-Than-Fair-Value Investigation of Mattresses from Indonesia: Whether to Select a Voluntary Respondent," dated September 16, 2020.

[12] *See Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, 85 FR 30984 (May 21, 2020).

[13] *See Initiation Notice*, 85 FR at 23004.

2

concerning product characteristics from the petitioners and the producers/exporters of mattresses from various countries, *i.e.*, Cozy Comfort LLC (Cozy Comfort), Zinus, and PT Graha.[14]  On June 1, 2020, Commerce officials spoke via telephone with counsel for the petitioners regarding the petitioners' product characteristics comments and rebuttal comments.[15]  On June 4, 2020, Commerce determined the product characteristics applicable to this investigation.[16]

On July 31, 2020, we requested that interested parties submit constructed value (CV) profit and selling expense comments and information.[17]  The petitioners and Zinus submitted comments and new factual information related to the determination of CV profit and selling expenses on August 17, 2020.[18]  On August 24, 2020, the petitioners submitted rebuttal comments concerning the submitted CV profit and selling expenses.[19]

On August 11, 2020, based on a request from the petitioners,[20] Commerce postponed the preliminary determination of this investigation by 50 days to October 27, 2020, pursuant to section 733(c)(1)(A) of the Act and 19 CFR 351.205(e).[21]

From June to July 2020, Zinus submitted timely responses to Section A of Commerce's AD questionnaire, *i.e.*, the section relating to general information, and Sections C and D of

---

[14] *See* Petitioners' Letter, "Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam: Mattress Petitioners' Product Characteristic Comments," dated May 11, 2020; *see also* Cozy Comfort's Letter, "Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Comments on Product Characteristics," dated May 11, 2020; Zinus' Letter, "Mattresses from Indonesia, Cambodia, Malaysia, Serbia, Thailand, the Republic of Turkey, the Socialist Republic of Vietnam, and the People's Republic of China: Zinus' Product Characteristics Comments," dated May 11, 2020; PT Graha's Letter, "Mattresses from Indonesia, Cambodia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: PT Graha Seribusatu Jaya Rebuttal Comments on Product Characteristics," dated May 21, 2020; Petitioners' Letter, "Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam: Product Characteristics Rebuttal Comments," dated May 21, 2020; Cozy Comfort's Letter, "Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Rebuttal Comments on Product Characteristics," dated May 21, 2020; and Zinus' Letter, "Mattresses from Indonesia, Cambodia, Malaysia, Serbia, Thailand, the Republic of Turkey, the Socialist Republic of Vietnam, and the People's Republic of China: Zinus' Rebuttal Product Characteristics Comments," dated May 21, 2020.

[15] *See* Memorandum, "Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam Antidumping Duty Investigations:  Phone Call with Counsel to Petitioners," dated June 1, 2020.

[16] *See* Commerce's Letter, "Product Characteristics for the Antidumping Duty Investigation of Mattresses from Cambodia," dated June 4, 2020 (Commerce's Products Characteristics Letter).

[17] *See* Memorandum, "Antidumping Duty Investigation of Mattresses from the Indonesia: Request for Constructed Value Profit and Selling Expense Comments and Information," dated July 31, 2020.

[18] *See* Petitioners' Letter, "Mattresses from Indonesia: Mattress Petitioners' Submission Concerning CV Profit and Selling Expenses," dated August 17, 2020 (Petitioners CV Submission); *see also*, Zinus's Letter, "Mattresses from Indonesia: Constructed Value Profit and Selling Expense Information and Comments," dated August 17, 2020.

[19] *See* Petitioners' Letter, "Mattresses from Indonesia: Petitioner's Rebuttal Submission Concerning CV Profit and Selling Expenses," dated August 24, 2020.

[20] *See* Petitioners' Letter, "Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam: Request to Extend Preliminary Results and Align the Countervailing Duty Investigation with the Concurrent Antidumping Duty Investigations," dated July 30, 2020.

[21] *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations*, 85 FR 48505 (August 11, 2020).

