IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
———————

PT. ZINUS GLOBAL INDONESIA
Plaintiff-Appellee,

v.

BROOLYN BEDDING, LLC, CORSICANA MATTRESS CO., ELITE
COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT
ENTERPRISES, INC., LEGGETT & PLATT, INC., INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, UNITED STEEL, PAPER AND
FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,
AFLCIO,
Plaintiffs-Appellants,

v.

UNITED STATES,
Defendant-Appellee.
———————

On Appeal from the United States Court of International Trade in
Consolidated Case No. 1:21-cv-00277-JCG
The Honorable Jennifer Choe-Groves

**NON-CONFIDENTIAL RESPONSE BRIEF OF PLAINTIFF-APPELLEE
PT. ZINUS GLOBAL INDONESIA**

<div style="margin-left:40%">

J. David Park
Henry D. Almond
Kang Woo Lee

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Phone: (202) 942-5646
*Counsel for Zinus*

</div>

October 3, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2025-1674 |
| **Short Case Caption** | PT. Zinus Global Indonesia v. US |
| **Filing Party/Entity** | PT. Zinus Global Indonesia |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/03/2025

Signature: /s/ Henry D. Almond

Name: Henry D. Almond

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| PT. Zinus Global Indonesia | | Zinus Inc. |
| | | Hyundai Department Store Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable  ☐ Additional pages attached

| | | |
|---|---|---|
| Lynn M. Fischer Fox, Arnold & Porter Kaye Scholer LLP | Gina M. Colarusso, Arnold & Porter Kaye Scholer LLP | |
| Daniel R. Wilson, Arnold & Porter Kaye Scholer LLP | Archana Rao Vasa, Arnold & Porter Kaye Scholer LLP | |
| Leslie C. Bailey, Arnold & Porter Kaye Scholer LLP | Anne E. Soh, Arnold & Porter Kaye Scholer LLP | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)  ☑ No  ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable  ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT ......................................1

II.  ARGUMENT ................................................................................................4

   A.  U.S. Inventory Allocation Ratio..................................................................4

      1.  Overview and Factual Background.............................................................4

      2.  Appellants Overstate the Relevance of the Claimed "Anomalies" in the Data ................................................................................................................7

      3.  Commerce Correctly Excluded "In-Transit" Mattresses from its Analysis ............................................................................................................12

      4.  Commerce's Decision and the CIT's Review is not Undermined by Any *Post Hoc* Rationalizations .................................................................13

      5.  Commerce Reasonably Exercised its Discretion in not Separately Verifying the Inventory Data Gathered on Remand ..............................16

   B.  Commerce's Use of Indonesian Import Data to Value Affiliated Party Purchases..................................................................................................18

III. CONCLUSION ............................................................................................27

# **CONFIDENTIAL MATERIAL OMITTED**

Pursunat to Federal Circuit Rules 28(d)(1)(B), 25.1(d) and 25.1(e)(1)(B), counsel for Plaintiff-Appellee has prepared a non-confidential version of its response brief from which it has redacted certain confidential information. Confidential information has been removed from pages 2, 3, 8, 9, and 10 of this response brief.

The confidential material omitted from pages 2, 3, 8, 9, and 10 of this response brief relates to Plaintiff-Appellee's inventory and sales data that was treated as propreitary information in the underlying investigation.

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................7

19 U.S.C. § 1677b(c)(4)...........................................................................21

19 U.S.C. § 1677b(f)(2) ...............................................................18, 19, 23

19 U.S.C. § 1677m(e)(2)..........................................................................16

19 U.S.C. § 1677m(i)............................................................................3, 16

**REGULATIONS**

19 C.F.R. § 351.408(c)(2).........................................................................21

**CASES**

*Best Mattresses Int'l Co., Ltd. v. United States*,
    622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) .........................24, 25, 26

*Best Mattresses Int'l Co., Ltd. v. United States*,
    703 F. Supp. 3d 1382 (Ct. Int'l Trade 2024) .....................................25

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)........................7

*Ellwood City Forge Co. v. United States*,
    600 F. Supp. 3d 1281 (Ct. Int'l Trade 2022) .....................................17

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) ....................17

*Monsanto Co. v. United States*, 698 F.Supp. 275 (Ct. Int'l Trade 1988) ...............17

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) .................7, 8

*Suramerica de Aleaciones Laminadas, C.A. v. U.S.*,
    44 F.3d 978 (Fed. Cir. 1994) .......................................................7, 16

*Rebar Trade Action Coal. v. United States*,
398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) .....................................................26

*Zinus Global Indonesia v. United States*,
628 F.Supp.3d 1252 (Ct. Int'l Trade 2023) ...............................................5, 18, 19

*Zinus Global Indonesia v. United States*,
686 F.Supp.3d 1349 (Ct. Int'l Trade 2024) ......................................................5, 8

