# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————

PT. ZINUS GLOBAL INDONESIA,

*Plaintiff-Appellee,*

BROOKLYN BEDDING, LLC, CORSICANA MATTRESS CO., ELITE
COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT
ENTERPRISES, INC., LEGGETT & PLATT, INC., INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, UNITED STEEL, PAPER AND
FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL
AND SERVICE WORKERS INTERNATIONAL UNION, AFLCIO,

*Plaintiffs-Appellants,*

v.

UNITED STATES,

*Defendant-Appellee.*

———————————

On Appeal from the United States Court of International Trade in case nos. 1:21-cv-
00277 and 1:21-cv-00284, Judge Jennifer Choe-Groves.

———————————

## DEFENDANT-APPELLEE'S NON-CONFIDENTIAL RESPONSE BRIEF

———————————

BRETT A. SHUMATE
  *Principal Deputy Assistant Attorney General*

PATRICIA M. McCARTHY
  *Director*

*Of Counsel:*

CLAUDIA BURKE
BLAKE W. COWMAN

SHANNI ALON
  *Attorney, Office of the Chief Counsel for*
  *Trade Enforcement and Compliance*
  *Office of the General Counsel*
  *U.S. Department of Commerce*

  *Attorneys, Commercial Litigation Branch*
  *Civil Division, U.S. Department of Justice*
  *P.O. Box 480, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 353-2494*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF THE ISSUE ....................................................................1

STATEMENT OF THE CASE .....................................................................2

I. Statutory Background.......................................................................2

    A. General Framework for Antidumping Duty Proceedings........................2

    B. Constructed Export Price....................................................3

    C. Normal Value: Transactions Disregarded Rule ........................3

II. Factual Background and Prior Proceedings ...........................................5

    A. Initiation of Investigation................................................5

    B. Final Determination.......................................................5

    C. First CIT Decision.........................................................7

    D. First Remand Redetermination ..........................................8

    E. Second CIT Decision.....................................................11

    F. Second Remand Redetermination........................................12

    G. Final CIT Decision.......................................................14

SUMMARY OF ARGUMENT .....................................................................15

ARGUMENT ..........................................................................................17

I. Standard of Review.......................................................................17

II. Commerce's Inclusion of Inventory Data in its Quarterly Ratio
Calculations Was Supported by Substantial Evidence...........................18

    A.     Commerce Explained that the Exclusion of In-Transit Mattresses was Based on Aggregate Totals.................................................................18

    B.     Commerce Explained that the Inclusion of Inventory Data Generates the Most Plausible Estimates of Normal Value......................21

    C.     Brooklyn Bedding Forfeited the Argument that Commerce Failed to Verify Zinus's Inventory Data by Not Raising it Before Commerce.....................................................................................................26

III.    Commerce's Use of Indonesian GTA Data in Applying the Transactions Disregarded Rule Was Supported by Substantial Evidence................................28

    A.     Commerce Explained that Indonesian GTA Data Best Reflected the Prices Available to the Respondent.........................................................28

    B.     Commerce's Approach Was Consistent With its Past Practice..............29

CONCLUSION...............................................................................................................32

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
   802 F.3d 1339 (Fed. Cir. 2015) .................................................................................. 18

*Al Ghurair Iron & Steel LLC v. United States,*
   65 F.4th 1351 (Fed. Cir. 2023) .................................................................................. 26

*Best Mattresses Int'l Co. Ltd. v. United States,*
   622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ......................................................... 4, 30

*Dorbest Ltd. v. United States,*
   604 F.3d 1363 (Fed. Cir. 2010) .................................................................................. 26

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) .................................................................................... 17

*Guizhou Tyre Co., Ltd. v. United States,*
   641 F. Supp. 3d 1386 (Ct. Int'l Trade 2023) .............................................................. 27

*Micron Tech. v. United States,*
   117 F.3d 1386 (Fed. Cir. 1997) ....................................................................... 27, 28, 29

*Mittal Steel Point Lisas Ltd. v. United States,*
   548 F.3d 1375 (Fed. Cir. 2008) .................................................................................. 26

*Nippon Steel Corp. v. United States,*
   337 F.3d 1373 (Fed. Cir. 2003) .................................................................................. 17

*NTN Bearing Corp. v. United States,*
   74 F.3d 1204 (Fed. Cir. 1995) .................................................................................... 21

*PT. Zinus Glob. Indon. v. United States,*
   628 F. Supp. 3d 1252, (Ct. Int'l Trade 2023) ..................................................... 7, 8, 11

*PT. Zinus Glob. Indon. v. United States,*
   686 F. Supp. 3d 1349 (Ct. Int'l Trade 2024) .......................................................... 11, 31

*PT. Zinus Glob. Indon. v. United States,*
   762 F. Supp. 3d 1257 (Ct. Int'l Trade 2025) ..................................................... 14, 21, 25

*Rebar Trade Action Coal. v. United States,*
  337 F. Supp. 3d 1251 (Ct. Int'l Trade 2018)......................................................4

*Rebar Trade Action Coal. v. United States,*
  398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ...................................................5

*Timken Co. v. United States,*
  59 F. Supp. 2d 1371 (Ct. Int'l Trade 1999) .............................................21, 22

*Union Steel v. United States,*
  713 F.3d 1101 (Fed. Cir. 2013).............................................. 17, 18, 19, 20

*United States v. L.A. Tucker Truck Lines,*
  344 U.S. 33 (1952) ......................................................................................26

## Statutes

19 U.S.C. § 1673..............................................................................................2

19 U.S.C. § 1673d(a)(1) ...................................................................................3

19 U.S.C. § 1677b(a) ........................................................................................3

19 U.S.C. § 1677b(f)(2) ...........................................................................passim

19 U.S.C. § 1677b(f)(3) ............................................................................30, 31

28 U.S.C. § 1581(c) ...........................................................................................1

28 U.S.C. §§ 1295(a)(5) .....................................................................................1

U.S.C. § 1677b(f)(2) ..........................................................................................8

