# BEFORE THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PT. ZINUS GLOBAL INDONESIA,

*Plaintiff-Appellee*,

BROOLYN BEDDING, LLC, CORSICANA MATTRESS CO., ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES, INC., LEGGETT & PLATT, INC., INTERNATIONAL BROTHERHOOD OF TEAMSTERS, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,

*Plaintiffs-Appellants*,

v.

UNITED STATES,

*Defendant-Appellee*.

---

Appeal from the United States Court of International Trade in
Consoli. Case No. 1:21-cv-00277-JCG
Judge Jennifer Choe-Groves

---

PLAINTIFF-APPELLANTS' NONCONFIDENTIAL REPLY BRIEF

Yohai Baisburd
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave. NW, Suite 300
Washington, DC 20037
Phone: (202) 567-2300
Fax: (202) 567-2301

*Counsel for Plaintiff-Appellants*

Dated: December 23, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---:|:---|
| **Case Number** | 2025-1674 |
| **Short Case Caption** | PT. Zinus Global Indonesia v. US |
| **Filing Party/Entity** | Mattress Petitioners |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/23/2025

Signature: /s/ Yohai Baisburd

Name: Yohai Baisburd

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Brooklyn Bedding, LLC | | |
| Corsicana Mattress Company | | |
| Elite Comfort Solutions | | Leggett & Platt, Incorporated |
| FXI, Inc. | | |
| Innocor, Inc. | | FXI, Inc. |
| Kolcraft Enterprises, Inc. | | |
| Leggett & Platt, Incorporated | | BlackRock, Inc. The Vanguard Group, Inc. |
| International Brotherhood of Teamsters | | |
| United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☑ Additional pages attached

| | | |
|---|---|---|
| Please see Attachment A. | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)     ☐ No     ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Attachment A

**Attachment A to Form 9A**
**CAFC No. 2025-1674**

The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court and who have not already entered an appearance in this Court.

*Appearing before trial court or agency:*     **CASSIDY LEVY KENT (USA) LLP**
Ulrika K. Swanson
Chase J. Dunn
Jeffery B. Denning (formerly)
Sarah E. Shulman (formerly)

# TABLE OF CONTENTS

I.       Introduction......................................................................................................1

II.      Argument ........................................................................................................2

  A.     Commerce Failed to Support Its Methodological Changes with
         Substantial Evidence ...................................................................................2

    1.   Commerce Did Not Reasonably Support Its Decision to Remove
         In-Transit Mattresses Because It Relied on a Demonstrably
         Inaccurate "Fact" to Justify Its Decision ...................................................2

    2.   Commerce Did Not Reasonably Support Its Decision to Reject a
         Quarterly Ratio Calculation Based Only on Purchase Data ....................5

  B.     Commerce's Reliance on Zinus US' Unverified Inventory Data was
         Contrary to Law .........................................................................................12

  C.     Commerce Failed to Follow its Established Hierarchy in Applying
         the Transactions Disregarded Rule ...........................................................15

III.     Conclusion and Relief Requested.................................................................18

## Confidential Material Omitted

Pursuant to Federal Circuit Rule 28(d)(1)(B), Plaintiff-Appellants have prepared a nonconfidential version of their brief from which they have redacted certain confidential information. Confidential information has been removed from pages 2 and 6 of the brief.  This confidential information relates to details of Plaintiff-Appellee's operations and inventory and sales data that was treated as proprietary in the underlying investigation.

## TABLE OF AUTHORITIES

**Page(s)**

<u>Statutes</u>

19 U.S.C. § 1677b(f)(3) ........................................................................17

19 U.S.C. § 1677m(e)(2)......................................................................12

19 U.S.C. § 1677m(i) ......................................................................12, 14

19 U.S.C. § 1677m(i)(1) ................................................................. 14-15

<u>Regulations</u>

19 C.F.R. § 351.401(g) .........................................................................7

19 C.F.R. § 351.407(b) ........................................................................17

<u>Court Decisions</u>

*Agro Dutch Indus., Ltd. v. United States*, 508 F.3d 1024 (Fed. Cir. 2007)........ 13-14

*Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347
(Ct. Int'l Trade 2023)............................................................................17