3

Commerce's AD questionnaire, *i.e.*, the sections relating to U.S. sales and cost of production (COP)/CV.[22]

From August through September 2020, Zinus replied to Commerce's supplemental questionnaires.[23] The petitioners submitted comments and new factual information to rebut, clarify, or correct information regarding Zinus's questionnaire responses from August to October 2020.[24] Zinus submitted rebuttal comments in response to the petitioners' submissions.[25]

On August 10, 2020, the petitioners alleged that a particular market situation (PMS) existed in Indonesia during the POI that renders the respondent's reported input costs unreliable.[26] *See* the "Particular Market Situation" section, below, for further discussion.

On October 7, 2020, in light of concerns raised by the petitioners, we requested that Zinus place on the record certain business proprietary information pertaining to its Chinese affiliate, which was a respondent in the AD investigation of mattresses from China.[27] Zinus submitted this information on October 14, 2020, as requested,[28] and the petitioners filed comments regarding

---

[22] *See* Zinus's Letters, "Mattresses from Indonesia: Zinus' Section A Questionnaire Response," dated June 19, 2020 (AQR); "Mattresses from Indonesia: Zinus' Section D Questionnaire Response," dated July 7, 2020; and "Mattresses from Indonesia: Zinus' Section C Questionnaire Response," dated July 14, 2020 (CQR).

[23] *See* Zinus's Letters, "Mattresses from Indonesia: Zinus' Section A Supplemental Questionnaire Response," dated August 20, 2020; "Mattresses from Indonesia: Zinus' Section C Supplemental Questionnaire Response (part 1)," dated September 21, 2020; "Mattresses from Indonesia: Zinus' Section D Supplemental Questionnaire Response," dated September 23, 2020; "Mattresses from Indonesia: Zinus' Section C Supplemental Questionnaire Response (part 2)," dated September 28, 2020; and, "Mattresses from Indonesia: Zinus' Second Section C Supplemental Questionnaire Response," dated September 28, 2020.

[24] *See* Petitioners' Letters, "Mattresses from Indonesia: Rebuttal Factual Information Concerning the Zinus Section C Questionnaire Response," dated August 3, 2020; "Mattresses from Indonesia: Mattress Petitioners' Deficiency Comments Concerning Zinus' Section C Questionnaire Response — Part 1: Reconciliation and CEP Inventory Country of Origin," dated August 10, 2020; "Mattresses from Indonesia: Mattress Petitioners' Deficiency Comments Concerning Zinus' Section C Questionnaire Response — Part 2: US Sales," dated August 11, 2020; "Mattresses from Indonesia: Petitioners' Response to Zinus' Comments," dated August 25, 2020; "Mattresses from Indonesia: Mattress Petitioners' Request for Additional Supplemental Question Concerning Assets Obtained From Affiliates," dated September 3, 2020; "Mattresses from Indonesia: Petitioners' Request that Commerce Issue an Addendum to the Zinus Supplemental Section C Questionnaire," dated September 9, 2020; "Mattresses from Cambodia, Indonesia, Serbia, and Thailand: Submission of China CVD Preliminary Determination to the Record," dated September 24, 2020; "Mattresses from Indonesia: Rebuttal Factual Information Concerning Zinus' Supplemental Section D Questionnaire Response," dated October 2, 2020; and, "Mattresses from Indonesia: Mattress Petitioners' Response to Zinus's October 7, 2020 Letter," dated October 8, 2020.

[25] *See* Zinus's Letters, "Mattresses from Indonesia: Response to Petitioners' Rebuttal Factual Information," dated October 9, 2020; and, "Mattresses from Indonesia: Response to Petitioners' October 8, 2020, Letter," dated October 14, 2020.

[26] *See* Petitioners' Letter, "Mattresses from Indonesia: Mattress Petitioners' Particular Market Situation Allegation," dated August 10, 2020 (Petitioners' PMS Allegation).

[27] *See* Commerce's Letter, "Antidumping Duty Investigation of Mattresses from Indonesia: Request for Additional Information," dated October 7, 2020; *see also* Petitioners' Letters, ""Mattresses from Indonesia: Mattress Petitioners' Request That Zinus Be Instructed to Place Certain Confidential Information on This Record," dated August 31, 2020; and, "Mattresses from Indonesia: Mattress Petitioners' Revised Request that Zinus Be Instructed to Place Certain Confidential Information on this Record," dated September 22, 2020.