*Zinus Global Indonesia v. United States*,
762 F.Supp.3d 1257 (Ct. Int'l Trade 2025) .......................................9, 11, 13, 16

## ADMINISTRATIVE DETERMINATIONS

*Mattresses from Indonesia: Final Affirmative Determination of Sales
at Less Than Fair Value*, 86 Fed. Reg. 15,899 (March 25, 2021).......................1

# I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT

Appellants challenge two aspects of the Department of Commerce's ("Commerce's") final determination, as amended via remand, in the less-than-fair-value investigation of mattresses from Indonesia. *See Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,899 (Dep't Commerce Mar. 25, 2021) and accompanying Issues and Decision Memorandum ("IDM") (Appx10200-10236).  In particular, they challenge (1) Commerce's allocation ratios the agency used to calculate the proportion of mattresses sold out of Zinus' U.S. inventory that were of Indonesian origin (as opposed to mattresses that were produced in other countries), and (2) Commerce's use of Indonesian import trade data to value inputs for use in mattress production that PT Zinus Global Indonesia ("Zinus Indonesia") imported into Indonesia from affiliated parties located in China and imported into Indonesia for use in mattress production.

With respect to the first issue – treatment of U.S. inventory sales – Appellants attack Commerce's and the U.S. Court of International Trade's decisions on multiple fronts; however, each line of attack ignores key evidence and the agency's reasoned and supported explanations, as upheld by the Court of International Trade.  *First*, they complain that so-called "in-transit" merchandise was excluded from the agency's quarterly ratio calculations.  *See* Appellants' Br. at

13-15.  However, the record unequivocally shows that these "in-transit" mattresses were not in U.S. inventory, and therefore Commerce properly excluded them from the analysis of mattresses held in U.S. inventory.  *See* Final Results of Redetermination Pursuant to Court Remand in Slip Op. 24-19 (Dep't Commerce, May 17 2024) ("Second Remand Redetermination") at 13-14 (Appx10054-10055).  None of their arguments or claims overcome Commerce's reasoned assessment of the facts or suggest that Commerce's conclusions failed to meet the substantial evidence standard.

*Second*, they argue that their analysis of certain model-specific inventory, purchase, and sales quantities undermines the reasonableness of Commerce's ultimate quarterly ratio calculations from the second remand determination.  *See* Appellants' Br. at 16-20.  However, Appellants overstate their case.  As indicated at page 18 of their opening brief, they believe that [NUMBER] mattresses, on a model-specific basis, were sold out of inventory beyond the possible inventory and purchase levels for those mattresses (i.e., there were more sales out of inventory than there was possible inventory).  Absent from their discussions is any reference to the overall size of Zinus' U.S. inventory and sales.  In particular, the record shows that Zinus sold [ NUMBER ] mattresses out of U.S. inventory during the relevant period.  *See* Second Remand Redetermination at 6 (Appx10047).  Thus, these claimed anomalous transactions are equal to 0.16 percent of the total

inventory sales volume (i.e., [NUMBER] divided by [NUMBER]). *See PT. Zinus Global Indonesia v. United States*, Consol. Ct. No. 21-00277, Slip Op. 25-15 ("*Zinus III*") at 20 (Appx10023). Such an insignificant volume does not detract from the reasonableness of Commerce's calculations or the weight of the evidence supporting them. The Court of International Trade was correct to sustain Commerce's determination on remand.

*Third*, Appellants claim that Commerce acted contrary to 19 U.S.C. § 1677m(i) by not verifying the inventory data Zinus submitted during the second remand proceeding. *See* Appellants' Br. at 27-28. As an initial matter, Appellants never asked Commerce to verify the data, nor did they argue in their comments to the agency on remand that the data needed to be verified. Thus, this Court should view this argument as waived under the exhaustion doctrine. Moreover, the agency has considerable discretion in determining what information to verify, and this Court need not mandate a verification requirement beyond that which Commerce determined was necessary.

With respect to the second issue – Commerce's treatment of Zinus' purchases from affiliated parties – Appellants argue that Commerce was obligated to use data pertaining to the country in which the affiliated parties were located, rather than the country in which Zinus produced mattresses. *See* Appellants Br. at 28-34. Yet, they do not actually argue that Commerce was obligated to use data

from that country – China. Rather, they argued to Commerce and the Court of International Trade (and indirectly suggest in their brief here, *see* Appellants' Br. at 33), that Commerce was obligated to instead use a mixed basket of import data from a variety of countries they argue are economically comparable to China. While their preferred methodology bears some resemblance to Commerce's non-market economy methodology, there is no support in the statute or logic to adopt their suggest approach when valuing inputs sourced from affiliated parties for importation into a market economy, Indonesia. Rather, Commerce reasonably used data available in Indonesia to value inputs that Zinus imported into Indonesia. The Court of International Trade was correct to uphold this aspect of Commerce's determination, and this Court should likewise affirm Commerce's treatment.