U.S.C. § 1677m(d).............................................................................................11

## Regulations

19 C.F.R. § 351.207...........................................................................................3

19 C.F.R. § 351.401(b) .......................................................................................3

19 C.F.R. § 351.401(g) .....................................................................................24

19 C.F.R. §§ 351.205(a).......................................................................................3

**Administrative Determinations**

*Bottom Mount Refrigerators from Mexico,* 77 Fed. Reg. 17,422 (March 26, 2014) .............. 29

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations,* 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) ......................... 5

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court. The Government is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

## STATEMENT OF JURISDICTION

The United States Court of International Trade (CIT or trial court) possessed jurisdiction pursuant to 28 U.S.C. § 1581(c). The CIT entered final judgment on February 18, 2025, and plaintiff-appellants Brooklyn Bedding, LLC et al. (Brooklyn Bedding) filed their notice of appeal on April 17, 2025. Therefore, this appeal is timely, as it was filed within 60 days of the CIT's final judgment. *See* 28 U.S.C. §§ 1295(a)(5); 2107(b).

## STATEMENT OF THE ISSUE

This appeal arrives in this Court after three remands to Commerce from the CIT. Brooklyn Bedding is an American mattress producer that challenges two of Commerce's post-remand determinations upheld by the CIT in a case about Indonesian mattress imports made by plaintiff-appellee, PT Zinus Global Indonesia (Zinus). The issues in this case are:

1. Whether Commerce's decision to remove Zinus's in-transit mattresses and include Zinus's inventory data in its quarterly ratio calculations was supported by substantial evidence, where Zinus's inventory data showed that no in-transit mattresses entered Zinus's inventory during the relevant period.

2. Whether Commerce's decision to use Indonesian Global Trade Atlas (GTA) data in applying the transactions disregarded rule was supported by substantial evidence, where Commerce determined such data best reflected the prices available to the respondent.

## STATEMENT OF THE CASE

### I.   Statutory Background

####   A.   General Framework for Antidumping Duty Proceedings

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices. If Commerce "determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," it will impose an antidumping duty on the merchandise in the amount that "the normal value exceeds the export price." 19 U.S.C. § 1673. Thus, in an antidumping proceeding, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (the price of the goods sold in the United States) and the "normal value" of the merchandise. *See* 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C), 1677b(a).

To ensure that the normal value is an appropriate benchmark against which to measure whether sales in the United States are being dumped, Commerce tests the normal value sales to determine if they are made below cost. *Id.* § 1677b(b). Commerce calculates a respondent-specific per unit cost of production of the merchandise and compares it to the normal value sales to ensure they are made above cost. Below cost sales are "disregarded in the determination of normal value." *Id.* § 1677b(b)(1). Using the normal value sales that are made above cost, if Commerce finds that a foreign producer or importer is selling its goods for less than these normal value sales, it makes an affirmative determination of dumping. The United States

International Trade Commission (ITC), in turn, determines whether such dumping has "materially injured" or threatened material injury to a United States industry. *Id.* § 1673d(b)(1).

If Commerce makes a final determination that "the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value," and if the ITC makes a final determination that a United States industry has suffered injury or is threatened with material injury, Commerce issues an antidumping duty order. *See* 19 U.S.C. § 1673d(a)(1), (b)(1), (c)(2); *see also* 19 C.F.R. § 351.207; 19 C.F.R. §§ 351.205(a), 351.210(a). Such an order imposes a duty in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price).

## B. Constructed Export Price

As discussed above, in assessing a respondent's dumping margin, Commerce compares "the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a). The statute defines constructed export price sales as "the price at which the subject merchandise is first sold (or agreed to be sold) before or after the date of importation . . . to" an unaffiliated purchaser in the United States. *Id.* § 1677a(b).

## C. Normal Value: Transactions Disregarded Rule

In the calculation of normal value, Commerce may revise prices between affiliates using the transactions disregarded and major input rules, if it determines that the reported prices are below market value. *See* 19 U.S.C. § 1677b(f)(2)–(3); 19 C.F.R.

§ 351.401(b). Under the transactions disregarded rule, Commerce may disregard transactions between persons found to be affiliated for purposes of calculating costs of production "if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2). "The phrase 'market under consideration,' therefore, is purposefully broad to ensure that, whatever the choice, Commerce may select a market that allows for a reasonable source for market value, to confirm that the affiliated prices reflect arm's length transactions." *Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1384 (Ct. Int'l Trade 2023) (citations and quotation marks omitted).

In applying the rule, Commerce's practice is to adjust the transfer price (*i.e.* the price paid to the affiliated supplier) for the service or input at issue so that it reflects the market price. *See, e.g.,* R*ebar Trade Action Coal. v. United States, 337 F. Supp. 3d 1*251, 1259 (Ct. Int'l Trade 2018) (citing administrative decisions interpreting the transactions disregarded rule). An underlying assumption built into this provision and the antidumping duty calculation, in general, is that values must be based on market prices and prices from non-market economy countries cannot be used because they are not priced by the forces of supply and demand. *See id.* Commerce has established preferences for how to establish market value: "First, it looks at whether respondent purchased the input from an unaffiliated supplier; if unavailable, it looks to sales of

the input between an affiliate supplier and an unaffiliated party, and as a final resort, to a reasonable source for market value available on the record." *Rebar Trade Action Coal. v. United States*, 398 F. Supp. 3d 1359, 1372 (Ct. Int'l Trade 2019).

## II.    Factual Background and Prior Proceedings

### A.    Initiation of Investigation

In April 2020, Commerce initiated the less than fair value investigation of mattresses from Indonesia. *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020); Appx10682.  Commerce selected Zinus Indonesia as the single mandatory respondent.  Appx10705.