*Best Mattresses International Co. v. United States,* 703 F. Supp. 3d 1382
(Ct. Int'l Trade 2024)............................................................................18

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ...............................10

*CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367 (Fed.
Cir. 2016) ............................................................................................10

*ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270 (1987) ..........................10

*Itochu Blg. Products v. United States*, 733 F.3d 1140 (Fed. Cir. 2013).................13

*Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) .............................7

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) .........................................................10

*Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705 (D.C. Cir. 1977) ...............................................................................................................11

*Timken Co. v. United States*, 894 F.2d 385 (Fed. Cir. 1990) ...................................10

*Unicatch Industrial Co., Ltd. v. United States*, 539 F. Supp. 3d 1229 (Ct. Int'l Trade 2021) ...................................................................................................16

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ...................................................................................................11

## I.   INTRODUCTION

This reply brief is submitted on behalf of Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, "Mattress Petitioners") in response to the briefs submitted by Appellees the United States and PT Zinus Global Indonesia ("Zinus").  As detailed below, neither of the responses overcome the challenges raised.  While Commerce has significant discretion to make determinations under the antidumping duty law, Commerce must support those determinations with substantial evidence and ensure it acts within the clear guardrails provided by the statute.  Commerce's determinations in this case—in which it rationalized its decisions based on demonstrably erroneous factual conclusions, ignored explicit statutory requirements, and failed to explain a significant departure from its established practice—render its determinations unsupported by substantial evidence and contrary to law.

## II.   ARGUMENT

### A. Commerce Failed to Support Its Methodological Changes with Substantial Evidence

#### 1. Commerce Did Not Reasonably Support Its Decision to Remove In-Transit Mattresses Because It Relied on a Demonstrably Inaccurate "Fact" to Justify Its Decision

In its second remand redetermination, Commerce removed "in transit" mattresses—those which Zinus U.S. purchased from its parent company Zinus Korea, but which had not yet entered its physical inventory at the end of the POI—from the input data used in its quarterly ratio calculations. *See* "Corrected Defendant-Appellee's Confidential Response Brief," CAFC ECF No. 53 (December 3, 2025) ("United States Br.") at 18. As the United States correctly notes, Commerce had included such "in transit" mattresses in its previous calculations because "Zinus's own data showed more total mattresses sold than purchased." *Id*. at 19 (citing Appx10094-10096). After collecting Zinus' actual beginning inventory data during the second remand proceeding, Commerce determined that such concerns were no longer relevant because—once the inventory data were incorporated—the "record now included inventory data reflecting a total number of mattresses that was greater than Zinus's sales." *Id*. at 19. As Mattress Petitioners explained in their opening brief, while this was true on an aggregate basis, it was not true on a model-specific level, where the record still showed [     ] models for which Zinus U.S.' total sales exceeded the number of

mattresses available in inventory. *See* "Plaintiff-Appellants' Second Corrected Confidential Principal Brief," CAFC ECF No. 24 (June 23, 2025) ("Opening Br.") at 15-20.

In its response brief the United States does not dispute the data identified by Mattress Petitioners. Instead, the United States argues that Commerce's decision to "focus on aggregate totals in deciding to exclude in-transit mattresses was reasonable and supported by substantial evidence because Commerce used aggregate totals in justifying its inclusion of in-transit mattresses in the original final determination and first remand."[1] United States Br. at 20.

The United States ignores that the reason Commerce focused on aggregate totals in the original final determination and first remand was because model-specific inventory data was not on the record at the time of these determinations. As Commerce itself acknowledged, it did not collect model-specific inventory data

---

[1] For its part, Zinus claims that the identified "anomalies" are not in fact anomalies. *See* "Second Corrected Confidential Response Brief of Plaintiff-Appellee PT. Zinus Global Indonesia," CAFC ECF No. 46 (November 5, 2025) ("Zinus Br.") at 8-13. To be clear, Mattress Petitioners described the data as "anomalies" because in its second final remand redetermination, Commerce stated that it would be "impossible" for Zinus to sell more Indonesian mattresses than were accounted for in its inventory records. Appx10049, Appx10052. The record data identified by Mattress Petitioners—which demonstrated that for certain models Zinus did sell more mattresses than were available in its all-country inventory—is anomalous insofar as it contradicts a factual conclusion that Commerce made and used to justify its decisions to both remove in-transit mattresses and introduce inventory data into the quarterly ratio calculation.