[28] *See* Zinus's Letter, "Mattresses from Indonesia: Submission of Zinus Xiamen's Proprietary Information from the Mattresses from the People's Republic of China Investigation," dated October 14, 2020.

4

Zinus's submission on October 23, 2020.[29]  As the petitioners filed their comments shortly before the deadline for this preliminary determination, we did not have sufficient time to consider the concerns raised in their submission for purposes of the preliminary determination; however, we intend to further consider these issues prior to the final determination.

On September 30, 2020, the petitioners requested that, in the event of a negative preliminary determination in this investigation, Commerce postpone its final determination in accordance with section 735(a)(2)(B) of the Act and 19 CFR 351.210(b)(2)(i).[30]  On October 15, 2020, Zinus requested that Commerce postpone its final determination by 60 days and extend provisional measures from a four-month period to a period not to exceed six months in accordance with 19 CFR 351.210(b)(2)(ii) and 19 CFR 351.210(e)(2), respectively.[31]

On October 9, 2020, the petitioners submitted comments with respect to Zinus for consideration in the preliminary determination.[32]  On October 19 and 22, 2020, Zinus and the petitioners submitted rebuttal and sur-rebuttal comments for consideration in the preliminary determination.[33]

## III.  PERIOD OF INVESTIGATION

The POI is January 1, 2019 through December 31, 2019.  This period corresponds to the four most recent fiscal quarters prior to the month of the filing of the Petition, which was March 2020.[34]

## IV.  DISCUSSION OF THE METHODOLOGY

### A.  Comparisons to Normal Value

To determine whether sales of mattresses from Indonesia to the United States were made at LFTV, we compared the export prices (EPs) and constructed export prices (CEPs) to the CV, in accordance with sections 777A(d)(1)(B) and 773(a)(4) of the Act.

---

[29] *See* Petitioners' Letter, "Mattresses from Indonesia:  Comments on China BPI," dated October 23, 2020.
[30] *See* Petitioners' Letter, "Mattresses from Indonesia:  Mattress Petitioners' Request to Postpone Final Determination," dated September 30, 2020; *see also* Petitioners' Letter, "Mattresses from Indonesia: Mattress Petitioners' Revised Request to Postpone Final Determination," dated October 15, 2020.
[31] *See* Zinus's Letter, "Mattresses from Indonesia:  Request for Postponement of Final Determination," October 15, 2020.
[32] *See* Petitioners' Letter, "Mattresses from Indonesia:  Mattress Petitioners' Comments Concerning the Preliminary Determination," dated October 9, 2020.
[33] *See* Zinus's Letters, "Mattresses from Indonesia:  Response to Petitioners' Pre-Preliminary Comments," dated October 19, 2020; and, "Mattresses from Indonesia:  Second Part of Response to Petitioners' Pre-Preliminary Comments," dated October 19, 2020; *see also* Petitioners' Letter, "Mattresses from Indonesia: Reply to Zinus' Response to Pre-Preliminary Comments," dated October 21, 2020.
[34] *See* 19 CFR 351.204(b)(1).

5

1.      Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing weighted-average normal values (NVs) to weighted-average EPs or CEPs, *i.e.*, the average-to-average method, unless Commerce determines that another method is appropriate in a particular situation.  In LTFV investigations, Commerce examines whether to compare weighted-average NVs with the EPs or CEPs of individual sales, *i.e.*, the average-to-transaction method, as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous investigations, Commerce has applied a "differential pricing" analysis for determining whether application of the average-to-transaction method is appropriate in a particular situation pursuant to 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[35] Commerce finds that the differential pricing analysis used in recent investigations may be instructive for purposes of examining whether to apply an alternative comparison method in this investigation.  Commerce will continue to develop its approach in this area based on comments received in this and other proceedings, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the average-to-average method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used in this preliminary determination examines whether there exists a pattern of EPs or CEPs for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all export sales by purchasers, regions, and time periods to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are defined using the reported destination code, *i.e.*, zip code, and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the POI based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean, *i.e.*, weighted-average price, of a test group and the mean, *i.e.*, weighted-average price, of a comparison group.  First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the

---

[35] *See, e.g., Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013); *Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of  Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise. The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test: small, medium, or large (0.2, 0.5, and 0.8, respectively). Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists. For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large, *i.e.*, 0.8, threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's *d* test. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method. If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's *d* test. If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the average-to-average method.