## II.    ARGUMENT

### A.    U.S. Inventory Allocation Ratio

#### 1.    Overview and Factual Background

Throughout the course of Commerce's investigation, Zinus explained that its U.S. warehouse locations did not maintain records that permit the company to definitively determine the country of origin for prior sales made during the POI. *See e.g.*, IDM at 8 (Appx10210). This inventory tracking matters in Commerce's antidumping duty calculations because the agency needs to review only sales of subject merchandise (i.e., mattresses produced in Indonesia), and not examine sales

of product that is not subject to the investigation (i.e., mattresses produced in countries other than Indonesia). Zinus initially reported its data using a first-in-first out (or "FIFO") methodology to identify U.S. sales of Indonesian product. *See e.g.*, IDM at 8 (Appx10210). That is, Zinus used a theoretical inventory analysis to assign country of origin to sales on the basis of the oldest inventory available. (The "first in" mattresses in inventory were assigned as the "first out" sales). The Department declined to use this approach, and instead initially adopted a so called "quarterly ratio" methodology advocated by Appellants ("Petitioners" in the underlying investigation). IDM at 9 (Appx10211). At its most simple level, the quarterly ratios are intended to identify the percentage of mattresses sold out of U.S. inventory that were of Indonesian origin in a given quarter.

Zinus took issue, both at Commerce and before the Court of International Trade, with aspects of Commerce's quarterly ratios, most principally Commerce's inclusion of so called "in-transit" mattresses within the ratio calculations. *See PT. Zinus Global Indonesia v. United States*, 628 F.Supp.3d 1252 (Ct. Int'l Trade 2023) ("*Zinus I*"), at 1262-65 (Appx10137-10144); *PT. Zinus Global Indonesia v. United States*, 686 F.Supp.3d 1349 (Ct. Int'l Trade 2024) ("*Zinus II*"), at 1354-56 (Appx10076-10079). These mattresses were mattresses that were literally in transit from Indonesia to the United States during the period of review, and

therefore could not have been sold out of inventory (and therefore needed to be excluded from the inventory data when calculating the quarterly ratios).

The Court of International Trade remanded the treatment of "in-transit" mattresses to Commerce twice. On first remand, Commerce offered additional explanation to support its prior decision. *See* Final Results of Redetermination Pursuant to Court Remand in Slip Op. 23-39 (Dep't Commerce, June 9, 2023) ("First Remand Redetermination") at 6-9 (Appx10094-10097). In its second remand determination, pursuant to the CIT's remand order, Commerce gathered additional information on Zinus' inventories during the period as well as details on the mattresses that remained "in transit." *See* Second Remand Redetermination at 5-7 (Appx 10046-10048). Based on this additional data, which Appellants now question, Commerce modified its quarterly ratio calculations to account for (1) beginning inventory volumes, (2) purchase data (i.e., additions to the volumes in inventory), and (3) sales data (i.e., subtractions from inventory). *See* Second Remand Redetermination at 12-13 (Appx10053-10054) and Department Memorandum "Final Remand Results Calculation Memorandum for PT Zinus Global Indonesia" (May 16, 2024) at Attachment 4 (Appx26433). On the basis of this additional data and more precise calculations, Commerce updated its quarterly ratio calculations to determine the proportion of sales out of inventory that were of

Indonesian origin.  *Id.*  The Court of International Trade affirmed these calculations.

### 2.  Appellants Overstate the Relevance of the Claimed "Anomalies" in the Data

Appellants start their substantive argument with a header addressing "in-transit" mattresses.  Appellants Br. at 13.  We address the factual and substantial evidence question related to in transit mattresses below, in Section II.A.3 of this brief.  However, we first address the claimed model-specific "anomalies" Appellants discuss at pages 16-19 of their opening brief, as their claims on this point underpin much of their arguments related to Zinus' U.S. inventory sales and Commerce's quarterly ratio calculations.

With respect to these arguments, the appropriate treatment of the inventory data and Commerce's quarterly ratio calculations are squarely a question of fact, which this Court reviews under the substantial evidence standard set forth in19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  While this Court reviews CIT decisions *de novo*, this Court "give{s} great weight to 'the informed opinion of the Court of International Trade.'"  *Nippon Steel Corp. v United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. U.S.*, 44 F.3d 978, 983 (Fed. Cir. 1994)).  Indeed, a party contesting Commerce's factual

determinations "has chosen a course with a high barrier to reversal," *Nippon Steel*

*Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Appellants do not overcome these hurdles, and this Court should sustain

Commerce's decision as supported by substantial evidence.

Indeed, this issue comes to the Court after Commerce's careful consideration

throughout the investigation and two subsequent remand proceedings (one in

which Commerce gathered additional information), and three opinions from the

CIT. The reasoned and supported determinations by Commerce and the CIT have

been fully vetted through the administrative and judicial appeal process at the

lower court, are supported by substantial record evidence, and this Court need not

disturb these decisions.