In Commerce's initial questionnaire, it instructed Zinus Indonesia to report, among other things, its ownership, corporate structure, affiliates, sales process, and the quantity and value of its U.S. sales.  Appx10712.  The questionnaire specifically identified which U.S. sales are relevant for the dumping calculation, explaining that the U.S. price to be reported was the "price at which the subject merchandise is first sold to a person not affiliated with the foreign producer or exporter."  Appx10840.

### B.    Final Determination

In the final determination, Commerce made two determinations relevant to this appeal.

First, Commerce determined that Zinus was unable to identify the country of

origin of its imported mattresses once those mattresses entered its United States warehouse. Appx10210-11. For this reason, Zinus could not identify the country of origin of its mattress sales, for purposes of reporting sales of subject merchandise (*i.e.* mattresses from Indonesia) back to Commerce. *Id.* To estimate Zinus's sales of mattresses from Indonesia, Commerce applied a quarterly ratio sales methodology to determine the quantity of Zinus's U.S. sales in calculating its constructed export price. Appx10206. These calculations identified the ratio of Zinus's US warehouses' purchases from Indonesia in a given quarter, and allocated that ratio to Zinus's final sales to estimate the number of Indonesian mattresses sold. In its quarterly ratio calculations, Commerce included both Zinus's purchase data and the number of mattresses that were in-transit to Zinus's warehouse but had not yet entered the United States at the conclusion of the investigation. *Id.*

Second, Commerce found that Zinus obtained ten types of minor inputs from non-market economy based affiliated suppliers. Appx10218. Commerce determined that the record showed that Zinus did not purchase many of the minor inputs from unaffiliated suppliers, leaving Commerce without a market price against which to test the affiliated party purchases for these items. Appx10219. Commerce further determined that, although Commerce will often solicit the affiliated supplier's cost of production for use as a surrogate market price in applying the transactions disregarded rule, it could not do so here because the affiliate was based in a non-market economy, causing the affiliate's costs to not reflect market costs. *Id.* Commerce therefore

requested and obtained two sources of GTA data from potential surrogate countries to determine the market price: a basket of potentially similar countries to the non-market economy country (Brazil, Malaysia, Mexico, Romania, Russia, and Turkey), and GTA import data for Indonesia, the market in which Zinus is located. *Id.*

At the preliminary determination stage, Commerce used the basket of countries' GTA import data for those inputs that Zinus did not purchase from an unaffiliated supplier. Appx10219-20. However, in the final determination, Commerce instead calculated the market price using the Indonesian GTA data. Appx10220. Commerce explained that "the statute {19 U.S.C. § 1677b(f)(2)} directs Commerce to look to the market under consideration when testing the affiliated supplier transfer price against a market price." *Id.*

Commerce calculated Zinus's antidumping duty margin rate at 2.22 percent. Appx10201.

## C.    First CIT Decision

On appeal to the CIT, Zinus challenged both Commerce's decision to apply a quarterly ratios methodology, as well as Commerce's decision to include in-transit mattresses in those quarterly ratio calculations as being unsupported by substantial evidence. *PT. Zinus Glob. Indon. v. United States*, 628 F. Supp. 3d 1252, 1261-63, (Ct. Int'l Trade 2023) (*Zinus I*). For their part, Brooklyn Bedding challenged Commerce's decision to use Indonesian GTA data in its transactions disregarded analysis as being contrary to the requirements of 19 U.S.C. § 1677b(f)(2). *Id.* at 1283.

On March 20, 2023, the CIT issued the first decision in this matter. The court sustained Commerce's use of quarterly ratio calculations as reasonable. *Id.* at 1265. However, the court remanded to Commerce for further consideration of its determination to include in-transit mattresses in its calculation of constructed export price, concluding that "Commerce failed to provide sufficient explanation or citations to record evidence to support its inclusion of in-transit pre-importation goods sold in this case." *Id.*

The court also remanded to Commerce to reconsider its application of the transactions disregarded rule, concluding "that Commerce's interpretation of 'market under consideration' as only the market under investigation {was} unreasonably narrow and not in accordance with the law." *Id.* at 1284. The court's decision did not preclude Zinus from relying on Indonesian GTA, but rather instructed Commerce "to provide further explanation or to reconsider whether Commerce's selection of Indonesia constituted a reasonable method to confirm that the affiliated prices reflect arm's length transactions under 19 U.S.C. § 1677b(f)(2)." *Id.* at 1285.

### D.     First Remand Redetermination

On remand, Commerce again determined to include in-transit mattresses in its quarterly ratio calculations because the "record facts demonstrate that Zinus U.S. actually sold more mattresses of the type that are subject merchandise than they had in inventory during the {period of investigation (POI)}. This means that Zinus U.S. must have been treating the in-transit mattresses at issue as 'in inventory,' and

available for sale." Appx10091. Commerce also explained that this approach would be consistent with its treatment of other types of constructed export price sales. Appx10092. Although Zinus argued before Commerce that Commerce's constructed export price calculations were wrong because they did not include the total mattresses in inventory, Commerce concluded that "Zinus has cited no record data to show that there was inventory of relevant mattresses that were not accounted for by Commerce's calculation." Appx10096.

Commerce also again chose to use Indonesian data, rather than the basket of third-country data, in its transactions disregarded analysis. Commerce acknowledged that the statutory provision did not always require the use of Indonesian data as the country under investigation. Appx10104-06. Commerce explained that, while there is a "preference" for prices available to the respondent in the respondent's market, the availability of record data may require Commerce to use other sources. *Id.* Commerce also pointed to its established hierarchy in applying the transactions disregarded rule demonstrating that data from other markets may be used. *Id.*