until the second remand proceeding, when it reopened the record and requested that Zinus provide this information:

> On {the second} remand, we issued to Zinus Indonesia a questionnaire requesting it provide: (1) Zinus U.S.' quantity of mattresses in inventory at the beginning of the POI and its purchase quantity of in-transit CEP inventory mattresses at the end of the POI both on a model-specific and aggregate basis and (2) documentation to support the model-specific and aggregate quantity amounts of mattresses in inventory at the beginning of the POI and mattresses in-transit at the end of the POI. Appx10046-10047 (emphasis supplied).

Commerce made clear that it considered this model-specific information (rather than the aggregate data) in its second remand redetermination, concluding that "Zinus U.S.'s **model-specific** beginning inventory and in-transit sales data and supporting accounting records, established…{that} Zinus U.S. had a sufficient number of the Indonesia model numbers that were in common with other countries in its physical inventory to support the U.S. sale of such products reported as non-subject merchandise in its U.S. sales database." Appx10051-10052 (emphasis supplied).

Thus, contrary to the United States' *post-hoc* assertions, *see* United States Br. at 20, in its second remand redetermination Commerce did not simply focus its conclusions on aggregate totals but instead specifically cited Zinus U.S.'s model-specific inventory data, erroneously asserting that this model-specific data supported its conclusions. The anomalous data identified by Mattress Petitioners conclusively demonstrate this is not the case. Opening Br. at 18.

Contrary to the United States' assertions, *see* United States Br. at 20-21, whether or not these discrepancies are significant enough to disturb Commerce's decision to exclude in-transit mattresses from the quarterly ratio calculations is a factual question that Commerce must itself decide and support with substantial evidence. Commerce erred here because it did not consider this issue, and instead erroneously claimed that the model-specific beginning inventory and in-transit sales data established as "fact" that Zinus had a sufficient number of mattresses to support its model-specific sales when it did not. *See* Appx10051-10052.

> 2. Commerce Did Not Reasonably Support Its Decision to Reject a Quarterly Ratio Calculation Based Only on Purchase Data

In its final second remand redetermination, Commerce determined to make a major change from its draft second remand redetermination and introduce inventory data into the quarterly ratio calculation for the first time. Commerce made this change because it determined that relying only on purchase data—as it did in the draft second remand redetermination—led to estimates of Indonesia-specific sales that exceeded the actual number of Indonesian mattresses available in inventory during the POI, on both an aggregate and model-specific basis. Appx10052-10053. Asserting that such results were "impossible," Commerce determined that it was necessary to recalculate the quarterly ratios using both purchase and inventory data newly placed on the record during the second remand proceeding. Appx10049-10060 (emphasis in original).

Commerce's reasoning was flawed because Commerce failed to acknowledge that the actual, all-country inventory and sales data placed on the record by Zinus demonstrated that it was, in fact, possible for Zinus U.S. to sell more mattresses than it physically held in its inventory. In fact, as Mattress Petitioners demonstrated in their Opening Brief, there were [     ] mattress models for which Zinus U.S.' total POI sales exceeded the number of mattresses available in its inventory. Opening Br. at 18. In other words, Commerce's sole rationale for abandoning a purchase-only quarterly ratio methodology—*i.e.* that it leads to "impossible" estimates of Indonesian sales—was unsupported by record evidence which demonstrated that Zinus U.S. could—and in fact did—have sales quantities in excess of its physical inventory.

This is the crux of the issue. While Commerce could, of course, have offered various other explanations for why introducing the inventory data to the quarterly ratio calculations was reasonable and appropriate, the sole reason it did offer—*i.e.* that it was "impossible" for Zinus U.S. to sell more mattresses than were physically present in its inventory—is disproven by record facts.