If both tests in the first stage, *i.e.,* the Cohen's *d* test and the ratio test, demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can appropriately account for such differences. In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only. If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate. A difference in the weighted-average dumping margins is considered meaningful if 1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold, or 2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold.

Interested parties may present arguments and justifications in relation to the above-described differential pricing approach used in this preliminary determination, including arguments for modifying the group definitions used in this proceeding.[36]

2.   Results of the Differential Pricing Analysis

Based on the results of the differential pricing analysis, Commerce preliminarily finds that 51.58 percent of the value of U.S. sales pass the Cohen's *d* test,[37] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce preliminarily determines that the average-to-average method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the average-to-average method and when calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test.  Thus, for this preliminary determination, Commerce is applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test to calculate the weighted-average dumping margin for Zinus.

B.   Product Comparisons

As stated above, Commerce gave parties an opportunity to comment on the appropriate hierarchy of physical characteristics used to define each product, including for model matching purposes, within a certain deadline.[38]  We considered the comments that were submitted and established the appropriate product characteristics to use as a basis for defining the product control numbers of mattresses in this AD investigation.  Commerce identified twelve criteria for the physical characteristics of the subject merchandise:  (1) coil type, (2) coil count, (3) mattress size, (4) nominal height, (5) foam layers, (6) type and amount of foam, (7) foam additives, (8) memory foam density, (9) other foam density (other foam is all foam other than memory foam), (10) quilting, (11) ticking, and (12) sensor.[39]  We instructed Zinus to use these product characteristics in its response to the AD questionnaire issued in this investigation.[40]

On May 28, 2020, Zinus informed Commerce that its home market sales of the merchandise under investigation constituted less than five percent of the volume of its U.S. sales during the period of investigation.[41]  Zinus also informed Commerce that it did not have a viable third country market during the POI.[42]   Because there were no viable POI sales of identical or similar

---

[36] The Court of Appeals for the Federal Circuit (CAFC) in *Apex Frozen Foods v. United States*, 16-1789 (Fed. Cir. July 12, 2017) affirmed much of Commerce's differential pricing methodology.  We ask interested that parties present only arguments on issues which have not already been decided by the CAFC.
[37] *See* Memorandum, "Preliminary Determination Margin Calculation for PT Zinus Global Indonesia," dated concurrently with this memorandum (Zinus Preliminary Calculation Memo).
[38] *See Initiation Notice*, 85 FR at 23004.
[39] *See* Commerce's Products Characteristics Letter.
[40] *Id.*
[41] *See* Zinus's Letter, "Mattresses from Indonesia: Notification of Non-Viable Home Market," dated May 28, 2020.
[42] *Id*.

8

merchandise sold in the home market (or to a third country) to compare to U.S. sales, we made comparisons based on CV.  *See* "Normal Value" section below for further discussion.

### C.  Date of Sale

Section 351.401(i) of Commerce's regulations states that, in identifying the date of sale of the subject merchandise or foreign like product, Commerce normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. Additionally, Commerce may use a date other than the date of invoice if it is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[43]  Finally, Commerce has a long-standing practice of finding that, where the shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are established.[44]  Zinus reported the earlier of the invoice date or the shipment date as the date of sale for its U.S. sales.[45]  Therefore, consistent with 19 CFR 351.401(i) and Commerce's practice, we used the earlier of Zinus's shipment date or invoice date as the date of sale, as applicable.

### D.  Export Price

Section 772(a) of the Act defines EP as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," as adjusted under subsection 772(c) of the Act.  In accordance with section 772(a) of the Act, we calculated EP where the subject merchandise was first sold to an unaffiliated purchaser in the United States prior to importation and the CEP methodology was not otherwise warranted based on the facts of the record.