During the second remand proceeding, pursuant to the CIT's suggestion, *See*

*Zinus II* at 11-14 (Appx10078-10079), Commerce requested, and Zinus provided,

data regarding the total quantity and value of Zinus U.S.'s inventory balances as of

the close of December 31, 2018 (i.e., the inventory balances available at the start of

the 2019 period of investigation). *See* Zinus' Remand Supplemental Questionnaire

Response (Mar. 20, 2024) at 13-15 and Exhibit RS-10 (Appx25449-25451,

Appx25500-25505). The materials in this submission showed that as of January 1,

2019, Zinus U.S. held [ NUMBER ] mattresses meeting the physical description of the

scope of the investigation in U.S. inventory. *Id*. Zinus subsequently submitted

comments that included a proposed revised quarterly ratio methodology calculation that accounted for these beginning inventory balances. *See* Zinus' Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand (April 26, 2024) at 16-19 and Exhibit 2 (Appx26011-26014, Appx26020-26024). Commerce ultimately used these calculations, with minor modifications in its Final Remand Determination. *See* Second Remand Redetermination at 12-13 (Appx10053-10054) and Department Memorandum "Final Remand Results Calculation Memorandum for PT Zinus Global Indonesia" (May 16, 2024) at Attachment 4 (Appx26433).

Appellants now point to what they characterize as "anomalies" in the inventory data, which suggest that for [ NUMBER ] mattress models, Zinus had sales of a total of [ NUMBER ] mattresses beyond which Zinus' indicated beginning inventories or in-period purchases could account for. Appellant's Br. at 18. Here, Zinus emphasizes again that the total sales subject to the ratio calculations is [ NUMBER ] mattresses. *See* Second Remand Redetermination at 6 (Appx10047). Thus, as Zinus argued and the CIT recognized, these claimed anomalous transactions are *equal to 0.16 percent* of the total inventory sales volume. *See PT. Zinus Global Indonesia v. United States,* 762 F.Supp.3d 1257, 1267 (Ct. Int'l Trade 2025) ("*Zinus III*") (Appx10023). This is truly an insignificant quantity that hardly rises to the level of a rounding error. Even if one assumes these are entirely

unaccounted for, or may constitute some error, such a small number relative to the total inventory and sale population would have no impact on the underlying quarterly ratio calculations or Commerce's overall country of origin assessment. In short, such an insignificant volume of sales is not indicative of a flaw in Commerce's methodology, nor does it call into question the overall reasonableness of Commerce's calculations.

Also relevant here is the purpose for which these data are being used – to calculate relative quarterly ratios of mattress sales by country of origin. That is, these figures are used to calculate an allocation ratio to be applied to Zinus' sales data. Thus, how these [NUMBER] mattresses are treated simply has no meaningful impact on the bottom line ratio calculations because these small volumes would have minimal effect on the calculated allocation ratios. The CIT correctly viewed these claimed "anomalies" as insignificant, with the overall weight of the evidence supporting Commerce's treatment of the data and calculations, as the CIT stated:

> Considering the relatively minor scale of the discrepancies and the fact that the anomalies were balanced out when mattress sales were considered in the aggregate, the Court concludes that Commerce's methodology is reasonable under the circumstances of this case and would result in only very minor distortions of less than one percent (0.16 percent of hundreds of thousands of mattresses) in the calculation of constructed export price. Cf. 19 C.F.R. § 351.401(g) ("The Secretary may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided the Secretary is satisfied that the allocation method used does not cause inaccuracies or distortions.").

*Zinus III* at 1267 (Appx. 10023).

Not only are these claimed anomalies insignificant, but their existence is also consistent with the other record information, suggesting that the claimed anomalies are not necessarily indicative of any error or problem with the data. Specifically, as explained in Zinus' initial Section A response, during the POI there were instances in which mattresses were added to inventory "for a reason other than a normal purchase" such as "through a reflection of inventory stock-taking differences." Zinus' Section A Questionnaire Response (June 19, 2020) at A-7 (Appx10882) (explaining that when such instances occurred, Zinus' reporting methodology was to "assume{} that the number of mattresses are segregated by the proportion of the mattresses' beginning inventory balance by country of origin on that day.").

Also, in Zinus' Supplemental Section A response, the company explained that a particular account was used "for recognizing inventory adjustments that are not segregated at the detailed product code level. This account mostly related to human data entry errors." Zinus' Section A Supplemental Questionnaire Response (Aug. 20, 2020) at 7 (Appx15833). As explained in that response, this account was created in December 2018 and by the end of December 2019 the account no longer had any balance, meaning these data entry errors necessarily persisted during the 2019 period at issue here. *See Id*. In other words, during the POI, Zinus personnel

regularly conducted physical inventory checks and made adjustments to the system data, as necessary, whenever differences occurred between the physical inventory data and the system inventory data.