Commerce, first, seeks to compare the input prices the respondent paid to the affiliated party with prices the respondent paid to unaffiliated parties. *Id.* In the absence of prices paid to unaffiliated input sellers, Commerce then will normally compare the price charged by the affiliated input producer to other unaffiliated customers of the affiliated input supplier. *Id.* In the absence of affiliated supplier prices to other unaffiliated customers, Commerce normally uses the cost of

production for the affiliated supplier or other information available.  *Id.*

Commerce also explained that it will not use the cost of production for the affiliated supplier if it is located in a non-market economy country and, thus, its prices are not market-based.  *Id.*  And the statute provides that, in the absence of any of the above information on the record, "the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated."  19 U.S.C. § 1677b(f)(2).  As demonstrated by Commerce's longstanding practice, the phrase "market under consideration" in the transactions disregarded provision does not limit Commerce to only use the market in which the respondent is located.  Appx10107, 10110.  Rather, while there is a preference for data available to the respondent in the country where production is located, such data may be flawed or unavailable, and thus Commerce may use other data depending on what information is available on the record of the specific segment of the proceeding.  *Id.*

In selecting the Indonesian GTA data, Commerce explained that the "Indonesian GTA data { } reflect the market economy imports of the relevant inputs into Indonesia which could reasonably be expected to be available to the respondent." Appx10107.  Commerce went on to find that the GTA data on imports into countries other than Indonesia "would not necessarily be available to {the} Indonesian respondent."  Appx10108.  Thus, Commerce continued to determine "to use the market import data for the relevant inputs into Indonesia, rather than an average of

Indonesia's import data with that of other countries." *Id.*

E. **Second CIT Decision**

Zinus again challenged Commerce's decision to use in-transit mattresses in its constructed export price calculations on appeal at the CIT. *PT. Zinus Glob. Indon. v. United States*, 686 F. Supp. 3d 1349, 1354 (Ct. Int'l Trade 2024) (*Zinus II*). Specifically, Zinus alleged that Commerce erroneously failed to request missing data regarding its U.S. inventory, and that Commerce's use of in-transit mattresses to fill the gap was an improper application of adverse facts available. *Id.* The court agreed, holding that "Commerce's determination to use in transit mattress information as facts otherwise available is neither in accordance with law nor supported by substantial evidence," and suggested that Commerce "consider reopening the record to address the missing sales data, inventory, and in transit mattress issues as Commerce fulfills its obligations under 19 U.S.C. § 1677m(d)." *Id.* at 1255-56.

Likewise, Brooklyn Bedding again challenged Commerce's decision to use Indonesian GTA data in its transactions disregarded analysis. *Id.* at 1358. It contended that Commerce has an established practice of calculating market price that reflects the respondent's experience in the market under consideration. *Id.*

The CIT rejected Brooklyn Bedding's arguments, concluding that Commerce followed its past practice of "look{ing} to a reasonable source of market value on the record" because "{t}he phrase 'market under consideration' is purposefully broad to allow Commerce to choose a market that allows for a reasonable source for market

value to confirm that the affiliated prices reflect arm's length transactions." *Id.* Therefore, because Commerce explained that "adoption of the Indonesian GTA data allowed for the calculation of a market rate that Zinus Indonesia would have experienced but for its affiliation to its suppliers," a reasonable market price as available in the record and Commerce was not required "to consider other available options, such as the average of other country GTA data." *Id.* The court therefore sustained Commerce's application of the transactions disregarded rule.

### F. Second Remand Redetermination

As relevant to this appeal, one final issue remained during the second remand: what data Commerce should consider in its calculation of constructed export price via quarterly allocation ratios.

Pursuant to the CIT's instructions, Commerce collected and incorporated the opening inventory of relevant mattresses at Zinus U.S. warehouses at the beginning of the POI in its calculation for estimating the number of Indonesian mattresses available for sale during the POI based on opening inventory and POI purchases. Appx10047. Commerce determined that, when the opening inventory balances were included in the calculation, there were sufficient mattresses in Zinus's U.S. warehouses to cover its Indonesian sales. *Id.* Commerce also determined that Zinus's "accounting records clearly demonstrate that the in-transit quantity of Indonesian mattress model numbers . . . did not enter Zinus U.S.'{s} inventory during the POI." Appx1047-48.

Commerce concluded that "{c}onsequently, if the . . . in-transit mattress quantity of Indonesia-origin mattresses did not enter Zinus U.S.' inventory during the POI, and the sum of Zinus U.S.' beginning inventory quantity and purchased quantity of mattresses entering its inventory during the POI is greater than its inventory sales of Indonesia mattress model numbers during the POI, then there is no longer a basis to include the in-transit quantity in the quarterly ratio calculation." Appx10048.

In the draft second remand redetermination, Commerce proposed "that removing the in-transit quantity from the quarterly ratio calculation and basing the calculation on just the Indonesian model number purchase data would theoretically provide a more accurate result." Appx10049. However, after considering the comments from the parties, Commerce ultimately revised the quarterly ratio calculations "to include not just the purchase data but also the existing inventory data for Indonesian model numbers in common with other countries." Appx10049.

In support of this change, Commerce determined that inclusion of Zinus's inventory data created the most plausible estimate once the quarterly allocation ratio was applied:

> {A}pplying quarterly ratios calculated using only the Indonesian mattress models purchased during the POI and applying those ratios to the total sales reported in both U.S. sales databases yields an <u>impossible</u> result – a total sales quantity of Indonesian mattresses . . . that is . . . greater than the . . . Indonesian-sourced mattresses that Zinus US purchased from Zinus Korea and which Zinus US had available for sale from its inventory during the POI. On the other hand, applying quarterly ratios that are based on both the purchase and existing inventory data of Indonesia model numbers to the total sales reported in both U.S. sales databases

yields <u>possible</u> results—a total sales quantity that is less than the quantity of Indonesian-sourced mattresses that Zinus US had in its inventory and available for sale during the POI.

Appx10049 (emphasis in original). Commerce concluded that the "quarterly ratios using both purchase and existing inventory data . . . yields more plausible results." Appx10053.

Based on the changes made in the two remands, Commerce revised its average dumping margin to 0.00 percent. Appx10064.