Attempts by the United States and Zinus to justify Commerce's decision are both improper *post-hoc* reasoning and fall flat. *First*, the United States argues that that because the quarterly ratios were an allocation methodology, Commerce "was

not required to directly evaluate the underlying data submitted by Zinus."[2] United States Br. at 24; *see also id*. ("Commerce's analysis rightly focused on the accuracy of the end result—the calculation—rather than the underlying data."). Such claims are both absurd and wholly irrelevant. As an initial matter, the accuracy of the output of the quarterly ratios methodology—or any statistical model—is necessarily premised on the accuracy of the input data that goes into the model.[3]

More importantly, the question at issue on appeal is whether Commerce adequately explained its decision to rely on purchase plus inventory data—rather than just purchase data—in its quarterly ratio calculations. Opening Br. at 2. The only explanation provided by Commerce for this change was that it is "impossible" for Zinus to sell more mattresses than it had in inventory, *see* Appx10052-10054,

---

[2] In support of this conclusion, the United States cites Commerce's regulations at 19 C.F.R. § 351.401(g) which are, on their face, only applicable to "allocated expenses and price adjustments," of which this is neither. United States Br. at 24. Instead, the quarterly ratios here are being used to allocate sales to a particular country of origin, rendering 19 C.F.R. § 351.401(g) inapplicable.

[3] As this Court recently recognized in *Marmen Inc. v. United States*, use of a flawed input in a statistical test *ipso facto* leads to a flawed output from that test, regardless of that test's independent validity. 134 F.4th 1334, 1346 (Fed. Cir. 2025) ("If the output of the Cohen's d test is incorrect, then the flawed output becomes a flawed input to the ratio test. That flawed input to the ratio test leads to a flawed output…"). So too here, and contrary to the United States' assertions, *see* United States Br. at 24, Commerce cannot ensure the "accuracy of the end result" without first ensuring the accuracy of the underlying data.

which is a conclusion that Mattress Petitioners demonstrated is simply not supported by record facts, *see* Opening Br. at 15-20. If Commerce is going to make a factual assertion, *i.e.* that it is "impossible" for Zinus U.S. to sell more Indonesian mattresses than it has in inventory, then it must make sure that the relevant underlying data support that conclusion. Here the data simply do not.

*Second*, the United States claims that Commerce did address the fact that Zinus' data contained anomalies "albeit in the context of the model output." United States Br. at 24 (citing Appx10054). Here again, the United States puts the cart before the horse. As the United States rightly notes, anomalies in estimates are to be expected. United States Br. at 23. However, the anomalies identified in Zinus US' actual inventory and sales records are distinct because they directly impeach the factual basis for one of Commerce's core conclusions, *viz.*, that it was "impossible" for Zinus to sell more mattresses than it had in inventory. Contrary to the United States' assertions, this is an important distinction that is relevant insofar as it directly impeaches Commerce's findings of fact.

*Finally*, the United States claims that because the anomalies in the inventory and sales data constituted just 0.16 percent of the mattresses Zinus sold during the POI the distortion "would result in only very minor distortions of less than one percent (0.16 percent of the hundreds of thousands of mattresses) in the calculation of constructed export price." United States Br. at 25 (*quoting PT. Zinus Glob.*

*Indon. v. United States*, 762 F. Supp. 3d 1257, 1267 (Ct. Int'l Trade 2025); *see also* Zinus Br. at 3. Again, the United States and Zinus offer conclusory *post-hoc* rationalizations that entirely miss the point. In its second remand redetermination, Commerce justified its decision to introduce inventory data into the quarterly ratios model based <u>solely</u> on its claim that it was "impossible" for Zinus U.S. to sell mattresses not physically present in its inventory. Appx10052-10054. If the record shows that it was possible—even for a small fraction of mattresses sold— then Commerce's conclusion cannot be sustained without further explanation by Commerce.

Contrary to the United States' assertions, this is not a case of harmless error. *See* United States Br. at 25-26. If Commerce had identified the anomalies in the underlying data it may well have found another basis to conclude that introduction of the inventory data was reasonable. Or it may have found that continuing to rely on only purchase data was reasonable because Zinus' own data demonstrated that it was somehow able to sell more mattresses than it had in inventory on an aggregate, all-country basis. Or it may have chosen to use an entirely different methodology to estimate Zinus U.S.' Indonesian sales. The point is that it is unknown what Commerce would have decided because Commerce entirely failed to recognize the issue and instead assumed—without record support—that it was

"impossible" for Zinus U.S. to sell more mattresses than it had in inventory on both an aggregate and model-specific basis. Appx10052-10054.