We calculated EP based on the packed prices that Zinus charged to the first unaffiliated purchaser in the United States.  We made a deduction from the starting price for rebates, as appropriate.  We also made deductions, where appropriate, for movement expenses, *i.e.*, foreign inland freight, foreign brokerage and handling, international freight, inland and marine insurance, U.S. warehousing, U.S. inland freight, and other U.S. transportation expenses (*i.e.*, brokerage and handling, customs processing fees, and harbor maintenance fees), in accordance with section 772(c)(2)(A) of the Act.

### E.  Constructed Export Price

Zinus reported that for certain mattresses purchased from various affiliates outside of Indonesia, its inventory management and sales systems do not track the country of origin for its CEP

---

[43] *See* 19 CFR 351.401(i); *see also Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001) (quoting 19 CFR 351.401(i)).

[44] *See, e.g., Certain Polyester Staple Fiber from the Republic of Korea: Preliminary Results of the 2007/2008 Antidumping Duty Administrative Review*, 74 FR 27281, 27283 (June 9, 2009), unchanged in *Certain Polyester Staple Fiber from the Republic of Korea: Final Results of the 2007-2008 Antidumping Duty Administrative Review*, 74 FR 65517 (December 10, 2009).

[45] *See* CQR at C-26 to C-27.

9

inventory sales in the normal course of business.[46]  Furthermore, Zinus U.S.'s third-party warehouses do not provide sufficient details to trace sales back to inbound shipments to the warehouse.[47]  In order to allocate a portion of these inventory sales to shipments from Indonesia for reporting purposes, Zinus applied a first-in-first-out (FIFO) methodology.[48]  Questions remain about the accuracy of this methodology with respect to CEP sales reporting.  Thus, for purposes of the preliminary determination, we applied quarterly ratios, calculated based on the proportion of mattresses purchased from Indonesia during the POI, to the universe of Zinus U.S.'s warehouse sales.[49]  Commerce will continue to examine this issue for purposes of the final determination.

Pursuant to section 772(b) of the Act, the CEP is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," as adjusted under sections 772(c) and (d) of the Act.  In accordance with section 772(b) of the Act, we used CEP for certain of Zinus's sales because the sales were made on its behalf by its U.S. sales affiliate in the United States (*i.e.*, Zinus Inc.) to unaffiliated purchasers in the United States.

For these sales, we calculated CEP based on packed, delivered prices to unaffiliated purchasers in the United States.  We increased the starting price by the amount of billing adjustments, and we made deductions for rebates, as appropriate.  We also made deductions for movement expenses in accordance with section 772(c)(2)(A) of the Act.  These movement expenses included, where applicable, foreign inland freight from plant to the port of exportation, foreign brokerage and handling, U.S. brokerage and handling, international freight, marine insurance, U.S. customs duties (including merchandise processing fees, harbor maintenance fees), U.S. inland insurance, U.S. inland freight from port to warehouse, and U.S. inland freight from the warehouse to the unaffiliated customer.

In accordance with section 772(d)(1) of the Act, we also deducted selling expenses associated with economic activities occurring in the United States, which include direct selling expenses (imputed credit expenses, advertising expenses, bank charges, credit card processing fees, early payment expenses, and quality check expenses), and indirect selling expenses (inventory carrying costs and other indirect selling expenses).  Finally, we made an adjustment for profit allocated to these expenses, in accordance with sections 772(d)(3) of the Act.  To calculate the amount of CEP profit, we used the profit rate discussed below in the "Calculation of NV Based on CV" section.

---

[46] *See* AQR at A-5 to A-7.
[47] *Id*.
[48] *Id*.
[49] *See* Zinus Preliminary Calculation Memo.