Thus, while Commerce only asked for beginning inventory balance figures, and not details on any and all inventory adjustments or reclassifications throughout the period, the record includes adequate information and explanation which suggests that the claimed "anomalies" are not the smoking gun Appellants suggest, but are consistent with the company's explanations regarding its inventory management mechanics. Thus, the claimed anomalies are insignificant, do not undermine Commerce's calculations, and are consistent with normal inventory records and movement when dealing with thousands of sales out of multiple warehouses.

### 3. Commerce Correctly Excluded "In-Transit" Mattresses from its Analysis

Appellants do not address the facts underpinning the "in-transit" mattresses at length in their brief, but instead tie their argument that Commerce should have retained "in-transit" mattresses in the analysis to their argument regarding the claimed "anomalous" data discussed above. To be clear, the so called "in-transit" mattresses were mattresses that had been shipped from Indonesia to the United States during the period of investigation, but had not yet arrived in the United States. *See* Second Remand Redetermination at 6-7 (Appx10047-10048) ("Zinus

U.S.' accounting records clearly demonstrate that the in-transit quantity…did not enter Zinus U.S.' inventory during the POI.").  In their brief, Appellants do not question this conclusion or the underlying facts with respect to these mattresses.  Accordingly, because Commerce determined that the mattresses were not in U.S. inventory during the period of investigation, Commerce properly excluded them from the calculations.  Appellants raise no factual or legal arguments that would disturb this conclusion.

### 4. Commerce's Decision and the CIT's Review is not Undermined by Any *Post Hoc* Rationalizations

Appellants argue that further remand is warranted because Commerce did not specifically address the claimed "anomalous" transactions on remand, but instead only addressed the issue before the CIT following remand.  Appellants Br. at 20-23.  The CIT correctly accepted Commerce's calculations and reliance on the inventory data, recognizing that "Commerce is not required to use perfect data but must explain why its choice was reasonable on the record." *Zinus III* at 1267 (Appx. 10022).  That is, the CIT does not appear to rest its decision to uphold Commerce's Second Remand Determination on any explanations offered by government counsel; rather, the CIT viewed Commerce's overall explanation and justification as articulated in the remand redetermination as reasonable and consistent with the record, notwithstanding any possible minor "anomalies" in the data.  Thus, Appellant's focus on any *post hoc* justifications offered following

remand is misplaced, as any such *post hoc* rationalizations offered by the government do not appear to have impacted the CIT's decision.

Moreover, Appellants' claims also overlook the history and timeline of Commerce's remand proceeding. In particular, Zinus submitted its inventory data for the record on March 20, 2024. *See* Zinus Remand Supplemental Questionnaire Response (Mar. 20, 2024) (Appx25430). At this point the factual record was closed and no further submissions of new factual information were allowed or accepted into the record. Thus, to the extent any so-called "anomalies" existed in the data, they existed from this date forward. Subsequently, Appellants submitted multiple rounds of comments to Commerce in advance of the Remand Determination. *See* Mattress Petitioners' Rebuttal Comments on Zinus' Supplemental Questionnaire Response on Remand (March 27, 2024) (Appx25639), and Mattress Petitioners' Comments on the Department's Draft Results of Redetermination (April 26, 2024) (Appx25970). Appellants had all of the underlying data to assess any possible "anomalies" while preparing both sets of these comments, but at no point did they identify to Commerce the issue that is now central to their litigation.

They claim that "the challenged errors were revealed for the first time in the final Second Remand Redetermination filed with the CIT." Appellant's Br. at 20-21. In making this argument, they point to Attachment 5 of the May 16, 2024,

Second Final Remand Calculation Memorandum, but this attachment was not new information; it was a series of calculations and compilations of record data that had all existed on the record since at least March 20, 2024, over a month before they submitted comments on the Draft Remand Determination. *See* Department Memorandum "Final Remand Results Calculation Memorandum for PT Zinus Global Indonesia" (May 16, 2024) at Attachment 5 (Appx26435-26436). Plaintiff-Appellee recognizes that there is a significant volume of data in Attachment 5, and preparing the attachment required pulling data from multiple sources, but Appellants could have reviewed the record data and prepared similar calculations to those Commerce included in its remand calculations. That is, as part of Commerce's remand process they could have identified any anomalous data to Commerce, but did not do so. Instead, they waited until Commerce provided its full calculations, and only then did they raise the claimed "anomalies" in the data to the CIT, and now claim that any explanation the government may offer related those data is a *post hoc* rationalization that cannot support Commerce's decision. Appellant's Br. at 23.