## G. Final CIT Decision

Brooklyn Bedding appealed Commerce's decision to exclude in-transit mattresses in its quarterly ratio calculations and its decision to incorporate Zinus's inventory data into the quarterly ratio calculations to the CIT. *PT. Zinus Glob. Indon. v. United States*, 762 F. Supp. 3d 1257, 1266 (Ct. Int'l Trade 2025) (*Zinus III*). Brooklyn Bedding argued that examples of "individual mattress model numbers for which the quantity of sales from Zinus U.S.' inventory during the period of investigation exceeded the quantity of mattresses in inventory" meant that Commerce's determination that Zinus had sufficient inventory to account for its sales of subject mattresses was not supported by substantial evidence. *Id.*

The CIT sustained both Commerce's quarterly ratio methodology and its exclusion of in-transit mattresses. *Id.* The court concluded that Commerce "based its choice of methodology on record evidence and provided a reasonable explanation for any minor discrepancies." *Id.* at 1267.

# SUMMARY OF ARGUMENT

Brooklyn Bedding challenges two of Commerce's post-remand determinations: (1) Commerce's decision to exclude Zinus's in-transit mattresses from its quarterly ratio calculations and include Zinus's inventory data, obtained during the remand pursuant to the CIT's order; and (2) Commerce's use of Indonesian GTA data in applying the transactions disregarded rule. However, rather than showing that either determination was unsupported by substantial evidence, Brooklyn Bedding's arguments amount to mere disagreement with Commerce's decisions, falling far short of the required showing.

*First*, Commerce's quarterly ratio calculations were supported by substantial evidence.

Commerce included Zinus's in-transit mattresses during the first remand because Zinus's total aggregate mattress sales were greater than the number of mattresses Zinus had in its inventory, and because Zinus's records did not show any inventory unaccounted for in Commerce's calculation. However, after the second remand, Commerce obtained new inventory data from Zinus that definitively showed Zinus had a greater total number of mattresses in its inventory than its number of mattresses sold during the POI. The data also showed that none of the in-transit mattresses entered Zinus's inventory during the POI. Therefore, Commerce reasonably determined that in-transit mattresses should not be included in the quarterly ratio calculations, because the reason they were included in the first place—

discrepancies in aggregate mattress totals—no longer existed.

Brooklyn Bedding challenges Commerce's decision to include the newly obtained inventory data from Zinus in the quarterly ratio calculations because, for a small number of individual mattress types, Zinus's sales exceeded the mattresses it had in inventory. However, this argument fails for several reasons. For one, Commerce fully explained the change—without including inventory data, the calculations yielded an impossible result, where the total sales of Indonesian mattresses was greater than the number of mattresses Zinus had in inventory. Further, Commerce acknowledged that its calculations resulted in discrepancies for some individual model numbers, but concluded this was acceptable because the discrepancies smoothed out in the aggregate. Brooklyn Bedding contends that this explanation is insufficient because there were discrepancies in the underlying inventory data before calculations were applied, but this is a distinction without a difference. Commerce was creating the best possible estimate using imperfect data, and acknowledged the discrepancies created by its approach. It makes no difference whether those discrepancies stemmed from the underlying data or the calculations—they were acknowledged in the final product, the quarterly ratio calculations. Finally, any error in Commerce's calculations was harmless, as the alleged anomalies were truly de minimis, constituting just 0.16 percent of the total mattresses. Whereas the alternative, including in-transit mattresses, would mean including a certain quantity of in-transit Indonesian mattress models that Zinus Korea sold to Zinus U.S. during the

POI that did not enter Zinus U.S.' inventory until after the period of investigation had concluded. The CIT correctly concluded that Commerce's decision was reasonable and supported by substantial evidence.

*Second*, Commerce explained that Indonesian GTA data reflected the market price available to the respondent, which was consistent with Commerce's established practice in its application of the transactions disregarded rule. Brooklyn Bedding's arguments to the contrary miss one crucial fact: The affiliated supplier in this case was located in China, a non-market economy, meaning that Commerce could not use the affiliate's costs of production because they were not based on market prices. Brooklyn Bedding's argument that Commerce should have instead used a basket of GTA data for countries similar to China similarly fails.

## ARGUMENT

## I.     Standard of Review

In reviewing the trial court's judgments, this Court "reappl{ies} the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). Accordingly, this Court will uphold Commerce's determination unless it is unsupported by substantial record evidence, or otherwise unlawful. *See Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Although this amounts to repeating the trial court's work, and precedent

set by the trial court is not binding, this Court has declared that it "will not ignore the informed opinion of the {trial court}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citation and quotation marks omitted).

## II. Commerce's Inclusion of Inventory Data in its Quarterly Ratio Calculations Was Supported by Substantial Evidence

### A. Commerce Explained that the Exclusion of In-Transit Mattresses was Based on Aggregate Totals

The trial court correctly held that Commerce's decision to remove in-transit mattresses from its quarterly ratio calculations of Zinus's constructed export price was supported by substantial evidence. As Commerce determined, the reason for including the in-transit mattress data in the first place—that Zinus's total aggregate mattress sales was greater than the number of mattresses that Zinus had in inventory—was obviated when Commerce obtained new information, specifically Zinus's inventory data. Appx10048.

Commerce fully explained its reasoning for excluding in-transit mattresses in the second remand redetermination and its departure from the first remand redetermination. In the first remand redetermination, Commerce chose to include the in-transit mattresses because the total number of sales of the subject mattress model numbers exceeded the total number of mattresses that Zinus purchased: "the quantity of mattresses with subject merchandise model numbers that Zinus purchased during the POI . . . is less than the quantity of subject merchandise mattresses Zinus sold from inventory during the POI," based on Zinus's data. Appx10094. Moreover,

Commerce found that "Zinus has cited no record data to show that there was inventory of relevant mattresses that were not accounted for by Commerce's calculation," Appx10096, and concluded "that the difference could only be accounted for by the mattresses in transit," Appx10094. Therefore, two concerns drove Commerce's initial decision to include in transit mattresses: (1) Zinus's own data showed more total mattresses sold than purchased; and (2) Zinus cited no inventory of mattresses that could account for the difference. *See* Appx10094-96.