As this Court has previously made clear, in reviewing a Commerce determination, courts are limited to the explanations actually provided by the agency. *See CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987)) (emphasizing that "a reviewing court 'may not affirm on a basis containing **any** element of discretion—including the discretion to find facts and interpret statutory ambiguities—that is not the basis the agency used, since that would remove the discretionary judgment from the agency to the court") (emphasis supplied); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) ("...a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."); *Burlington Truck Lines v. United States*, 371 U.S. 156, 168–69 (1962) ("The courts may not accept ... counsel's post hoc rationalizations for agency action; ... an agency's discretionary order {must} be upheld, if at all, on the same basis articulated in the order by the agency itself."); *Timken Co. v. United States*, 894 F.2d 385, 389 (Fed. Cir. 1990) ("The first mention of these justifications appears in Commerce's appeal brief before the CIT. '{A}gency action cannot be sustained on post hoc

rationalizations supplied during judicial review.'") (quoting *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 709–710 (D.C.Cir.1977)).

In its second remand redetermination Commerce unambiguously did not address the identified anomalies in Zinus' actual inventory and sales data nor did it explain why its conclusion that it was "impossible" for Zinus to sell more mattresses than it had in inventory was reasonable, when record data showed that—at least for certain mattress models—Zinus did just that. Contrary to Zinus' assertions, demanding that Commerce provide a reasoned—and factually accurate—basis for its conclusions is not "upend{ing}the substantial evidence standard." Zinus Br. at 16-17. Instead, it is properly requesting that Commerce articulate an explanation for its decision based on actual record facts, rather than its unsupported conjecture about what is or is not "impossible." *See Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (explaining that the substantial evidence standard requires Commerce to provide a satisfactory explanation for its actions based on record evidence rather than mere conjecture or supposition).

Such demands also do not create an unreasonable burden on Commerce. As the United States correctly notes, Commerce has the authority to change its methodology between a preliminary and final determination, however Commerce must ensure that "it explains the change and its decision is supported by substantial

evidence." United States Br. at 21. Here, between its draft and final second remand redetermination Commerce made a significant change to its quarterly ratio calculation, determining to utilize purchase and inventory data—rather than just purchase data—based solely on its determination that it was "impossible" for Zinus to sell more mattresses than were physically present in its inventory. Appx10052-10054. Commerce made this change between its draft and final remand redeterminations based solely on arguments put forth by Zinus and without providing Mattress Petitioners an opportunity to comment. While Commerce has the authority to make a change in such circumstances, when it does so it runs the risk that—as here—it missed something in its analysis and, if so, that its decision will be remanded for further explanation, by Commerce.

 B. <u>Commerce's Reliance on Zinus US' Unverified Inventory Data was Contrary to Law</u>

In its final second remand redetermination, Commerce inappropriately relied on inventory data that was never verified as required under the statute. *See* 19 U.S.C. § 1677m(i) ("The {Department} shall verify all information relied upon in making a final determination in an investigation."); *see also* 19 U.S.C. § 1677m(e)(2) (permitting Commerce to rely on information submitted by an interested party only where "the information can be verified").

Neither the United States nor Zinus dispute that the inventory data was not verified, nor does either dispute that the U.S. Court of International Trade failed to

address this issue. United States Br. at 26-27; Zinus Br. at 17-18. Instead, they claim that Mattress Petitioners forfeited any such arguments because they failed to raise them in their comments to Commerce's draft second remand determination and to accept them now would raise "fairness" concerns for the agency. United States Br. at 26. Such concerns are overblown. As an initial matter, while Commerce cited the newly acquired inventory data in its draft second remand redetermination it did not incorporate the data into the quarterly ratio model—or claim that doing so was necessary because it was "impossible" for Zinus to sell more mattresses than it had available in its physical inventory—until the final second remand determination. *Compare* Appx10051-10055 *with* Appx25683-25688. Mattress Petitioners thus appropriately raised concerns with Commerce's reliance on unverified inventory data in its calculations in their comments before the U.S. Court of International Trade.