Filed By: Janae Martin, Filed Date: 10/28/20 4:30 PM, Submission Status: Approved
Appx00241

F.     Normal Value

1.     Comparison Market Viability

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV, *i.e.*, the aggregate volume of home market sales of the foreign like product is equal to or greater than five percent of the aggregate volume of U.S. sales, we normally compare the respondent's volume of home market sales of the foreign like product to the volume of U.S. sales of the subject merchandise, in accordance with sections 773(a)(1)(A) and (B) of the Act.  If we determine that no viable home market exists, we may, if appropriate, use a respondent's sales of the foreign like product to a third-country market as the basis for comparison market sales, in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

Based on our analysis of information on the record, we preliminarily determined that neither a viable home market nor a viable third-country market exists.  Consequently, we have preliminarily determined that the NV of the subject merchandise cannot be determined for Zinus pursuant to section 773(a)(1)(B) of the Act (*i.e.*, there is no viable comparison market as required under sections 773(a)(1)(B)(ii)(II) or 773(a)(1)(C)(ii) of the Act and 19 CFR 351.404(b)(2)).  As such, in accordance with section 773(a)(4) of the Act, we have preliminarily based NV on CV for Zinus.

2.     Level of Trade

Because Zinus had no viable home or third-country market during the POI, we based NV on CV. When NV is based on CV, the NV level of trade (LOT) is that of the sales from which we derive selling expenses and profit.  In accordance with 19 CFR 351.412(d), where possible, Commerce will make its LOT determination under paragraph (d)(1) of that section on the basis of sales of the foreign like product by the producer or exporter.  Because it is not possible to make an LOT determination for the respondent in this investigation on the basis of sales of the foreign like product in the home or third-country market, Commerce may use sales of different or broader product lines, sales by other companies, or any other reasonable basis.

As discussed further below in section titled "Calculation of NV Based on CV," we based the CV profit for Zinus on the 2019 financial statements of Emirates Sleep Systems Private Limited (Emirates), an Indian producer of mattresses.  There is no information on the record pertaining to Emirates' selling activities with respect to its overall sales of mattress products that allows us to determine the LOT of the sales from which we derived profit for CV, or establish whether any difference in LOT exists or affects price comparability.  Therefore, because there is no basis to evaluate whether the price comparability has been affected due to difference in the LOT, we did not grant an LOT adjustment to NV that we established for Zinus in this investigation.

G.     Calculation of NV Based on CV

In accordance with section 773(a)(4) of the Act, we based Zinus's NV on CV because Zinus had had no viable home or third-country markets.

11

In accordance with section 773(e) of the Act, we calculated CV based on the sum of Zinus's respective cost of materials and fabrication employed in producing the subject merchandise, plus amounts for general and administrative (G&A) and financial expenses, CV profit and selling expenses, and U.S. packing costs. We calculated the cost of materials and fabrication, G&A, and financial expenses, based on the COP databases submitted by Zinus in its original and supplemental questionnaire responses, except in instances where we determined that the information was not valued correctly. Specifically, we adjusted Zinus's reported transfer prices for minor inputs purchased from affiliated parties in accordance with section 773(f)(2) of the Act.[50] We also revised the reported G&A expenses to include certain research and development costs.[51] Finally, we examined the cost data submitted by Zinus and preliminarily determined that our quarterly cost methodology is not warranted. Therefore, we have applied our standard methodology of using annual costs based on the reported data.

Because Zinus does not have a comparison market, Commerce cannot determine selling expenses and profit under section 773(e)(2)(A) of the Act, which requires sales by the respondent of the foreign like product, in the ordinary course of trade, for consumption in a foreign country. Therefore, we have relied on section 773(e)(2)(B) of the Act to determine Zinus's selling expenses and profit.

In situations where CV selling expenses and profit cannot be calculated under the "preferred method," section 773(e)(2)(B) of the Act sets forth three alternatives. Those alternatives are: (i) the use of the actual amounts incurred and realized by the specific exporter or producer in connection with the production and sale of merchandise that is in the same general category of products as the subject merchandise; (ii) the use of the weighted average of the actual amounts incurred and realized by exporters or producers (other than the respondent) that are subject to the investigation or review; or (iii) based on any other reasonable method, except that the amount for profit may not exceed the amount realized by exporters or producers (other than the respondents) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise (*i.e.*, the "profit cap"). The statute does not establish a hierarchy for selecting among these alternative methodologies.[52]

The first statutory alternative provided in section 773(e)(2)(B) is not possible because we do not have information on the record to permit a calculation of these amounts specific to products in the "same general category" as the subject merchandise and exclusive of the subject merchandise sold by Zinus. The second alternative for determining CV profit is not available to us in this case because there are no other exporters or producers subject to individual examination in this investigation.