In essence, they argue that the CIT was powerless to even consider arguments related to the "anomalous" data, and instead was legally required to have remanded the question back to Commerce for explanation. Appellant's Br. at 24 ("It is for Commerce to decide whether something is material."). Appellants'

reading of the case law, however, seeks to upend the substantial evidence standard. In particular, the CIT reviewed whether Commerce's remand determination was supported by substantial record evidence and concluded that it was. *Zinus III* at 1267 (Appx10023-10024). The substantial evidence standard requires a reviewing court to "take into account whatever in the record fairly detracts from" the conclusion drawn. *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F. 3d 978, 985 (Fed. Cir. 1994). Here, the CIT did just that – it reviewed Commerce's decision and the claims regarding the "anomalous" sales data and concluded that the arguments and facts related to the claimed "anomalous" sales data did not detract from the overall conclusion. Thus, Commerce's decision was supported by substantial evidence, and the CIT's review did not amount to a legal error. This Court should likewise uphold Commerce's decision.

### 5. Commerce Reasonably Exercised its Discretion in not Separately Verifying the Inventory Data Gathered on Remand

Appellants also claim that Commerce's reliance on Zinus U.S.'s inventory data was contrary to law because Commerce did not separately verify the inventory data that the Department gathered in the second remand proceeding. Appellants' Br. at 27-28. In support of their argument, they cite to 19 U.S.C. 1677m(e)(2) and (i). As an initial matter, despite submitting multiple rounds of arguments and comments, Appellants did not request that Commerce conduct verification as part of its second remand proceeding. Accordingly, the Court should deem this

argument waived because Appellants failed to exhaust their administrative remedies on this issue. *See Ellwood City Forge Co. v. United States*, 600 F. Supp. 3d 1281 (Ct. Int'l Trade 2022) (declining to address an argument regarding Commerce's verification procedures, because the party did not raise the argument at the administrative level).

Moreover, as Appellants correctly recognize, "this Court has previously found that Commerce has wide latitude in developing its verification procedures." Appellants Br. at 27 (citing *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997). In this instance, Commerce gathered a relatively small set of data during the course of the second remand proceeding relevant to this issue – an inventory list for mattresses held in inventory as of December 31, 2018. *See* Zinus' Remand Supplemental Questionnaire Response (Mar. 20, 2024) at Exhibit RS-10 (Appx25500-25505). It was well within Commerce's discretion as to whether to subject this particular piece of data to verification. Indeed, "{v}erification is a spot check," and the statute does not mandate that Commerce verify each and every piece of data. *Monsanto Co. v. United States*, 698 F.Supp. 275, 281 (Ct. Int'l Trade 1988). Verification always has been a sampling and spot check exercise and Commerce routinely relies on data that has not specifically been examined at verification.

In the case of remand proceedings, they would have Commerce conduct a mandatory verification every time the agency gathers additional information for the investigation record as part of the remand proceeding. Imposing a hard verification requirement any time data is gathered in a remand proceeding would usurp Commerce's discretion and wide latitude in determining which data to verify and how to conduct its remand proceedings. In short, Commerce reasonably exercised its discretion in electing not to conduct a separate verification procedure as part of the remand proceeding. Further, Appellants did not request that Commerce conduct a verification and any argument that Commerce needed to have conducted a verification is therefore properly considered waived on appeal.

### B. Commerce's Use of Indonesian Import Data to Value Affiliated Party Purchases

In the underlying investigation Commerce determined that Indonesian Global Trade Atlas (GTA) import data was the best available information to use as a surrogate market price for its transactions disregarded adjustments. IDM at 16-18 (Appx10218-10220). In its first Remand Order, the Court found Commerce had insufficiently explained why its selection of Indonesia import data constituted a reasonable method to confirm that the prices Zinus paid to affiliated suppliers reflect arm's length transactions under 19 U.S.C. § 1677b(f)(2). *Zinus I* at 1284 (Appx10192). The Court also found that Commerce's interpretation of "market

under consideration," as used in 19 U.S.C. § 1677b(f)(2)), as only the market under investigation (*i.e.*, the Indonesian market) was "unreasonably narrow." *Id*.

In its First Remand Results, Commerce provided additional explanation for its decision to rely on Indonesia GTA import data and why its methodology was reasonable under the statute. First Remand Redetermination at 16-23 (Appx 10104-10111). Commerce's explanation was reasonable and supported by substantial evidence, and this Court should not disturb Commerce's decision.

As Commerce states, "the goal of the transactions disregarded analysis is to arrive at a market price which would be available to the respondent to the extent the record contains such information." First Remand Redetermination at 19 (Appx10107). The statute does not prescribe a specific methodology by which Commerce is to select the "information available" to use. 19 U.S.C. § 1677b(f)(2). As Commerce explained in its First Remand Redetermination, "Commerce's preference is to determine a market value based on the respondent's own purchases of the input from unaffiliated suppliers." First Remand Redetermination at 18 (Appx10106). When market prices are not available to test affiliated party transactions, Commerce looks to the affiliated supplier's sales of the input to unaffiliated parties, and, lacking that, to the cost of production ("COP") of the affiliated supplier. *Id*.

In this case, because these transactions were between Zinus Indonesia and non-market economy ("NME")-based affiliated suppliers, Commerce determined that it was unable to use the NME-based affiliated suppliers' sales or COP as a substitute for market price. *Id*. (citing IDM at 16-19 (Appx10218-10221)). Therefore, Commerce requested alternative market-based price information that would allow it to conduct an arm's-length analysis under the statute.