However, after Commerce obtained Zinus's actual beginning inventory data during the second remand, these concerns dissipated. Commerce specifically concluded that "Zinus U.S. had a sufficient number of the Indonesia model numbers that were in common with other countries in its physical inventory to support the U.S. sales of such products reported as non-subject merchandise in its U.S. sales database." Appx10052. The record now included inventory data reflecting a total number of mattresses that was greater than Zinus's sales. *See id.* Therefore, Commerce concluded that "given that the beginning inventory and purchase data are now well documented on this record, these data must be incorporated in the quarterly ratio calculation." *Id.*

In addition, Commerce determined that Zinus's "accounting records clearly demonstrate that the in-transit quantity of Indonesian mattress model numbers . . . did not enter Zinus U.S.'{s} inventory during the POI." Appx1047-48. In other words, the information available on the record showed that the in-transit mattresses

could not have entered the inventory during the POI, and Commerce determined that "there is no longer a basis to include the in-transit quantity in the quarterly ratio calculation." Appx10048.

Brooklyn Bedding contends on appeal that this determination is not supported by substantial evidence because "Commerce only considered aggregate totals for all mattresses and failed to examine the data on a model specific basis." App. Br. at 15. In support of this argument, Brooklyn Bedding alleges that the inventory data provided by Zinus during the second remand establishes that, for specific model numbers, Zinus had fewer mattresses in inventory than its reported sales from that inventory. *Id.*

However, Commerce's focus on aggregate totals in deciding to exclude in-transit mattresses was reasonable and supported by substantial evidence because Commerce used aggregate totals in justifying its inclusion of in-transit mattresses in the original final determination and first remand. *See* Appx1094-96. It was therefore reasonable for commerce to similarly rely on aggregate totals in deciding to not include in-transit mattresses in the second remand redetermination. *See* Appx1047-48. Brooklyn Bedding does not identify anywhere on the record that Commerce relied on disparities in specific model numbers in justifying the inclusion of in-transit mattresses. For this reason, the discrepancies in Zinus's inventory data for specific mattress model numbers, discussed in great detail below, are not significant enough do not disturb Commerce's decision to exclude in-transit mattresses from the

quarterly ratio calculations. Therefore, independent of its inclusion of inventory data discussed below, Commerce's exclusion of Zinus's in-transit mattresses was supported by substantial evidence. *Zinus III*, 762 F. Supp. 3d at 1267.

## B. Commerce Explained that the Inclusion of Inventory Data Generates the Most Plausible Estimates of Normal Value

The trial court also correctly concluded that Commerce's decision to include Zinus's inventory data in its quarterly ratio calculations was supported by substantial evidence. *Id.*

In the draft second remand redetermination, Commerce calculated its quarterly ratio using only Indonesian model number purchase data. Appx25687. However, after receiving comments from the parties, Commerce changed its methodology to "include not just the purchase data but also the existing inventory data for Indonesian model numbers in common with other countries." Appx10049. Commerce may change its methodology between a preliminary and final determination, so long as it explains the change and its decision is supported by substantial evidence. *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("preliminary determinations are 'preliminary' precisely because they are subject to change."); *Timken Co. v. United States*, 59 F. Supp. 2d 1371, 1376 (Ct. Int'l Trade 1999).

Commerce explained the reasoning for this change: the draft calculation, which was "calculated using only the Indonesian mattress models purchased during the POI and applying those ratios to the total sales reported in both U.S. sales

databases yields an <u>impossible</u> result—a total sales quantity of Indonesian mattresses . . . that is . . . greater than the . . . Indonesian-sourced mattresses that Zinus US purchased from Zinus Korea and which Zinus US had available for sale from its inventory during the POI." *Id.* Put simply, the draft quarterly ratio calculations resulted in more mattresses sold than Zinus has for sale in its inventory. Commerce explained, however, that inclusion of the inventory data Zinus submitted during the remand fixes this problem: "applying quarterly ratios that are based on both the purchase and existing inventory data of Indonesia model numbers to the total sales reported in both U.S. sales databases yields <u>possible</u> results—a total sales quantity that is less than the quantity of Indonesian-sourced mattresses that Zinus US had in its inventory and available for sale during the POI." Appx10049-50 (emphasis in original).

Commerce further explained that this discontinuity in the draft, purchases-only methodology extended to individual model numbered mattresses, too. "{I}t is indisputable that applying the revised quarterly ratios (based on purchase data only results in an adjusted sales quantity for multiple Indonesia model numbers that is greater than the quantity Zinus U.S. had in inventory for those model numbers." Appx10053. As Commerce explained, "{t}he only way to avoid such results on both an aggregate and model-number-specific basis is to further revise the quarterly ratio calculations to also include Zinus U.S.'s existing inventory data." *Id.*

Commerce recognized that this estimation was not perfect, but it was the most

plausible result possible given the information in the record:

> although this approach results in sold quantities being greater than purchased quantities for some models, these seemingly incongruous results are smoothed out when cumulated, such that the aggregate adjusted sales quantity for all Indonesia mattress sales is less than the total purchase quantity of these mattress model numbers from Indonesia. Therefore, unlike a quarterly ratio calculation based on purchase data only, a quarterly ratio calculation based on both purchase and inventory data applied to Zinus U.S.' CEP sales transactions results in a sales quantity assigned to Indonesia that is less than its total purchase quantity on an aggregate level, which is a more plausible result than we reached in the draft remand results.

Appx10054.

Therefore, taken together, Commerce advanced three reasons for its methodological change in its final second remand redetermination: (1) the in-transit mattress information could no longer be used, as the newly obtained data from Zinus demonstrated that the in-transit mattresses did not enter Zinus's inventory during the POI; (2) using purchase data only in the quarterly ratio calculations resulted in more mattresses sold than available, both in aggregate and for individual model numbers; and (3) including inventory data in the quarterly ratio calculations produced the most plausible results—enough inventory to cover aggregate sales, with greater sold quantities than inventory for some models that are smoothed out when cumulated. Commerce's explanation demonstrates that its decision to include inventory data in the quarterly ratio calculations was supported by substantial evidence because it produces the most plausible result—and therefore the most accurate antidumping calculations.