Moreover, as this Court has made clear, the exhaustion doctrine is discretionary and only required "where appropriate," meaning it must "serve some practical purpose where applied." *Itochu Blg. Products v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013). Requiring exhaustion may therefore be inappropriate where "the issue for the court is a 'pure question of law' that can be addressed without further factual development or further agency exercise of discretion." *Id*. (citing *Agro Dutch Indus., Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir.

13

2007)).  The facts here raise one such "pure question of law," namely may Commerce—pursuant to 19 U.S.C. § 1677m(i)—reopen the record of a final investigation on remand and make no effort whatsoever to verify the accuracy of the information submitted.  While the United States apparently believes Commerce has such power, *see* United States Br. at 24 ("{Commerce} was not required to directly evaluate the underlying {inventory} data submitted by Zinus"), Mattress Petitioners contend that some sort of evaluation is, as a legal matter, required by 19 U.S.C. § 1677m(i).  While the parameters of that verification may be discretionary, the failure to make any effort to validate information received is not.  *See* 19 U.S.C. § 1677m(i)(1) ("{Commerce} shall verify all information relied upon in making a final determination in an investigation.") (emphasis supplied).

The United States and Zinus additionally argue that even if the issue was not forfeited, Commerce was not required to verify the newly collected information as "Commerce conducted verification in the underlying proceeding and determined the information on the record to be reliable."  United States Br. at 27; *see also* Zinus Br. at 19.  While Mattress Petitioners agree that verification is ultimately a "spot check{}" of the information on the record that allows Commerce to "extrapolate the reliability of the entire reported dataset," United States Br. at 27, here the inventory data in question was unambiguously not on the record at the time Commerce conducted verification in the underlying proceeding and thus

could not have been included in Commerce's prior spot checks. By relying on the data in its second final remand redetermination, Commerce violated the statutory obligation set forth in 19 U.S.C. § 1677m(i)(1) ("{Commerce} shall verify all information relied upon in making a final determination in an investigation."), requiring remand.

C. Commerce Failed to Follow its Established Hierarchy in Applying the Transactions Disregarded Rule

The United States argues that Commerce's determination to use Indonesian GTA import data as a benchmark in its transactions disregarded analysis was "consistent with its established hierarchy used in applying the transactions disregarded rule." United States Br. at 28. This is simply not the case. Under its established hierarchy in applying the transactions disregarded rule, Commerce looks to compare prices paid to affiliated suppliers for an input to, in order of preference: (1) the prices the respondent actually paid to unaffiliated suppliers for the same input, (2) the prices the respondent's affiliated supplier actually charged to unaffiliated customers for the input, and (3) the affiliated supplier's actual cost of production. United States Br. at 28 (citing Appx10104). Contrary to the United States' assertions, *id.* at 29, in applying this hierarchy Commerce does not seek to determine a general market price available to any producer. Instead, Commerce seeks to find a benchmark that reflects price the respondent would have paid if the transaction occurred between unaffiliated parties based on the actual experiences

15

of the respondent and/or its affiliated supplier. *See generally Unicatch Industrial Co., Ltd. v. United States*, 539 F. Supp. 3d 1229, 1249 (Ct. Int'l Trade 2021) (confirming that Commerce's goal in applying the transactions disregarded rule is to find a market price that "best represents the respondent's own experience").

In this case, Zinus' actual experience was purchasing inputs from an affiliated supplier located in China, a non-market economy. As Zinus did not purchase these inputs from unaffiliated suppliers and as Zinus' affiliated supplier did not make any sales to unaffiliated parties, Commerce's first two preferred options were not available.[4] United States Br. at 6 (citing Appx10219). Moreover, as Commerce noted, it could not use Zinus' affiliated suppliers' cost of production because they are located in a non-market economy. *Id*.