Therefore, for this preliminary determination, we determined CV profit and selling expenses in accordance with section 773(e)(2)(B)(iii) of the Act (*i.e.*, based on "any other reasonable method"). When Commerce calculates CV profit and selling expenses ratios under alternative (iii), it considers the following factors:

---

[50] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – PT Zinus Global Indonesia," dated October 27, 2020.
[51] *Id*.
[52] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA), H.R. Doc. 103-316, vol. 1 (1994) at 840.

12

1. The similarity between potential surrogate company's business operations and products and the respondent's business operations and products;
2. The extent to which a potential surrogate company has sales in the United States and the home market;
3. The contemporaneity of the surrogate data to the period of investigation; and
4. The similarity of the customer base between a potential surrogate company and the respondent.

We analyzed the numerous CV profit and selling expense options provided by both the petitioners and Zinus. We eliminated those options where the financial statements were either incomplete, had a qualified audit opinion, did not reflect the production and sales of comparable merchandise, or were not contemporaneous with the POI. We preliminarily calculated CV profit and selling expenses using data contained in the financial statements of Emirates,[53] an Indian producer of mattresses. Even though Emirates' financial statements reflect production in a country other than the country under investigation, they do reflect a producer and seller of mattresses, the identical merchandise under investigation. They are also contemporaneous with the current POI and there is no indication that the company's sales are predominantly to the United States. As such we consider these financial statements to be the best information available on the record of this investigation for determining CV profit and selling expenses. Further, because there is no information on the record of this investigation concerning the profit on sales in Indonesia of products in the same general category of merchandise, we are unable to calculate the amount realized by exporters or producers in connection with the sale, for consumption in the foreign country, of the merchandise in the same general category of products as the subject merchandise (*i.e.*, the "profit cap"), in accordance with section 773(e)(2)(B)(iii) of the Act. However, the SAA makes clear that Commerce might have to apply alternative (iii) on the basis of facts available.[54] Accordingly, we find that Emirates' profit information serves as a reasonable profit cap for this preliminary determination.

Based on the foregoing, for this preliminary determination, we calculated Zinus's CV profit and selling expenses under section 773(e)(2)(B)(iii) of the Act using Emirates' CV profit and selling expenses, which results in a rate of 18.36 percent and 1.77 percent, respectively.[55]

## V. PARTICULAR MARKET SITUATION

Sections 773(a)(1)(B)(ii)(III) and 773(a)(1)(C)(iii) of the Act, as well as 19 CFR 351.404(c)(2), state that Commerce will not use home market prices, or third country prices (as the case may be), to calculate NV if a particular market situation in the home market or third country market

---

[53] *See* Petitioners CV Submission at Attachment 2
[54] *See* SAA at 840.
[55] *See* Petitioners' CV Submission at Attachment 2.

Filed By: Janae Martin, Filed Date: 10/28/20 4:30 PM, Submission Status: Approved
Appx00244

prevents a proper comparison with U.S. price.[56]  Commerce has declined to use home market sale prices to calculate NV in certain cases where it found a particular market situation to exist.[57]

Further, section 504 of the Trade Preferences Extension Act of 2015[58] added the concept of "particular market situation" in the definition of the term "ordinary course of trade," for purposes of CV under section 773(e) of the Act, and through these provisions for purposes of the COP under section 773(b)(3) of the Act.  Section 773(e) of the Act states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the COP in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology."

Consistent with section 504 of the TPEA, Commerce has also found that a particular market situation distorted COP in multiple cases.[59]  In such circumstances, Commerce has found that the costs have been distorted (*i.e.*, not within the ordinary course of trade) for inputs to a respondent's production of the subject merchandise.

Commerce's practice in examining particular market situations starts with an allegation from an interested party that is sufficient to warrant further investigation.  Neither the statute, Commerce's regulations, nor the SAA define the term "particular market situation."[60] Commerce is continuing to develop the concepts and types of analysis that are necessary to address future allegations of particular market situations under section 773(e) of the Act.