Commerce had available on the record Indonesian GTA data that reflect market economy imports of the relevant inputs into Indonesia which could reasonably be expected to be available to Zinus, and also had GTA import data for Brazil, Malaysia, Mexico, Romania, Russia, and Turkey. First Remand Redetermination at 17 (Appx10105); IDM at 16-18 (Appx10218-10220). Commerce explained in its First Remand Redetermination that "{i}t is clearly less reflective of the respondent's experience to use prices and/or costs in other countries which are not necessarily available to the respondent." First Remand Redetermination at 19 (Appx10107). In this case, Commerce reasoned that, "because actual market import prices into Indonesia are more likely to be available to our Indonesian respondent than market import prices into other countries, we continue to find it appropriate to use the market import data for the relevant inputs into Indonesia, rather than an average of Indonesia's import data with that of other countries." *Id*. at 20 (Appx10108).

Commerce's explanation is reasonable and in line with the purpose of the transactions disregarded test, which is to determine whether an affiliated input price is fair when compared to an unaffiliated input price in the market under consideration. Moreover, despite the fact that the materials at issue were sourced from a NME, Commerce's decision to utilize exclusively Indonesian import data implicitly recognizes the fundamental differences between a market economy country and a NME country such as the People's Republic of China. Specifically, the applicable law established a unique methodology for calculating normal value in a NME country, in which the foreign respondent company's actual costs for inputs sourced from non-market suppliers are valued, to the extent possible, from a single third (market economy) country. *See* 19 U.S.C. § 1677b(c)(4); 19 C.F.R. § 351.408(c)(2). That selected surrogate country, by statute, must be economically comparable to the NME at issue. Thus, there is no consideration for the actual geographical situation of the primary surrogate country, because there is no legal requirement that the company located in that NME be able to access the inputs in that primary surrogate country.

In this case, in contrast, Zinus operates in a market economy, and the calculation of normal value is not governed by the special statutory scheme with respect to NMEs. Indeed, with very limited exceptions – as relevant here, establishing market value for inputs sourced from affiliated suppliers – the statute

directs Commerce to rely on costs derived from the company's records, as long as those costs are maintained under the local country's accounting principles. Thus, rather than constructing a normal value on a theoretical basis independent from the geographical location of the surrogate country as is performed under the special NME methodology, Commerce is obliged to calculate a normal value that considers the company's actual geographical location. In this case, the company is located in Indonesia, a market economy. Therefore, the most reasonable surrogate cost for the materials at issue becomes the relative availability of those materials to that company.

In its First Remand Redetermination, Commerce recognized that although it has a preference to use the data available to the respondent in the country in which its production is located, there are circumstances under which such data may not be available or may be flawed and cannot be used. First Remand Redetermination at 19 and 22-23 (Appx10107; Appx10110-10111). That is, Commerce recognized the flexibility permitted by the statute. However, in this case, given the available information and the absence of any flaws or distortions in the Indonesian GTA data, Commerce correctly chose to rely on the import prices that are more likely to be available to the respondent in the country in which its production is located rather than prices available in other, unrelated countries (or an average of all available prices). *See* IDM at 18-19 (Appx10220-10221).

This all goes to show that Commerce's decision on remand was reasonable and based on the best information available. Appellants, however, argue that the statute, 19 U.S.C. § 1677b(f)(2), imposes a strict limit on the analysis such that Commerce must focus on the specifics of the "transaction" at issue and attempt to recreate that specific transaction based on the location of the affiliated company. Appellant's Br. at 28-30. There are multiple flaws with their constrained reading of the statute. *First*, Appellants *do not actually argue that Commerce should use any data from China*. On the one hand, they argue that Commerce was obligated to use data from the locus of the affiliate; however, because the affiliates are located in China they argue for a mixed bag of third country surrogate data. Their preferred result alone undermines their entire theory because they do not actually argue that Commerce should use data as though Zinus sourced from unaffiliated companies in China. Rather, they argue that (1) the statute requires Commerce to use data from China, but (2) China is unusable, therefore (3) Commerce should instead use import data for shipments into Brazil, Malaysia, Mexico, Romania, Russia, and Turkey instead.

*Second*, while they argue that the statute's use of the phrase "transaction" ties Commerce to the country where the affiliate is located, this line of reasoning ignores the fact that the "transactions" are ultimately set for importation into Indonesia. That is, while Zinus purchases inputs from affiliates in China, those

inputs are subsequently imported into Indonesia. Thus, even if Commerce is tied to the geography of the transaction, Commerce's use of data pertaining to *imports into Indonesia* is a reasonable application of the statute as tied to the transactions at issue here: material inputs for importation into Indonesia.