Brooklyn Bedding contends that Commerce did not provide a reasonable explanation because it did not address the fact that, in Zinus's underlying inventory data, there was an insufficient quantity of mattresses for individual model numbers to account for the sales of [number] total model numbers. App. Br. at 24-27. This argument is incorrect for three reasons.

First, in the second remand redetermination, Commerce chose the best allocation methodology to create the most accurate constructed export price; it was not required to directly evaluate the underlying data submitted by Zinus. *See* 19 C.F.R. § 351.401(g) ("The Secretary may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided the Secretary is satisfied that the *allocation method* used does not cause inaccuracies or distortions." (emphasis added)). Therefore, Commerce's analysis rightly focused on the accuracy of the end-result—the calculation—rather than the underlying data. Commerce is limited to using the data on the record. Where, as here, Commerce is working with imperfect data sets, as discussed above, it was reasonable for Commerce to focus on the outputs of its estimation, as opposed to combing the underlying data for possible inconsistencies.

Second, as the trial court concluded, Commerce *did* address the fact that the inventory data results in sold quantities being greater than inventory for certain model numbers, albeit in the context of the model output. *See* Appx10054. Brooklyn Bedding contends that this explanation is insufficient because it "went to the results

of the <u>application</u> of the quarterly ratios, not the input data used in the <u>calculation</u> of those ratios." App. Br. at 21 (emphasis in original). But this is a distinction without a difference. Commerce was choosing the best combination of data to include in its inventory calculations, and it recognized that, when including inventory data, some sold quantities were greater than purchase quantities. Regardless of whether that issue stemmed from the underlying data or calculations themselves, Commerce determined inclusion of the inventory data was the most "plausible" estimate. Appx10053. This is a reasoned explanation supported by substantial evidence.

Third, as the trial court concluded, the anomalies in the inventory data constituted just 0.16 percent of the hundreds of thousands of mattresses sold from Zinus's inventory during the POI, and none of the anomalous mattress models were among those in-transit at the end of the POI. *See* Appx10022-23. As the trial court held, "{c}onsidering the relatively minor scale of the discrepancies and the fact that the anomalies were balanced out when mattress sales were considered in the aggregate . . . Commerce's methodology is reasonable under the circumstances of this case and would result in only very minor distortions of less than one percent (0.16 percent of hundreds of thousands of mattresses) in the calculation of constructed export price." *Zinus III*, 762 F. Supp. 3d at 1267. Such distortions are even less impactful in the context of a quarterly ratio calculation, which is an estimate where Commerce tried to identify the most "plausible" result, not a perfect result. Appx10053.

Brooklyn Bedding decries this as a post hoc rationalization. *See* App. Br. at 20.

But this information shows that any failure by Commerce to address such minor deviations would be, at most, harmless error, as a remand to Commerce could not result in in-transit mattresses being included in the calculation. *See Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023) (applying harmless error analysis where error did not impact Commerce's overall determination).

### C. Brooklyn Bedding Forfeited the Argument that Commerce Failed to Verify Zinus's Inventory Data by Not Raising it Before Commerce

Brooklyn Bedding alleges for the first time on appeal that Commerce failed to verify the inventory data submitted by Zinus during the second remand. *See* App. Br. at 27-28. However, "parties are 'procedurally required to raise the {ir} issue before Commerce at the time Commerce {is} addressing the issue." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (quoting *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383 (Fed. Cir. 2008)). "This is because '{s}imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.'" *Id.* (quoting *United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37 (1952).

Despite Commerce relying on the newly-provided inventory data to alter its quarterly ratio methodology to exclude in-transit mattresses in the draft remand redetermination, and knowing that Commerce may incorporate that data directly into

the quarterly ratio methodologies in the final remand redetermination, Brooklyn Bedding did not raise the verification issue nor argue that the data should be excluded in its comments on the draft remand. *See* Appx25992-226060.

Thus, Brooklyn Bedding's attempt to challenge the verification of the data on appeal for the first time before this Court comes too late. *See Guizhou Tyre Co., Ltd. v. United States*, 641 F. Supp. 3d 1386, 1399-1400 (Ct. Int'l Trade 2023) (concluding that plaintiff forfeited argument that Commerce "was required to, but did not, verify the information" submitted, because plaintiff did not raise the issue in its comments on the remand decision).

Even if not forfeited, verification is where Commerce assesses the reliability of the information placed on the record by a respondent. Commerce is not required to verify every piece of information relied upon and verifications are not meant to be comprehensive examinations; rather, Commerce spot checks the information on the record from which Commerce can extrapolate the reliability of the entire reported dataset. *See Micron Tech. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997). Thus, the attempt to challenge the verification of the data is unavailing as Commerce conducted verification in the underlying proceeding and determined the information on the record to be reliable. Brooklyn Bedding identifies no authority requiring Commerce to verify every single piece of data it obtains.

**III.** **Commerce's Use of Indonesian GTA Data in Applying the Transactions Disregarded Rule Was Supported by Substantial Evidence**

   **A.** **Commerce Explained that Indonesian GTA Data Best Reflected the Prices Available to the Respondent**

Commerce's use of Indonesian GTA data was supported by substantial evidence because Commerce explained why Indonesian GTA data represented the market price available to respondent on the record, and was consistent with its established hierarchy used in applying the transactions disregarded rule.