While the question was one of first impression for Commerce, it is instructed by the major input rule under which Commerce looks to the same three potential benchmarks (*i.e.* price paid to unaffiliated supplier, price at which the affiliated

---

[4] The United States' related claim that because Commerce had a "market price" (*i.e.* Indonesian GTA import data) on the record "Commerce had no need to utilize the respondent's cost of production under the established hierarchy," United States Br. at 29, falls flat. If such claims were true, then Commerce could place GTA import data on the record of **any** proceeding and use it to establish a "market price," meaning that there would never be a reason to rely on cost of production data. However, as the United States itself acknowledges, this is not part of Commerce's "established hierarchy in applying the transactions disregarded rule." *Id*. at 28.

supplier sold to unaffiliated customer, and the affiliated supplier's cost of production) and selects the <u>highest</u> of the three options as the benchmark price. 19 U.S.C. § 1677b(f)(3); *see also* 19 C.F.R. § 351.407(b). In *Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1365-66 (Ct. Int'l Trade 2023), Commerce faced a similar challenge under the major input rule wherein the record did not have either unaffiliated price and Commerce determined the affiliated supplier's COP was unusable because it was an NME entity. In that case, Commerce ultimately utilized GTA import data from six countries to estimate the non-market economy affiliated suppliers' cost of production ("COP"). *Id.*[5]

Mattress Petitioner's simply argue that Commerce should use the same approach to estimate the affiliated supplier's COP in its application of the transactions disregarded rule as it does in the major input rule or adequately explain why deviation is necessary. As explained above, under Commerce's long-established practice the major input and transactions disregarded rules have always been linked, relying on the same data sources with the ultimate benchmark selection based on either a hierarchical preference between the three options

---

[5] While Zinus is correct that in *Best Mattresses International Co. v. United States*, 703 F. Supp. 3d 1382 (Ct. Int'l Trade 2024), Commerce ultimately relied on import data from the subject country, Cambodia, as a benchmark under the transactions disregarded rule, *see* Zinus Br. at 26, Mattress Petitioners believe that decision was also an unexplained deviation from Commerce's practice.

(transactions disregarded rule) or automatically selecting the highest value (major input rule).

Commerce's determination here breaks the connection between the two rules without adequate explanation. Now, rather than examining the same data sources under both the transactions disregarded and major input rules, whenever the affiliated input supplier is located in a non-market economy, Commerce will now rely on different potential data sources under each rule, a change that Commerce failed to adequately explain or justify as reasonable.

## III. CONCLUSION AND RELIEF REQUESTED

For the reasons discussed above, Mattress Petitioners respectfully request that this Court vacate the U.S. Court of International Trade's opinions in *PT. Zinus Glob. Indon. v. United States,* 686 F. Supp. 3d 1349 (Ct. Int'l Trade 2024) and *PT. Zinus Glob. Indon. v. United States*, 762 F. Supp. 3d 1257 (Ct. Int'l Trade 2025), find Commerce's First Remand Redetermination and Second Remand Redetermination to be unsupported by substantial evidence and not in accordance with law, and remand for reconsideration consistent with the Court's opinion.

\* \* \*

Respectfully submitted,

/s/ Yohai Baisburd
Yohai Baisburd
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP

*Counsel for Brooklyn Bedding, LLC;
Corsicana Mattress Company; Elite
Comfort Solutions; FXI, Inc.; Innocor,
Inc.; Kolcraft Enterprises Inc.; Leggett
& Platt, Incorporated; the International
Brotherhood of Teamsters; and United
Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial
and Service Workers International
Union, AFL-CIO*

December 23, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2025-1674

**Short Case Caption:** PT. Zinus Global Indonesia v. US

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains \_\_\_\_\_1\_\_\_\_\_ number of unique words (including numbers) marked confidential.

☑    This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐    This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐    This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 12/23/2025

Signature: /s/ Yohai Baisburd

Name: Yohai Baisburd

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2025-1674

**Short Case Caption:** PT. Zinus Global Indonesia v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes ___4276___ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 12/23/2025

Signature: /s/ Yohai Baisburd

Name: Yohai Baisburd

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF SERVICE</u>

**Case Number** 2025-1674

**Short Case Caption** PT. Zinus Global Indonesia v. US

> **NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on __12/23/2025__

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Henry Almond, Kang Woo Lee, J. David PArk (Arnold & Porter Kay Scholer LLP) | Public version served via email and court's electronic filing system. Confidential version served via email and secure file transfer site. |
| Blake Cowman (DOJ) | Public version served via email and court's electronic filing system. Confidential version served via email and secure file transfer site. |
| | |
| | |
| | |

☐ Additional pages attached.

Date: __12/23/2025__

Signature: __/s/ Yohai Baisburd__

Name: __Yohai Baisburd__