On August 10, 2020, the petitioners in this investigation alleged that a particular market situation existed in Indonesia during the POI which distorted Zinus's cost to produce mattresses. Specifically, the petitioners alleged that a PMS exists with respect to production costs in the Indonesian mattress industry as a result of:  (1) increased Chinese foreign direct investment

---

[56] Examples of prior cases where we have found a particular market situation include *Notice of Final Determination of Sales at Less Than Fair Value: Fresh Atlantic Salmon from Chile*, 63 FR 31411 (June 9, 1998); *Mechanical Transfer Presses from Japan; Final Results of Antidumping Duty Administrative Review and Revocation of Antidumping Duty Administrative Order in Part*, 63 FR 37331 (July 10, 1998); and *Notice of Final Results of the Ninth Administrative Review of the Antidumping Duty Order on Certain Pasta from Italy*, 72 FR 7011 (February 14, 2007).

[57] *See Biodiesel From Indonesia: Final Determination of Sales at Less Than Fair Value*, 83 FR 8835 (March 1, 2018) (*Biodiesel from Indonesia*), and accompanying Issues and Decision Memorandum (IDM) at Comment 2; *see* also *Biodiesel From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part* 83 FR 8837 (March 1, 2008) (*Biodiesel from Argentina*), and accompanying IDM at Comment 2.

[58] *See Trade Preferences Extension Act of 2015*, Pub. L. No. 114-27, 129 Stat. 362 (2015) (TPEA).

[59] *See, e.g., Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18105 (April 17, 2017), and accompanying IDM at Comment 3; *Biodiesel from Indonesia* IDM at Comment 3; and *Biodiesel from Argentina* IDM at Comment 3.

[60] *See* SAA, H.R. Doc. 103-316, vol. 1 (1994).  As indicated, the SAA does not define the term, but it does provide a non-exhaustive list of examples of what might be considered a particular market situation.  For instance, a particular market situation might exist where the home market consists of a single sale, where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set, or where the demand patterns in the foreign market are different from those in the United States (*e.g.*, where substantial price changes are closely correlated with holidays occurring at different times of the year in the two markets).

14

through China's Belt and Road Initiative; (2) increased Chinese exports to Indonesia of mattress inputs at relatively low prices; (3) and increased exports of mattresses from Indonesia to the United States.[61]

For the purposes of this preliminary determination, Commerce determines that there is insufficient evidence to warrant further investigation into whether a cost-based PMS exists. For a complete discussion of our decision with respect to the PMS allegation, *see* the accompanying PMS Memorandum.[62]

---

[61] *See* Petitioners' PMS Allegation at 11-22.
[62] *See* Memorandum, "Less-Than-Fair Value Investigation of Mattresses from Indonesia: Allegation of a Particular Market Situation," dated concurrently with this memorandum (PMS Memorandum).

## VI.    RECOMMENDATION

We recommend applying the above methodology for this preliminary determination.

☒                                    ☐

_____                    _____
Agree                              Disagree

10/27/2020

✗  _____

Signed by: JEFFREY KESSLER

Jeffrey I. Kessler
Assistant Secretary
 for Enforcement and Compliance

16

Appx00247

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-1674

**Short Case Caption:** PT. Zinus Global Indonesia v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 7428 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/23/2025

Signature: /s/ Yohai Baisburd

Name: Yohai Baisburd

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2025-1674

**Short Case Caption:** PT. Zinus Global Indonesia v. US

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains __42__ number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 06/23/2025

Signature: /s/ Yohai Baisburd

Name: Yohai Baisburd

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2025-1674

**Short Case Caption** PT. Zinus Global Indonesia v. US

> **NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on  06/23/2025

by  ☐ U.S. Mail  ☐ Hand Delivery  ☑ Email  ☐ Facsimile
☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Henry Almond, Kang Woo Lee, J. David Park (Arnold & Porter Kay Scholer LLP) | Public version served via email and court's electronic filing system. Confidential version served via email and secure file transfer site. |
| Blake Cowman (DOJ) | Public version served via email and court's electronic filing system. Confidential version served via email and secure file transfer site. |
| | |
| | |
| | |

☐ Additional pages attached.

Date: 06/23/2025

Signature: /s/ Yohai Baisburd

Name: Yohai Baisburd