*Third*, Appellants' citation to a few Commerce decisions does not establish that Commerce has a firm and fixed practice regarding treatment of affiliated party purchases where the affiliated party is located in China. The case most directly on point that Appellants cite is *Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1358 (Ct. Int'l Trade 2023) ("*Best Mattresses I*"). However, that case dealt with two distinct questions: (1) Commerce's application of the Major Input Rule (19 U.S.C. § 1677b(f)(3)) and (2) Commerce's separate application of the Transactions Disregarded Rule (19 U.S.C. § 1677b(f)(2)). Appellants only cite the discussion of the Major Input Rule, a section of the statute that does not apply in this case.

With respect to the Major Input Rule, the CIT upheld Commerce's use of import data for imports into a range of countries as a surrogate for the Chinese affiliate's cost of production. *Best Mattresses I*, at 1370-81. With respect to the Transactions Disregarded Rule, the procedural posture and case history is basically the same as the case at hand. That is, in the investigation at issue in the *Best Mattresses* case, Commerce used data from Cambodia (the country under

investigation) and the CIT remanded to the agency for additional explanation as to why Cambodian data constituted the best information available. *Best Mattresses I*, at 1381-86. On remand, Commerce offered additional explanation, and the CIT sustained Commerce's use of Cambodian import data (just as the CIT sustained the use of Indonesian import data here). *See Best Mattresses International Co. v. United States*, 703 F. Supp. 3d 1382 (Ct. Int'l Trade 2024) ("*Best Mattresses II*").

There are two key points to highlight from the CIT's analysis in the *Best Mattresses* litigation. First, Appellants' reference to the Major Input Rule analysis at pages 32-33 of their brief is entirely inapposite. The Major Input Rule instructs Commerce to assess the affiliate's *cost of production*. That necessarily pertains to the country where the *production* takes place. Moreover, the data the agency looks to is completely different in a COP as compared to input purchase scenario. The COP analysis consists of values for the inputs the affiliate purchases to produce the product it sells to the respondent, as well as the affiliate's labor, overhead, general expenses, and profits. All of those datapoints must relate to the country of production, unlike affiliated party purchases, which can relate to products produced in one country but sold or imported into another. Although the two sections of the statute both assess affiliated party valuations, their structure and the question the two sections seek to answer are entirely different.

Second, the *Best Mattresses* litigation addressing the Transactions Disregarded Rule establishes that Commerce has no fixed methodology (despite Appellants' claims that Commerce rigidly looks to the country of the affiliated seller). There, the CIT recognized that Commerce does not have a "unified interpretation" in terms of using the country of the supplier or the respondent. *Best Mattresses I*, at 1383. The CIT went on to point to other CIT decisions indicating that Commerce in certain circumstances may need to resort to any "reasonable method" in evaluating whether affiliated party transactions reflect arm's length values. *Best Mattresses I,* at 1383 (citing *Rebar Trade Action Coal. v. United States*, 398 F. Supp. 3d 1359, 1372 (Ct. Int'l Trade 2019). Commerce's and the CIT's reasoning in *Best Mattresses* and the instant case is entirely reasonable, as the agency used the best information available, consistent with the statute. The Court should accordingly uphold Commerce's determination.

## III. CONCLUSION

The CIT correctly upheld Commerce's Second Remand Determination and we respectfully request that the Federal Circuit affirm the CIT's decision.

Respectfully submitted,

/s/ J. David Park
J. David Park
Henry D. Almond
Kang Woo Lee

*Counsel to PT Zinus Global Indonesia*
*Plaintiff-Appellee*

ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202)942-5646
Fax: (202) 942-5999
E-mail: david.park@apks.com

**Dated: October 3, 2025**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF CONFIDENTIAL MATERIAL</u>

**Case Number:** <u>2025-1674</u>

**Short Case Caption:** <u>PT. Zinus Global Indonesia v. US</u>

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains <u>4</u> number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: <u>10/03/2025</u>

Signature: <u>/s/ Henry D. Almond</u>

Name: <u>Henry D. Almond</u>

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2025-1674

**Short Case Caption:**  PT. Zinus Global Indonesia v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  5,895  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 10/03/2025

Signature:  /s/ Henry D. Almond

Name:  Henry D. Almond

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF SERVICE

**Case Number**   2025-1674

**Short Case Caption**   PT. Zinus Global Indonesia v. US

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system.  See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).  Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on  10/03/2025

by  ☐ U.S. Mail    ☐ Hand Delivery    ☑ Email    ☐ Facsimile
    ☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Yohai Baisburd and Nicole Brunda of Cassidy Levy Kent (USA) LLP | Public version served via email and court's electronic filing system. confidential version served via email and secure file transfer site. |
| Blake Cowman (DOJ) | Public version served via email and court's electronic filing system. confidential version served via email and secure file transfer site |
|  |  |
|  |  |
|  |  |

☐   Additional pages attached.

Date:  10/03/2025

Signature:  /s/ Henry D. Almond

Name:   Henry D. Almond