Commerce has an established hierarchy in applying the transactions disregarded rule. Commerce, first, seeks to compare the input prices the respondent paid to the affiliated party with prices the respondent paid to unaffiliated parties. Appx10104. In the absence of prices paid to unaffiliated input sellers, Commerce then will normally compare the price charged by the affiliated input producer to other unaffiliated customers of the affiliated input supplier. *Id.* In the absence of affiliated respondent prices to other unaffiliated customers, Commerce normally uses the cost of production for the affiliated supplier or other information available. *Id.*

In selecting the Indonesian GTA data, Commerce explained that the "Indonesian GTA data { } reflect the market economy imports of the relevant inputs into Indonesia which could reasonably be expected to be available to the respondent." Appx10107-08. Commerce went on to find that the GTA data on imports into countries other than Indonesia "would not necessarily be available to {the}

Indonesian respondent." Appx10108. Thus, with a market price on the record, Commerce had no need to utilize the respondent's cost of production under the established hierarchy. As a result, Commerce's determination "to use the market import data for the relevant inputs into Indonesia, rather than an average of Indonesia's import data with that of other countries," *id.* was supported by substantial evidence.

## B. Commerce's Approach Was Consistent With its Past Practice

Brooklyn Bedding alleges that Commerce impermissibly deviated from its past practices in applying the transactions disregarded rule.

First, Brooklyn Bedding alleges that Commerce did not explain its deviation from its practice of using the affiliated supplier's cost of production (COP) without taking "the location of the affiliated supplier into account." App. Br. at 30. However, Commerce explained the deviation for one simple reason: Commerce will not use the COP for the affiliated supplier if it is located in a non-market economy country and, thus, its prices are not market based. Appx10104-05; 19 U.S.C. § 1677b(f)(2). Thus, Commerce's decision not to use COP from the China-based affiliate was reasonable, as the affiliate's costs were not based on market prices.

Brooklyn Bedding cites *Bottom Mount Refrigerators from Mexico*, where Commerce used South Korean COP to determine that market price for the Mexican respondent, where the affiliated supplier was located in South Korea. 77 Fed. Reg. 17,422 (Mar.

26, 2012).  However, *Bottom Mount Refrigerators* is not analogous because South Korea is not a non-market economy.  Here, by contrast, Commerce did not use the Chinese-affiliated supplier's costs because China is a non-market economy.  Appx10104-05.  Therefore, *Bottom Mount Refrigerators from Mexico* distinguishable and does not demonstrate that Commerce deviated from past practice.

Second, Brooklyn Bedding cites *Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1358 (Ct. Int'l Trade 2023) for the proposition that Commerce has an established practice of using third country data for a non-market economy supplier.  *Id.*  However, while Commerce agreed in the first remand redetermination that it *may* use third country data, whether it will do so depends on what data were on the record of the proceeding at issue.  In *Best Mattresses*, an investigation covering mattresses from Cambodia, under the transaction disregarded rule, Commerce resorted to Cambodian Trademap import data from a source other than GTA and not a basket of third country GTA data.  *Id.* at 1366, 1386.  Although the Court in *Best Mattresses* remanded Commerce's interpretation of "market under consideration," to only mean the country under investigation, the Court explicitly did not preclude Commerce from using *only* Cambodian import data on remand.  *Id.* at 1384.

*Best Mattresses* is also distinguishable because, in the portions cited by Brooklyn Bedding, Commerce used third country GTA import data from six countries under a different statutory provision, the major input rule (19 U.S.C. § 1677b(f)(3)), and did so *only* for purposes of the major input rule.  *See id.* at 1372-73.  Although Commerce's

transactions disregarded practice allows the use of cost of production (like the major input rule) as a proxy for market price if there are no market prices, the focus of the comparison is transfer price to market price. 19 U.S.C. § 1677b(f)(2). In contrast, the major input rule explicitly compares transfer price to market prices *and* cost of production and instructs Commerce to take the higher of the three prices. *Id.* § 1677b(f)(3). When applying the transactions disregarded rule in this case, Commerce examined the record and found a market price—the GTA Indonesian trade data—and used it. Appx10111. It was not necessary for Commerce to use the last resort option of cost of production data, or in other words, for Commerce to use the basket of six-country GTA data. *Id.* Thus, Contrary to appellant's argument, Commerce consistently applied the transactions disregarded analysis in both *Best Mattresses* and in the instant case.

Based on the above, Commerce does not have a practice of using a basket of GTA data for countries economically comparable to the non-market economy supplier country under the transactions disregarded rule when market price data is available. Appx10110-11. Rather, Commerce has a transactions disregarded non-market economy practice of preferring import prices available to the respondent in the respondent's country to the extent the record data permits. *Id.* As the trial court held, Commerce's use of the Indonesian GTA data was reasonable and in accordance with law "{b}ecause a reasonable market price was available on the record, it was not necessary for Commerce to consider other available options, such as the average of

31

other country GTA data." *Zinus II*, 686 F. Supp. 3d at 1358.

## CONCLUSION

For these reasons, the judgment of the Court of International Trade should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

PATRICIA M. McCARTHY
  *Director*

*Of Counsel:*

CLAUDIA BURKE
  *Deputy Director*

*SHANNI ALON*
*Attorney*
*Office of the Chief Counsel for Trade*
*Enforcement and Compliance*
*Office of the General Counsel*
*U.S. Department of Commerce*

/s/ *BLAKE W. COWMAN*
BLAKE W. COWMAN
  *Trial Attorney*
  *Commercial Litigation Branch*
  *Civil Division*
  *U.S. Department of Justice*
  *P.O. Box 480, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 353-2494*
  *Blake.W.Cowman@usdoj.gov*

December 3, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,564 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ BLAKE W. COWMAN*
BLAKE W. COWMAN

## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rules 28(d)(1)(B), 25.1(d) and 25.1(e)(1)(B), undersigned has prepared a non-confidential version of its response brief from which it has redacted certain confidential information. Confidential information has been removed from page 24 of this response brief. The confidential material omitted from page 24 of this response brief relates to Plaintiff-Appellee's inventory and sales data that was treated as proprietary information in the underlying investigation.

/s/ BLAKE W. COWMAN
BLAKE W. COWMAN